No. 2026-1301

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

JAIME VIAL, individually, as representative of the heirs of Rene Correa Borquez, and on behalf of other persons similarly situated,
Plaintiff-Appellant,

v.

AARON BINDER, in his official capacity as Treasurer of the State of New Jersey; STEVEN HARRIS, in his official capacity as Administrator of the State of New Jersey Unclaimed Property Administration,
Defendants-Appellees.

---

Appeal from the United States District Court for the
U.S. District Court of New Jersey,
Case No. 3:24-cv-11301, Judge Robert Kirsch

---

## OPENING BRIEF FOR PLAINTIFF-APPELLANT
## AND APPENDIX VOLUME 1 (APPX001–APPX070)

William W. Palmer, Esq.
Palmer Law Group, a PLC
2443 Fair Oaks Boulevard, No. 545
Sacramento, CA 95825
Telephone: (916) 972-0761

Kevin P. Roddy, Esq.
Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ 07095
Telephone: (732) 636-8000

Jonathan S. Massey, Esq.
Bret R. Vallacher, Esq.
Massey & Gail LLP
1000 Maine Ave. SW, Suite 450
Washington, D.C. 20024
Telephone: (202) 652-4511

May 29, 2026                        *Attorneys for Plaintiff-Appellant*

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

SUBJECT MATTER & APPELLATE JURISDICTION .........................................6

STATEMENT OF THE ISSUES.............................................................................7

RELATED CASES AND PROCEEDINGS.............................................................9

STATEMENT OF THE CASE.................................................................................9

      A.     Statutory Framework......................................................................9

      B.     Factual Background.......................................................................12

      C.     Procedural History........................................................................14

SUMMARY OF THE ARGUMENT ......................................................................15

STANDARD OF REVIEW ....................................................................................17

ARGUMENT .........................................................................................................18

I.     THE DISTRICT COURT ERRED IN HOLDING THAT VIAL LACKS STANDING TO SEEK PROSPECTIVE RELIEF .................................................................19

      A.     Vial Faces a Substantial Likelihood of Future Injury if All Parties Simply Proceed as the Law Requires...................................19

      B.     Vial Is Suffering Cognizable Present Injury Because the NJUPA Compels Him to Act to Avoid Injury..............................31

      C.     Vial Has Standing to Seek an Accounting .................................37

II.    THE ELEVENTH AMENDMENT DOES NOT BAR VIAL'S REQUEST TO BE MADE WHOLE FROM NON-STATE FUNDS OUTSIDE THE STATE'S TREASURY ...................................................................................................38

      A.     The District Court Correctly Held That the Funds at Issue Are Not State Funds But Then Erroneously Held That the Eleventh Amendment Protects Them Anyways Based on California-Specific Caselaw....................................................................40

B.    Even if State Funds Were Implicated, the *Ex Parte Young* Exception to the Eleventh Amendment Would Apply..........................47

CONCLUSION ................................................................................................49

CERTIFICATION OF BAR MEMBERSHIP ..............................................1

CERTIFICATION OF COMPLIANCE .......................................................2

CERTIFICATION OF SERVICE.................................................................3

# TABLE OF AUTHORITIES

**Cases**

*31 Foster Child. v. Bush*,
329 F.3d 1255 (11th Cir. 2003) .................................................................24

*Am. Exp. Travel Related Servs., Inc. Sidamon-Eristoff*,
669 F.3d 359 (3d Cir. 2012) ......................................................................41

*Askew v. Church of the Lord Jesus Christ*,
684 F.3d 413 (3d Cir.2012) .......................................................................18

*Blanciak v. Allegheny Ludlum Corp.*,
77 F.3d 690 (3d Cir. 1996) ........................................................................18

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983)........................................................................ 24, 25, 26

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)............................................................ 20, 25, 28, 32

*Clemens v. ExecuPharm Inc.*,
48 F.4th 146 (3d Cir. 2022) .................................................................. 20, 35

*Clymer v. Summit Bancorp, Inc.*,
171 N.J. 57 (N.J. 2002)........................................................................ 11, 41

*Const. Party of Pennsylvania v. Aichele*,
757 F.3d 347 (3d Cir. 2014) ................................................................. 17, 18

*Edelman v. Jordan*,
415 U.S. 651 (1974)...................................................................................48

*Free Speech Coal., Inc. v. Att'y Gen. of U.S.*,
677 F.3d 519 (3d Cir. 2012) .......................................................................18

*Fuentes v. Shevin*,
407 U.S. 67 (1972)............................................................................... 23, 43

*Garza v. Woods*,
150 F.4th 1118 (9th Cir. 2025) ............................................................. 31, 44

*Hess v. Port Auth. Trans-Hudson Corp.*,
    513 U.S. 30 (1994)...........................................................................40, 45

*In re Horizon Healthcare Servs. Inc. Data Breach Litig.*,
    846 F.3d 625 (3d Cir. 2017) ..................................................... passim

*In re U.S. Mortg. Corp.*,
    491 B.R. 642 (Bankr. D.N.J. 2013) .....................................................38

*Jones v. Flowers*,
    547 U.S. 220 (2006)..................................................................... 2, 22

*Knellinger v. Young*,
    134 F.4th 1034 (10th Cir. 2025) .........................................................31

*Knick v. Twp. of Scott, Pennsylvania*,
    588 U.S. 180 (2019).............................................................................30

*Marathon Petroleum Corp. v. Sec'y of Fin. for Del.*,
    876 F.3d 481 (3d Cir. 2017) ..................................................................1

*Maron v. Chief Fin. Officer of Fla.*,
    136 F.4th 1322 (11th Cir. 2025) ....................................... 6, 17, 38, 48

*Merritts v. Richards*,
    62 F4th 764 (3d Cir. 2023) .................................................................47

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010)..................................................... 4, 17, 32, 36

*Mullane v. Cent. Hanover Bank & Trust Co.*,
    339 U.S. 306 (1950).................................................................. 16, 22

*Murthy v. Missouri*,
    603 U.S. 43 (2024)..............................................................................20

*Pennell v. City of San Jose*,
    485 U.S. 1 (1988)................................................................................20

*Peters v. Cohen*,
    No. 24-1040, 2025 WL 733237 (9th Cir. Mar. 7, 2025) ..................... 29, 43, 47

*Pic-A-State Pa., Inc. v. Reno,*
 76 F.3d 1294 (3d Cir. 1996) ...............................................................4

*Pyatkova v. Motorcars,*
 2016 WL 674862 (D.N.J. Feb. 3, 2016) .............................................36

*Rd.-Con, Inc. v. City of Philadelphia,*
 120 F.4th 346 (3d Cir. 2024) .............................................................25

*Reilly v. Ceridian Corp.,*
 664 F.3d 38 (3d Cir. 2011) ................................................................35

*Ross v. Meese,* ...................................................................................31

*Ross v. Meese,*
 818 F.2d 1132 (4th Cir. 1987) ..................................................... 23, 43

*Suever v. Connell,*
 579 F.3d 1047 (9th Cir. 2009) ......................................... 43, 44, 46, 47

*Susan B. Anthony List v. Driehaus,*
 573 U.S. 149 (2014).........................................................................20

*Taylor v. Chiang,*
 2007 WL 1628050
 (E.D. Cal. June 1, 2007)............................................... 23, 31, 43

*Taylor v. Westly,*
 402 F.3d 924 (9th Cir. 2005) ....................................................... 41, 47

*Taylor v. Yee,*
 136 S. Ct. 929 (2016).........................................................................1

*Tyler v. Hennepin County,*
 598 U.S. 631 (2023)..................................................................... 18, 39

*United States v. 564.54 Acres Land,*
 441 U.S. 506 (1979).........................................................................42

*United States v. Reynolds,*
 397 U.S. 14 (1970)..................................................................... passim

*Waterfront Comm'n of New York Harbor v. Governor of N.J.*,
  961 F.3d 234 (3d Cir. 2020) ..........................................................47

**Statutes**

28 U.S.C. § 1291 ...........................................................................6

28 U.S.C. § 1331 ...........................................................................6

28 U.S.C. § 1343 ...........................................................................6

42 U.S.C.§ 1983 ....................................................................... 6, 14

N.J.S.A. § 46:30B-1 .......................................................................9

N.J.S.A. § 46:30B-7 ………………………………………………………10

N.J.S.A. § 46:30B-7.1 ................................................... 10, 13, 21, 27

N.J.S.A. § 46:30B-10 ..................................................... 3, 14, 21

N.J.S.A. § 46:30B-31 ................................................. 3, 10, 13, 21

N.J.S.A. § 46:30B-46 .....................................................................9

N.J.S.A. § 46:30B-50 ............................................................. passim

N.J.S.A. § 46:30B-51 ..................................................... 11, 31

N.J.S.A. § 46:30B-52 ....................................................................11

N.J.S.A. § 46:30B-57 ..................................................... 9, 11

N.J.S.A. § 46:30B-60.1 ................................................... 10, 11

N.J.S.A. § 46:30B-61 ....................................................................10

N.J.S.A. § 46:30B-68 ..................................................... 12, 46

N.J.S.A. § 46:30B-77 ..................................................... 11, 44

N.J.S.A. § 46:30B-79 ..................................................... 12, 46

**Codes**

CAL. CIV. PROC. CODE § 1564....................................................................44

CAL. CIV. PROC. CODE § 1562....................................................................46

**Rules**

Fed. R. App. P. 4...........................................................................................7

Fed. R. Civ. P. 12 ................................................................................ 15, 17

Fed. R. Civ. P. 8 ........................................................................................36

## INTRODUCTION

This Court has recognized that state escheat laws are vulnerable to "being exploited to raise revenue rather than to safeguard abandoned property for the benefit of its owners." *Marathon Petroleum Corp. v. Sec'y of Fin. for Del.*, 876 F.3d 481, 488 (3d Cir. 2017) (cleaned up). Justices of the Supreme Court have echoed that concern, observing that the "trend—combining shortened escheat periods with minimal notification procedures—raises important due process concerns" about states' "constitutional obligation to provide adequate notice before escheating private property." *Taylor v. Yee*, 136 S. Ct. 929, 930 (2016) (Alito, J., joined by Thomas, J., concurring in denial of certiorari).

This case presents that constitutional concern in its starkest form. The New Jersey Unclaimed Property Act's ("NJUPA") sole individualized pre-escheatment notice mechanism requires holders—the private companies compelled to escheat the property—to send written notice to the owners "by certified mail." N.J.S.A. § 46:30B-50. But the United States Postal Service does not deliver certified mail internationally. *See* Appx125, Amended Complaint ("AC") ¶¶ 61–63. For any owner whose last known address lies outside the United States—including Plaintiff Jaime Vial, a Chilean citizen—the statute's only form of pre-escheat notice is a dead letter. Appx125, AC ¶ 63. The Supreme Court has made clear that a government cannot satisfy its constitutional notice obligation by using a method it knows will

fail: "If the Commissioner prepared a stack of letters to mail to delinquent taxpayers, handed them to the postman, and then watched as the departing postman accidentally dropped the letters down a storm drain, one would certainly expect the Commissioner's office to prepare a new stack of letters and send them again." *Jones v. Flowers*, 547 U.S. 220, 229 (2006); *see also id.* at 232 (holding that following a process the government knows will not result in actual notice does not "relieve[] the State of its constitutional obligation to provide adequate notice"). New Jersey does not prepare a new stack. It simply takes the property—and currently holds over $6 billion in purportedly "unclaimed" property. Appx110, AC ¶ 6.

Vial brought this putative class action to challenge that structural deficiency—both as applied to him, and on its face with respect to all foreign property owners who are categorically denied any constitutionally adequate pre-seizure notice under the NJUPA. Appx138, AC ¶¶ 127–28. Vial's family has already felt the consequences. Rene Correa Borquez, a Chilean lawyer and investor, had financial services accounts associated with his Chilean address and owned 905 shares of Exxon Corporation stock. Appx130–31 AC ¶¶ 85–92. He and his heirs had no connection to New Jersey and no reason to know the State had seized their property—because the NJUPA's sole notice mechanism was structurally incapable of informing them. Appx130–31, AC ¶¶ 87–92. After Borquez's death, the NJUPA Administrator escheated and liquidated those shares without providing any notice to

anyone—before or after the seizure. Appx131, AC ¶¶ 91. The family learned of the taking through a finder or locator and only after years of independent effort. AC Appx131–32, ¶¶ 93–94. When Vial eventually filed a claim, the State returned $487,581.23—the liquidation proceeds—while the shares, had they never been seized, would have been worth approximately $623,936. Appx132, AC ¶¶ 94, 97. The shortfall exceeds $136,000. Appx143, AC ¶ 157 & n.14.

The district court acknowledged what it called a "classic pocketbook injury": Defendants "escheated Borquez's Exxon stock without proper notice and undercompensated him for that action." Appx052, Court's January 12, 2026 Opinion ("Op.") at 14. Nevertheless, the court dismissed the case in full—holding that Vial lacks Article III standing to seek any prospective relief and that the Eleventh Amendment bars his remaining claims. Appx054–66, Op. at 16–28. Both holdings are wrong.

On standing, the district court characterized Vial's risk of future no-notice escheatment as resting on a "highly attenuated chain of possibilities." Appx055, Op. at 17. But there is no chain of contingencies here. Vial currently owns shares of Exxon Mobil—a New Jersey corporation—through a New Jersey–incorporated broker, whose address on file for Vial is in Chile. Appx133, AC ¶¶ 102–104. If all parties simply comply with the statute as written, Vial's property will be escheated without notice. *See* N.J.S.A. §§ 46:30B-10(e), 46:30B-31, 46:30B-50; Appx133–34,

3

AC ¶¶ 104–107. In other words, the same statutory scheme that already seized his family's stock applies with identical force to his current holdings for exactly the same reason. Appx114, 133–34, AC ¶¶ 20, 102–112.

The district court compounded this error by rejecting Vial's cognizable present injuries. The NJUPA forces Vial to alter his practices to mitigate the risk of future injury—a burden the Supreme Court and this Court have recognized as a cognizable present injury. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 154–55 (2010); *Pic-A-State Pa., Inc. v. Reno*, 76 F.3d 1294, 1300 (3d Cir. 1996) (plaintiffs had standing where law created need to change "business practices"). The Ninth Circuit has squarely applied this principle in the unclaimed-property context, holding that owners "having to constantly monitor their property to avoid escheat" is its own injury sufficient for standing. *Taylor v. Westly*, 488 F.3d 1197, 1199–1200 (9th Cir. 2007) ("*Taylor II*"). And the court's dismissal of Vial's equitable accounting request as a "fishing expedition," Appx054, Op. at 16 n.19, rested on circular logic: it faulted Vial for failing to identify seized property that only the State's records can reveal, when the absence of notice is itself the reason Vial cannot know what was taken. Appx132, AC ¶ 95.

On sovereign immunity, the district court acknowledged that the Unclaimed Personal Property Trust Fund holds private property in custodial trust, not state funds, Op. at 24—and then, in the same opinion, extended Eleventh Amendment

protection to those very funds. Op. at 26–27. It cannot be both. Two other federal courts within this Circuit have rejected the very arguments the district court accepted. *See Salvato v. Harris*, 2022 WL 1224962, at \*4–6 (D.N.J. Apr. 26, 2022) (holding the Act's placement of funds in a separate trust account confirms the custodial nature of New Jersey's unclaimed property fund); *Vial v. Mayrack*, 2026 WL 800611, at \*3–5 (D. Del. Mar. 23, 2026) (denying substantially similar motion to dismiss challenging a parallel custodial escheat scheme, finding that the plaintiff adequately alleged standing for prospective relief and declining to dismiss on Eleventh Amendment grounds). Defendants themselves have conceded that "the Act provides that title to unclaimed property does not vest in the State, but rather remains vested in the owner, with the State acting as custodian while holding his property." Appx165, State's Motion to Dismiss ("MTD") (Dkt. 49) at 5.

The Fund currently holds over $6 billion in notational accounts, Appx110, AC ¶ 6; in reality, the State freely draws upon it to pay auditor bounties and its own administrative costs, N.J.S.A. § 46:30B-74(c); Appx119–20, AC ¶ 39; and it has returned only $2.7 billion to owners since the program's inception, Appx116, AC ¶ 30. Accordingly, unless Vial's relief requires over $3.3 billion dollars, he can be "put in the same position monetarily as he would have occupied if his property had

not been taken," *United States v. Reynolds*, 397 U.S. 14, 16 (1970), without paying a penny of the State's money. Appx135-36, AC ¶¶ 116–117.

And even if the Eleventh Amendment were implicated, the *Ex parte Young* exception applies because the State's ongoing failure to provide him just compensation for property taken without notice is an "ongoing violation" of federal law. *See Maron v. Chief Fin. Officer of Fla.*, 136 F.4th 1322, 1333–34 (11th Cir. 2025) (holding that "sovereign immunity did not bar" the "takings claim because it sought not damages but prospective relief to end an ongoing violation of federal law").

The district court's order should be reversed in its entirety.

## SUBJECT MATTER & APPELLATE JURISDICTION

The district court had subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343 because Vial brought this lawsuit under 42 U.S.C.§ 1983 alleging that Defendants violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the Takings Clause of the Fifth Amendment, applied to the States through the Fourteenth Amendment.

This Court has appellate jurisdiction under 28 U.S.C. § 1291 because this appeal is from a final judgment in favor of Defendants.

The district court entered its final judgment on February 10, 2026 (Dkt. 57), Appx070, after granting Defendant's motion to dismiss, on the grounds that Vial

lacked standing for certain relief and the Eleventh Amendment barred all other relief (Dkt. 55), Appx068-69.

The Notice of Appeal was filed with the Clerk of the district court on February 10, 2026 (Dkt. 58), Appx001-038. This appeal is timely pursuant to Federal Rule of Appellate Procedure 4(a)(1)(A).

## STATEMENT OF THE ISSUES

1. Whether the district court erred in holding that Vial lacks Article III standing to seek prospective injunctive and declaratory relief against the NJUPA's no-notice escheatment scheme, where (a) the district court itself acknowledged that Vial suffered a "classic pocketbook injury" from Defendants' prior no-notice escheatment of his family's Exxon stock; (b) the NJUPA's sole pre-escheat notice mechanism—certified mail—is structurally incapable of reaching Vial's address in Chile; (c) the same statutory scheme that produced his prior injury applies with equal force to Vial's current Exxon Mobil holdings through his New Jersey-incorporated broker; and (d) injury will occur if all parties simply comply with the statute as written.[1]

2. Whether the district court erred in holding Vial fails to allege cognizable present injury, where (a) Vial alleges his burdens of monitoring and

---

[1] This issue was raised by Appellant in his Opposition to the Motion to Dismiss ("Opp.") (ECF No. 50), Appx234–42, Opp. at 21–29, and ruled upon by the district court in its Opinion, Appx054–58, Op. at 16–20.

"churning" his property to avoid no-notice escheatment, and (b) the statute forces Vial to choose between incurring those mitigation costs or suffering the unconstitutional seizure of his property without notice.[2]

3.      Whether the district court erred in dismissing Vial's request for an equitable accounting as a "fishing expedition" too speculative for standing purposes, where (a) the district court itself found that Vial has standing based on the prior no-notice escheatment of the Borquez Exxon stock; (b) the information necessary to identify any property that may have been seized from Borquez's multiple U.S. financial accounts is exclusively within the State's possession; and (c) Vial cannot identify the property without the very relief sought.[3]

4.      Whether the district court erred in holding that the Eleventh Amendment bars Vial's claim for relief from the Unclaimed Personal Property Trust Fund, where the district court itself recognized that the Fund holds private property in custodial trust outside the State treasury, yet extended sovereign immunity based on inapposite California-specific caselaw governing a materially different statutory scheme.[4]

---

[2] This issue was raised by Appellant, Appx240–42, Opp. at 27–29, and ruled upon by the district court, Appx058–61, Op. at 20–23.

[3] This issue was raised by Appellant, Appx224–25, 235, Opp. at 11–12, 22, and ruled upon by the district court, Appx054, Op. at 16 n.19.

[4] This issue was raised by Appellant, Appx224–32, Opp. at 11–19, and ruled upon by the district court, Appx061-66, Op. at 23–28.

5.     Whether the district court erred in holding that the *Ex parte Young* exception to the Eleventh Amendment does not permit Vial's claims for prospective relief, where the State's ongoing failure to provide just compensation for property taken without notice constitutes an ongoing violation of the Constitution.[5]

## RELATED CASES AND PROCEEDINGS

This case has never been before this Court previously. Plaintiff-Appellant is currently pursuing similar claims against officers representing the State of Delaware in the District Court for the District of Delaware. Those defendants raised arguments that were substantially similar to the issues here in their motion to dismiss, which the Delaware District Court denied. *Mayrack*, 2026 WL 800611, at *4.

## STATEMENT OF THE CASE

### A.     Statutory Framework

The New Jersey Unclaimed Property Act ("NJUPA" or the "Act"), N.J.S.A. § 46:30B-1 et seq., requires every business doing business in New Jersey ("holders")—including banks with safety deposit boxes and companies that issue shares (even those held in a retirement account)—to deliver property to the State once that property is deemed "abandoned." *See* N.J.S.A. §§ 46:30B-46, 46:30B-57, 6:30B-6(g). New Jersey uses a short, three-year "dormancy" period to determine whether most types of property may be deemed dormant and, therefore,

---

[5] This issue was raised by Appellant, Appx232-34, Opp. at 19–21, and ruled upon by the district court, Appx064, Op. at 26 n.33.

"abandoned." N.J.S.A. § 46:30B-7. The same period applies to securities. *See* N.J.S.A. § 46:30B-31. Property is subject to escheat under the NJUPA if the last known address "of the apparent owner is in a foreign nation and the holder is a domiciliary" of New Jersey. N.J.S.A. § 46:30B-10(e).

As is relevant here, stocks are deemed "abandoned" if the owner goes three years without interacting with the holder or the account in such a way that the NJUPA specifies. *See* N.J.S.A §§ 46:30B-7, 46:30B-7.1. As a result, if a stockowner goes three years without making a written communication concerning the property or account, or an oral communication contemporaneously recorded concerning the property or account, or a presentment of an instrument of payment, or other activity in the account (such as a deposit or withdrawal), N.J.S.A. § 46:30B-7.1, or if dividends are automatically reinvested, three years after the second statement or other account notification is returned as undeliverable or after the holder discontinued mailings, N.J.S.A. § 46:30B-31, the NJUPA requires his broker to remit all of the owner's stocks to the state, N.J.S.A. § 46:30B-57. Thus an investor pursuing a buy-and-hold strategy—one of the most common investment approaches—triggers the dormancy presumption simply by doing nothing other than owning his property for three years. Appx142–45, AC ¶¶ 34–37. The holder is immunized for escheating the property. *See* N.J.S.A. §§ 46:30B-60.1–61.

The Act's sole individualized pre-escheatment notice mechanism requires the

holder to send "by certified mail, and with return receipt requested, written notice to the apparent owner at the last known address." N.J.S.A. § 46:30B-50. The statute makes no exception for foreign addresses. *Id.* This matters because the United States Postal Service does not deliver certified mail internationally. Appx125, AC ¶¶ 61–63. For an owner whose last known address is outside the United States, the statute's sole individualized notice mechanism is a dead letter. Appx125, AC ¶ 63. Post-escheatment notice consists of publication only in local New Jersey newspapers and listing on an online database, replete with issues. N.J.S.A. §§ 46:30B-51, -52; Appx125–130, AC ¶¶ 64–82.

Abandoned property is then seized by the Administration under the supervision of the Administrator, *see* N.J.S.A. §§ 46:30B-57; 46:30B-60.1, who acts as property custodian, *see generally* N.J.S.A. § 46:30B-74 (requiring the establishment of trust funds to pay claims and expenses of trust administration). The NJUPA establishes a custodial escheatment regime under which property presumed abandoned is reported by "holders"—typically financial institutions—remitted to the State, and held in trust for the benefit of the true owner. N.J.S.A. § 46:30B-77; Appx120, AC ¶¶ 42–43. Title does not vest in the State but remains in the owner, with the State acting as custodian—owners may claim their property "at any time in perpetuity." *Clymer v. Summit Bancorp, Inc.*, 171 N.J. 57, 63 (N.J. 2002); *see also* N.J.S.A. § 46:30B-77.

Unless the Administrator decides otherwise, seventy-five percent of all funds received into the Unclaimed Personal Property Trust Fund are transferred to the General State Fund (used for public purposes), while the remaining twenty-five percent is retained to pay claims and administration costs. N.J.S.A. § 46:30B-74(c). The State currently has over $6 billion in "unclaimed" property. Appx110, AC ¶ 6.

Upon a valid claim for liquidated stock, the NJUPA provides the claimant: (1) the net proceeds of sale; (2) dividends, interest, or other increments realized or accruing on the property at or before liquidation; and (3) interest at a rate fixed by the Administrator. N.J.S.A. §§ 46:30B-79, -68. Critically, the statute does not provide the appreciated value of the stock—that is, what the shares would have been worth had they not been seized and prematurely liquidated without notice. AC ¶ 48. Nor does it compensate owners for their rights of ownership that are lost upon the escheatment, such as the right to vote shares in matters of corporate governance. Appx122, AC ¶ 49.

## B. Factual Background

Rene Correa Borquez was a Chilean lawyer and investor who had financial services accounts associated with his Chilean address and owned 905 shares of Exxon Corporation stock. Appx130–31, AC ¶¶ 85, 92. He died testate in Chile in 2006, leaving his estate to his brother, who in turn died in 2007. Appx131, AC ¶¶ 86–88. All heirs, including Mr. Vial, reside in Chile; none has ever resided in New

Jersey. *Id.*

After Borquez's death, the NJUPA Administrator escheated and liquidated his heirs' 905 shares of Exxon stock without providing any notice to the Borquez family—before or after the seizure. Appx131, AC ¶¶ 89–92. Vial—empowered by all Borquez heirs under Chilean law—learned of the escheatment only after years of effort to locate Borquez's assets. AC ¶¶ Appx131–32, 93–94. Vial filed a claim with the Administrator and, on November 8, 2023, received $487,581.23. Appx132, 143, AC ¶¶ 94, 156. Had the shares not been seized and liquidated, they would have been worth approximately $623,936 at the time this lawsuit was filed—a shortfall of $136,354.77. Appx132, AC ¶ 97; *see also* Appx144, AC ¶ 157 & n.14.

Vial remains at risk today. "For example, in an attempt to begin repurchasing some of the property New Jersey seized, Plaintiff has purchased (and currently owns) shares of Exxon Mobil via Tradeup Securities (which is a New Jersey corporation)." Appx133, AC ¶ 102. As a Chilean national whose address is beyond the reach of certified mail, Vial faces the NJUPA's structural deficiency: NJUPA's notice provisions will not provide him with constitutionally adequate notice before any future seizure. Appx133–35, AC ¶¶ 104–112. Vial intends to pursue a buy-and-hold strategy for those shares, doing nothing with them while they appreciate for years to come. Appx133, AC ¶ 104. Under the NJUPA, that inactivity will trigger the three-year dormancy presumption, N.J.S.A. §§ 46:30B-7.1, 46:30B-31, and

because the address "of the apparent owner is in a foreign nation and the holder is a domiciliary" of New Jersey, NJUPA will require TradeUp to escheat the property, N.J.S.A. § 46:30B-10(e).

Moreover, the full scope of the State's seizures remains unknown. Borquez was a Chilean lawyer with many significant investments, including various stocks in financial services accounts across the United States. Appx130–31, AC ¶ 85. Additional property may have been seized by Defendants, but Vial would require an accounting from the State's records whether New Jersey holds property belonging to his family. Appx132, AC ¶ 95.

## C. Procedural History

Vial filed this putative class action on December 19, 2024, asserting claims under 42 U.S.C. § 1983 for violations of the Fourteenth Amendment Due Process Clause and the Fifth Amendment Takings Clause against the New Jersey State Treasurer and the NJUPA Administrator in their official capacities. Appx001–107, ECF 1. The proposed Class consists of "all persons and entities owning purportedly 'abandoned' property transferred to Defendants under color of the NJUPA within the applicable statute of limitations who were denied constitutionally adequate pre-seizure notice under the NJUPA because they resided outside of the United States." Appx138, AC ¶ 127.

Vial filed an Amended Complaint on May 5, 2025, (ECF 45), pursuing the

same claims on revised allegations and seeking the following revised relief: (1) a declaration that Defendants' administration of the NJUPA violates the Due Process Clause and Takings Clause; (2) an injunction requiring Defendants to provide constitutionally adequate notice to foreign property owners before seizing their property; (3) an equitable accounting to identify properties seized without adequate notice; and (4) the return of property or to be put in the same position monetarily as he would have occupied but for the no-notice escheat. AC, Prayer for Relief ¶¶ A–F. Defendants moved to dismiss under Rules 12(b)(1) and 12(b)(6). Dkt. 49.

On January 12, 2026, the district court issued an opinion granting the motion, Appx039–67, ECF 54, and then dismissed the Amended Complaint without prejudice, Appx068–69, ECF 55. On February 9, 2026, Vial elected to stand on the Amended Complaint and requested the district court enter a final judgment to allow for appellate jurisdiction, Appx280–85, ECF 56. The court entered final judgment on February 10, Appx70, ECF 57, and plaintiff filed his notice of appeal that same day, Appx001–38, ECF 58.

## SUMMARY OF THE ARGUMENT

The district court dismissed this case on the theory that Vial cannot establish standing to seek prospective relief and that the Eleventh Amendment bars his remaining claims. Both holdings are wrong. This Court should reverse.

On standing, the district court characterized Vial's risk of future no-notice escheatment as resting on a "highly attenuated chain of possibilities." Appx155, Op. at 17. But there is no chain of contingencies here. The injury will occur if all parties simply comply with the statute and nothing else happens. The NJUPA only specifies one form of pre-escheat notice: holders must use certified mail. However, the U.S. Postal Service does not deliver certified mail internationally and Vial lives in Chile. If the holder does what the statute requires, Vial's property *will* be escheated without notice. That is not speculation—it is the statute operating as written.[6]

The court compounded this error by rejecting Vial's allegations of present injury from monitoring costs, holding those allegations "irreconcilable" with what would have been Vial's plan for his shares: to do nothing but "buy-and-hold." Appx059–60, Op. at 21–22. This gets the injury backwards. The risk of the no-notice escheat compels him to monitor, and that forced monitoring is the injury. As the Ninth Circuit recognized, "the injuries suffered by plaintiffs include not only those attendant to having their property escheated without notice, but also include" the "cost of having to constantly monitor their property to avoid escheat," including by "'churning' their property so that it stays active and avoids escheat." *Taylor II,* 488 F.3d at 1199–1200. Being forced to choose between monitoring costs and

---

[6] *Cf. Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950) (Due Process requires pre-deprivation "notice reasonably calculated, under all the circumstances, to apprise interested parties").

unconstitutional seizure is itself a concrete, present harm. *See Monsanto*, 561 U.S. at 154–55. Additionally, the court erred in dismissing Vial's accounting request as a "fishing expedition."

On sovereign immunity, the court held that because Vial already received the liquidation proceeds, his claim for the appreciated value of the stock is "indistinguishable in effect from claims for money damages." Appx134–35, Op. at 26–27. But this ignores that the sums sought would not come from the State's treasury or State funds altogether, but private funds for which the State is merely the custodian. The district court acknowledged as much, but then incorrectly applied California-specific caselaw to hold the Eleventh Amendment protects these admittedly private funds anyways. Finally, even if the funds were somehow considered the State's fisc, the relief sought fits within the *Ex Parte Young* exception because it prospectively seeks to end the "ongoing violation" of the State not providing just compensation for the taking, as the Eleventh Circuit held in *Maron*, 136 F.4th at 1333.

The district court's order should be reversed in its entirety.

## **STANDARD OF REVIEW**

"A motion to dismiss for want of standing" is "properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter." *Const. Party of Pennsylvania v. Aichele*, 757 F.3d 347, 357 (3d Cir. 2014). The "Eleventh

Amendment is a jurisdictional bar which deprives federal courts of subject matter jurisdiction," so its application is also reviewed as a 12(b)(1) motion. *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 694 n.2 (3d Cir. 1996).

"Questions of subject matter jurisdiction raised on a motion to dismiss under Rule 12(b)(1)" are "reviewed de novo." *Free Speech Coal., Inc. v. Att'y Gen. of U.S.*, 677 F.3d 519, 530 (3d Cir. 2012). On a facial challenge to jurisdiction (as here),[7] courts must "apply the same standard of review it would use in considering a motion to dismiss under Rule 12(b)(6)," *Aichele*, 757 F.3d at 358–59 (cleaned up). "Consequently, [courts must] accept the Plaintiffs' well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the Plaintiffs' favor." *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 633 (3d Cir. 2017).

## ARGUMENT

The district court acknowledged that Vial suffered a "classic pocketbook injury" when Defendants "escheated Borquez's Exxon stock without proper notice and undercompensated him for that action." Appx122, Op. at 14 (quoting *Tyler v. Hennepin County*, 598 U.S. 631, 636 (2023)). Indeed, Vial and his family have lost over a hundred thousand dollars from New Jersey's no-notice escheatment of his

---

[7] *Cf. Askew v. Church of the Lord Jesus Christ*, 684 F.3d 413, 417 (3d Cir.2012) ("As the defendants had not answered and the parties had not engaged in discovery, the first motion to dismiss was facial.").

family's stocks. Appx144, AC ¶ 157 & n.14. And, as explained in the amended complaint, Vial "continues to suffer ongoing injury from the NJUPA" because "he has additional property that is likely to be escheated without notice" and "he must make efforts to prevent that, which is its own injury." Appx132, AC ¶ 101; *see also* Appx133–135, AC ¶¶ 97, 102–112.

Notwithstanding these past, present, and future injuries, the district court dismissed Vial's complaint in full, denying him all relief. The district court held that (I) Vial lacked standing to pursue prospective relief notwithstanding (A) his extremely likely future injuries; (B) his present injuries; and (C) his need for an accounting. And it held (II) the Eleventh Amendment barred his being made whole notwithstanding that (A) the funds sought are neither from the State's treasury nor the State's funds altogether and (B) the *Ex Parte Young* exception applies to prevent the "ongoing violation." As explained below, both holdings are erroneous and must be reversed.

**I.    THE DISTRICT COURT ERRED IN HOLDING THAT VIAL LACKS STANDING TO SEEK PROSPECTIVE RELIEF**

**A.    Vial Faces a Substantial Likelihood of Future Injury if All Parties Simply Proceed as the Law Requires**

Article III standing requires a plaintiff to show "that she has suffered, or will suffer, an injury that is concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Murthy v.*

*Missouri*, 603 U.S. 43, 57 (2024) (cleaned up). "[A]llegations of future injury 'suffice if the threatened injury is certainly impending or there is a substantial risk that the harm will occur.'" *Clemens v. ExecuPharm Inc.*, 48 F.4th 146, 152–53 (3d Cir. 2022) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). "A substantial risk means a 'realistic danger of sustaining a direct injury.'" *Id.* (quoting *Pennell v. City of San Jose*, 485 U.S. 1, 8 (1988)).

Critically, Article III standing does **not** "require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013). For example, in *Pennell*, the Supreme Court found that landlords had standing to enjoin a city ordinance that would prohibit rent increases found to cause an "unreasonably severe financial or economic hardship" on tenants—even though the landlords had not shown several future events: (1) that they intended to raise their rents to the point of causing unreasonably severe hardship; (2) that the tenants would challenge those increases; or (3) that the city's officials would find against the landlords. *Pennell,* 485 U.S. at 6. The Supreme Court nevertheless held that the *Pennell* plaintiffs demonstrated a "realistic danger of sustaining a direct injury as a result of the statute's operation," which was sufficient for Article III standing. *Id.* at 8.

Here, the risk of a no-notice escheatment occurring to Vial is much more than "substantial" and "realistic"—it is structurally built into the statute's text such that

no-notice escheatment *will* occur if all parties simply proceeded as the law requires. In "an attempt to begin repurchasing some of the property New Jersey seized, Vial has purchased (and currently owns) shares of Exxon Mobil via Tradeup Securities (which is a New Jersey corporation)." Appx133, AC ¶ 102. Property is subject to escheat under the NJUPA if "the holder is a domiciliary" of New Jersey and the last known address "of the apparent owner is in a foreign nation and the holder is a domiciliary" of New Jersey. N.J.S.A. § 46:30B-10(e); AC ¶ 104. "Plaintiff's address on file with Tradeup, the relevant holder here, would be in Chile," Appx133, AC ¶ 104. Thus, NJUPA will require TradeUp (a New Jersey domiciliary) to escheat the property. Appx133, AC ¶ 104.

Under the NJUPA, stocks are deemed abandoned if a stockowner goes three years without performing specific actions vis-à-vis his stocks and the holder, such as making a written communication concerning the property or account, or an oral communication contemporaneously recorded concerning the property or account, or a presentment of an instrument of payment, or other activity in the account like automatic dividend reinvestment. *See* N.J.S.A. §§ 46:30B-7.1, 46:30B-31. Vial "intends to pursue a buy-and-hold strategy for those shares, doing nothing with them while they appreciate for years to come." Appx133, AC ¶ 104. As a result, Vial owns "additional property vulnerable to seizure and taking under the NJUPA." Appx133, AC ¶ 102.

And because he lives in Chile, it is impossible for the sole form of notice that NJUPA requires—certified mail from the holder—to reach him. The NJUPA provides for pre-escheat notice to be given in only one form: the holder must send a letter by certified mail to the owner. N.J.S.A. § 46:30B-50. However, the United States Postal Service only offers the Certified Mail within the United States (apart from service to U.S. military and diplomatic installations). *See* Appx112–13, AC ¶ 16 & n.5. Thus, ***it is not even possible*** for the Act's sole mandated form of pre-escheat notice to actually provide notice to individuals like Vial and the proposed Class members, who have addresses located outside of the United States. *See also* Appx124–25, AC ¶¶ 58–63.

Nevertheless, the State will simply take the property in question without any pre-escheat notice in direct contravention of the Supreme Court's command that notice be "reasonably calculated, under all the circumstances, to apprise interested parties" before they are deprived of property. *Mullane*, 339 U.S. at 314. Indeed, following a process the government knows will not result in actual notice, does not "relieve[] the State of its constitutional obligation to provide adequate notice." *Flowers,* 547 U.S. at 232; *see id.* at 229 ("If the Commissioner prepared a stack of letters to mail to delinquent taxpayers, handed them to the postman, and then watched as the departing postman accidentally dropped the letters down a storm

22

drain, one would certainly expect the Commissioner's office to prepare a new stack of letters and send them again.").

This demonstrates a sufficient likelihood of two forms of future harm. First, "the denial of a constitutional right"—here, the seizure of property without pre-deprivation notice reasonably calculated to reach owners—"constitutes irreparable harm," *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987). No post-deprivation process nor even a "damage award can undo the fact that the arbitrary taking that was subject to the right of procedural due process has already occurred." *Fuentes v. Shevin*, 407 U.S. 67, 82 (1972). Second, "[w]hen [the government] takes custody of property pursuant to the [unclaimed property law], even temporarily, certain rights associated with ownership are lost which are not compensable in money damages." *Taylor v. Chiang*, 2007 WL 1628050, at *2 (E.D. Cal. June 1, 2007). For example, "the owner is deprived of the right to vote his or her shares in important matters of corporate governance." *Id.*

This is the same course of events that previously injured plaintiff: "Plaintiff is a citizen and resident of Chile who received no notice at all before his (and his family's) Exxon Mobil shares were seized and taken by Defendants under the NJUPA." Appx112, AC ¶ 13. When, as here, a plaintiff previously suffered the alleged injury, past wrongs are "evidence bearing on whether there is a real and immediate threat of repeated injury," *City of Los Angeles v. Lyons*, 461 U.S. 95, 102

(1983). Where "the threatened acts that will cause injury are authorized or part of a policy," as is the case here, "it is significantly more likely that the injury will occur again." *31 Foster Child. v. Bush*, 329 F.3d 1255, 1266 (11th Cir. 2003).

The Ninth Circuit previously held that the plaintiffs challenging California' unclaimed property law had standing for prospective relief under these circumstances: "plaintiffs' securities have been lost to escheat, thus establishing concrete injury" and "[t]he likelihood of recurrence is also established because the 'wrong' plaintiffs seek to enjoin is the escheating of property without written notice calculated to be received by the owner, and the State of California has a written policy of doing just that." *Taylor II*, 488 F.3d at 1200. The District Court of Delaware recently held that allegations similar to the ones at bar were sufficient "as to the likelihood of future injury" because they showed a "realistic danger of sustaining a direct injury as a result of the statute's operation." *Mayrack*, 2026 WL 800611 at **2–3.

The district court downplayed the likelihood of future injury by (1) baselessly isolating Vial's prior injury from his risk of future injury and (2) construing the statute operating as written as a "highly attenuated course of events." Appx055, Op. at 17. Both reasons fail upon examination.

First, the district court attempted to distinguish *Taylor II* on the grounds that

24

the "risk of repeated injury" standard does not apply here. [8] Appx060, Op. at 22 & n.30. This is so, according to the district court, because "Plaintiff pleads no facts to indicate that there is a 'sufficient likelihood' that any of the ***Borquez's*** property will be escheated 'in a similar way,'" Appx053–54, Op. at 15–16 (emphases added). Throughout its opinion, the district court drew an artificial distinction between Plaintiff's prior injury as a member of the Borquez family (which the court incorrectly assumes exclusively resulted in his representative capacity) and his risk of future injury (which is raised in his personal capacity). However, the court's hermetically sealed isolation of the two injuries is factually and legally untenable.

The Amended Complaint makes clear that Vial is not a stranger to the escheatment that happened to his family—he, himself, was injured by it. The Amended Complaint pleads that "Plaintiff is a citizen and resident of Chile who received no notice at all before **his** (and his family's) **Exxon Mobil shares were seized** and taken by Defendants under the NJUPA." Appx112, AC ¶ 13 (emphasis added). "Plaintiff has not only lost over a hundred thousand dollars from New Jersey's no notice escheatment of his family's stocks, but he remains at risk of other

---

[8] The district court, in a footnote, also implied that *Clapper* had perhaps changed the *Lyons* standard on which *Taylor II* had relied. But this Court still cites *Lyons* routinely. *See, e.g., Rd.-Con, Inc. v. City of Philadelphia*, 120 F.4th 346, 354 (3d Cir. 2024) (holding Plaintiffs had standing for prospective relief for prior injury likely to recur). And this Court deems it relevant when "plaintiffs are not complaining solely of future injuries," *In re Horizon Healthcare Servs.*, 846 F.3d at 640 n.20.

of his securities being escheated without notice under the NJUPA." Appx114, AC ¶ 20. At the risk of stating the obvious: Vial was personally harmed when his family was harmed and he owns property today subject to the same injury under the same policy. He is the same person, with the same property exposure, facing the same constitutionally deficient notice scheme. The wall drawn by the district court obfuscates and ignores that continuity.

Moreover, the district court cites no authority for the proposition that Vial's past injury (to him and his family) and his future injury (to him alone) must be considered in isolation from one another. Rather, Vial's "standing to seek the injunction requested depended on whether he was likely to suffer future injury," and "[p]ast wrong[s] were evidence bearing" on that question. *Lyons*, 461 U.S. at 102, 105. It is illogical to conclude that, because Vial was first injured by Defendants' no-notice escheatment as a member of his family, his past injury is not probative evidence of whether he is likely at risk of that injury as an individual. Rather, the same policy remains operative and continues to expose Vial's remaining stock for the same reasons.

Second, the district court held that Vial's risk of future harm is not sufficient to confer standing because it purportedly depends upon a "highly attenuated chain of possibilities," Appx055, Op. at 17. Upon examination, the district court's "highly attenuated chain of possibilities" only appears "highly attenuated" because it failed

to accept as true Vial's well-pleaded factual allegations and blatantly re-wrote an unambiguous requirement in the NJUPA. Both constitute reversible error.

The district court first found: "[f]or Plaintiff's predicted escheatment to occur, Plaintiff would" have to "avoid contact with TradeUp for multiple years," Appx57, Op. at 19. However, the Amended Complaint—which the district court must accept "as true and draw all reasonable inferences" in Vial's favor, *In re Horizon Healthcare Servs.*, 846 F.3d at 633—alleges that he plans to pursue a buy-and-hold approach in which he does nothing with TradeUp or his shares. Appx134, AC ¶¶ 106–107. There are zero allegations that Vial will contact TradeUp in one of the specific forms that Section 46:30B-7.1 requires to prevent escheatment. In fact, even if the inferences were somehow construed *against* the plaintiff, it is not a reasonable inference that Vial would have "contact" with TradeUp in one of those very specific ways.

The district court next found that Vial "would have to affirmatively ignore all statutorily required notice from TradeUp," Appx057, Op. at 19. But this argument assumes away the central flaw of the NJUPA: Vial—as an overseas owner—will certainly **not** receive notice if TradeUp provides the notice that NJUPA requires. As explained above, the only pre-escheat notice is requiring holders to send notice via certified mail, which categorically does not exist for overseas owners. *See* N.J.S.A. § 46:30B-50; Appx125, AC ¶¶ 61–63.

The district court attempts to brush off this structural problem in a footnote by dismissing it as "Plaintiff's interpretation" and claims to use the canon of constitutional avoidance to effectively re-write the statute. Appx057, Op. at 19, n.24. "But that canon of construction applies only when ambiguity exists." *Iancu v. Brunetti*, 588 U.S. 388, 397 (2019). No court can "rewrite a law to conform it to constitutional requirements." *Id.* So even assuming the district court's "reading would eliminate [constitutional] problems, [it] may adopt it only if [it] can see it in the statutory language." *Id.* And here, the statutory language is unequivocal: it specifies that the holder "**shall send by certified mail**, and with return receipt requested, written notice to the apparent owner at the last known address," N.J.S.A. § 46:30B-50 (emphasis added). As written, the statute requires a very specific method of service that will not provide notice to plaintiff or similarly situated property owners. That is not one "interpretation" of many—it is the statute operating as unambiguously written.

Relatedly, the district court found that it was "speculative" that TradeUp "will not provide pre-escheatment notice" and cited *Clapper* for the proposition that "Plaintiffs cannot rely on speculation about the 'unfettered choices made by independent actors not before the courts.'" Appx158, Op. at 20 (quoting *Clapper*, 568 U.S. at 414 n.5). *Clapper* found it too speculative that a government department would decide to seek permission of "the Foreign Intelligence Surveillance Court" to

28

access their private communications, something the challenged law did not require said department to do. *Id.* at 413. But no such "unfettered" choices are at issue here: NJUPA *requires* holders to use a form of notice that cannot reach Vial.

Indeed, the injury *will* occur if the holder does exactly *as the Statute requires*. It is the *district court* that impermissibly speculates that TradeUp will provide notice to Vial in a manner other than what the NJUPA commands—even though the NJUPA does not provide any choice or discretion to the holder regarding that method. The district court has no basis for this assumption—and it is particularly inappropriate for the district court to make this unfounded assumption in this procedural posture where the district court must "accept the Plaintiffs' well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the Plaintiffs' favor." *In re Horizon Healthcare Servs.*, 846 F.3d at 633.

The district court next found that the "predicted course of conduct is particularly implausible given Plaintiff's assertion" that "he is 'constantly monitor[ing]' his property out of fear of future escheatment." Appx058, Op. at 20. In support, the district court cites *Peters v. Cohen*, 2025 WL 733237 (9th Cir. Mar. 7, 2025). But the *Peters* court questioned the likelihood that California would seize shares of stock in a ***German*** brokerage account. *Peters*, 2025 WL 733237, at *1. By contrast, TradeUp is a *New Jersey* corporation on which the NJUPA unquestionably imposes escheatment obligations, Appx133, AC ¶ 102.

In any case, this argument—leveraging a plaintiff's supposed enhanced ability to prevent another escheatment to defeat standing—was rejected by the Ninth Circuit. "Although plaintiffs' newly acquired knowledge of the law—**and their ability to monitor their property**—can perhaps reduce the likelihood of again having their property escheated without notice, it does not make this likelihood 'remote.'" *Taylor II*, 488 F.3d at 1200 (emphasis added). Notably, this holding stems from the same case in which—as here—the plaintiffs had standing because they alleged "the injuries attendant to having to continually monitor one's property will recur as long as California's system remains in place." *Id.* Thus the two theories of harm (present monitoring and future risk) do not negate one another.

The district court also held that for injury to occur, "the Administrator's *post-escheatment* publication efforts would have to fail to reach plaintiff" and "Plaintiff would have to fail to prevent the liquidation by submitting a claim for the return of his stock" prior to liquidation. Appx057, Op at 19 (emphasis added). Those assertions are irrelevant to standing. The injurious violation is "complete at the time of the taking," such that a property owner may bring a claim at that time before submitting a claim. *See Knick v. Twp. of Scott, Pennsylvania*, 588 U.S. 180, 202 (2019). The Ninth and the Tenth Circuit have applied *Knick* to hold that "a property owner has no obligation to seek a remedy through state administrative proceedings"

to have standing to sue in federal court. *Knellinger v. Young*, 134 F.4th 1034, 1044–45 (10th Cir. 2025); *accord Garza v. Woods*, 150 F.4th 1118, 1125 (9th Cir. 2025).

Moreover, as discussed above, the deprivation of property without notice itself constitutes harm that post-deprivation process cannot undo. *See* Section I.A, *supra*. When the government takes custody of property "even temporarily, certain rights associated with ownership are lost." *Taylor v. Chiang*, 2007 WL 1628050, at *2 (E.D. Cal. June 1, 2007). Accordingly, it is of no moment that Vial could theoretically receive post-taking notice and act upon it.

In any case—contrary to the district court's predictions—it is also extremely likely that the "post-escheatment efforts *would . . .* fail to reach plaintiff," Appx057, Op. at 19 (emphasis added), and similarly situated individuals. Other than a website riddled with problems, Appx125–30, AC ¶ 64–83, and not known to people all over the world, the only form of post-escheat notice issued by the state is publication notice exclusively within a newspaper within the state of New Jersey—regardless of where the out-of-state owner resides. *See* N.J.S.A. § 46:30B-51.

**B.** **Vial Is Suffering Cognizable Present Injury Because the NJUPA Compels Him to Act to Avoid Injury**

Even setting aside the near-certainty of future no-notice escheatment explained above, Vial has Article III standing based on injuries he suffers *today*. The Supreme Court has recognized that "in some instances, we have found standing based on a 'substantial risk' that the harm will occur, which may prompt plaintiffs

31

to reasonably incur costs to mitigate or avoid that harm." *Clapper*, 568 U.S. at 414 n.5. Indeed, burdens incurred to "minimize the likelihood of potential harm" are "sufficiently concrete to satisfy the injury-in-fact prong" of Article III—even if the underlying harm never materializes. *Monsanto*, 561 U.S. at 154–55.

In *Monsanto*, a group of conventional alfalfa growers sought injunctive relief against an agency decision to deregulate genetically engineered alfalfa. 561 U.S. at 152. They claimed that deregulation would harm them because their neighbors *might* plant the genetically engineered seed, the bees *might* obtain pollen from the neighbors' plants, and then the bees *might* (harmfully) contaminate their own conventional alfalfa with the genetically modified gene. *Id.* Without expressing views about the probability of that future contamination harm coming to pass, the Supreme Court found standing because the plaintiffs would suffer ***present*** harm by trying to monitor or mitigate the threat. *Id.* at 154–55. The plaintiffs "would have to conduct testing to find out whether and to what extent their crops have been contaminated" and take other "measures to minimize the likelihood of potential contamination." *Id.* The Court held: "Such harms, which respondents ***will suffer even if their crops are not actually infected*** with the Roundup Ready gene, are sufficiently concrete to satisfy the injury-in-fact prong of the constitutional standing analysis." *Id.* at 155 (emphasis added).

Indeed, in the unclaimed property context, the Ninth Circuit held that: "the injuries suffered by plaintiffs include not only those attendant to having their property escheated without notice, but also include" the "cost of having to constantly monitor their property to avoid escheat, either by devoting significant time to searching the internet themselves, by paying a service to do the same, or by 'churning' their property so that it stays active and avoids escheat." *Taylor II*, 488 F.3d at 1199–1200. That court held that these injuries were presently existing as long as the statute existed: "it is obvious that, at the very least, the injuries attendant to having to continually monitor one's property will recur as long as California's system remains in place." *Id.* at 1200.

Vial's present injuries fall squarely within this framework. The fact that Vial is compelled to monitor or churn his property to *prevent* escheatment demonstrates *current harm*. The NJUPA's structurally deficient notice regime forces Vial into an impossible choice: either (a) incur the burdens of monitoring and "churning" his property to avoid escheatment, or (b) suffer the unconstitutional seizure of his property without notice. Appx 132–35, AC ¶¶ 101, 104–112. Either path produces concrete harm traceable to the NJUPA's operation.

The district court rejected this cognizable present harm on the grounds that (1) the allegations were "insufficiently concrete," (2) they were "irreconcilable" with his allegations of future injury. Again, neither reason withstands scrutiny.

33

First, the district court rejected Vial's present harm as "bare, conclusory allegations" that are "insufficiently concrete to confer standing." Appx059, Op. at 21. But Vial alleges that "[t]o avoid escheat, [he] would be required to churn and monitor that property (and other property) in order to ensure that the Administrator does not attempt to seize it." Appx134, AC ¶ 108. He further alleges that he "is incurring, and will continue to incur, the real and concrete cost of having to constantly monitor his property to avoid escheat, including retention of counsel in the United States." AC ¶ 111. These allegations describe concrete burdens, specifically including retention of professionals. It is unclear what further details the district court seeks.

In any case, standing does not depend on the degree of burden, but whether the burden is concrete—and here that burden is met because that the statute requires Vial to take specific actions to avoid escheat. Nothing in Article III requires a plaintiff to plead the dollar amount of monitoring costs. Rather, at the motion-to-dismiss stage, the district court should have accepted these "well-pleaded factual allegations as true" and it should have "draw[n] all reasonable inferences from those allegations in [Vial's] favor." *In re Horizon Healthcare Servs. Inc.*, 846 F.3d at 633. *Taylor II* found standing based on precisely the same level of generality—"the inherent burden of having to constantly monitor their property to avoid escheat," 488 F.3d at 1199–1200—without requiring any specific dollar figure.

The district court's attempts to distinguish *Taylor II* are unconvincing. First, the district court revisits its contention that the "*Taylor II* plaintiffs had already personally suffered previous escheatment for their property," but Plaintiff supposedly had not. Appx060, Op. at 22. As discussed in Section I.A., this is factually and legally mistaken. Second, the district court relies on purported distinguishing facts that the *Taylor II* decision not only did not turn on—*but did not even mention*. Appx061, Op. at 23, n.31. Indeed, the district court relied on facts buried in a brief filed in the Eastern District of California—not even before the Ninth Circuit. The cherry on top is that those facts were adduced in a *reply* brief, meaning that it's unclear whether those facts were even properly before the *district court* in *Taylor II*. *Taylor II* is persuasive and indistinguishable in all material aspects: Vial's efforts to avoid no-notice escheat constitute cognizable present harm.

The district court also invoked *Reilly v. Ceridian Corp.*, 664 F.3d 38, 46 (3d Cir. 2011), for the proposition that "costs incurred 'prophylactically' to prevent injury are insufficient to confer standing." Appx060, Op. at 22 n.29. In *Clemens*, 48 F.4th at 153, this Court clarified that *Reilly* does not establish a "bright line rule"— much less one precluding standing whenever harm has not yet materialized. In any case, in *Reilly*, this Court found no standing based on data breach because (1) there was "no evidence that the intrusion was intentional or malicious;" (2) there was no evidence "that the data has been—or will ever be—misused;" and (3) the chain of

35

events leading to harm was "entirely speculative"—dependent on "unknown third part[ies]" choosing to exploit the stolen data. 664 F.3d at 42–44. Here, by contrast, the risk flows not from hypothetical choices made by independent actors, but from the mandatory operation of a statute that *requires* a notice method incapable of reaching foreign addresses

The district court also held that Vial's monitoring allegations are "irreconcilable" with his stated buy-and-hold investment strategy—reasoning that Vial either monitors (making escheatment implausible) or does not (negating any present-injury claim). Appx059, Op. at 21. This gets the injury precisely backwards. As the Supreme Court's holding in *Monsanto* demonstrates: Being forced to choose between monitoring costs and the risk of future harm is itself a concrete, present harm. 561 U.S. at 154–55. Vial is forced to choose between two paths, each of which produces concrete harm: monitoring and churning (which imposes ongoing burden) or pursuing his intended hands-off buy-and-hold approach (which will result in unconstitutional seizure without notice). Appx133–35, AC ¶¶ 104–112. Federal Rule of Civil Procedure 8(d)(2) expressly permits parties to "set out 2 or more statements of a claim or defense alternatively" in this manner. The district court declined to apply this rule by reference to *Pyatkova v. Motorcars*, 2016 WL 674862, at \*2 (D.N.J. Feb. 3, 2016). However, that case only stands for the proposition that courts "need not accept **factual claims** that are internally inconsistent." But there is

no internal inconsistency here—just a property owner forced to choose between present cognizable injury (in the form of a burden) or proceeding as he otherwise would have, undertaking substantial risk of future injury (in the form of no-notice escheat). These are not "internally inconsistent" factual claims; they are the two horns of a statutorily-imposed dilemma.

## C.     Vial Has Standing to Seek an Accounting

In a single footnote—devoid of any substantive analysis of the equitable accounting doctrine—the district court dismissed Vial's request for an equitable accounting as a "fishing expedition" that was "too speculative for standing purposes." Appx054, Op. at 16 n.19. The court essentially faulted Vial for failing to identify specific additional property. Appx054, Op. at 16 n.19. But that is precisely the information that the accounting is designed to produce. Requiring Vial to already possess the information he seeks as a precondition to obtaining it is impossibly circular.

And it is particularly unjust given the nature of the constitutional violation alleged. Vial alleges that the State seized property without providing any notice whatsoever. Appx131, AC ¶¶ 89–90. Where the State has a constitutional duty to provide notice but systemically fails to do so, the resulting information asymmetry is not a basis for denying relief; it is the very injury that warrants an equitable

accounting.[9]

**II.**     **THE ELEVENTH AMENDMENT DOES NOT BAR VIAL'S REQUEST TO BE MADE WHOLE FROM NON-STATE FUNDS OUTSIDE THE STATE'S TREASURY**

After dismissing for lack of standing Vial's claims for injunctive and declaratory relief pertaining to the risks of further no-notice escheatment, the district court held that the Eleventh Amendment barred Vial's remaining injunctive and equitable relief, which it characterized as "compensation." Appx061, Op. at 23.

At the outset, the district court misstates Vial's claim. The Fifth Amendment commands that when property is appropriated by the States, "the owner is to be put in the same position monetarily as he would have occupied if his property had not been taken." *Reynolds*, 397 U.S. at 16. A claim asking the Court to "order the state to pay just compensation" is "prospective relief" where, as here the state has "failed to give them just compensation"—which itself, is an "ongoing violation" of federal law until that just compensation is paid. *Maron*, 136 F.4th at 1333.

---

[9] Although the merits of the equitable accounting are not before this Court, such relief is warranted. "The party seeking to obtain an accounting must establish: (1) a fiduciary or trust relationship; (2) the complicated nature of the character of the account; and (3) the need of discovery." *In re U.S. Mortg. Corp.*, 491 B.R. 642, 670 (Bankr. D.N.J. 2013) (citation omitted). All three elements are met here: (1) Under the NJUPA, the State acts as a custodian—indeed, a "trustee"—of escheated property; (2) given that the website is too erroneous and unreliable to even provide minimal assistance, Appx127–30, AC ¶¶ 70–83, accounting for the harm would otherwise be complicated; (3) and the information is solely in the possession of Defendants.

As is relevant to Vial, "[b]ut for New Jersey's unnoticed seizure and liquidation of those stocks, the Borquez Family would have had stocks of Exxon Mobil Corporation worth over $623,936 instead of the $487,581.23 returned." Appx132, AC ¶ 97. Indeed, the district court correctly acknowledged that Vial suffered a "classic pocketbook injury" when Defendants "escheated Borquez's Exxon stock without proper notice and undercompensated him for that action," Appx052, Op. at 14 (quoting *Tyler*, 598 U.S. at 636).

Consistent with that due process injury and the Fifth Amendment's mandate, Vial seeks "[i]njunctive and equitable relief requiring Defendants to return (rather than destroy or liquidate) the property . . . still in the State's possession, or otherwise put Plaintiff and Class Members in the same position monetarily as they would have occupied if the property had not been unconstitutionally seized and taken, including compensation for any appreciation in the value of the property since its seizure," Appx119, 145–46, AC at 37–38, Prayer for Relief D. Thus, in addition to an accounting for any of Vial's other property currently in the possession of the state,[10] Vial seeks the $136,354 difference between the amount the Defendants' administrative process provided and the amount he would have had in *but-for* world in which the Defendants did not escheat his property without notice. Appx144, AC ¶ 157 & n.14.

---

[10] *See* Section I.C. regarding equitable accounting.

39

Restoring Vial to the "position monetarily as he would have occupied if his property had not been taken," *Reynolds*, 397 U.S. at 16, does not run afoul of the Eleventh Amendment because (A) the funds at issue are not public funds belonging to the state, and (B) even if these funds did implicate the Eleventh Amendment, the *Ex Parte Young* exception applies.

### A. The District Court Correctly Held That the Funds at Issue Are Not State Funds But Then Erroneously Held That the Eleventh Amendment Protects Them Anyways Based on California-Specific Caselaw

The Eleventh Amendment's core concern is to prevent "federal-court judgments that must be paid ***out of a State's treasury***." *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 48 (1994) (emphasis added). Here, Vial seeks to be made whole from funds outside the State's treasury, which are not even the State's funds altogether.

The NJUPA specifies that all "moneys received as unclaimed property presumed abandoned, the accretions thereon, and the proceeds of sale of unclaimed property shall be deposited into the Unclaimed Personal Property Trust Fund." N.J.S.A. § 46:30B-74(c). Some of these funds are transferred to the General State Fund, but the remaining funds are to be "used to pay claims duly presented and allowed and all expenses and costs incurred by the State of New Jersey." *Id.* Vial seeks to be made whole from these "funds explicitly and purposefully set aside in a custodial trust separate from New Jersey's treasury." Appx131, AC ¶ 121.

The district court correctly observed that these funds are not New Jersey's funds altogether: "unclaimed funds the Administration has escheated are 'held by the Treasurer as trustee for the public interest,' ___not the state of New Jersey___." Appx062, Op. at 24 (emphasis added) (quoting *Clymer v. Summit Bancorp, Inc.*, 171 N.J. 57, 63 (2002)). This is because the NJUPA sets up a "custodial" escheatment system, wherein unclaimed property and its proceeds ___are private property___ held in trust for the benefit of the owners—not state funds. *See, e.g.*, *Am. Exp. Travel Related Servs., Inc. Sidamon-Eristoff*, 669 F.3d 359, 365 (3d Cir. 2012) ("the original property owner still maintains the right to the property"); *Salvato*, 2022 WL 1224962 at *4–6; *Clymer*, 171 N.J. at 63 ("title to the unclaimed property does not vest in the State but remains in the owner, as the State only assumes custody of the intangible property"); Defendants themselves have conceded this custodial character—both here and in prior litigation.[11] As the Ninth Circuit held: "sovereign immunity applies to the state's money" but "___[m]oney that the state holds in custody for the benefit of private individuals is not the state's money, any more than towed cars are the state's cars___." *Taylor v. Westly*, 402 F.3d 924, 932 (9th Cir. 2005)

---

[11] In *Salvato*, Defendants admitted that "when property is transferred to the State under the auspices of the UPA, the 'funds [are held] in perpetuity for the true owner.'" *Salvato*, 2022 WL 1224962, at *6 (quoting Defendant's brief). And Defendants concede again in this case that "the Act provides that **title to unclaimed property does not vest in the State**, but rather remains vested in the owner, with the State acting as custodian while holding his property." Appx165, MTD at 5.

41

("*Taylor I*").

After correctly holding that these funds are not in the State's treasury and are not even the State's funds, the district court incorrectly extended Eleventh Amendment protection to these funds. The district court did so simply because Plaintiff previously received the proceeds of his (known) escheated and liquidated property through the State's administrative claims process. Appx064, Op. at 26.

This makes no sense. If the funds in the Unclaimed Personal Property Trust Fund are not the State's money—as the district court itself recognized—then a claim for additional disbursement from that same fund cannot be a claim against the State's money either. In other words, what the district court characterizes as "additional compensation" is ***still not*** a claim against the State's own money.

The district court's characterization of Vial's claim for the appreciated value of the escheated stock as a request for "additional compensation," Appx064, Op. at 26, is also incorrect because it ignores the constitutional baseline, requiring that an owner be "put in the same position monetarily as he would have occupied if his property had not been taken." *Reynolds*, 397 U.S. at 16; *see also United States v. 564.54 Acres Land*, 441 U.S. 506, 510 (1979) (owner must be placed "in as good a position pecuniarily as if his property had not been taken"). The difference between $487,581.23 and $623,936 is not a windfall, a bonus, or "additional" money. It is the constitutionally-compelled measure of just compensation for property taken without

notice and prematurely liquidated. Appx132, 141–43, AC ¶¶ 97, 142–155. Properly viewed through this lens, Vial's claim is a demand for the value of property that he would have had but-for Defendants' no-notice seizure, from funds held in a custodial trust that exists for the sole purpose of making owners like him whole.[12]

The district court's erroneous conclusion appears to be based on a misreading of caselaw. The district court began by correctly observing that the Ninth Circuit and Eleventh Circuits have held that "the Eleventh Amendment did not bar the Plaintiffs from recovering their escheated property" under "a similarly custodial unclaimed property system." Appx064, Op. at 26 (citations omitted). However, the district court then incorrectly extrapolated: "in the cases in which states had returned the proceeds of liquidated property and plaintiff sought additional compensation-namely, as here, the appreciated value of escheated stock-courts have held that sovereign immunity bars such recovery." Appx065, Op. at 27. The district court bases this entire extrapolation on *Suever v. Connell*, 579 F.3d 1047 (9th Cir. 2009) and *Peters*, 2025 WL 733237, which simply followed *Suever*. But these cases pertain to a

---

[12] At most—this would be an argument that Plaintiff no longer has standing because Plaintiff's injury has been remedied. But the district court held Plaintiff had standing for this past injury. Appx052, Op. at 14. And for the reasons explained above, Plaintiff has suffered harm from the seizure without notice regardless of compensation. *See* Section I.A *supra* (citing *Meese*, *Fuentes*, and *Chiang*). Moreover, that payment was not "just compensation" because it did not restore him to the "position monetarily as he would have occupied if his property had not been taken," *Reynolds*, 397 U.S. at 16.

fundamentally different escheatment fund structure under California's Unclaimed Property Law.

The *Suever* court explicitly rejected that plaintiff's request for appreciation on the grounds that California's system required the Controller to sweep all funds in the Unclaimed Property Fund in excess of $50,000 to the General Fund every month, such that "there is not $5.3 billion worth of private money in the Unclaimed Property Fund." *See Suever*, 579 F.3d at 1060 (citing CAL. CIV. PROC. CODE § 1564(c)). Thus, there was not, in practical terms, a segregated pool of private money available to pay claims for additional compensation. *Id.* That is not the case under the NJUPA. *See* N.J.S.A. § 46:30B-74 (unclaimed property funds are deposited into the Unclaimed Personal Property Trust Fund, wherein the administrator may transfer 75% of received funds to the General State Fund, the remaining amount is expressly "retained in the trust fund, administered and invested by the State Treasurer, and used to pay claims duly presented and allowed and all expenses and costs incurred by the State of New Jersey.").[13] *See Garza*, 150 F.4th at 1126 (sovereign immunity did not apply because plaintiffs did not seek "money that belonged to the government" because Arizona's Act "plainly requires the Department to hold

---

[13] Notably, even if the funds have been transferred to the General Fund, a person can claim their abandoned property at any time, and there is no provision in the NJUPA that would limit the ability to claim said property or its proceeds—even *after* its technical passage to the general fund. *See* N.J.S.A. § 46:30B-77.

44

unclaimed property for the benefit of owners").

Currently, Defendants hold over $6 billion in purportedly "unclaimed" property, Appx110, AC ¶ 6, and the State has made no showing that all of it will be claimed. Indeed, since the inception of the program, the state has returned around $2.7 billion. Appx122, AC ¶ 30. Thus, Vial can be made whole without paying a penny of the State's money.[14] Appx135–36, AC ¶¶ 116–117.

This is not a semantic distinction. It goes to the heart of the Eleventh Amendment analysis. The Supreme Court has held that "the vulnerability of the State's purse [is] the most salient factor in Eleventh Amendment determinations." *Hess*, 513 U.S. at 48. Where a plaintiff seeks recovery from a fund that belongs to private owners—not the State—the Eleventh Amendment's core purpose of protecting the state fisc is not implicated. As the District Court of Delaware astutely recognized earlier this year: "in escheat cases such as this, there is a caveat: if the Plaintiff seeks recovery out of a state's specially-earmarked fund for escheat claims, then those are damages drawn *from a fund that is custodial in nature*, whose administrators are not protected by the Eleventh Amendment." *Mayrack*, 2026 WL 800611, at *4.

---

[14] Indeed, the State has only returned $2.7 billion since the inception of the program, Appx116, AC ¶ 30, so for the state's funds to be implicated, the Class members' recovery in this lawsuit alone would have to ***exceed the sum total of all unclaimed property payments New Jersey has ever made twice over***.

The *Suever* court held, in the alternative, "the Controller could not lawfully use it to pay Plaintiffs the difference between the proceeds of the sale of their escheated property and what they claim that property is worth now; to do so, the Controller would by definition have to use money belonging to other owners of unclaimed property." 579 F.3d at 1060. But this does not provide a basis to dismiss Vial's case under the Eleventh Amendment. Protecting "money belonging to other" private individuals is simply not within the ambit of Eleventh Amendment. This holding is also limited to the structure of California's system. Unlike California's system, the NJUPA does not limit claimants to merely the value the state itself received from the escheatment and liquidation of their property.[15] Accordingly, *Suever*'s categorical prohibition against paying "[m]oney belonging to other" owners from the fund does not apply in New Jersey. Indeed, the State uses those funds to pay "all expenses and costs incurred by the State of New Jersey," including auditors—evidently without any concern that it is transferring private property from the rightful owner to an auditor. N.J.S.A. § 46:30B-74(c); AC ¶ 39. Moreover, much

---

[15] California and New Jersey both pass on to the owner "any dividends, interest or other increments realized or accruing on such property *at or prior to liquidation*" CAL. CIV. PROC. CODE § 1562 (emphasis added); N.J.S.A. § 46:30B-68 (similar). However, California makes clear that "[e]xcept for amounts so credited the owner is not entitled to receive income or other increments on money or other property paid or delivered to the State Controller," CCPC § 1562, whereas New Jersey also entitles owners to "interest upon the monies of the claimant for the period during which those monies were in the custody of the administrator" at a statutorily defined rate. N.J.S.A. § 46:30B-79.

of the Fund is composed of sums that can never be returned to the owners because the State does not request or receive the ownership information. N.J.S.A. § 46:30B-47 (only requiring owner information for property over $50).

In short, the district court's uncritical importation of California caselaw into a case governed by New Jersey's materially different statutory regime was error. This Court should decline to extend *Suever* and *Peters* beyond the narrow context in which they arose and should hold that the Eleventh Amendment does not bar Vial's claims for relief drawn entirely from a custodial trust fund that was never the State's money.

**B.     Even if State Funds Were Implicated, the *Ex Parte Young* Exception to the Eleventh Amendment Would Apply**

In a footnote, the district court held that Vial's requested relief "plainly does not fall under the *Ex parte Young* exception." Appx064, Op. at 26 n.33. In support, the district court simply cited *Suever*, 579 F.3d at 1058–59, *Taylor I*, 402 F.3d at 935, and *Merritts v. Richards*, 62 F4th 764, 772 (3d Cir. 2023).

The doctrine of *Ex parte Young* holds that "a state official is stripped of his official or representative character and thereby deprived of the State's immunity, when he commits an ongoing violation of federal law." *Waterfront Comm'n of New York Harbor v. Governor of N.J.*, 961 F.3d 234, 238 (3d Cir. 2020) (cleaned up). In *Merritts*, this Court explained "for the *Ex parte Young* exception to apply, there must be both an ongoing violation of federal law and a request for relief that can be

properly characterized as prospective." *Merritts*, 62 F.4th at 771. Both are satisfied here.

In *Maron*, 136 F.4th at 1333–34, the court applied *Ex parte Young* to permit claims challenging Florida's unclaimed property scheme. Like Defendants here, Florida argued that the "just compensation" relief sought was retrospective. The Eleventh Circuit rejected that argument because "the Takings Clause . . . prohibits not takings, but takings without just compensation" such that the "*lack of compensation is a part of an ongoing tort*." *Id.* at 1334 (emphasis added). As the Eleventh Circuit held, "sovereign immunity did not bar the . . . takings claim because it sought not damages but prospective relief to end an ongoing violation of federal law." *Maron*, 136 F.4th at 1334.

That reasoning is squarely applicable here. Vial requests "just compensation"—something he has not received to this day because he has not yet been restored to the same "position monetarily as he would have occupied if his property had not been taken," *Reynolds*, 397 U.S. at 16. The monetary relief sought therefore is not damages reflecting a "monetary loss resulting from a ***past breach*** of a legal duty," *Edelman v. Jordan*, 415 U.S. 651, 668 (1974) (emphasis added), but constitutionally compelled "just compensation" that Vial is currently being deprived of as part of an ongoing violation of the Fifth Amendment. This Court should adopt the reasoning in *Maron*.

48

Thus, even assuming the Eleventh Amendment otherwise applies to Vial's request, the *Ex parte Young* exception independently authorizes the prospective injunctive and equitable relief at the heart of this case.

**CONCLUSION**

For the foregoing reasons, we respectfully request that the Court reverse the District Court's decision and remand for further proceedings.

May 29, 2026

Respectfully submitted,

/s/ Bret R. Vallacher
Jonathan Massey
Bret R. Vallacher, Esq.
MASSEY & GAIL LLP
1000 Maine Ave. SW
Suite 450
Washington, D.C. 20024
Telephone: (202) 650-5452
Email: bvallacher@masseygail.com

William W. Palmer, Esq.
PALMER LAW GROUP, a PLC
2443 Fair Oaks Boulevard, No. 545
Sacramento, CA 95825
Telephone: (916) 972-0761
Email: wpalmer@palmercorp.com

Kevin P. Roddy, Esq.
WILENTZ, GOLDMAN &
SPITZER, P.A.
90 Woodbridge Center Drive,
Suite 900
Woodbridge, NJ 07095
Telephone: (732) 636-8000
Email: kroddy@wilentz.com


*Attorneys for Plaintiff-Appellant*

## <u>CERTIFICATION OF BAR MEMBERSHIP</u>

Pursuant to Third Circuit Local Rule 28.3(d), I certify that I am a member of

the Bar of the Court.


May 29, 2026                                    /s/ *Bret R. Vallacher*
                                                Bret R. Vallacher

# TABLE OF CONTENTS

INTRODUCTION ...........................................................................................1

SUBJECT MATTER & APPELLATE JURISDICTION .........................................6

STATEMENT OF THE ISSUES...........................................................................7

RELATED CASES AND PROCEEDINGS................................................................9

STATEMENT OF THE CASE...........................................................................9

    A.    Statutory Framework..............................................................9

    B.    Factual Background................................................................12

    C.    Procedural History.................................................................14

SUMMARY OF THE ARGUMENT .....................................................................15

STANDARD OF REVIEW ...............................................................................17

ARGUMENT ................................................................................................18

I.    THE DISTRICT COURT ERRED IN HOLDING THAT VIAL LACKS STANDING TO SEEK PROSPECTIVE RELIEF ...........................................................19

    A.    Vial Faces a Substantial Likelihood of Future Injury if All Parties Simply Proceed as the Law Requires................................19

    B.    Vial Is Suffering Cognizable Present Injury Because the NJUPA Compels Him to Act to Avoid Injury.................................31

    C.    Vial Has Standing to Seek an Accounting ...............................37

II.    THE ELEVENTH AMENDMENT DOES NOT BAR VIAL'S REQUEST TO BE MADE WHOLE FROM NON-STATE FUNDS OUTSIDE THE STATE'S TREASURY ................................................................................38

    A.    The District Court Correctly Held That the Funds at Issue Are Not State Funds But Then Erroneously Held That the Eleventh Amendment Protects Them Anyways Based on California-Specific Caselaw...............................................................................40

B.      Even if State Funds Were Implicated, the *Ex Parte Young* Exception to the Eleventh Amendment Would Apply..........................47

CONCLUSION .........................................................................................................49

CERTIFICATION OF BAR MEMBERSHIP ...........................................................1

CERTIFICATION OF COMPLIANCE ....................................................................2

CERTIFICATION OF SERVICE.............................................................................3

# TABLE OF AUTHORITIES

**Cases**

*31 Foster Child. v. Bush*,
329 F.3d 1255 (11th Cir. 2003) ............................................................24

*Am. Exp. Travel Related Servs., Inc. Sidamon-Eristoff*,
669 F.3d 359 (3d Cir. 2012) ...............................................................41

*Askew v. Church of the Lord Jesus Christ*,
684 F.3d 413 (3d Cir.2012) .................................................................18

*Blanciak v. Allegheny Ludlum Corp.*,
77 F.3d 690 (3d Cir. 1996) ..................................................................18

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983)................................................................. 24, 25, 26

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)........................................................ 20, 25, 28, 32

*Clemens v. ExecuPharm Inc.*,
48 F.4th 146 (3d Cir. 2022) ......................................................... 20, 35

*Clymer v. Summit Bancorp, Inc.*,
171 N.J. 57 (N.J. 2002)................................................................ 11, 41

*Const. Party of Pennsylvania v. Aichele*,
757 F.3d 347 (3d Cir. 2014) ........................................................ 17, 18

*Edelman v. Jordan*,
415 U.S. 651 (1974)............................................................................48

*Free Speech Coal., Inc. v. Att'y Gen. of U.S.*,
677 F.3d 519 (3d Cir. 2012) ...............................................................18

*Fuentes v. Shevin*,
407 U.S. 67 (1972)....................................................................... 23, 43

*Garza v. Woods*,
150 F.4th 1118 (9th Cir. 2025) ................................................... 31, 44

*Hess v. Port Auth. Trans-Hudson Corp.*,
  513 U.S. 30 (1994)..................................................................... 40, 45

*In re Horizon Healthcare Servs. Inc. Data Breach Litig.*,
  846 F.3d 625 (3d Cir. 2017) ........................................................ passim

*In re U.S. Mortg. Corp.*,
  491 B.R. 642 (Bankr. D.N.J. 2013) ...............................................38

*Jones v. Flowers*,
  547 U.S. 220 (2006)................................................................... 2, 22

*Knellinger v. Young*,
  134 F.4th 1034 (10th Cir. 2025) ...................................................31

*Knick v. Twp. of Scott, Pennsylvania*,
  588 U.S. 180 (2019)...................................................................30

*Marathon Petroleum Corp. v. Sec'y of Fin. for Del.*,
  876 F.3d 481 (3d Cir. 2017) .........................................................1

*Maron v. Chief Fin. Officer of Fla.*,
  136 F.4th 1322 (11th Cir. 2025) ...................................... 6, 17, 38, 48

*Merritts v. Richards*,
  62 F4th 764 (3d Cir. 2023) ...........................................................47

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010).................................................... 4, 17, 32, 36

*Mullane v. Cent. Hanover Bank & Trust Co.*,
  339 U.S. 306 (1950)................................................................ 16, 22

*Murthy v. Missouri*,
  603 U.S. 43 (2024)....................................................................20

*Pennell v. City of San Jose*,
  485 U.S. 1 (1988)......................................................................20

*Peters v. Cohen*,
  No. 24-1040, 2025 WL 733237 (9th Cir. Mar. 7, 2025) ...................... 29, 43, 47

*Pic-A-State Pa., Inc. v. Reno,*
76 F.3d 1294 (3d Cir. 1996) ................................................................4

*Pyatkova v. Motorcars,*
2016 WL 674862 (D.N.J. Feb. 3, 2016) ...............................................36

*Rd.-Con, Inc. v. City of Philadelphia,*
120 F.4th 346 (3d Cir. 2024) ..............................................................25

*Reilly v. Ceridian Corp.,*
664 F.3d 38 (3d Cir. 2011) ................................................................35

*Ross v. Meese,* ...............................................................................31

*Ross v. Meese,*
818 F.2d 1132 (4th Cir. 1987) ...................................................... 23, 43

*Suever v. Connell,*
579 F.3d 1047 (9th Cir. 2009) ............................................ 43, 44, 46, 47

*Susan B. Anthony List v. Driehaus,*
573 U.S. 149 (2014).........................................................................20

*Taylor v. Chiang,*
2007 WL 1628050
(E.D. Cal. June 1, 2007).......................................................... 23, 31, 43

*Taylor v. Westly,*
402 F.3d 924 (9th Cir. 2005) .......................................................... 41, 47

*Taylor v. Yee,*
136 S. Ct. 929 (2016)..........................................................................1

*Tyler v. Hennepin County,*
598 U.S. 631 (2023).................................................................... 18, 39

*United States v. 564.54 Acres Land,*
441 U.S. 506 (1979)........................................................................42

*United States v. Reynolds,*
397 U.S. 14 (1970).................................................................... passim

*Waterfront Comm'n of New York Harbor v. Governor of N.J.*,
   961 F.3d 234 (3d Cir. 2020) ................................................................47

**Statutes**

28 U.S.C. § 1291 ..................................................................................6

28 U.S.C. § 1331 ..................................................................................6

28 U.S.C. § 1343 ..................................................................................6

42 U.S.C.§ 1983 ............................................................................. 6, 14

N.J.S.A. § 46:30B-1 ............................................................................9

N.J.S.A. § 46:30B-7 ………………………………………………………………10

N.J.S.A. § 46:30B-7.1 ..................................................... 10, 13, 21, 27

N.J.S.A. § 46:30B-10 ...................................................... ... 3, 14, 21

N.J.S.A. § 46:30B-31 .................................................... 3, 10, 13, 21

N.J.S.A. § 46:30B-46 ..........................................................................9

N.J.S.A. § 46:30B-50 ................................................................ passim

N.J.S.A. § 46:30B-51 ................................................................. 11, 31

N.J.S.A. § 46:30B-52 ........................................................................11

N.J.S.A. § 46:30B-57 ................................................................... 9, 11

N.J.S.A. § 46:30B-60.1 .............................................................. 10, 11

N.J.S.A. § 46:30B-61 ........................................................................10

N.J.S.A. § 46:30B-68 ................................................................. 12, 46

N.J.S.A. § 46:30B-77 ................................................................. 11, 44

N.J.S.A. § 46:30B-79 ................................................................. 12, 46

**Codes**

Cal. Civ. Proc. Code § 1564....................................................................44

Cal. Civ. Proc. Code § 1562....................................................................46

**Rules**

Fed. R. App. P. 4.................................................................................7

Fed. R. Civ. P. 12 ......................................................................... 15, 17

Fed. R. Civ. P. 8 ...............................................................................36

This Court has recognized that state escheat laws are vulnerable to "being exploited to raise revenue rather than to safeguard abandoned property for the benefit of its owners." *Marathon Petroleum Corp. v. Sec'y of Fin. for Del.*, 876 F.3d 481, 488 (3d Cir. 2017) (cleaned up). Justices of the Supreme Court have echoed that concern, observing that the "trend—combining shortened escheat periods with minimal notification procedures—raises important due process concerns" about states' "constitutional obligation to provide adequate notice before escheating private property." *Taylor v. Yee*, 136 S. Ct. 929, 930 (2016) (Alito, J., joined by Thomas, J., concurring in denial of certiorari).

This case presents that constitutional concern in its starkest form. The New Jersey Unclaimed Property Act's ("NJUPA") sole individualized pre-escheatment notice mechanism requires holders—the private companies compelled to escheat the property—to send written notice to the owners "by certified mail." N.J.S.A. § 46:30B-50. But the United States Postal Service does not deliver certified mail internationally. *See* Appx125, Amended Complaint ("AC") ¶¶ 61–63. For any owner whose last known address lies outside the United States—including Plaintiff Jaime Vial, a Chilean citizen—the statute's only form of pre-escheat notice is a dead letter. Appx125, AC ¶ 63. The Supreme Court has made clear that a government cannot satisfy its constitutional notice obligation by using a method it knows will

fail: "If the Commissioner prepared a stack of letters to mail to delinquent taxpayers, handed them to the postman, and then watched as the departing postman accidentally dropped the letters down a storm drain, one would certainly expect the Commissioner's office to prepare a new stack of letters and send them again." *Jones v. Flowers*, 547 U.S. 220, 229 (2006); *see also id.* at 232 (holding that following a process the government knows will not result in actual notice does not "relieve[] the State of its constitutional obligation to provide adequate notice"). New Jersey does not prepare a new stack. It simply takes the property—and currently holds over $6 billion in purportedly "unclaimed" property. Appx110, AC ¶ 6.

Vial brought this putative class action to challenge that structural deficiency—both as applied to him, and on its face with respect to all foreign property owners who are categorically denied any constitutionally adequate pre-seizure notice under the NJUPA. Appx138, AC ¶¶ 127–28. Vial's family has already felt the consequences. Rene Correa Borquez, a Chilean lawyer and investor, had financial services accounts associated with his Chilean address and owned 905 shares of Exxon Corporation stock. Appx130–31 AC ¶¶ 85–92. He and his heirs had no connection to New Jersey and no reason to know the State had seized their property—because the NJUPA's sole notice mechanism was structurally incapable of informing them. Appx130–31, AC ¶¶ 87–92. After Borquez's death, the NJUPA Administrator escheated and liquidated those shares without providing any notice to

2

anyone—before or after the seizure. Appx131, AC ¶¶ 91. The family learned of the taking through a finder or locator and only after years of independent effort. AC Appx131–32, ¶¶ 93–94. When Vial eventually filed a claim, the State returned $487,581.23—the liquidation proceeds—while the shares, had they never been seized, would have been worth approximately $623,936. Appx132, AC ¶¶ 94, 97. The shortfall exceeds $136,000. Appx143, AC ¶ 157 & n.14.

The district court acknowledged what it called a "classic pocketbook injury": Defendants "escheated Borquez's Exxon stock without proper notice and undercompensated him for that action." Appx052, Court's January 12, 2026 Opinion ("Op.") at 14. Nevertheless, the court dismissed the case in full—holding that Vial lacks Article III standing to seek any prospective relief and that the Eleventh Amendment bars his remaining claims. Appx054–66, Op. at 16–28. Both holdings are wrong.

On standing, the district court characterized Vial's risk of future no-notice escheatment as resting on a "highly attenuated chain of possibilities." Appx055, Op. at 17. But there is no chain of contingencies here. Vial currently owns shares of Exxon Mobil—a New Jersey corporation—through a New Jersey–incorporated broker, whose address on file for Vial is in Chile. Appx133, AC ¶¶ 102–104. If all parties simply comply with the statute as written, Vial's property will be escheated without notice. *See* N.J.S.A. §§ 46:30B-10(e), 46:30B-31, 46:30B-50; Appx133–34,

3

AC ¶¶ 104–107. In other words, the same statutory scheme that already seized his family's stock applies with identical force to his current holdings for exactly the same reason. Appx114, 133–34, AC ¶¶ 20, 102–112.

The district court compounded this error by rejecting Vial's cognizable present injuries. The NJUPA forces Vial to alter his practices to mitigate the risk of future injury—a burden the Supreme Court and this Court have recognized as a cognizable present injury. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 154–55 (2010); *Pic-A-State Pa., Inc. v. Reno*, 76 F.3d 1294, 1300 (3d Cir. 1996) (plaintiffs had standing where law created need to change "business practices"). The Ninth Circuit has squarely applied this principle in the unclaimed-property context, holding that owners "having to constantly monitor their property to avoid escheat" is its own injury sufficient for standing. *Taylor v. Westly*, 488 F.3d 1197, 1199–1200 (9th Cir. 2007) ("*Taylor II*"). And the court's dismissal of Vial's equitable accounting request as a "fishing expedition," Appx054, Op. at 16 n.19, rested on circular logic: it faulted Vial for failing to identify seized property that only the State's records can reveal, when the absence of notice is itself the reason Vial cannot know what was taken. Appx132, AC ¶ 95.

On sovereign immunity, the district court acknowledged that the Unclaimed Personal Property Trust Fund holds private property in custodial trust, not state funds, Op. at 24—and then, in the same opinion, extended Eleventh Amendment

protection to those very funds. Op. at 26–27. It cannot be both. Two other federal courts within this Circuit have rejected the very arguments the district court accepted. *See Salvato v. Harris*, 2022 WL 1224962, at *4–6 (D.N.J. Apr. 26, 2022) (holding the Act's placement of funds in a separate trust account confirms the custodial nature of New Jersey's unclaimed property fund); *Vial v. Mayrack*, 2026 WL 800611, at *3–5 (D. Del. Mar. 23, 2026) (denying substantially similar motion to dismiss challenging a parallel custodial escheat scheme, finding that the plaintiff adequately alleged standing for prospective relief and declining to dismiss on Eleventh Amendment grounds). Defendants themselves have conceded that "the Act provides that title to unclaimed property does not vest in the State, but rather remains vested in the owner, with the State acting as custodian while holding his property." Appx165, State's Motion to Dismiss ("MTD") (Dkt. 49) at 5.

The Fund currently holds over $6 billion in notational accounts, Appx110, AC ¶ 6; in reality, the State freely draws upon it to pay auditor bounties and its own administrative costs, N.J.S.A. § 46:30B-74(c); Appx119–20, AC ¶ 39; and it has returned only $2.7 billion to owners since the program's inception, Appx116, AC ¶ 30. Accordingly, unless Vial's relief requires over $3.3 billion dollars, he can be "put in the same position monetarily as he would have occupied if his property had

not been taken," *United States v. Reynolds*, 397 U.S. 14, 16 (1970), without paying a penny of the State's money. Appx135-36, AC ¶¶ 116–117.

And even if the Eleventh Amendment were implicated, the *Ex parte Young* exception applies because the State's ongoing failure to provide him just compensation for property taken without notice is an "ongoing violation" of federal law. *See Maron v. Chief Fin. Officer of Fla.*, 136 F.4th 1322, 1333–34 (11th Cir. 2025) (holding that "sovereign immunity did not bar" the "takings claim because it sought not damages but prospective relief to end an ongoing violation of federal law").

The district court's order should be reversed in its entirety.

## SUBJECT MATTER & APPELLATE JURISDICTION

The district court had subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343 because Vial brought this lawsuit under 42 U.S.C.§ 1983 alleging that Defendants violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the Takings Clause of the Fifth Amendment, applied to the States through the Fourteenth Amendment.

This Court has appellate jurisdiction under 28 U.S.C. § 1291 because this appeal is from a final judgment in favor of Defendants.

The district court entered its final judgment on February 10, 2026 (Dkt. 57), Appx070, after granting Defendant's motion to dismiss, on the grounds that Vial

lacked standing for certain relief and the Eleventh Amendment barred all other relief (Dkt. 55), Appx068-69.

The Notice of Appeal was filed with the Clerk of the district court on February 10, 2026 (Dkt. 58), Appx001-038. This appeal is timely pursuant to Federal Rule of Appellate Procedure 4(a)(1)(A).

## STATEMENT OF THE ISSUES

1. Whether the district court erred in holding that Vial lacks Article III standing to seek prospective injunctive and declaratory relief against the NJUPA's no-notice escheatment scheme, where (a) the district court itself acknowledged that Vial suffered a "classic pocketbook injury" from Defendants' prior no-notice escheatment of his family's Exxon stock; (b) the NJUPA's sole pre-escheat notice mechanism—certified mail—is structurally incapable of reaching Vial's address in Chile; (c) the same statutory scheme that produced his prior injury applies with equal force to Vial's current Exxon Mobil holdings through his New Jersey-incorporated broker; and (d) injury will occur if all parties simply comply with the statute as written.[1]

2. Whether the district court erred in holding Vial fails to allege cognizable present injury, where (a) Vial alleges his burdens of monitoring and

---

[1] This issue was raised by Appellant in his Opposition to the Motion to Dismiss ("Opp.") (ECF No. 50), Appx234–42, Opp. at 21–29, and ruled upon by the district court in its Opinion, Appx054–58, Op. at 16–20.

"churning" his property to avoid no-notice escheatment, and (b) the statute forces Vial to choose between incurring those mitigation costs or suffering the unconstitutional seizure of his property without notice.[2]

3.      Whether the district court erred in dismissing Vial's request for an equitable accounting as a "fishing expedition" too speculative for standing purposes, where (a) the district court itself found that Vial has standing based on the prior no-notice escheatment of the Borquez Exxon stock; (b) the information necessary to identify any property that may have been seized from Borquez's multiple U.S. financial accounts is exclusively within the State's possession; and (c) Vial cannot identify the property without the very relief sought.[3]

4.      Whether the district court erred in holding that the Eleventh Amendment bars Vial's claim for relief from the Unclaimed Personal Property Trust Fund, where the district court itself recognized that the Fund holds private property in custodial trust outside the State treasury, yet extended sovereign immunity based on inapposite California-specific caselaw governing a materially different statutory scheme.[4]

---

[2] This issue was raised by Appellant, Appx240–42, Opp. at 27–29, and ruled upon by the district court, Appx058–61, Op. at 20–23.

[3] This issue was raised by Appellant, Appx224–25, 235, Opp. at 11–12, 22, and ruled upon by the district court, Appx054, Op. at 16 n.19.

[4] This issue was raised by Appellant, Appx224–32, Opp. at 11–19, and ruled upon by the district court, Appx061-66, Op. at 23–28.

5.      Whether the district court erred in holding that the *Ex parte Young* exception to the Eleventh Amendment does not permit Vial's claims for prospective relief, where the State's ongoing failure to provide just compensation for property taken without notice constitutes an ongoing violation of the Constitution.[5]

## RELATED CASES AND PROCEEDINGS

This case has never been before this Court previously. Plaintiff-Appellant is currently pursuing similar claims against officers representing the State of Delaware in the District Court for the District of Delaware. Those defendants raised arguments that were substantially similar to the issues here in their motion to dismiss, which the Delaware District Court denied. *Mayrack*, 2026 WL 800611, at *4.

## STATEMENT OF THE CASE

### A.      Statutory Framework

The New Jersey Unclaimed Property Act ("NJUPA" or the "Act"), N.J.S.A. § 46:30B-1 et seq., requires every business doing business in New Jersey ("holders")—including banks with safety deposit boxes and companies that issue shares (even those held in a retirement account)—to deliver property to the State once that property is deemed "abandoned." *See* N.J.S.A. §§ 46:30B-46, 46:30B-57, 6:30B-6(g). New Jersey uses a short, three-year "dormancy" period to determine whether most types of property may be deemed dormant and, therefore,

---

[5] This issue was raised by Appellant, Appx232-34, Opp. at 19–21, and ruled upon by the district court, Appx064, Op. at 26 n.33.

"abandoned." N.J.S.A. § 46:30B-7. The same period applies to securities. *See* N.J.S.A. § 46:30B-31. Property is subject to escheat under the NJUPA if the last known address "of the apparent owner is in a foreign nation and the holder is a domiciliary" of New Jersey. N.J.S.A. § 46:30B-10(e).

As is relevant here, stocks are deemed "abandoned" if the owner goes three years without interacting with the holder or the account in such a way that the NJUPA specifies. *See* N.J.S.A §§ 46:30B-7, 46:30B-7.1. As a result, if a stockowner goes three years without making a written communication concerning the property or account, or an oral communication contemporaneously recorded concerning the property or account, or a presentment of an instrument of payment, or other activity in the account (such as a deposit or withdrawal), N.J.S.A. § 46:30B-7.1, or if dividends are automatically reinvested, three years after the second statement or other account notification is returned as undeliverable or after the holder discontinued mailings, N.J.S.A. § 46:30B-31, the NJUPA requires his broker to remit all of the owner's stocks to the state, N.J.S.A. § 46:30B-57. Thus an investor pursuing a buy-and-hold strategy—one of the most common investment approaches—triggers the dormancy presumption simply by doing nothing other than owning his property for three years. Appx142–45, AC ¶¶ 34–37. The holder is immunized for escheating the property. *See* N.J.S.A. §§ 46:30B-60.1–61.

The Act's sole individualized pre-escheatment notice mechanism requires the

10

holder to send "by certified mail, and with return receipt requested, written notice to the apparent owner at the last known address." N.J.S.A. § 46:30B-50. The statute makes no exception for foreign addresses. *Id.* This matters because the United States Postal Service does not deliver certified mail internationally. Appx125, AC ¶¶ 61–63. For an owner whose last known address is outside the United States, the statute's sole individualized notice mechanism is a dead letter. Appx125, AC ¶ 63. Post-escheatment notice consists of publication only in local New Jersey newspapers and listing on an online database, replete with issues. N.J.S.A. §§ 46:30B-51, -52; Appx125–130, AC ¶¶ 64–82.

Abandoned property is then seized by the Administration under the supervision of the Administrator, *see* N.J.S.A. §§ 46:30B-57; 46:30B-60.1, who acts as property custodian, *see generally* N.J.S.A. § 46:30B-74 (requiring the establishment of trust funds to pay claims and expenses of trust administration). The NJUPA establishes a custodial escheatment regime under which property presumed abandoned is reported by "holders"—typically financial institutions—remitted to the State, and held in trust for the benefit of the true owner. N.J.S.A. § 46:30B-77; Appx120, AC ¶¶ 42–43. Title does not vest in the State but remains in the owner, with the State acting as custodian—owners may claim their property "at any time in perpetuity." *Clymer v. Summit Bancorp, Inc.*, 171 N.J. 57, 63 (N.J. 2002); *see also* N.J.S.A. § 46:30B-77.

Unless the Administrator decides otherwise, seventy-five percent of all funds received into the Unclaimed Personal Property Trust Fund are transferred to the General State Fund (used for public purposes), while the remaining twenty-five percent is retained to pay claims and administration costs. N.J.S.A. § 46:30B-74(c). The State currently has over $6 billion in "unclaimed" property. Appx110, AC ¶ 6.

Upon a valid claim for liquidated stock, the NJUPA provides the claimant: (1) the net proceeds of sale; (2) dividends, interest, or other increments realized or accruing on the property at or before liquidation; and (3) interest at a rate fixed by the Administrator. N.J.S.A. §§ 46:30B-79, -68. Critically, the statute does not provide the appreciated value of the stock—that is, what the shares would have been worth had they not been seized and prematurely liquidated without notice. AC ¶ 48. Nor does it compensate owners for their rights of ownership that are lost upon the escheatment, such as the right to vote shares in matters of corporate governance. Appx122, AC ¶ 49.

### B. Factual Background

Rene Correa Borquez was a Chilean lawyer and investor who had financial services accounts associated with his Chilean address and owned 905 shares of Exxon Corporation stock. Appx130–31, AC ¶¶ 85, 92. He died testate in Chile in 2006, leaving his estate to his brother, who in turn died in 2007. Appx131, AC ¶¶ 86–88. All heirs, including Mr. Vial, reside in Chile; none has ever resided in New

Jersey. *Id.*

After Borquez's death, the NJUPA Administrator escheated and liquidated his heirs' 905 shares of Exxon stock without providing any notice to the Borquez family—before or after the seizure. Appx131, AC ¶¶ 89–92. Vial—empowered by all Borquez heirs under Chilean law—learned of the escheatment only after years of effort to locate Borquez's assets. AC ¶¶ Appx131–32, 93–94. Vial filed a claim with the Administrator and, on November 8, 2023, received $487,581.23. Appx132, 143, AC ¶¶ 94, 156. Had the shares not been seized and liquidated, they would have been worth approximately $623,936 at the time this lawsuit was filed—a shortfall of $136,354.77. Appx132, AC ¶ 97; *see also* Appx144, AC ¶ 157 & n.14.

Vial remains at risk today. "For example, in an attempt to begin repurchasing some of the property New Jersey seized, Plaintiff has purchased (and currently owns) shares of Exxon Mobil via Tradeup Securities (which is a New Jersey corporation)." Appx133, AC ¶ 102. As a Chilean national whose address is beyond the reach of certified mail, Vial faces the NJUPA's structural deficiency: NJUPA's notice provisions will not provide him with constitutionally adequate notice before any future seizure. Appx133–35, AC ¶¶ 104–112. Vial intends to pursue a buy-and-hold strategy for those shares, doing nothing with them while they appreciate for years to come. Appx133, AC ¶ 104. Under the NJUPA, that inactivity will trigger the three-year dormancy presumption, N.J.S.A. §§ 46:30B-7.1, 46:30B-31, and

because the address "of the apparent owner is in a foreign nation and the holder is a domiciliary" of New Jersey, NJUPA will require TradeUp to escheat the property, N.J.S.A. § 46:30B-10(e).

Moreover, the full scope of the State's seizures remains unknown. Borquez was a Chilean lawyer with many significant investments, including various stocks in financial services accounts across the United States. Appx130–31, AC ¶ 85. Additional property may have been seized by Defendants, but Vial would require an accounting from the State's records whether New Jersey holds property belonging to his family. Appx132, AC ¶ 95.

## C. Procedural History

Vial filed this putative class action on December 19, 2024, asserting claims under 42 U.S.C. § 1983 for violations of the Fourteenth Amendment Due Process Clause and the Fifth Amendment Takings Clause against the New Jersey State Treasurer and the NJUPA Administrator in their official capacities. Appx001–107, ECF 1. The proposed Class consists of "all persons and entities owning purportedly 'abandoned' property transferred to Defendants under color of the NJUPA within the applicable statute of limitations who were denied constitutionally adequate pre-seizure notice under the NJUPA because they resided outside of the United States." Appx138, AC ¶ 127.

Vial filed an Amended Complaint on May 5, 2025, (ECF 45), pursuing the

same claims on revised allegations and seeking the following revised relief: (1) a declaration that Defendants' administration of the NJUPA violates the Due Process Clause and Takings Clause; (2) an injunction requiring Defendants to provide constitutionally adequate notice to foreign property owners before seizing their property; (3) an equitable accounting to identify properties seized without adequate notice; and (4) the return of property or to be put in the same position monetarily as he would have occupied but for the no-notice escheat. AC, Prayer for Relief ¶¶ A–F. Defendants moved to dismiss under Rules 12(b)(1) and 12(b)(6). Dkt. 49.

On January 12, 2026, the district court issued an opinion granting the motion, Appx039–67, ECF 54, and then dismissed the Amended Complaint without prejudice, Appx068–69, ECF 55. On February 9, 2026, Vial elected to stand on the Amended Complaint and requested the district court enter a final judgment to allow for appellate jurisdiction, Appx280–85, ECF 56. The court entered final judgment on February 10, Appx70, ECF 57, and plaintiff filed his notice of appeal that same day, Appx001–38, ECF 58.

## <u>SUMMARY OF THE ARGUMENT</u>

The district court dismissed this case on the theory that Vial cannot establish standing to seek prospective relief and that the Eleventh Amendment bars his remaining claims. Both holdings are wrong. This Court should reverse.

On standing, the district court characterized Vial's risk of future no-notice escheatment as resting on a "highly attenuated chain of possibilities." Appx155, Op. at 17. But there is no chain of contingencies here. The injury will occur if all parties simply comply with the statute and nothing else happens. The NJUPA only specifies one form of pre-escheat notice: holders must use certified mail. However, the U.S. Postal Service does not deliver certified mail internationally and Vial lives in Chile. If the holder does what the statute requires, Vial's property *will* be escheated without notice. That is not speculation—it is the statute operating as written.[6]

The court compounded this error by rejecting Vial's allegations of present injury from monitoring costs, holding those allegations "irreconcilable" with what would have been Vial's plan for his shares: to do nothing but "buy-and-hold." Appx059–60, Op. at 21–22. This gets the injury backwards. The risk of the no-notice escheat compels him to monitor, and that forced monitoring is the injury. As the Ninth Circuit recognized, "the injuries suffered by plaintiffs include not only those attendant to having their property escheated without notice, but also include" the "cost of having to constantly monitor their property to avoid escheat," including by "'churning' their property so that it stays active and avoids escheat." *Taylor II,* 488 F.3d at 1199–1200. Being forced to choose between monitoring costs and

---

[6] *Cf. Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950) (Due Process requires pre-deprivation "notice reasonably calculated, under all the circumstances, to apprise interested parties").

unconstitutional seizure is itself a concrete, present harm. *See Monsanto*, 561 U.S. at 154–55. Additionally, the court erred in dismissing Vial's accounting request as a "fishing expedition."

On sovereign immunity, the court held that because Vial already received the liquidation proceeds, his claim for the appreciated value of the stock is "indistinguishable in effect from claims for money damages." Appx134–35, Op. at 26–27. But this ignores that the sums sought would not come from the State's treasury or State funds altogether, but private funds for which the State is merely the custodian. The district court acknowledged as much, but then incorrectly applied California-specific caselaw to hold the Eleventh Amendment protects these admittedly private funds anyways. Finally, even if the funds were somehow considered the State's fisc, the relief sought fits within the *Ex Parte Young* exception because it prospectively seeks to end the "ongoing violation" of the State not providing just compensation for the taking, as the Eleventh Circuit held in *Maron*, 136 F.4th at 1333.

The district court's order should be reversed in its entirety.

## **STANDARD OF REVIEW**

"A motion to dismiss for want of standing" is "properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter." *Const. Party of Pennsylvania v. Aichele*, 757 F.3d 347, 357 (3d Cir. 2014). The "Eleventh

Amendment is a jurisdictional bar which deprives federal courts of subject matter jurisdiction," so its application is also reviewed as a 12(b)(1) motion. *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 694 n.2 (3d Cir. 1996).

"Questions of subject matter jurisdiction raised on a motion to dismiss under Rule 12(b)(1)" are "reviewed de novo." *Free Speech Coal., Inc. v. Att'y Gen. of U.S.*, 677 F.3d 519, 530 (3d Cir. 2012). On a facial challenge to jurisdiction (as here),[7] courts must "apply the same standard of review it would use in considering a motion to dismiss under Rule 12(b)(6)," *Aichele*, 757 F.3d at 358–59 (cleaned up). "Consequently, [courts must] accept the Plaintiffs' well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the Plaintiffs' favor." *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 633 (3d Cir. 2017).

**ARGUMENT**

The district court acknowledged that Vial suffered a "classic pocketbook injury" when Defendants "escheated Borquez's Exxon stock without proper notice and undercompensated him for that action." Appx122, Op. at 14 (quoting *Tyler v. Hennepin County*, 598 U.S. 631, 636 (2023)). Indeed, Vial and his family have lost over a hundred thousand dollars from New Jersey's no-notice escheatment of his

---

[7] *Cf. Askew v. Church of the Lord Jesus Christ*, 684 F.3d 413, 417 (3d Cir.2012) ("As the defendants had not answered and the parties had not engaged in discovery, the first motion to dismiss was facial.").

family's stocks. Appx144, AC ¶ 157 & n.14. And, as explained in the amended complaint, Vial "continues to suffer ongoing injury from the NJUPA" because "he has additional property that is likely to be escheated without notice" and "he must make efforts to prevent that, which is its own injury." Appx132, AC ¶ 101; *see also* Appx133–135, AC ¶¶ 97, 102–112.

Notwithstanding these past, present, and future injuries, the district court dismissed Vial's complaint in full, denying him all relief. The district court held that (I) Vial lacked standing to pursue prospective relief notwithstanding (A) his extremely likely future injuries; (B) his present injuries; and (C) his need for an accounting. And it held (II) the Eleventh Amendment barred his being made whole notwithstanding that (A) the funds sought are neither from the State's treasury nor the State's funds altogether and (B) the *Ex Parte Young* exception applies to prevent the "ongoing violation." As explained below, both holdings are erroneous and must be reversed.

## I. THE DISTRICT COURT ERRED IN HOLDING THAT VIAL LACKS STANDING TO SEEK PROSPECTIVE RELIEF

### A. Vial Faces a Substantial Likelihood of Future Injury if All Parties Simply Proceed as the Law Requires

Article III standing requires a plaintiff to show "that she has suffered, or will suffer, an injury that is concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Murthy v.*

*Missouri*, 603 U.S. 43, 57 (2024) (cleaned up). "[A]llegations of future injury 'suffice if the threatened injury is certainly impending or there is a substantial risk that the harm will occur.'" *Clemens v. ExecuPharm Inc.*, 48 F.4th 146, 152–53 (3d Cir. 2022) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). "A substantial risk means a 'realistic danger of sustaining a direct injury.'" *Id.* (quoting *Pennell v. City of San Jose*, 485 U.S. 1, 8 (1988)).

Critically, Article III standing does **not** "require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013). For example, in *Pennell*, the Supreme Court found that landlords had standing to enjoin a city ordinance that would prohibit rent increases found to cause an "unreasonably severe financial or economic hardship" on tenants—even though the landlords had not shown several future events: (1) that they intended to raise their rents to the point of causing unreasonably severe hardship; (2) that the tenants would challenge those increases; or (3) that the city's officials would find against the landlords. *Pennell,* 485 U.S. at 6. The Supreme Court nevertheless held that the *Pennell* plaintiffs demonstrated a "realistic danger of sustaining a direct injury as a result of the statute's operation," which was sufficient for Article III standing. *Id.* at 8.

Here, the risk of a no-notice escheatment occurring to Vial is much more than "substantial" and "realistic"—it is structurally built into the statute's text such that

no-notice escheatment *will* occur if all parties simply proceeded as the law requires. In "an attempt to begin repurchasing some of the property New Jersey seized, Vial has purchased (and currently owns) shares of Exxon Mobil via Tradeup Securities (which is a New Jersey corporation)." Appx133, AC ¶ 102. Property is subject to escheat under the NJUPA if "the holder is a domiciliary" of New Jersey and the last known address "of the apparent owner is in a foreign nation and the holder is a domiciliary" of New Jersey. N.J.S.A. § 46:30B-10(e); AC ¶ 104. "Plaintiff's address on file with Tradeup, the relevant holder here, would be in Chile," Appx133, AC ¶ 104. Thus, NJUPA will require TradeUp (a New Jersey domiciliary) to escheat the property. Appx133, AC ¶ 104.

Under the NJUPA, stocks are deemed abandoned if a stockowner goes three years without performing specific actions vis-à-vis his stocks and the holder, such as making a written communication concerning the property or account, or an oral communication contemporaneously recorded concerning the property or account, or a presentment of an instrument of payment, or other activity in the account like automatic dividend reinvestment. *See* N.J.S.A. §§ 46:30B-7.1, 46:30B-31. Vial "intends to pursue a buy-and-hold strategy for those shares, doing nothing with them while they appreciate for years to come." Appx133, AC ¶ 104. As a result, Vial owns "additional property vulnerable to seizure and taking under the NJUPA." Appx133, AC ¶ 102.

And because he lives in Chile, it is impossible for the sole form of notice that NJUPA requires—certified mail from the holder—to reach him. The NJUPA provides for pre-escheat notice to be given in only one form: the holder must send a letter by certified mail to the owner. N.J.S.A. § 46:30B-50. However, the United States Postal Service only offers the Certified Mail within the United States (apart from service to U.S. military and diplomatic installations). *See* Appx112–13, AC ¶ 16 & n.5. Thus, ***<u>it is not even possible</u>*** for the Act's sole mandated form of pre-escheat notice to actually provide notice to individuals like Vial and the proposed Class members, who have addresses located outside of the United States. *See also* Appx124–25, AC ¶¶ 58–63.

Nevertheless, the State will simply take the property in question without any pre-escheat notice in direct contravention of the Supreme Court's command that notice be "reasonably calculated, under all the circumstances, to apprise interested parties" before they are deprived of property. *Mullane*, 339 U.S. at 314. Indeed, following a process the government knows will not result in actual notice, does not "relieve[] the State of its constitutional obligation to provide adequate notice." *Flowers,* 547 U.S. at 232; *see id.* at 229 ("If the Commissioner prepared a stack of letters to mail to delinquent taxpayers, handed them to the postman, and then watched as the departing postman accidentally dropped the letters down a storm

drain, one would certainly expect the Commissioner's office to prepare a new stack of letters and send them again.").

This demonstrates a sufficient likelihood of two forms of future harm. First, "the denial of a constitutional right"—here, the seizure of property without pre-deprivation notice reasonably calculated to reach owners—"constitutes irreparable harm," *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987). No post-deprivation process nor even a "damage award can undo the fact that the arbitrary taking that was subject to the right of procedural due process has already occurred." *Fuentes v. Shevin*, 407 U.S. 67, 82 (1972). Second, "[w]hen [the government] takes custody of property pursuant to the [unclaimed property law], even temporarily, certain rights associated with ownership are lost which are not compensable in money damages." *Taylor v. Chiang*, 2007 WL 1628050, at *2 (E.D. Cal. June 1, 2007). For example, "the owner is deprived of the right to vote his or her shares in important matters of corporate governance." *Id.*

This is the same course of events that previously injured plaintiff: "Plaintiff is a citizen and resident of Chile who received no notice at all before his (and his family's) Exxon Mobil shares were seized and taken by Defendants under the NJUPA." Appx112, AC ¶ 13. When, as here, a plaintiff previously suffered the alleged injury, past wrongs are "evidence bearing on whether there is a real and immediate threat of repeated injury," *City of Los Angeles v. Lyons*, 461 U.S. 95, 102

(1983). Where "the threatened acts that will cause injury are authorized or part of a policy," as is the case here, "it is significantly more likely that the injury will occur again." *31 Foster Child. v. Bush*, 329 F.3d 1255, 1266 (11th Cir. 2003).

The Ninth Circuit previously held that the plaintiffs challenging California' unclaimed property law had standing for prospective relief under these circumstances: "plaintiffs' securities have been lost to escheat, thus establishing concrete injury" and "[t]he likelihood of recurrence is also established because the 'wrong' plaintiffs seek to enjoin is the escheating of property without written notice calculated to be received by the owner, and the State of California has a written policy of doing just that." *Taylor II*, 488 F.3d at 1200. The District Court of Delaware recently held that allegations similar to the ones at bar were sufficient "as to the likelihood of future injury" because they showed a "realistic danger of sustaining a direct injury as a result of the statute's operation." *Mayrack*, 2026 WL 800611 at **2–3.

The district court downplayed the likelihood of future injury by (1) baselessly isolating Vial's prior injury from his risk of future injury and (2) construing the statute operating as written as a "highly attenuated course of events." Appx055, Op. at 17. Both reasons fail upon examination.

First, the district court attempted to distinguish *Taylor II* on the grounds that

24

the "risk of repeated injury" standard does not apply here. [8] Appx060, Op. at 22 & n.30. This is so, according to the district court, because "Plaintiff pleads no facts to indicate that there is a 'sufficient likelihood' that any of the ***Borquez's*** property will be escheated 'in a similar way,'" Appx053–54, Op. at 15–16 (emphases added). Throughout its opinion, the district court drew an artificial distinction between Plaintiff's prior injury as a member of the Borquez family (which the court incorrectly assumes exclusively resulted in his representative capacity) and his risk of future injury (which is raised in his personal capacity). However, the court's hermetically sealed isolation of the two injuries is factually and legally untenable.

The Amended Complaint makes clear that Vial is not a stranger to the escheatment that happened to his family—he, himself, was injured by it. The Amended Complaint pleads that "Plaintiff is a citizen and resident of Chile who received no notice at all before **his** (and his family's) **Exxon Mobil shares were seized** and taken by Defendants under the NJUPA." Appx112, AC ¶ 13 (emphasis added). "Plaintiff has not only lost over a hundred thousand dollars from New Jersey's no notice escheatment of his family's stocks, but he remains at risk of other

---

[8] The district court, in a footnote, also implied that *Clapper* had perhaps changed the *Lyons* standard on which *Taylor II* had relied. But this Court still cites *Lyons* routinely. *See, e.g., Rd.-Con, Inc. v. City of Philadelphia*, 120 F.4th 346, 354 (3d Cir. 2024) (holding Plaintiffs had standing for prospective relief for prior injury likely to recur). And this Court deems it relevant when "plaintiffs are not complaining solely of future injuries," *In re Horizon Healthcare Servs.*, 846 F.3d at 640 n.20.

of his securities being escheated without notice under the NJUPA." Appx114, AC ¶ 20. At the risk of stating the obvious: Vial was personally harmed when his family was harmed and he owns property today subject to the same injury under the same policy. He is the same person, with the same property exposure, facing the same constitutionally deficient notice scheme. The wall drawn by the district court obfuscates and ignores that continuity.

Moreover, the district court cites no authority for the proposition that Vial's past injury (to him and his family) and his future injury (to him alone) must be considered in isolation from one another. Rather, Vial's "standing to seek the injunction requested depended on whether he was likely to suffer future injury," and "[p]ast wrong[s] were evidence bearing" on that question. *Lyons*, 461 U.S. at 102, 105. It is illogical to conclude that, because Vial was first injured by Defendants' no-notice escheatment as a member of his family, his past injury is not probative evidence of whether he is likely at risk of that injury as an individual. Rather, the same policy remains operative and continues to expose Vial's remaining stock for the same reasons.

Second, the district court held that Vial's risk of future harm is not sufficient to confer standing because it purportedly depends upon a "highly attenuated chain of possibilities," Appx055, Op. at 17. Upon examination, the district court's "highly attenuated chain of possibilities" only appears "highly attenuated" because it failed

to accept as true Vial's well-pleaded factual allegations and blatantly re-wrote an unambiguous requirement in the NJUPA. Both constitute reversible error.

The district court first found: "[f]or Plaintiff's predicted escheatment to occur, Plaintiff would" have to "avoid contact with TradeUp for multiple years," Appx57, Op. at 19. However, the Amended Complaint—which the district court must accept "as true and draw all reasonable inferences" in Vial's favor, *In re Horizon Healthcare Servs.*, 846 F.3d at 633—alleges that he plans to pursue a buy-and-hold approach in which he does nothing with TradeUp or his shares. Appx134, AC ¶¶ 106–107. There are zero allegations that Vial will contact TradeUp in one of the specific forms that Section 46:30B-7.1 requires to prevent escheatment. In fact, even if the inferences were somehow construed *against* the plaintiff, it is not a reasonable inference that Vial would have "contact" with TradeUp in one of those very specific ways.

The district court next found that Vial "would have to affirmatively ignore all statutorily required notice from TradeUp," Appx057, Op. at 19. But this argument assumes away the central flaw of the NJUPA: Vial—as an overseas owner—will certainly **not** receive notice if TradeUp provides the notice that NJUPA requires. As explained above, the only pre-escheat notice is requiring holders to send notice via certified mail, which categorically does not exist for overseas owners. *See* N.J.S.A. § 46:30B-50; Appx125, AC ¶¶ 61–63.

The district court attempts to brush off this structural problem in a footnote by dismissing it as "Plaintiff's interpretation" and claims to use the canon of constitutional avoidance to effectively re-write the statute. Appx057, Op. at 19, n.24. "But that canon of construction applies only when ambiguity exists." *Iancu v. Brunetti*, 588 U.S. 388, 397 (2019). No court can "rewrite a law to conform it to constitutional requirements." *Id.* So even assuming the district court's "reading would eliminate [constitutional] problems, [it] may adopt it only if [it] can see it in the statutory language." *Id.* And here, the statutory language is unequivocal: it specifies that the holder "**shall send by certified mail**, and with return receipt requested, written notice to the apparent owner at the last known address," N.J.S.A. § 46:30B-50 (emphasis added). As written, the statute requires a very specific method of service that will not provide notice to plaintiff or similarly situated property owners. That is not one "interpretation" of many—it is the statute operating as unambiguously written.

Relatedly, the district court found that it was "speculative" that TradeUp "will not provide pre-escheatment notice" and cited *Clapper* for the proposition that "Plaintiffs cannot rely on speculation about the 'unfettered choices made by independent actors not before the courts.'" Appx158, Op. at 20 (quoting *Clapper*, 568 U.S. at 414 n.5). *Clapper* found it too speculative that a government department would decide to seek permission of "the Foreign Intelligence Surveillance Court" to

28

access their private communications, something the challenged law did not require said department to do. *Id.* at 413. But no such "unfettered" choices are at issue here: NJUPA *requires* holders to use a form of notice that cannot reach Vial.

Indeed, the injury *will* occur if the holder does exactly *as the Statute requires*. It is the *district court* that impermissibly speculates that TradeUp will provide notice to Vial in a manner other than what the NJUPA commands—even though the NJUPA does not provide any choice or discretion to the holder regarding that method. The district court has no basis for this assumption—and it is particularly inappropriate for the district court to make this unfounded assumption in this procedural posture where the district court must "accept the Plaintiffs' well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the Plaintiffs' favor." *In re Horizon Healthcare Servs.*, 846 F.3d at 633.

The district court next found that the "predicted course of conduct is particularly implausible given Plaintiff's assertion" that "he is 'constantly monitor[ing]' his property out of fear of future escheatment." Appx058, Op. at 20. In support, the district court cites *Peters v. Cohen*, 2025 WL 733237 (9th Cir. Mar. 7, 2025). But the *Peters* court questioned the likelihood that California would seize shares of stock in a ***German*** brokerage account. *Peters*, 2025 WL 733237, at *1. By contrast, TradeUp is a *New Jersey* corporation on which the NJUPA unquestionably imposes escheatment obligations, Appx133, AC ¶ 102.

In any case, this argument—leveraging a plaintiff's supposed enhanced ability to prevent another escheatment to defeat standing—was rejected by the Ninth Circuit. "Although plaintiffs' newly acquired knowledge of the law—**and their ability to monitor their property**—can perhaps reduce the likelihood of again having their property escheated without notice, it does not make this likelihood 'remote.'" *Taylor II*, 488 F.3d at 1200 (emphasis added). Notably, this holding stems from the same case in which—as here—the plaintiffs had standing because they alleged "the injuries attendant to having to continually monitor one's property will recur as long as California's system remains in place." *Id.* Thus the two theories of harm (present monitoring and future risk) do not negate one another.

The district court also held that for injury to occur, "the Administrator's *post-escheatment* publication efforts would have to fail to reach plaintiff" and "Plaintiff would have to fail to prevent the liquidation by submitting a claim for the return of his stock" prior to liquidation. Appx057, Op at 19 (emphasis added). Those assertions are irrelevant to standing. The injurious violation is "complete at the time of the taking," such that a property owner may bring a claim at that time before submitting a claim. *See Knick v. Twp. of Scott, Pennsylvania*, 588 U.S. 180, 202 (2019). The Ninth and the Tenth Circuit have applied *Knick* to hold that "a property owner has no obligation to seek a remedy through state administrative proceedings"

to have standing to sue in federal court. *Knellinger v. Young*, 134 F.4th 1034, 1044–45 (10th Cir. 2025); *accord Garza v. Woods*, 150 F.4th 1118, 1125 (9th Cir. 2025).

Moreover, as discussed above, the deprivation of property without notice itself constitutes harm that post-deprivation process cannot undo. *See* Section I.A, *supra*. When the government takes custody of property "even temporarily, certain rights associated with ownership are lost." *Taylor v. Chiang*, 2007 WL 1628050, at *2 (E.D. Cal. June 1, 2007). Accordingly, it is of no moment that Vial could theoretically receive post-taking notice and act upon it.

In any case—contrary to the district court's predictions—it is also extremely likely that the "post-escheatment efforts *would* . . . fail to reach plaintiff," Appx057, Op. at 19 (emphasis added), and similarly situated individuals. Other than a website riddled with problems, Appx125–30, AC ¶ 64–83, and not known to people all over the world, the only form of post-escheat notice issued by the state is publication notice exclusively within a newspaper within the state of New Jersey—regardless of where the out-of-state owner resides. *See* N.J.S.A. § 46:30B-51.

### B. Vial Is Suffering Cognizable Present Injury Because the NJUPA Compels Him to Act to Avoid Injury

Even setting aside the near-certainty of future no-notice escheatment explained above, Vial has Article III standing based on injuries he suffers *today*. The Supreme Court has recognized that "in some instances, we have found standing based on a 'substantial risk' that the harm will occur, which may prompt plaintiffs

to reasonably incur costs to mitigate or avoid that harm." *Clapper*, 568 U.S. at 414 n.5. Indeed, burdens incurred to "minimize the likelihood of potential harm" are "sufficiently concrete to satisfy the injury-in-fact prong" of Article III—even if the underlying harm never materializes. *Monsanto*, 561 U.S. at 154–55.

In *Monsanto*, a group of conventional alfalfa growers sought injunctive relief against an agency decision to deregulate genetically engineered alfalfa. 561 U.S. at 152. They claimed that deregulation would harm them because their neighbors *might* plant the genetically engineered seed, the bees *might* obtain pollen from the neighbors' plants, and then the bees *might* (harmfully) contaminate their own conventional alfalfa with the genetically modified gene. *Id.* Without expressing views about the probability of that future contamination harm coming to pass, the Supreme Court found standing because the plaintiffs would suffer ***present*** harm by trying to monitor or mitigate the threat. *Id.* at 154–55. The plaintiffs "would have to conduct testing to find out whether and to what extent their crops have been contaminated" and take other "measures to minimize the likelihood of potential contamination." *Id.* The Court held: "Such harms, which respondents ***will suffer even if their crops are not actually infected*** with the Roundup Ready gene, are sufficiently concrete to satisfy the injury-in-fact prong of the constitutional standing analysis." *Id.* at 155 (emphasis added).

Indeed, in the unclaimed property context, the Ninth Circuit held that: "the injuries suffered by plaintiffs include not only those attendant to having their property escheated without notice, but also include" the "cost of having to constantly monitor their property to avoid escheat, either by devoting significant time to searching the internet themselves, by paying a service to do the same, or by 'churning' their property so that it stays active and avoids escheat." *Taylor II*, 488 F.3d at 1199–1200. That court held that these injuries were presently existing as long as the statute existed: "it is obvious that, at the very least, the injuries attendant to having to continually monitor one's property will recur as long as California's system remains in place." *Id.* at 1200.

Vial's present injuries fall squarely within this framework. The fact that Vial is compelled to monitor or churn his property to *prevent* escheatment demonstrates *current harm*. The NJUPA's structurally deficient notice regime forces Vial into an impossible choice: either (a) incur the burdens of monitoring and "churning" his property to avoid escheatment, or (b) suffer the unconstitutional seizure of his property without notice. Appx 132–35, AC ¶¶ 101, 104–112. Either path produces concrete harm traceable to the NJUPA's operation.

The district court rejected this cognizable present harm on the grounds that (1) the allegations were "insufficiently concrete," (2) they were "irreconcilable" with his allegations of future injury. Again, neither reason withstands scrutiny.

First, the district court rejected Vial's present harm as "bare, conclusory allegations" that are "insufficiently concrete to confer standing." Appx059, Op. at 21. But Vial alleges that "[t]o avoid escheat, [he] would be required to churn and monitor that property (and other property) in order to ensure that the Administrator does not attempt to seize it." Appx134, AC ¶ 108. He further alleges that he "is incurring, and will continue to incur, the real and concrete cost of having to constantly monitor his property to avoid escheat, including retention of counsel in the United States." AC ¶ 111. These allegations describe concrete burdens, specifically including retention of professionals. It is unclear what further details the district court seeks.

In any case, standing does not depend on the degree of burden, but whether the burden is concrete—and here that burden is met because that the statute requires Vial to take specific actions to avoid escheat. Nothing in Article III requires a plaintiff to plead the dollar amount of monitoring costs. Rather, at the motion-to-dismiss stage, the district court should have accepted these "well-pleaded factual allegations as true" and it should have "draw[n] all reasonable inferences from those allegations in [Vial's] favor." *In re Horizon Healthcare Servs. Inc.*, 846 F.3d at 633. *Taylor II* found standing based on precisely the same level of generality—"the inherent burden of having to constantly monitor their property to avoid escheat," 488 F.3d at 1199–1200—without requiring any specific dollar figure.

34

The district court's attempts to distinguish *Taylor II* are unconvincing. First, the district court revisits its contention that the "*Taylor II* plaintiffs had already personally suffered previous escheatment for their property," but Plaintiff supposedly had not. Appx060, Op. at 22. As discussed in Section I.A., this is factually and legally mistaken. Second, the district court relies on purported distinguishing facts that the *Taylor II* decision not only did not turn on—*but did not even mention*. Appx061, Op. at 23, n.31. Indeed, the district court relied on facts buried in a brief filed in the Eastern District of California—not even before the Ninth Circuit. The cherry on top is that those facts were adduced in a *reply* brief, meaning that it's unclear whether those facts were even properly before the *district court* in *Taylor II*. *Taylor II* is persuasive and indistinguishable in all material aspects: Vial's efforts to avoid no-notice escheat constitute cognizable present harm.

The district court also invoked *Reilly v. Ceridian Corp.*, 664 F.3d 38, 46 (3d Cir. 2011), for the proposition that "costs incurred 'prophylactically' to prevent injury are insufficient to confer standing." Appx060, Op. at 22 n.29. In *Clemens*, 48 F.4th at 153, this Court clarified that *Reilly* does not establish a "bright line rule"—much less one precluding standing whenever harm has not yet materialized. In any case, in *Reilly*, this Court found no standing based on data breach because (1) there was "no evidence that the intrusion was intentional or malicious;" (2) there was no evidence "that the data has been—or will ever be—misused;" and (3) the chain of

events leading to harm was "entirely speculative"—dependent on "unknown third part[ies]" choosing to exploit the stolen data. 664 F.3d at 42–44. Here, by contrast, the risk flows not from hypothetical choices made by independent actors, but from the mandatory operation of a statute that *requires* a notice method incapable of reaching foreign addresses

The district court also held that Vial's monitoring allegations are "irreconcilable" with his stated buy-and-hold investment strategy—reasoning that Vial either monitors (making escheatment implausible) or does not (negating any present-injury claim). Appx059, Op. at 21. This gets the injury precisely backwards. As the Supreme Court's holding in *Monsanto* demonstrates: Being forced to choose between monitoring costs and the risk of future harm is itself a concrete, present harm. 561 U.S. at 154–55. Vial is forced to choose between two paths, each of which produces concrete harm: monitoring and churning (which imposes ongoing burden) or pursuing his intended hands-off buy-and-hold approach (which will result in unconstitutional seizure without notice). Appx133–35, AC ¶¶ 104–112. Federal Rule of Civil Procedure 8(d)(2) expressly permits parties to "set out 2 or more statements of a claim or defense alternatively" in this manner. The district court declined to apply this rule by reference to *Pyatkova v. Motorcars*, 2016 WL 674862, at *2 (D.N.J. Feb. 3, 2016). However, that case only stands for the proposition that courts "need not accept **factual claims** that are internally inconsistent." But there is

no internal inconsistency here—just a property owner forced to choose between present cognizable injury (in the form of a burden) or proceeding as he otherwise would have, undertaking substantial risk of future injury (in the form of no-notice escheat). These are not "internally inconsistent" factual claims; they are the two horns of a statutorily-imposed dilemma.

### C. Vial Has Standing to Seek an Accounting

In a single footnote—devoid of any substantive analysis of the equitable accounting doctrine—the district court dismissed Vial's request for an equitable accounting as a "fishing expedition" that was "too speculative for standing purposes." Appx054, Op. at 16 n.19. The court essentially faulted Vial for failing to identify specific additional property. Appx054, Op. at 16 n.19. But that is precisely the information that the accounting is designed to produce. Requiring Vial to already possess the information he seeks as a precondition to obtaining it is impossibly circular.

And it is particularly unjust given the nature of the constitutional violation alleged. Vial alleges that the State seized property without providing any notice whatsoever. Appx131, AC ¶¶ 89–90. Where the State has a constitutional duty to provide notice but systemically fails to do so, the resulting information asymmetry is not a basis for denying relief; it is the very injury that warrants an equitable

accounting. [9]

**II.     THE ELEVENTH AMENDMENT DOES NOT BAR VIAL'S REQUEST TO BE MADE WHOLE FROM NON-STATE FUNDS OUTSIDE THE STATE'S TREASURY**

After dismissing for lack of standing Vial's claims for injunctive and declaratory relief pertaining to the risks of further no-notice escheatment, the district court held that the Eleventh Amendment barred Vial's remaining injunctive and equitable relief, which it characterized as "compensation." Appx061, Op. at 23.

At the outset, the district court misstates Vial's claim. The Fifth Amendment commands that when property is appropriated by the States, "the owner is to be put in the same position monetarily as he would have occupied if his property had not been taken." *Reynolds*, 397 U.S. at 16. A claim asking the Court to "order the state to pay just compensation" is "prospective relief" where, as here the state has "failed to give them just compensation"—which itself, is an "ongoing violation" of federal law until that just compensation is paid. *Maron*, 136 F.4th at 1333.

---

[9] Although the merits of the equitable accounting are not before this Court, such relief is warranted. "The party seeking to obtain an accounting must establish: (1) a fiduciary or trust relationship; (2) the complicated nature of the character of the account; and (3) the need of discovery." *In re U.S. Mortg. Corp.*, 491 B.R. 642, 670 (Bankr. D.N.J. 2013) (citation omitted). All three elements are met here: (1) Under the NJUPA, the State acts as a custodian—indeed, a "trustee"—of escheated property; (2) given that the website is too erroneous and unreliable to even provide minimal assistance, Appx127–30, AC ¶¶ 70–83, accounting for the harm would otherwise be complicated; (3) and the information is solely in the possession of Defendants.

As is relevant to Vial, "[b]ut for New Jersey's unnoticed seizure and liquidation of those stocks, the Borquez Family would have had stocks of Exxon Mobil Corporation worth over $623,936 instead of the $487,581.23 returned." Appx132, AC ¶ 97. Indeed, the district court correctly acknowledged that Vial suffered a "classic pocketbook injury" when Defendants "escheated Borquez's Exxon stock without proper notice and undercompensated him for that action," Appx052, Op. at 14 (quoting *Tyler*, 598 U.S. at 636).

Consistent with that due process injury and the Fifth Amendment's mandate, Vial seeks "[i]njunctive and equitable relief requiring Defendants to return (rather than destroy or liquidate) the property . . . still in the State's possession, or otherwise put Plaintiff and Class Members in the same position monetarily as they would have occupied if the property had not been unconstitutionally seized and taken, including compensation for any appreciation in the value of the property since its seizure," Appx119, 145–46, AC at 37–38, Prayer for Relief D. Thus, in addition to an accounting for any of Vial's other property currently in the possession of the state,[10] Vial seeks the $136,354 difference between the amount the Defendants' administrative process provided and the amount he would have had in *but-for* world in which the Defendants did not escheat his property without notice. Appx144, AC ¶ 157 & n.14.

---

[10] *See* Section I.C. regarding equitable accounting.

Restoring Vial to the "position monetarily as he would have occupied if his property had not been taken," *Reynolds*, 397 U.S. at 16, does not run afoul of the Eleventh Amendment because (A) the funds at issue are not public funds belonging to the state, and (B) even if these funds did implicate the Eleventh Amendment, the *Ex Parte Young* exception applies.

**A.** **The District Court Correctly Held That the Funds at Issue Are Not State Funds But Then Erroneously Held That the Eleventh Amendment Protects Them Anyways Based on California-Specific Caselaw**

The Eleventh Amendment's core concern is to prevent "federal-court judgments that must be paid ***out of a State's treasury***." *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 48 (1994) (emphasis added). Here, Vial seeks to be made whole from funds outside the State's treasury, which are not even the State's funds altogether.

The NJUPA specifies that all "moneys received as unclaimed property presumed abandoned, the accretions thereon, and the proceeds of sale of unclaimed property shall be deposited into the Unclaimed Personal Property Trust Fund." N.J.S.A. § 46:30B-74(c). Some of these funds are transferred to the General State Fund, but the remaining funds are to be "used to pay claims duly presented and allowed and all expenses and costs incurred by the State of New Jersey." *Id.* Vial seeks to be made whole from these "funds explicitly and purposefully set aside in a custodial trust separate from New Jersey's treasury." Appx131, AC ¶ 121.

The district court correctly observed that these funds are not New Jersey's funds altogether: "unclaimed funds the Administration has escheated are 'held by the Treasurer as trustee for the public interest,' ***not the state of New Jersey***." Appx062, Op. at 24 (emphasis added) (quoting *Clymer v. Summit Bancorp, Inc.*, 171 N.J. 57, 63 (2002)). This is because the NJUPA sets up a "custodial" escheatment system, wherein unclaimed property and its proceeds ***are private property*** held in trust for the benefit of the owners—not state funds. *See, e.g.*, *Am. Exp. Travel Related Servs., Inc. Sidamon-Eristoff*, 669 F.3d 359, 365 (3d Cir. 2012) ("the original property owner still maintains the right to the property"); *Salvato*, 2022 WL 1224962 at *4–6; *Clymer*, 171 N.J. at 63 ("title to the unclaimed property does not vest in the State but remains in the owner, as the State only assumes custody of the intangible property"); Defendants themselves have conceded this custodial character—both here and in prior litigation.[11] As the Ninth Circuit held: "sovereign immunity applies to the state's money" but "***[m]oney that the state holds in custody for the benefit of private individuals is not the state's money, any more than towed cars are the state's cars***." *Taylor v. Westly*, 402 F.3d 924, 932 (9th Cir. 2005)

_____

[11] In *Salvato*, Defendants admitted that "when property is transferred to the State under the auspices of the UPA, the 'funds [are held] in perpetuity for the true owner.'" *Salvato*, 2022 WL 1224962, at *6 (quoting Defendant's brief). And Defendants concede again in this case that "the Act provides that **title to unclaimed property does not vest in the State**, but rather remains vested in the owner, with the State acting as custodian while holding his property." Appx165, MTD at 5.

("*Taylor I*").

After correctly holding that these funds are not in the State's treasury and are not even the State's funds, the district court incorrectly extended Eleventh Amendment protection to these funds. The district court did so simply because Plaintiff previously received the proceeds of his (known) escheated and liquidated property through the State's administrative claims process. Appx064, Op. at 26.

This makes no sense. If the funds in the Unclaimed Personal Property Trust Fund are not the State's money—as the district court itself recognized—then a claim for additional disbursement from that same fund cannot be a claim against the State's money either. In other words, what the district court characterizes as "additional compensation" is ***still not*** a claim against the State's own money.

The district court's characterization of Vial's claim for the appreciated value of the escheated stock as a request for "additional compensation," Appx064, Op. at 26, is also incorrect because it ignores the constitutional baseline, requiring that an owner be "put in the same position monetarily as he would have occupied if his property had not been taken." *Reynolds*, 397 U.S. at 16; *see also United States v. 564.54 Acres Land*, 441 U.S. 506, 510 (1979) (owner must be placed "in as good a position pecuniarily as if his property had not been taken"). The difference between $487,581.23 and $623,936 is not a windfall, a bonus, or "additional" money. It is the constitutionally-compelled measure of just compensation for property taken without

notice and prematurely liquidated. Appx132, 141–43, AC ¶¶ 97, 142–155. Properly viewed through this lens, Vial's claim is a demand for the value of property that he would have had but-for Defendants' no-notice seizure, from funds held in a custodial trust that exists for the sole purpose of making owners like him whole.[12]

The district court's erroneous conclusion appears to be based on a misreading of caselaw. The district court began by correctly observing that the Ninth Circuit and Eleventh Circuits have held that "the Eleventh Amendment did not bar the Plaintiffs from recovering their escheated property" under "a similarly custodial unclaimed property system." Appx064, Op. at 26 (citations omitted). However, the district court then incorrectly extrapolated: "in the cases in which states had returned the proceeds of liquidated property and plaintiff sought additional compensation-namely, as here, the appreciated value of escheated stock-courts have held that sovereign immunity bars such recovery." Appx065, Op. at 27. The district court bases this entire extrapolation on *Suever v. Connell*, 579 F.3d 1047 (9th Cir. 2009) and *Peters*, 2025 WL 733237, which simply followed *Suever*. But these cases pertain to a

---

[12] At most—this would be an argument that Plaintiff no longer has standing because Plaintiff's injury has been remedied. But the district court held Plaintiff had standing for this past injury. Appx052, Op. at 14. And for the reasons explained above, Plaintiff has suffered harm from the seizure without notice regardless of compensation. *See* Section I.A *supra* (citing *Meese*, *Fuentes*, and *Chiang*). Moreover, that payment was not "just compensation" because it did not restore him to the "position monetarily as he would have occupied if his property had not been taken," *Reynolds*, 397 U.S. at 16.

fundamentally different escheatment fund structure under California's Unclaimed Property Law.

The *Suever* court explicitly rejected that plaintiff's request for appreciation on the grounds that California's system required the Controller to sweep all funds in the Unclaimed Property Fund in excess of $50,000 to the General Fund every month, such that "there is not $5.3 billion worth of private money in the Unclaimed Property Fund." *See Suever*, 579 F.3d at 1060 (citing CAL. CIV. PROC. CODE § 1564(c)). Thus, there was not, in practical terms, a segregated pool of private money available to pay claims for additional compensation. *Id.* That is not the case under the NJUPA. *See* N.J.S.A. § 46:30B-74 (unclaimed property funds are deposited into the Unclaimed Personal Property Trust Fund, wherein the administrator may transfer 75% of received funds to the General State Fund, the remaining amount is expressly "retained in the trust fund, administered and invested by the State Treasurer, and used to pay claims duly presented and allowed and all expenses and costs incurred by the State of New Jersey.").[13] *See Garza*, 150 F.4th at 1126 (sovereign immunity did not apply because plaintiffs did not seek "money that belonged to the government" because Arizona's Act "plainly requires the Department to hold

---

[13] Notably, even if the funds have been transferred to the General Fund, a person can claim their abandoned property at any time, and there is no provision in the NJUPA that would limit the ability to claim said property or its proceeds—even *after* its technical passage to the general fund. *See* N.J.S.A. § 46:30B-77.

unclaimed property for the benefit of owners").

Currently, Defendants hold over $6 billion in purportedly "unclaimed" property, Appx110, AC ¶ 6, and the State has made no showing that all of it will be claimed. Indeed, since the inception of the program, the state has returned around $2.7 billion. Appx122, AC ¶ 30. Thus, Vial can be made whole without paying a penny of the State's money.[14] Appx135–36, AC ¶¶ 116–117.

This is not a semantic distinction. It goes to the heart of the Eleventh Amendment analysis. The Supreme Court has held that "the vulnerability of the State's purse [is] the most salient factor in Eleventh Amendment determinations." *Hess*, 513 U.S. at 48. Where a plaintiff seeks recovery from a fund that belongs to private owners—not the State—the Eleventh Amendment's core purpose of protecting the state fisc is not implicated. As the District Court of Delaware astutely recognized earlier this year: "in escheat cases such as this, there is a caveat: if the Plaintiff seeks recovery out of a state's specially-earmarked fund for escheat claims, then those are damages drawn *from a fund that is custodial in nature*, whose administrators are not protected by the Eleventh Amendment." *Mayrack*, 2026 WL 800611, at *4.

---

[14] Indeed, the State has only returned $2.7 billion since the inception of the program, Appx116, AC ¶ 30, so for the state's funds to be implicated, the Class members' recovery in this lawsuit alone would have to ***exceed the sum total of all unclaimed property payments New Jersey has ever made twice over***.

The *Suever* court held, in the alternative, "the Controller could not lawfully use it to pay Plaintiffs the difference between the proceeds of the sale of their escheated property and what they claim that property is worth now; to do so, the Controller would by definition have to use money belonging to other owners of unclaimed property." 579 F.3d at 1060. But this does not provide a basis to dismiss Vial's case under the Eleventh Amendment. Protecting "money belonging to other" private individuals is simply not within the ambit of Eleventh Amendment. This holding is also limited to the structure of California's system. Unlike California's system, the NJUPA does not limit claimants to merely the value the state itself received from the escheatment and liquidation of their property.[15] Accordingly, *Suever*'s categorical prohibition against paying "[m]oney belonging to other" owners from the fund does not apply in New Jersey. Indeed, the State uses those funds to pay "all expenses and costs incurred by the State of New Jersey," including auditors—evidently without any concern that it is transferring private property from the rightful owner to an auditor. N.J.S.A. § 46:30B-74(c); AC ¶ 39. Moreover, much

---

[15] California and New Jersey both pass on to the owner "any dividends, interest or other increments realized or accruing on such property *at or prior to liquidation*" CAL. CIV. PROC. CODE § 1562 (emphasis added); N.J.S.A. § 46:30B-68 (similar). However, California makes clear that "[e]xcept for amounts so credited the owner is not entitled to receive income or other increments on money or other property paid or delivered to the State Controller," CCPC § 1562, whereas New Jersey also entitles owners to "interest upon the monies of the claimant for the period during which those monies were in the custody of the administrator" at a statutorily defined rate. N.J.S.A. § 46:30B-79.

of the Fund is composed of sums that can never be returned to the owners because the State does not request or receive the ownership information. N.J.S.A. § 46:30B-47 (only requiring owner information for property over $50).

In short, the district court's uncritical importation of California caselaw into a case governed by New Jersey's materially different statutory regime was error. This Court should decline to extend *Suever* and *Peters* beyond the narrow context in which they arose and should hold that the Eleventh Amendment does not bar Vial's claims for relief drawn entirely from a custodial trust fund that was never the State's money.

### B.      Even if State Funds Were Implicated, the *Ex Parte Young* Exception to the Eleventh Amendment Would Apply

In a footnote, the district court held that Vial's requested relief "plainly does not fall under the *Ex parte Young* exception." Appx064, Op. at 26 n.33. In support, the district court simply cited *Suever*, 579 F.3d at 1058–59, *Taylor I*, 402 F.3d at 935, and *Merritts v. Richards*, 62 F4th 764, 772 (3d Cir. 2023).

The doctrine of *Ex parte Young* holds that "a state official is stripped of his official or representative character and thereby deprived of the State's immunity, when he commits an ongoing violation of federal law." *Waterfront Comm'n of New York Harbor v. Governor of N.J.*, 961 F.3d 234, 238 (3d Cir. 2020) (cleaned up). In *Merritts,* this Court explained "for the *Ex parte Young* exception to apply, there must be both an ongoing violation of federal law and a request for relief that can be

properly characterized as prospective." *Merritts*, 62 F.4th at 771. Both are satisfied here.

In *Maron*, 136 F.4th at 1333–34, the court applied *Ex parte Young* to permit claims challenging Florida's unclaimed property scheme. Like Defendants here, Florida argued that the "just compensation" relief sought was retrospective. The Eleventh Circuit rejected that argument because "the Takings Clause . . . prohibits not takings, but takings without just compensation" such that the "*lack of compensation is a part of an ongoing tort*." *Id.* at 1334 (emphasis added). As the Eleventh Circuit held, "sovereign immunity did not bar the . . . takings claim because it sought not damages but prospective relief to end an ongoing violation of federal law." *Maron*, 136 F.4th at 1334.

That reasoning is squarely applicable here. Vial requests "just compensation"—something he has not received to this day because he has not yet been restored to the same "position monetarily as he would have occupied if his property had not been taken," *Reynolds*, 397 U.S. at 16. The monetary relief sought therefore is not damages reflecting a "monetary loss resulting from a ***past breach*** of a legal duty," *Edelman v. Jordan*, 415 U.S. 651, 668 (1974) (emphasis added), but constitutionally compelled "just compensation" that Vial is currently being deprived of as part of an ongoing violation of the Fifth Amendment. This Court should adopt the reasoning in *Maron*.

Thus, even assuming the Eleventh Amendment otherwise applies to Vial's request, the *Ex parte Young* exception independently authorizes the prospective injunctive and equitable relief at the heart of this case.

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court reverse the District Court's decision and remand for further proceedings.

May 29, 2026

Respectfully submitted,

/s/ Bret R. Vallacher
Jonathan Massey
Bret R. Vallacher, Esq.
MASSEY & GAIL LLP
1000 Maine Ave. SW
Suite 450
Washington, D.C. 20024
Telephone: (202) 650-5452
Email: bvallacher@masseygail.com

William W. Palmer, Esq.
PALMER LAW GROUP, a PLC
2443 Fair Oaks Boulevard, No. 545
Sacramento, CA 95825
Telephone: (916) 972-0761
Email: wpalmer@palmercorp.com

Kevin P. Roddy, Esq.
WILENTZ, GOLDMAN &
SPITZER, P.A.
90 Woodbridge Center Drive,
Suite 900
Woodbridge, NJ 07095
Telephone: (732) 636-8000
Email: kroddy@wilentz.com


*Attorneys for Plaintiff-Appellant*

## CERTIFICATION OF BAR MEMBERSHIP

Pursuant to Third Circuit Local Rule 28.3(d), I certify that I am a member of the Bar of the Court.

May 29, 2026

/s/ *Bret R. Vallacher*
Bret R. Vallacher

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

SUBJECT MATTER & APPELLATE JURISDICTION ........................................6

STATEMENT OF THE ISSUES.................................................................................7

RELATED CASES AND PROCEEDINGS.................................................................9

STATEMENT OF THE CASE.................................................................................9

    A.    Statutory Framework................................................................................9

    B.    Factual Background................................................................................12

    C.    Procedural History................................................................................14

SUMMARY OF THE ARGUMENT ......................................................................15

STANDARD OF REVIEW ...................................................................................17

ARGUMENT .......................................................................................................18

I.    THE DISTRICT COURT ERRED IN HOLDING THAT VIAL LACKS STANDING TO SEEK PROSPECTIVE RELIEF .................................................................19

    A.    Vial Faces a Substantial Likelihood of Future Injury if All Parties Simply Proceed as the Law Requires................................................19

    B.    Vial Is Suffering Cognizable Present Injury Because the NJUPA Compels Him to Act to Avoid Injury...............................................31

    C.    Vial Has Standing to Seek an Accounting .........................................37

II.    THE ELEVENTH AMENDMENT DOES NOT BAR VIAL'S REQUEST TO BE MADE WHOLE FROM NON-STATE FUNDS OUTSIDE THE STATE'S TREASURY ..................................................................................................38

    A.    The District Court Correctly Held That the Funds at Issue Are Not State Funds But Then Erroneously Held That the Eleventh Amendment Protects Them Anyways Based on California-Specific Caselaw.................................................................................40

B.     Even if State Funds Were Implicated, the *Ex Parte Young* Exception to the Eleventh Amendment Would Apply ......................... 47

CONCLUSION ................................................................................................ 49

CERTIFICATION OF BAR MEMBERSHIP ........................................... 51

CERTIFICATION OF COMPLIANCE ................................................... 52

CERTIFICATION OF SERVICE ............................................................ 53

# TABLE OF AUTHORITIES

**Cases**

*31 Foster Child. v. Bush*,
329 F.3d 1255 (11th Cir. 2003) ......................................................................24

*Am. Exp. Travel Related Servs., Inc. Sidamon-Eristoff*,
669 F.3d 359 (3d Cir. 2012) .........................................................................41

*Askew v. Church of the Lord Jesus Christ*,
684 F.3d 413 (3d Cir.2012) ..........................................................................18

*Blanciak v. Allegheny Ludlum Corp.*,
77 F.3d 690 (3d Cir. 1996) ...........................................................................18

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983).................................................................. 24, 25, 26

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)......................................................... 20, 25, 28, 32

*Clemens v. ExecuPharm Inc.*,
48 F.4th 146 (3d Cir. 2022) ....................................................... 20, 35

*Clymer v. Summit Bancorp, Inc.*,
171 N.J. 57 (N.J. 2002)............................................................. 11, 41

*Const. Party of Pennsylvania v. Aichele*,
757 F.3d 347 (3d Cir. 2014) ....................................................... 17, 18

*Edelman v. Jordan*,
415 U.S. 651 (1974)....................................................................48

*Free Speech Coal., Inc. v. Att'y Gen. of U.S.*,
677 F.3d 519 (3d Cir. 2012) .........................................................18

*Fuentes v. Shevin*,
407 U.S. 67 (1972).................................................................. 23, 43

*Garza v. Woods*,
150 F.4th 1118 (9th Cir. 2025) ................................................... 31, 44

*Hess v. Port Auth. Trans-Hudson Corp.*,
513 U.S. 30 (1994) ......................................................... 40, 45

*In re Horizon Healthcare Servs. Inc. Data Breach Litig.*,
846 F.3d 625 (3d Cir. 2017) ....................................... passim

*In re U.S. Mortg. Corp.*,
491 B.R. 642 (Bankr. D.N.J. 2013) ..................................38

*Jones v. Flowers*,
547 U.S. 220 (2006) ........................................................ 2, 22

*Knellinger v. Young*,
134 F.4th 1034 (10th Cir. 2025) ......................................31

*Knick v. Twp. of Scott, Pennsylvania*,
588 U.S. 180 (2019) ...........................................................30

*Marathon Petroleum Corp. v. Sec'y of Fin. for Del.*,
876 F.3d 481 (3d Cir. 2017) ...............................................1

*Maron v. Chief Fin. Officer of Fla.*,
136 F.4th 1322 (11th Cir. 2025) ..................... 6, 17, 38, 48

*Merritts v. Richards*,
62 F4th 764 (3d Cir. 2023) ...............................................47

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010) ...................................... 4, 17, 32, 36

*Mullane v. Cent. Hanover Bank & Trust Co.*,
339 U.S. 306 (1950) ...................................................... 16, 22

*Murthy v. Missouri*,
603 U.S. 43 (2024) ............................................................20

*Pennell v. City of San Jose*,
485 U.S. 1 (1988) ..............................................................20

*Peters v. Cohen*,
No. 24-1040, 2025 WL 733237 (9th Cir. Mar. 7, 2025) ..................... 29, 43, 47

*Pic-A-State Pa., Inc. v. Reno,*
    76 F.3d 1294 (3d Cir. 1996) ................................................................4

*Pyatkova v. Motorcars,*
    2016 WL 674862 (D.N.J. Feb. 3, 2016) ..........................................36

*Rd.-Con, Inc. v. City of Philadelphia,*
    120 F.4th 346 (3d Cir. 2024) ..........................................................25

*Reilly v. Ceridian Corp.,*
    664 F.3d 38 (3d Cir. 2011) .............................................................35

*Ross v. Meese,* ................................................................................31

*Ross v. Meese,*
    818 F.2d 1132 (4th Cir. 1987) ................................................. 23, 43

*Suever v. Connell,*
    579 F.3d 1047 (9th Cir. 2009) ..................................... 43, 44, 46, 47

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014)........................................................................20

*Taylor v. Chiang,*
    2007 WL 1628050
    (E.D. Cal. June 1, 2007)........................................... 23, 31, 43

*Taylor v. Westly,*
    402 F.3d 924 (9th Cir. 2005) ...................................................... 41, 47

*Taylor v. Yee,*
    136 S. Ct. 929 (2016)........................................................................1

*Tyler v. Hennepin County,*
    598 U.S. 631 (2023)...................................................................... 18, 39

*United States v. 564.54 Acres Land,*
    441 U.S. 506 (1979).........................................................................42

*United States v. Reynolds,*
    397 U.S. 14 (1970)................................................................... passim

*Waterfront Comm'n of New York Harbor v. Governor of N.J.*,
     961 F.3d 234 (3d Cir. 2020) ...........................................................................47

**Statutes**

28 U.S.C. § 1291 ...........................................................................6

28 U.S.C. § 1331 ...........................................................................6

28 U.S.C. § 1343 ...........................................................................6

42 U.S.C.§ 1983 ........................................................................ 6, 14

N.J.S.A. § 46:30B-1 ...........................................................................9

N.J.S.A. § 46:30B-7 ...........................................................................10

N.J.S.A. § 46:30B-7.1 ........................................................... 10, 13, 21, 27

N.J.S.A. § 46:30B-10 ........................................................... 3, 14, 21

N.J.S.A. § 46:30B-31 ........................................................... 3, 10, 13, 21

N.J.S.A. § 46:30B-46 ...........................................................................9

N.J.S.A. § 46:30B-50 ........................................................... passim

N.J.S.A. § 46:30B-51 ........................................................... 11, 31

N.J.S.A. § 46:30B-52 ...........................................................................11

N.J.S.A. § 46:30B-57 ........................................................... 9, 11

N.J.S.A. § 46:30B-60.1 ........................................................... 10, 11

N.J.S.A. § 46:30B-61 ...........................................................................10

N.J.S.A. § 46:30B-68 ........................................................... 12, 46

N.J.S.A. § 46:30B-77 ........................................................... 11, 44

N.J.S.A. § 46:30B-79 ........................................................... 12, 46

**Codes**

CAL. CIV. PROC. CODE § 1564.................................................................44

CAL. CIV. PROC. CODE § 1562.................................................................46

**Rules**

Fed. R. App. P. 4.................................................................................7

Fed. R. Civ. P. 12................................................................... 15, 17

Fed. R. Civ. P. 8...............................................................................36

## INTRODUCTION

This Court has recognized that state escheat laws are vulnerable to "being exploited to raise revenue rather than to safeguard abandoned property for the benefit of its owners." *Marathon Petroleum Corp. v. Sec'y of Fin. for Del.*, 876 F.3d 481, 488 (3d Cir. 2017) (cleaned up). Justices of the Supreme Court have echoed that concern, observing that the "trend—combining shortened escheat periods with minimal notification procedures—raises important due process concerns" about states' "constitutional obligation to provide adequate notice before escheating private property." *Taylor v. Yee*, 136 S. Ct. 929, 930 (2016) (Alito, J., joined by Thomas, J., concurring in denial of certiorari).

This case presents that constitutional concern in its starkest form. The New Jersey Unclaimed Property Act's ("NJUPA") sole individualized pre-escheatment notice mechanism requires holders—the private companies compelled to escheat the property—to send written notice to the owners "by certified mail." N.J.S.A. § 46:30B-50. But the United States Postal Service does not deliver certified mail internationally. *See* Appx125, Amended Complaint ("AC") ¶¶ 61–63. For any owner whose last known address lies outside the United States—including Plaintiff Jaime Vial, a Chilean citizen—the statute's only form of pre-escheat notice is a dead letter. Appx125, AC ¶ 63. The Supreme Court has made clear that a government cannot satisfy its constitutional notice obligation by using a method it knows will

fail: "If the Commissioner prepared a stack of letters to mail to delinquent taxpayers, handed them to the postman, and then watched as the departing postman accidentally dropped the letters down a storm drain, one would certainly expect the Commissioner's office to prepare a new stack of letters and send them again." *Jones v. Flowers*, 547 U.S. 220, 229 (2006); *see also id.* at 232 (holding that following a process the government knows will not result in actual notice does not "relieve[] the State of its constitutional obligation to provide adequate notice"). New Jersey does not prepare a new stack. It simply takes the property—and currently holds over $6 billion in purportedly "unclaimed" property. Appx110, AC ¶ 6.

Vial brought this putative class action to challenge that structural deficiency—both as applied to him, and on its face with respect to all foreign property owners who are categorically denied any constitutionally adequate pre-seizure notice under the NJUPA. Appx138, AC ¶¶ 127–28. Vial's family has already felt the consequences. Rene Correa Borquez, a Chilean lawyer and investor, had financial services accounts associated with his Chilean address and owned 905 shares of Exxon Corporation stock. Appx130–31 AC ¶¶ 85–92. He and his heirs had no connection to New Jersey and no reason to know the State had seized their property—because the NJUPA's sole notice mechanism was structurally incapable of informing them. Appx130–31, AC ¶¶ 87–92. After Borquez's death, the NJUPA Administrator escheated and liquidated those shares without providing any notice to

anyone—before or after the seizure. Appx131, AC ¶¶ 91. The family learned of the taking through a finder or locator and only after years of independent effort. AC Appx131–32, ¶¶ 93–94. When Vial eventually filed a claim, the State returned $487,581.23—the liquidation proceeds—while the shares, had they never been seized, would have been worth approximately $623,936. Appx132, AC ¶¶ 94, 97. The shortfall exceeds $136,000. Appx143, AC ¶ 157 & n.14.

The district court acknowledged what it called a "classic pocketbook injury": Defendants "escheated Borquez's Exxon stock without proper notice and undercompensated him for that action." Appx052, Court's January 12, 2026 Opinion ("Op.") at 14. Nevertheless, the court dismissed the case in full—holding that Vial lacks Article III standing to seek any prospective relief and that the Eleventh Amendment bars his remaining claims. Appx054–66, Op. at 16–28. Both holdings are wrong.

On standing, the district court characterized Vial's risk of future no-notice escheatment as resting on a "highly attenuated chain of possibilities." Appx055, Op. at 17. But there is no chain of contingencies here. Vial currently owns shares of Exxon Mobil—a New Jersey corporation—through a New Jersey–incorporated broker, whose address on file for Vial is in Chile. Appx133, AC ¶¶ 102–104. If all parties simply comply with the statute as written, Vial's property will be escheated without notice. *See* N.J.S.A. §§ 46:30B-10(e), 46:30B-31, 46:30B-50; Appx133–34,

3

AC ¶¶ 104–107. In other words, the same statutory scheme that already seized his family's stock applies with identical force to his current holdings for exactly the same reason. Appx114, 133–34, AC ¶¶ 20, 102–112.

The district court compounded this error by rejecting Vial's cognizable present injuries. The NJUPA forces Vial to alter his practices to mitigate the risk of future injury—a burden the Supreme Court and this Court have recognized as a cognizable present injury. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 154–55 (2010); *Pic-A-State Pa., Inc. v. Reno*, 76 F.3d 1294, 1300 (3d Cir. 1996) (plaintiffs had standing where law created need to change "business practices"). The Ninth Circuit has squarely applied this principle in the unclaimed-property context, holding that owners "having to constantly monitor their property to avoid escheat" is its own injury sufficient for standing. *Taylor v. Westly*, 488 F.3d 1197, 1199–1200 (9th Cir. 2007) ("*Taylor II*"). And the court's dismissal of Vial's equitable accounting request as a "fishing expedition," Appx054, Op. at 16 n.19, rested on circular logic: it faulted Vial for failing to identify seized property that only the State's records can reveal, when the absence of notice is itself the reason Vial cannot know what was taken. Appx132, AC ¶ 95.

On sovereign immunity, the district court acknowledged that the Unclaimed Personal Property Trust Fund holds private property in custodial trust, not state funds, Op. at 24—and then, in the same opinion, extended Eleventh Amendment

protection to those very funds. Op. at 26–27. It cannot be both. Two other federal courts within this Circuit have rejected the very arguments the district court accepted. *See Salvato v. Harris*, 2022 WL 1224962, at *4–6 (D.N.J. Apr. 26, 2022) (holding the Act's placement of funds in a separate trust account confirms the custodial nature of New Jersey's unclaimed property fund); *Vial v. Mayrack*, 2026 WL 800611, at *3–5 (D. Del. Mar. 23, 2026) (denying substantially similar motion to dismiss challenging a parallel custodial escheat scheme, finding that the plaintiff adequately alleged standing for prospective relief and declining to dismiss on Eleventh Amendment grounds). Defendants themselves have conceded that "the Act provides that title to unclaimed property does not vest in the State, but rather remains vested in the owner, with the State acting as custodian while holding his property." Appx165, State's Motion to Dismiss ("MTD") (Dkt. 49) at 5.

The Fund currently holds over $6 billion in notational accounts, Appx110, AC ¶ 6; in reality, the State freely draws upon it to pay auditor bounties and its own administrative costs, N.J.S.A. § 46:30B-74(c); Appx119–20, AC ¶ 39; and it has returned only $2.7 billion to owners since the program's inception, Appx116, AC ¶ 30. Accordingly, unless Vial's relief requires over $3.3 billion dollars, he can be "put in the same position monetarily as he would have occupied if his property had

not been taken," *United States v. Reynolds*, 397 U.S. 14, 16 (1970), without paying a penny of the State's money. Appx135-36, AC ¶¶ 116–117.

And even if the Eleventh Amendment were implicated, the *Ex parte Young* exception applies because the State's ongoing failure to provide him just compensation for property taken without notice is an "ongoing violation" of federal law. *See Maron v. Chief Fin. Officer of Fla.*, 136 F.4th 1322, 1333–34 (11th Cir. 2025) (holding that "sovereign immunity did not bar" the "takings claim because it sought not damages but prospective relief to end an ongoing violation of federal law").

The district court's order should be reversed in its entirety.

## SUBJECT MATTER & APPELLATE JURISDICTION

The district court had subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343 because Vial brought this lawsuit under 42 U.S.C.§ 1983 alleging that Defendants violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the Takings Clause of the Fifth Amendment, applied to the States through the Fourteenth Amendment.

This Court has appellate jurisdiction under 28 U.S.C. § 1291 because this appeal is from a final judgment in favor of Defendants.

The district court entered its final judgment on February 10, 2026 (Dkt. 57), Appx070, after granting Defendant's motion to dismiss, on the grounds that Vial

lacked standing for certain relief and the Eleventh Amendment barred all other relief (Dkt. 55), Appx068-69.

The Notice of Appeal was filed with the Clerk of the district court on February 10, 2026 (Dkt. 58), Appx001-038. This appeal is timely pursuant to Federal Rule of Appellate Procedure 4(a)(1)(A).

## STATEMENT OF THE ISSUES

1.      Whether the district court erred in holding that Vial lacks Article III standing to seek prospective injunctive and declaratory relief against the NJUPA's no-notice escheatment scheme, where (a) the district court itself acknowledged that Vial suffered a "classic pocketbook injury" from Defendants' prior no-notice escheatment of his family's Exxon stock; (b) the NJUPA's sole pre-escheat notice mechanism—certified mail—is structurally incapable of reaching Vial's address in Chile; (c) the same statutory scheme that produced his prior injury applies with equal force to Vial's current Exxon Mobil holdings through his New Jersey-incorporated broker; and (d) injury will occur if all parties simply comply with the statute as written.[1]

2.      Whether the district court erred in holding Vial fails to allege cognizable present injury, where (a) Vial alleges his burdens of monitoring and

---

[1] This issue was raised by Appellant in his Opposition to the Motion to Dismiss ("Opp.") (ECF No. 50), Appx234–42, Opp. at 21–29, and ruled upon by the district court in its Opinion, Appx054–58, Op. at 16–20.

"churning" his property to avoid no-notice escheatment, and (b) the statute forces Vial to choose between incurring those mitigation costs or suffering the unconstitutional seizure of his property without notice.[2]

3.      Whether the district court erred in dismissing Vial's request for an equitable accounting as a "fishing expedition" too speculative for standing purposes, where (a) the district court itself found that Vial has standing based on the prior no-notice escheatment of the Borquez Exxon stock; (b) the information necessary to identify any property that may have been seized from Borquez's multiple U.S. financial accounts is exclusively within the State's possession; and (c) Vial cannot identify the property without the very relief sought.[3]

4.      Whether the district court erred in holding that the Eleventh Amendment bars Vial's claim for relief from the Unclaimed Personal Property Trust Fund, where the district court itself recognized that the Fund holds private property in custodial trust outside the State treasury, yet extended sovereign immunity based on inapposite California-specific caselaw governing a materially different statutory scheme.[4]

---

[2] This issue was raised by Appellant, Appx240–42, Opp. at 27–29, and ruled upon by the district court, Appx058–61, Op. at 20–23.

[3] This issue was raised by Appellant, Appx224–25, 235, Opp. at 11–12, 22, and ruled upon by the district court, Appx054, Op. at 16 n.19.

[4] This issue was raised by Appellant, Appx224–32, Opp. at 11–19, and ruled upon by the district court, Appx061-66, Op. at 23–28.

5.     Whether the district court erred in holding that the *Ex parte Young* exception to the Eleventh Amendment does not permit Vial's claims for prospective relief, where the State's ongoing failure to provide just compensation for property taken without notice constitutes an ongoing violation of the Constitution.[5]

## RELATED CASES AND PROCEEDINGS

This case has never been before this Court previously. Plaintiff-Appellant is currently pursuing similar claims against officers representing the State of Delaware in the District Court for the District of Delaware. Those defendants raised arguments that were substantially similar to the issues here in their motion to dismiss, which the Delaware District Court denied. *Mayrack*, 2026 WL 800611, at *4.

## STATEMENT OF THE CASE

### A.     Statutory Framework

The New Jersey Unclaimed Property Act ("NJUPA" or the "Act"), N.J.S.A. § 46:30B-1 et seq., requires every business doing business in New Jersey ("holders")—including banks with safety deposit boxes and companies that issue shares (even those held in a retirement account)—to deliver property to the State once that property is deemed "abandoned." *See* N.J.S.A. §§ 46:30B-46, 46:30B-57, 6:30B-6(g). New Jersey uses a short, three-year "dormancy" period to determine whether most types of property may be deemed dormant and, therefore,

---

[5] This issue was raised by Appellant, Appx232-34, Opp. at 19–21, and ruled upon by the district court, Appx064, Op. at 26 n.33.

"abandoned." N.J.S.A. § 46:30B-7. The same period applies to securities. *See* N.J.S.A. § 46:30B-31. Property is subject to escheat under the NJUPA if the last known address "of the apparent owner is in a foreign nation and the holder is a domiciliary" of New Jersey. N.J.S.A. § 46:30B-10(e).

As is relevant here, stocks are deemed "abandoned" if the owner goes three years without interacting with the holder or the account in such a way that the NJUPA specifies. *See* N.J.S.A §§ 46:30B-7, 46:30B-7.1. As a result, if a stockowner goes three years without making a written communication concerning the property or account, or an oral communication contemporaneously recorded concerning the property or account, or a presentment of an instrument of payment, or other activity in the account (such as a deposit or withdrawal), N.J.S.A. § 46:30B-7.1, or if dividends are automatically reinvested, three years after the second statement or other account notification is returned as undeliverable or after the holder discontinued mailings, N.J.S.A. § 46:30B-31, the NJUPA requires his broker to remit all of the owner's stocks to the state, N.J.S.A. § 46:30B-57. Thus an investor pursuing a buy-and-hold strategy—one of the most common investment approaches—triggers the dormancy presumption simply by doing nothing other than owning his property for three years. Appx142–45, AC ¶¶ 34–37. The holder is immunized for escheating the property. *See* N.J.S.A. §§ 46:30B-60.1–61.

The Act's sole individualized pre-escheatment notice mechanism requires the

holder to send "by certified mail, and with return receipt requested, written notice to the apparent owner at the last known address." N.J.S.A. § 46:30B-50. The statute makes no exception for foreign addresses. *Id.* This matters because the United States Postal Service does not deliver certified mail internationally. Appx125, AC ¶¶ 61–63. For an owner whose last known address is outside the United States, the statute's sole individualized notice mechanism is a dead letter. Appx125, AC ¶ 63. Post-escheatment notice consists of publication only in local New Jersey newspapers and listing on an online database, replete with issues. N.J.S.A. §§ 46:30B-51, -52; Appx125–130, AC ¶¶ 64–82.

Abandoned property is then seized by the Administration under the supervision of the Administrator, *see* N.J.S.A. §§ 46:30B-57; 46:30B-60.1, who acts as property custodian, *see generally* N.J.S.A. § 46:30B-74 (requiring the establishment of trust funds to pay claims and expenses of trust administration). The NJUPA establishes a custodial escheatment regime under which property presumed abandoned is reported by "holders"—typically financial institutions—remitted to the State, and held in trust for the benefit of the true owner. N.J.S.A. § 46:30B-77; Appx120, AC ¶¶ 42–43. Title does not vest in the State but remains in the owner, with the State acting as custodian—owners may claim their property "at any time in perpetuity." *Clymer v. Summit Bancorp, Inc.*, 171 N.J. 57, 63 (N.J. 2002); *see also* N.J.S.A. § 46:30B-77.

Unless the Administrator decides otherwise, seventy-five percent of all funds received into the Unclaimed Personal Property Trust Fund are transferred to the General State Fund (used for public purposes), while the remaining twenty-five percent is retained to pay claims and administration costs. N.J.S.A. § 46:30B-74(c). The State currently has over $6 billion in "unclaimed" property. Appx110, AC ¶ 6.

Upon a valid claim for liquidated stock, the NJUPA provides the claimant: (1) the net proceeds of sale; (2) dividends, interest, or other increments realized or accruing on the property at or before liquidation; and (3) interest at a rate fixed by the Administrator. N.J.S.A. §§ 46:30B-79, -68. Critically, the statute does not provide the appreciated value of the stock—that is, what the shares would have been worth had they not been seized and prematurely liquidated without notice. AC ¶ 48. Nor does it compensate owners for their rights of ownership that are lost upon the escheatment, such as the right to vote shares in matters of corporate governance. Appx122, AC ¶ 49.

## B. Factual Background

Rene Correa Borquez was a Chilean lawyer and investor who had financial services accounts associated with his Chilean address and owned 905 shares of Exxon Corporation stock. Appx130–31, AC ¶¶ 85, 92. He died testate in Chile in 2006, leaving his estate to his brother, who in turn died in 2007. Appx131, AC ¶¶ 86–88. All heirs, including Mr. Vial, reside in Chile; none has ever resided in New

Jersey. *Id.*

After Borquez's death, the NJUPA Administrator escheated and liquidated his heirs' 905 shares of Exxon stock without providing any notice to the Borquez family—before or after the seizure. Appx131, AC ¶¶ 89–92. Vial—empowered by all Borquez heirs under Chilean law—learned of the escheatment only after years of effort to locate Borquez's assets. AC ¶¶ Appx131–32, 93–94. Vial filed a claim with the Administrator and, on November 8, 2023, received $487,581.23. Appx132, 143, AC ¶¶ 94, 156. Had the shares not been seized and liquidated, they would have been worth approximately $623,936 at the time this lawsuit was filed—a shortfall of $136,354.77. Appx132, AC ¶ 97; *see also* Appx144, AC ¶ 157 & n.14.

Vial remains at risk today. "For example, in an attempt to begin repurchasing some of the property New Jersey seized, Plaintiff has purchased (and currently owns) shares of Exxon Mobil via Tradeup Securities (which is a New Jersey corporation)." Appx133, AC ¶ 102. As a Chilean national whose address is beyond the reach of certified mail, Vial faces the NJUPA's structural deficiency: NJUPA's notice provisions will not provide him with constitutionally adequate notice before any future seizure. Appx133–35, AC ¶¶ 104–112. Vial intends to pursue a buy-and-hold strategy for those shares, doing nothing with them while they appreciate for years to come. Appx133, AC ¶ 104. Under the NJUPA, that inactivity will trigger the three-year dormancy presumption, N.J.S.A. §§ 46:30B-7.1, 46:30B-31, and

because the address "of the apparent owner is in a foreign nation and the holder is a domiciliary" of New Jersey, NJUPA will require TradeUp to escheat the property, N.J.S.A. § 46:30B-10(e).

Moreover, the full scope of the State's seizures remains unknown. Borquez was a Chilean lawyer with many significant investments, including various stocks in financial services accounts across the United States. Appx130–31, AC ¶ 85. Additional property may have been seized by Defendants, but Vial would require an accounting from the State's records whether New Jersey holds property belonging to his family. Appx132, AC ¶ 95.

### C. Procedural History

Vial filed this putative class action on December 19, 2024, asserting claims under 42 U.S.C. § 1983 for violations of the Fourteenth Amendment Due Process Clause and the Fifth Amendment Takings Clause against the New Jersey State Treasurer and the NJUPA Administrator in their official capacities. Appx001–107, ECF 1. The proposed Class consists of "all persons and entities owning purportedly 'abandoned' property transferred to Defendants under color of the NJUPA within the applicable statute of limitations who were denied constitutionally adequate pre-seizure notice under the NJUPA because they resided outside of the United States." Appx138, AC ¶ 127.

Vial filed an Amended Complaint on May 5, 2025, (ECF 45), pursuing the

same claims on revised allegations and seeking the following revised relief: (1) a declaration that Defendants' administration of the NJUPA violates the Due Process Clause and Takings Clause; (2) an injunction requiring Defendants to provide constitutionally adequate notice to foreign property owners before seizing their property; (3) an equitable accounting to identify properties seized without adequate notice; and (4) the return of property or to be put in the same position monetarily as he would have occupied but for the no-notice escheat. AC, Prayer for Relief ¶¶ A–F. Defendants moved to dismiss under Rules 12(b)(1) and 12(b)(6). Dkt. 49.

On January 12, 2026, the district court issued an opinion granting the motion, Appx039–67, ECF 54, and then dismissed the Amended Complaint without prejudice, Appx068–69, ECF 55. On February 9, 2026, Vial elected to stand on the Amended Complaint and requested the district court enter a final judgment to allow for appellate jurisdiction, Appx280–85, ECF 56. The court entered final judgment on February 10, Appx70, ECF 57, and plaintiff filed his notice of appeal that same day, Appx001–38, ECF 58.

## SUMMARY OF THE ARGUMENT

The district court dismissed this case on the theory that Vial cannot establish standing to seek prospective relief and that the Eleventh Amendment bars his remaining claims. Both holdings are wrong. This Court should reverse.

On standing, the district court characterized Vial's risk of future no-notice escheatment as resting on a "highly attenuated chain of possibilities." Appx155, Op. at 17. But there is no chain of contingencies here. The injury will occur if all parties simply comply with the statute and nothing else happens. The NJUPA only specifies one form of pre-escheat notice: holders must use certified mail. However, the U.S. Postal Service does not deliver certified mail internationally and Vial lives in Chile. If the holder does what the statute requires, Vial's property *will* be escheated without notice. That is not speculation—it is the statute operating as written.[6]

The court compounded this error by rejecting Vial's allegations of present injury from monitoring costs, holding those allegations "irreconcilable" with what would have been Vial's plan for his shares: to do nothing but "buy-and-hold." Appx059–60, Op. at 21–22. This gets the injury backwards. The risk of the no-notice escheat compels him to monitor, and that forced monitoring is the injury. As the Ninth Circuit recognized, "the injuries suffered by plaintiffs include not only those attendant to having their property escheated without notice, but also include" the "cost of having to constantly monitor their property to avoid escheat," including by "'churning' their property so that it stays active and avoids escheat." *Taylor II,* 488 F.3d at 1199–1200. Being forced to choose between monitoring costs and

---

[6] *Cf. Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950) (Due Process requires pre-deprivation "notice reasonably calculated, under all the circumstances, to apprise interested parties").

unconstitutional seizure is itself a concrete, present harm. *See Monsanto*, 561 U.S. at 154–55. Additionally, the court erred in dismissing Vial's accounting request as a "fishing expedition."

On sovereign immunity, the court held that because Vial already received the liquidation proceeds, his claim for the appreciated value of the stock is "indistinguishable in effect from claims for money damages." Appx134–35, Op. at 26–27. But this ignores that the sums sought would not come from the State's treasury or State funds altogether, but private funds for which the State is merely the custodian. The district court acknowledged as much, but then incorrectly applied California-specific caselaw to hold the Eleventh Amendment protects these admittedly private funds anyways. Finally, even if the funds were somehow considered the State's fisc, the relief sought fits within the *Ex Parte Young* exception because it prospectively seeks to end the "ongoing violation" of the State not providing just compensation for the taking, as the Eleventh Circuit held in *Maron*, 136 F.4th at 1333.

The district court's order should be reversed in its entirety.

## **STANDARD OF REVIEW**

"A motion to dismiss for want of standing" is "properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter." *Const. Party of Pennsylvania v. Aichele*, 757 F.3d 347, 357 (3d Cir. 2014). The "Eleventh

Amendment is a jurisdictional bar which deprives federal courts of subject matter jurisdiction," so its application is also reviewed as a 12(b)(1) motion. *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 694 n.2 (3d Cir. 1996).

"Questions of subject matter jurisdiction raised on a motion to dismiss under Rule 12(b)(1)" are "reviewed de novo." *Free Speech Coal., Inc. v. Att'y Gen. of U.S.*, 677 F.3d 519, 530 (3d Cir. 2012). On a facial challenge to jurisdiction (as here),[7] courts must "apply the same standard of review it would use in considering a motion to dismiss under Rule 12(b)(6)," *Aichele*, 757 F.3d at 358–59 (cleaned up). "Consequently, [courts must] accept the Plaintiffs' well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the Plaintiffs' favor." *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 633 (3d Cir. 2017).

## ARGUMENT

The district court acknowledged that Vial suffered a "classic pocketbook injury" when Defendants "escheated Borquez's Exxon stock without proper notice and undercompensated him for that action." Appx122, Op. at 14 (quoting *Tyler v. Hennepin County*, 598 U.S. 631, 636 (2023)). Indeed, Vial and his family have lost over a hundred thousand dollars from New Jersey's no-notice escheatment of his

---

[7] *Cf. Askew v. Church of the Lord Jesus Christ*, 684 F.3d 413, 417 (3d Cir.2012) ("As the defendants had not answered and the parties had not engaged in discovery, the first motion to dismiss was facial.").

family's stocks. Appx144, AC ¶ 157 & n.14. And, as explained in the amended complaint, Vial "continues to suffer ongoing injury from the NJUPA" because "he has additional property that is likely to be escheated without notice" and "he must make efforts to prevent that, which is its own injury." Appx132, AC ¶ 101; *see also* Appx133–135, AC ¶¶ 97, 102–112.

Notwithstanding these past, present, and future injuries, the district court dismissed Vial's complaint in full, denying him all relief. The district court held that (I) Vial lacked standing to pursue prospective relief notwithstanding (A) his extremely likely future injuries; (B) his present injuries; and (C) his need for an accounting. And it held (II) the Eleventh Amendment barred his being made whole notwithstanding that (A) the funds sought are neither from the State's treasury nor the State's funds altogether and (B) the *Ex Parte Young* exception applies to prevent the "ongoing violation." As explained below, both holdings are erroneous and must be reversed.

## I. THE DISTRICT COURT ERRED IN HOLDING THAT VIAL LACKS STANDING TO SEEK PROSPECTIVE RELIEF

### A. Vial Faces a Substantial Likelihood of Future Injury if All Parties Simply Proceed as the Law Requires

Article III standing requires a plaintiff to show "that she has suffered, or will suffer, an injury that is concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Murthy v.*

*Missouri*, 603 U.S. 43, 57 (2024) (cleaned up). "[A]llegations of future injury 'suffice if the threatened injury is certainly impending or there is a substantial risk that the harm will occur.'" *Clemens v. ExecuPharm Inc.*, 48 F.4th 146, 152–53 (3d Cir. 2022) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). "A substantial risk means a 'realistic danger of sustaining a direct injury.'" *Id.* (quoting *Pennell v. City of San Jose*, 485 U.S. 1, 8 (1988)).

Critically, Article III standing does **not** "require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013). For example, in *Pennell*, the Supreme Court found that landlords had standing to enjoin a city ordinance that would prohibit rent increases found to cause an "unreasonably severe financial or economic hardship" on tenants—even though the landlords had not shown several future events: (1) that they intended to raise their rents to the point of causing unreasonably severe hardship; (2) that the tenants would challenge those increases; or (3) that the city's officials would find against the landlords. *Pennell,* 485 U.S. at 6. The Supreme Court nevertheless held that the *Pennell* plaintiffs demonstrated a "realistic danger of sustaining a direct injury as a result of the statute's operation," which was sufficient for Article III standing. *Id.* at 8.

Here, the risk of a no-notice escheatment occurring to Vial is much more than "substantial" and "realistic"—it is structurally built into the statute's text such that

no-notice escheatment *will* occur if all parties simply proceeded as the law requires. In "an attempt to begin repurchasing some of the property New Jersey seized, Vial has purchased (and currently owns) shares of Exxon Mobil via Tradeup Securities (which is a New Jersey corporation)." Appx133, AC ¶ 102. Property is subject to escheat under the NJUPA if "the holder is a domiciliary" of New Jersey and the last known address "of the apparent owner is in a foreign nation and the holder is a domiciliary" of New Jersey. N.J.S.A. § 46:30B-10(e); AC ¶ 104. "Plaintiff's address on file with Tradeup, the relevant holder here, would be in Chile," Appx133, AC ¶ 104. Thus, NJUPA will require TradeUp (a New Jersey domiciliary) to escheat the property. Appx133, AC ¶ 104.

Under the NJUPA, stocks are deemed abandoned if a stockowner goes three years without performing specific actions vis-à-vis his stocks and the holder, such as making a written communication concerning the property or account, or an oral communication contemporaneously recorded concerning the property or account, or a presentment of an instrument of payment, or other activity in the account like automatic dividend reinvestment. *See* N.J.S.A. §§ 46:30B-7.1, 46:30B-31. Vial "intends to pursue a buy-and-hold strategy for those shares, doing nothing with them while they appreciate for years to come." Appx133, AC ¶ 104. As a result, Vial owns "additional property vulnerable to seizure and taking under the NJUPA." Appx133, AC ¶ 102.

And because he lives in Chile, it is impossible for the sole form of notice that NJUPA requires—certified mail from the holder—to reach him. The NJUPA provides for pre-escheat notice to be given in only one form: the holder must send a letter by certified mail to the owner. N.J.S.A. § 46:30B-50. However, the United States Postal Service only offers the Certified Mail within the United States (apart from service to U.S. military and diplomatic installations). *See* Appx112–13, AC ¶ 16 & n.5. Thus, ***<u>it is not even possible</u>*** for the Act's sole mandated form of pre-escheat notice to actually provide notice to individuals like Vial and the proposed Class members, who have addresses located outside of the United States. *See also* Appx124–25, AC ¶¶ 58–63.

Nevertheless, the State will simply take the property in question without any pre-escheat notice in direct contravention of the Supreme Court's command that notice be "reasonably calculated, under all the circumstances, to apprise interested parties" before they are deprived of property. *Mullane*, 339 U.S. at 314. Indeed, following a process the government knows will not result in actual notice, does not "relieve[] the State of its constitutional obligation to provide adequate notice." *Flowers,* 547 U.S. at 232; *see id.* at 229 ("If the Commissioner prepared a stack of letters to mail to delinquent taxpayers, handed them to the postman, and then watched as the departing postman accidentally dropped the letters down a storm

22

drain, one would certainly expect the Commissioner's office to prepare a new stack of letters and send them again.").

This demonstrates a sufficient likelihood of two forms of future harm. First, "the denial of a constitutional right"—here, the seizure of property without pre-deprivation notice reasonably calculated to reach owners—"constitutes irreparable harm," *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987). No post-deprivation process nor even a "damage award can undo the fact that the arbitrary taking that was subject to the right of procedural due process has already occurred." *Fuentes v. Shevin*, 407 U.S. 67, 82 (1972). Second, "[w]hen [the government] takes custody of property pursuant to the [unclaimed property law], even temporarily, certain rights associated with ownership are lost which are not compensable in money damages." *Taylor v. Chiang*, 2007 WL 1628050, at *2 (E.D. Cal. June 1, 2007). For example, "the owner is deprived of the right to vote his or her shares in important matters of corporate governance." *Id.*

This is the same course of events that previously injured plaintiff: "Plaintiff is a citizen and resident of Chile who received no notice at all before his (and his family's) Exxon Mobil shares were seized and taken by Defendants under the NJUPA." Appx112, AC ¶ 13. When, as here, a plaintiff previously suffered the alleged injury, past wrongs are "evidence bearing on whether there is a real and immediate threat of repeated injury," *City of Los Angeles v. Lyons*, 461 U.S. 95, 102

23

(1983). Where "the threatened acts that will cause injury are authorized or part of a policy," as is the case here, "it is significantly more likely that the injury will occur again." *31 Foster Child. v. Bush*, 329 F.3d 1255, 1266 (11th Cir. 2003).

The Ninth Circuit previously held that the plaintiffs challenging California' unclaimed property law had standing for prospective relief under these circumstances: "plaintiffs' securities have been lost to escheat, thus establishing concrete injury" and "[t]he likelihood of recurrence is also established because the 'wrong' plaintiffs seek to enjoin is the escheating of property without written notice calculated to be received by the owner, and the State of California has a written policy of doing just that." *Taylor II*, 488 F.3d at 1200. The District Court of Delaware recently held that allegations similar to the ones at bar were sufficient "as to the likelihood of future injury" because they showed a "realistic danger of sustaining a direct injury as a result of the statute's operation." *Mayrack*, 2026 WL 800611 at **2–3.

The district court downplayed the likelihood of future injury by (1) baselessly isolating Vial's prior injury from his risk of future injury and (2) construing the statute operating as written as a "highly attenuated course of events." Appx055, Op. at 17. Both reasons fail upon examination.

First, the district court attempted to distinguish *Taylor II* on the grounds that

24

the "risk of repeated injury" standard does not apply here. [8] Appx060, Op. at 22 & n.30. This is so, according to the district court, because "Plaintiff pleads no facts to indicate that there is a 'sufficient likelihood' that any of the ***Borquez's*** property will be escheated 'in a similar way,'" Appx053–54, Op. at 15–16 (emphases added). Throughout its opinion, the district court drew an artificial distinction between Plaintiff's prior injury as a member of the Borquez family (which the court incorrectly assumes exclusively resulted in his representative capacity) and his risk of future injury (which is raised in his personal capacity). However, the court's hermetically sealed isolation of the two injuries is factually and legally untenable.

The Amended Complaint makes clear that Vial is not a stranger to the escheatment that happened to his family—he, himself, was injured by it. The Amended Complaint pleads that "Plaintiff is a citizen and resident of Chile who received no notice at all before **his** (and his family's) **Exxon Mobil shares were seized** and taken by Defendants under the NJUPA." Appx112, AC ¶ 13 (emphasis added). "Plaintiff has not only lost over a hundred thousand dollars from New Jersey's no notice escheatment of his family's stocks, but he remains at risk of other

---

[8] The district court, in a footnote, also implied that *Clapper* had perhaps changed the *Lyons* standard on which *Taylor II* had relied. But this Court still cites *Lyons* routinely. *See, e.g., Rd.-Con, Inc. v. City of Philadelphia*, 120 F.4th 346, 354 (3d Cir. 2024) (holding Plaintiffs had standing for prospective relief for prior injury likely to recur). And this Court deems it relevant when "plaintiffs are not complaining solely of future injuries," *In re Horizon Healthcare Servs.*, 846 F.3d at 640 n.20.

of his securities being escheated without notice under the NJUPA." Appx114, AC ¶ 20. At the risk of stating the obvious: Vial was personally harmed when his family was harmed and he owns property today subject to the same injury under the same policy. He is the same person, with the same property exposure, facing the same constitutionally deficient notice scheme. The wall drawn by the district court obfuscates and ignores that continuity.

Moreover, the district court cites no authority for the proposition that Vial's past injury (to him and his family) and his future injury (to him alone) must be considered in isolation from one another. Rather, Vial's "standing to seek the injunction requested depended on whether he was likely to suffer future injury," and "[p]ast wrong[s] were evidence bearing" on that question. *Lyons*, 461 U.S. at 102, 105. It is illogical to conclude that, because Vial was first injured by Defendants' no-notice escheatment as a member of his family, his past injury is not probative evidence of whether he is likely at risk of that injury as an individual. Rather, the same policy remains operative and continues to expose Vial's remaining stock for the same reasons.

Second, the district court held that Vial's risk of future harm is not sufficient to confer standing because it purportedly depends upon a "highly attenuated chain of possibilities," Appx055, Op. at 17. Upon examination, the district court's "highly attenuated chain of possibilities" only appears "highly attenuated" because it failed

26

to accept as true Vial's well-pleaded factual allegations and blatantly re-wrote an unambiguous requirement in the NJUPA. Both constitute reversible error.

The district court first found: "[f]or Plaintiff's predicted escheatment to occur, Plaintiff would" have to "avoid contact with TradeUp for multiple years," Appx57, Op. at 19. However, the Amended Complaint—which the district court must accept "as true and draw all reasonable inferences" in Vial's favor, *In re Horizon Healthcare Servs.*, 846 F.3d at 633—alleges that he plans to pursue a buy-and-hold approach in which he does nothing with TradeUp or his shares. Appx134, AC ¶¶ 106–107. There are zero allegations that Vial will contact TradeUp in one of the specific forms that Section 46:30B-7.1 requires to prevent escheatment. In fact, even if the inferences were somehow construed *against* the plaintiff, it is not a reasonable inference that Vial would have "contact" with TradeUp in one of those very specific ways.

The district court next found that Vial "would have to affirmatively ignore all statutorily required notice from TradeUp," Appx057, Op. at 19. But this argument assumes away the central flaw of the NJUPA: Vial—as an overseas owner—will certainly **not** receive notice if TradeUp provides the notice that NJUPA requires. As explained above, the only pre-escheat notice is requiring holders to send notice via certified mail, which categorically does not exist for overseas owners. *See* N.J.S.A. § 46:30B-50; Appx125, AC ¶¶ 61–63.

The district court attempts to brush off this structural problem in a footnote by dismissing it as "Plaintiff's interpretation" and claims to use the canon of constitutional avoidance to effectively re-write the statute. Appx057, Op. at 19, n.24. "But that canon of construction applies only when ambiguity exists." *Iancu v. Brunetti*, 588 U.S. 388, 397 (2019). No court can "rewrite a law to conform it to constitutional requirements." *Id.* So even assuming the district court's "reading would eliminate [constitutional] problems, [it] may adopt it only if [it] can see it in the statutory language." *Id.* And here, the statutory language is unequivocal: it specifies that the holder "**shall send by certified mail**, and with return receipt requested, written notice to the apparent owner at the last known address," N.J.S.A. § 46:30B-50 (emphasis added). As written, the statute requires a very specific method of service that will not provide notice to plaintiff or similarly situated property owners. That is not one "interpretation" of many—it is the statute operating as unambiguously written.

Relatedly, the district court found that it was "speculative" that TradeUp "will not provide pre-escheatment notice" and cited *Clapper* for the proposition that "Plaintiffs cannot rely on speculation about the 'unfettered choices made by independent actors not before the courts.'" Appx158, Op. at 20 (quoting *Clapper*, 568 U.S. at 414 n.5). *Clapper* found it too speculative that a government department would decide to seek permission of "the Foreign Intelligence Surveillance Court" to

28

access their private communications, something the challenged law did not require said department to do. *Id.* at 413. But no such "unfettered" choices are at issue here: NJUPA *requires* holders to use a form of notice that cannot reach Vial.

Indeed, the injury *will* occur if the holder does exactly *as the Statute requires*. It is the *district court* that impermissibly speculates that TradeUp will provide notice to Vial in a manner other than what the NJUPA commands—even though the NJUPA does not provide any choice or discretion to the holder regarding that method. The district court has no basis for this assumption—and it is particularly inappropriate for the district court to make this unfounded assumption in this procedural posture where the district court must "accept the Plaintiffs' well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the Plaintiffs' favor." *In re Horizon Healthcare Servs.*, 846 F.3d at 633.

The district court next found that the "predicted course of conduct is particularly implausible given Plaintiff's assertion" that "he is 'constantly monitor[ing]' his property out of fear of future escheatment." Appx058, Op. at 20. In support, the district court cites *Peters v. Cohen*, 2025 WL 733237 (9th Cir. Mar. 7, 2025). But the *Peters* court questioned the likelihood that California would seize shares of stock in a **_German_** brokerage account. *Peters*, 2025 WL 733237, at *1. By contrast, TradeUp is a *New Jersey* corporation on which the NJUPA unquestionably imposes escheatment obligations, Appx133, AC ¶ 102.

In any case, this argument—leveraging a plaintiff's supposed enhanced ability to prevent another escheatment to defeat standing—was rejected by the Ninth Circuit. "Although plaintiffs' newly acquired knowledge of the law—**and their ability to monitor their property**—can perhaps reduce the likelihood of again having their property escheated without notice, it does not make this likelihood 'remote.'" *Taylor II*, 488 F.3d at 1200 (emphasis added). Notably, this holding stems from the same case in which—as here—the plaintiffs had standing because they alleged "the injuries attendant to having to continually monitor one's property will recur as long as California's system remains in place." *Id.* Thus the two theories of harm (present monitoring and future risk) do not negate one another.

The district court also held that for injury to occur, "the Administrator's *post-escheatment* publication efforts would have to fail to reach plaintiff" and "Plaintiff would have to fail to prevent the liquidation by submitting a claim for the return of his stock" prior to liquidation. Appx057, Op at 19 (emphasis added). Those assertions are irrelevant to standing. The injurious violation is "complete at the time of the taking," such that a property owner may bring a claim at that time before submitting a claim. *See Knick v. Twp. of Scott, Pennsylvania*, 588 U.S. 180, 202 (2019). The Ninth and the Tenth Circuit have applied *Knick* to hold that "a property owner has no obligation to seek a remedy through state administrative proceedings"

30

to have standing to sue in federal court. *Knellinger v. Young*, 134 F.4th 1034, 1044–45 (10th Cir. 2025); *accord Garza v. Woods*, 150 F.4th 1118, 1125 (9th Cir. 2025).

Moreover, as discussed above, the deprivation of property without notice itself constitutes harm that post-deprivation process cannot undo. *See* Section I.A, *supra*. When the government takes custody of property "even temporarily, certain rights associated with ownership are lost." *Taylor v. Chiang*, 2007 WL 1628050, at *2 (E.D. Cal. June 1, 2007). Accordingly, it is of no moment that Vial could theoretically receive post-taking notice and act upon it.

In any case—contrary to the district court's predictions—it is also extremely likely that the "post-escheatment efforts *would* . . . fail to reach plaintiff," Appx057, Op. at 19 (emphasis added), and similarly situated individuals. Other than a website riddled with problems, Appx125–30, AC ¶ 64–83, and not known to people all over the world, the only form of post-escheat notice issued by the state is publication notice exclusively within a newspaper within the state of New Jersey—regardless of where the out-of-state owner resides. *See* N.J.S.A. § 46:30B-51.

### B. Vial Is Suffering Cognizable Present Injury Because the NJUPA Compels Him to Act to Avoid Injury

Even setting aside the near-certainty of future no-notice escheatment explained above, Vial has Article III standing based on injuries he suffers *today*. The Supreme Court has recognized that "in some instances, we have found standing based on a 'substantial risk' that the harm will occur, which may prompt plaintiffs

to reasonably incur costs to mitigate or avoid that harm." *Clapper*, 568 U.S. at 414 n.5. Indeed, burdens incurred to "minimize the likelihood of potential harm" are "sufficiently concrete to satisfy the injury-in-fact prong" of Article III—even if the underlying harm never materializes. *Monsanto*, 561 U.S. at 154–55.

In *Monsanto*, a group of conventional alfalfa growers sought injunctive relief against an agency decision to deregulate genetically engineered alfalfa. 561 U.S. at 152. They claimed that deregulation would harm them because their neighbors *might* plant the genetically engineered seed, the bees *might* obtain pollen from the neighbors' plants, and then the bees *might* (harmfully) contaminate their own conventional alfalfa with the genetically modified gene. *Id.* Without expressing views about the probability of that future contamination harm coming to pass, the Supreme Court found standing because the plaintiffs would suffer ***present*** harm by trying to monitor or mitigate the threat. *Id.* at 154–55. The plaintiffs "would have to conduct testing to find out whether and to what extent their crops have been contaminated" and take other "measures to minimize the likelihood of potential contamination." *Id.* The Court held: "Such harms, which respondents ***will suffer even if their crops are not actually infected*** with the Roundup Ready gene, are sufficiently concrete to satisfy the injury-in-fact prong of the constitutional standing analysis." *Id.* at 155 (emphasis added).

Indeed, in the unclaimed property context, the Ninth Circuit held that: "the injuries suffered by plaintiffs include not only those attendant to having their property escheated without notice, but also include" the "cost of having to constantly monitor their property to avoid escheat, either by devoting significant time to searching the internet themselves, by paying a service to do the same, or by 'churning' their property so that it stays active and avoids escheat." *Taylor II*, 488 F.3d at 1199–1200. That court held that these injuries were presently existing as long as the statute existed: "it is obvious that, at the very least, the injuries attendant to having to continually monitor one's property will recur as long as California's system remains in place." *Id.* at 1200.

Vial's present injuries fall squarely within this framework. The fact that Vial is compelled to monitor or churn his property to *prevent* escheatment demonstrates *current harm*. The NJUPA's structurally deficient notice regime forces Vial into an impossible choice: either (a) incur the burdens of monitoring and "churning" his property to avoid escheatment, or (b) suffer the unconstitutional seizure of his property without notice. Appx 132–35, AC ¶¶ 101, 104–112. Either path produces concrete harm traceable to the NJUPA's operation.

The district court rejected this cognizable present harm on the grounds that (1) the allegations were "insufficiently concrete," (2) they were "irreconcilable" with his allegations of future injury. Again, neither reason withstands scrutiny.

33

First, the district court rejected Vial's present harm as "bare, conclusory allegations" that are "insufficiently concrete to confer standing." Appx059, Op. at 21. But Vial alleges that "[t]o avoid escheat, [he] would be required to churn and monitor that property (and other property) in order to ensure that the Administrator does not attempt to seize it." Appx134, AC ¶ 108. He further alleges that he "is incurring, and will continue to incur, the real and concrete cost of having to constantly monitor his property to avoid escheat, including retention of counsel in the United States." AC ¶ 111. These allegations describe concrete burdens, specifically including retention of professionals. It is unclear what further details the district court seeks.

In any case, standing does not depend on the degree of burden, but whether the burden is concrete—and here that burden is met because that the statute requires Vial to take specific actions to avoid escheat. Nothing in Article III requires a plaintiff to plead the dollar amount of monitoring costs. Rather, at the motion-to-dismiss stage, the district court should have accepted these "well-pleaded factual allegations as true" and it should have "draw[n] all reasonable inferences from those allegations in [Vial's] favor." *In re Horizon Healthcare Servs. Inc.*, 846 F.3d at 633. *Taylor II* found standing based on precisely the same level of generality—"the inherent burden of having to constantly monitor their property to avoid escheat," 488 F.3d at 1199–1200—without requiring any specific dollar figure.

34

The district court's attempts to distinguish *Taylor II* are unconvincing. First, the district court revisits its contention that the "*Taylor II* plaintiffs had already personally suffered previous escheatment for their property," but Plaintiff supposedly had not. Appx060, Op. at 22. As discussed in Section I.A., this is factually and legally mistaken. Second, the district court relies on purported distinguishing facts that the *Taylor II* decision not only did not turn on—*but did not even mention*. Appx061, Op. at 23, n.31. Indeed, the district court relied on facts buried in a brief filed in the Eastern District of California—not even before the Ninth Circuit. The cherry on top is that those facts were adduced in a *reply* brief, meaning that it's unclear whether those facts were even properly before the *district court* in *Taylor II*. *Taylor II* is persuasive and indistinguishable in all material aspects: Vial's efforts to avoid no-notice escheat constitute cognizable present harm.

The district court also invoked *Reilly v. Ceridian Corp.*, 664 F.3d 38, 46 (3d Cir. 2011), for the proposition that "costs incurred 'prophylactically' to prevent injury are insufficient to confer standing." Appx060, Op. at 22 n.29. In *Clemens*, 48 F.4th at 153, this Court clarified that *Reilly* does not establish a "bright line rule"— much less one precluding standing whenever harm has not yet materialized. In any case, in *Reilly*, this Court found no standing based on data breach because (1) there was "no evidence that the intrusion was intentional or malicious;" (2) there was no evidence "that the data has been—or will ever be—misused;" and (3) the chain of

events leading to harm was "entirely speculative"—dependent on "unknown third part[ies]" choosing to exploit the stolen data. 664 F.3d at 42–44. Here, by contrast, the risk flows not from hypothetical choices made by independent actors, but from the mandatory operation of a statute that *requires* a notice method incapable of reaching foreign addresses

The district court also held that Vial's monitoring allegations are "irreconcilable" with his stated buy-and-hold investment strategy—reasoning that Vial either monitors (making escheatment implausible) or does not (negating any present-injury claim). Appx059, Op. at 21. This gets the injury precisely backwards. As the Supreme Court's holding in *Monsanto* demonstrates: Being forced to choose between monitoring costs and the risk of future harm is itself a concrete, present harm. 561 U.S. at 154–55. Vial is forced to choose between two paths, each of which produces concrete harm: monitoring and churning (which imposes ongoing burden) or pursuing his intended hands-off buy-and-hold approach (which will result in unconstitutional seizure without notice). Appx133–35, AC ¶¶ 104–112. Federal Rule of Civil Procedure 8(d)(2) expressly permits parties to "set out 2 or more statements of a claim or defense alternatively" in this manner. The district court declined to apply this rule by reference to *Pyatkova v. Motorcars*, 2016 WL 674862, at *2 (D.N.J. Feb. 3, 2016). However, that case only stands for the proposition that courts "need not accept **factual claims** that are internally inconsistent." But there is

no internal inconsistency here—just a property owner forced to choose between present cognizable injury (in the form of a burden) or proceeding as he otherwise would have, undertaking substantial risk of future injury (in the form of no-notice escheat). These are not "internally inconsistent" factual claims; they are the two horns of a statutorily-imposed dilemma.

### C. Vial Has Standing to Seek an Accounting

In a single footnote—devoid of any substantive analysis of the equitable accounting doctrine—the district court dismissed Vial's request for an equitable accounting as a "fishing expedition" that was "too speculative for standing purposes." Appx054, Op. at 16 n.19. The court essentially faulted Vial for failing to identify specific additional property. Appx054, Op. at 16 n.19. But that is precisely the information that the accounting is designed to produce. Requiring Vial to already possess the information he seeks as a precondition to obtaining it is impossibly circular.

And it is particularly unjust given the nature of the constitutional violation alleged. Vial alleges that the State seized property without providing any notice whatsoever. Appx131, AC ¶¶ 89–90. Where the State has a constitutional duty to provide notice but systemically fails to do so, the resulting information asymmetry is not a basis for denying relief; it is the very injury that warrants an equitable

accounting. [9]

## II. THE ELEVENTH AMENDMENT DOES NOT BAR VIAL'S REQUEST TO BE MADE WHOLE FROM NON-STATE FUNDS OUTSIDE THE STATE'S TREASURY

After dismissing for lack of standing Vial's claims for injunctive and declaratory relief pertaining to the risks of further no-notice escheatment, the district court held that the Eleventh Amendment barred Vial's remaining injunctive and equitable relief, which it characterized as "compensation." Appx061, Op. at 23.

At the outset, the district court misstates Vial's claim. The Fifth Amendment commands that when property is appropriated by the States, "the owner is to be put in the same position monetarily as he would have occupied if his property had not been taken." *Reynolds*, 397 U.S. at 16. A claim asking the Court to "order the state to pay just compensation" is "prospective relief" where, as here the state has "failed to give them just compensation"—which itself, is an "ongoing violation" of federal law until that just compensation is paid. *Maron*, 136 F.4th at 1333.

---

[9] Although the merits of the equitable accounting are not before this Court, such relief is warranted. "The party seeking to obtain an accounting must establish: (1) a fiduciary or trust relationship; (2) the complicated nature of the character of the account; and (3) the need of discovery." *In re U.S. Mortg. Corp.*, 491 B.R. 642, 670 (Bankr. D.N.J. 2013) (citation omitted). All three elements are met here: (1) Under the NJUPA, the State acts as a custodian—indeed, a "trustee"—of escheated property; (2) given that the website is too erroneous and unreliable to even provide minimal assistance, Appx127–30, AC ¶¶ 70–83, accounting for the harm would otherwise be complicated; (3) and the information is solely in the possession of Defendants.

As is relevant to Vial, "[b]ut for New Jersey's unnoticed seizure and liquidation of those stocks, the Borquez Family would have had stocks of Exxon Mobil Corporation worth over $623,936 instead of the $487,581.23 returned." Appx132, AC ¶ 97. Indeed, the district court correctly acknowledged that Vial suffered a "classic pocketbook injury" when Defendants "escheated Borquez's Exxon stock without proper notice and undercompensated him for that action," Appx052, Op. at 14 (quoting *Tyler*, 598 U.S. at 636).

Consistent with that due process injury and the Fifth Amendment's mandate, Vial seeks "[i]njunctive and equitable relief requiring Defendants to return (rather than destroy or liquidate) the property . . . still in the State's possession, or otherwise put Plaintiff and Class Members in the same position monetarily as they would have occupied if the property had not been unconstitutionally seized and taken, including compensation for any appreciation in the value of the property since its seizure," Appx119, 145–46, AC at 37–38, Prayer for Relief D. Thus, in addition to an accounting for any of Vial's other property currently in the possession of the state,[10] Vial seeks the $136,354 difference between the amount the Defendants' administrative process provided and the amount he would have had in *but-for* world in which the Defendants did not escheat his property without notice. Appx144, AC ¶ 157 & n.14.

---

[10] *See* Section I.C. regarding equitable accounting.

Restoring Vial to the "position monetarily as he would have occupied if his property had not been taken," *Reynolds*, 397 U.S. at 16, does not run afoul of the Eleventh Amendment because (A) the funds at issue are not public funds belonging to the state, and (B) even if these funds did implicate the Eleventh Amendment, the *Ex Parte Young* exception applies.

### A. The District Court Correctly Held That the Funds at Issue Are Not State Funds But Then Erroneously Held That the Eleventh Amendment Protects Them Anyways Based on California-Specific Caselaw

The Eleventh Amendment's core concern is to prevent "federal-court judgments that must be paid ***out of a State's treasury***." *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 48 (1994) (emphasis added). Here, Vial seeks to be made whole from funds outside the State's treasury, which are not even the State's funds altogether.

The NJUPA specifies that all "moneys received as unclaimed property presumed abandoned, the accretions thereon, and the proceeds of sale of unclaimed property shall be deposited into the Unclaimed Personal Property Trust Fund." N.J.S.A. § 46:30B-74(c). Some of these funds are transferred to the General State Fund, but the remaining funds are to be "used to pay claims duly presented and allowed and all expenses and costs incurred by the State of New Jersey." *Id.* Vial seeks to be made whole from these "funds explicitly and purposefully set aside in a custodial trust separate from New Jersey's treasury." Appx131, AC ¶ 121.

The district court correctly observed that these funds are not New Jersey's funds altogether: "unclaimed funds the Administration has escheated are 'held by the Treasurer as trustee for the public interest,' ___not the state of New Jersey___." Appx062, Op. at 24 (emphasis added) (quoting *Clymer v. Summit Bancorp, Inc.*, 171 N.J. 57, 63 (2002)). This is because the NJUPA sets up a "custodial" escheatment system, wherein unclaimed property and its proceeds ___are private property___ held in trust for the benefit of the owners—not state funds. *See, e.g.*, *Am. Exp. Travel Related Servs., Inc. Sidamon-Eristoff*, 669 F.3d 359, 365 (3d Cir. 2012) ("the original property owner still maintains the right to the property"); *Salvato*, 2022 WL 1224962 at *4–6; *Clymer*, 171 N.J. at 63 ("title to the unclaimed property does not vest in the State but remains in the owner, as the State only assumes custody of the intangible property"); Defendants themselves have conceded this custodial character—both here and in prior litigation.[11] As the Ninth Circuit held: "sovereign immunity applies to the state's money" but "___[m]oney that the state holds in custody for the benefit of private individuals is not the state's money, any more than towed cars are the state's cars___." *Taylor v. Westly*, 402 F.3d 924, 932 (9th Cir. 2005)

---

[11] In *Salvato*, Defendants admitted that "when property is transferred to the State under the auspices of the UPA, the 'funds [are held] in perpetuity for the true owner.'" *Salvato*, 2022 WL 1224962, at *6 (quoting Defendant's brief). And Defendants concede again in this case that "the Act provides that **title to unclaimed property does not vest in the State**, but rather remains vested in the owner, with the State acting as custodian while holding his property." Appx165, MTD at 5.

41

("*Taylor I*").

After correctly holding that these funds are not in the State's treasury and are not even the State's funds, the district court incorrectly extended Eleventh Amendment protection to these funds. The district court did so simply because Plaintiff previously received the proceeds of his (known) escheated and liquidated property through the State's administrative claims process. Appx064, Op. at 26.

This makes no sense. If the funds in the Unclaimed Personal Property Trust Fund are not the State's money—as the district court itself recognized—then a claim for additional disbursement from that same fund cannot be a claim against the State's money either. In other words, what the district court characterizes as "additional compensation" is ***still not*** a claim against the State's own money.

The district court's characterization of Vial's claim for the appreciated value of the escheated stock as a request for "additional compensation," Appx064, Op. at 26, is also incorrect because it ignores the constitutional baseline, requiring that an owner be "put in the same position monetarily as he would have occupied if his property had not been taken." *Reynolds*, 397 U.S. at 16; *see also United States v. 564.54 Acres Land*, 441 U.S. 506, 510 (1979) (owner must be placed "in as good a position pecuniarily as if his property had not been taken"). The difference between $487,581.23 and $623,936 is not a windfall, a bonus, or "additional" money. It is the constitutionally-compelled measure of just compensation for property taken without

42

notice and prematurely liquidated. Appx132, 141–43, AC ¶¶ 97, 142–155. Properly viewed through this lens, Vial's claim is a demand for the value of property that he would have had but-for Defendants' no-notice seizure, from funds held in a custodial trust that exists for the sole purpose of making owners like him whole.[12]

The district court's erroneous conclusion appears to be based on a misreading of caselaw. The district court began by correctly observing that the Ninth Circuit and Eleventh Circuits have held that "the Eleventh Amendment did not bar the Plaintiffs from recovering their escheated property" under "a similarly custodial unclaimed property system." Appx064, Op. at 26 (citations omitted). However, the district court then incorrectly extrapolated: "in the cases in which states had returned the proceeds of liquidated property and plaintiff sought additional compensation-namely, as here, the appreciated value of escheated stock-courts have held that sovereign immunity bars such recovery." Appx065, Op. at 27. The district court bases this entire extrapolation on *Suever v. Connell*, 579 F.3d 1047 (9th Cir. 2009) and *Peters*, 2025 WL 733237, which simply followed *Suever*. But these cases pertain to a

---

[12] At most—this would be an argument that Plaintiff no longer has standing because Plaintiff's injury has been remedied. But the district court held Plaintiff had standing for this past injury. Appx052, Op. at 14. And for the reasons explained above, Plaintiff has suffered harm from the seizure without notice regardless of compensation. *See* Section I.A *supra* (citing *Meese*, *Fuentes*, and *Chiang*). Moreover, that payment was not "just compensation" because it did not restore him to the "position monetarily as he would have occupied if his property had not been taken," *Reynolds*, 397 U.S. at 16.

fundamentally different escheatment fund structure under California's Unclaimed Property Law.

The *Suever* court explicitly rejected that plaintiff's request for appreciation on the grounds that California's system required the Controller to sweep all funds in the Unclaimed Property Fund in excess of $50,000 to the General Fund every month, such that "there is not $5.3 billion worth of private money in the Unclaimed Property Fund." *See Suever*, 579 F.3d at 1060 (citing CAL. CIV. PROC. CODE § 1564(c)). Thus, there was not, in practical terms, a segregated pool of private money available to pay claims for additional compensation. *Id.* That is not the case under the NJUPA. *See* N.J.S.A. § 46:30B-74 (unclaimed property funds are deposited into the Unclaimed Personal Property Trust Fund, wherein the administrator may transfer 75% of received funds to the General State Fund, the remaining amount is expressly "retained in the trust fund, administered and invested by the State Treasurer, and used to pay claims duly presented and allowed and all expenses and costs incurred by the State of New Jersey.").[13] *See Garza*, 150 F.4th at 1126 (sovereign immunity did not apply because plaintiffs did not seek "money that belonged to the government" because Arizona's Act "plainly requires the Department to hold

---

[13] Notably, even if the funds have been transferred to the General Fund, a person can claim their abandoned property at any time, and there is no provision in the NJUPA that would limit the ability to claim said property or its proceeds—even *after* its technical passage to the general fund. *See* N.J.S.A. § 46:30B-77.

44

unclaimed property for the benefit of owners").

Currently, Defendants hold over $6 billion in purportedly "unclaimed" property, Appx110, AC ¶ 6, and the State has made no showing that all of it will be claimed. Indeed, since the inception of the program, the state has returned around $2.7 billion. Appx122, AC ¶ 30. Thus, Vial can be made whole without paying a penny of the State's money.[14] Appx135–36, AC ¶¶ 116–117.

This is not a semantic distinction. It goes to the heart of the Eleventh Amendment analysis. The Supreme Court has held that "the vulnerability of the State's purse [is] the most salient factor in Eleventh Amendment determinations." *Hess*, 513 U.S. at 48. Where a plaintiff seeks recovery from a fund that belongs to private owners—not the State—the Eleventh Amendment's core purpose of protecting the state fisc is not implicated. As the District Court of Delaware astutely recognized earlier this year: "in escheat cases such as this, there is a caveat: if the Plaintiff seeks recovery out of a state's specially-earmarked fund for escheat claims, then those are damages drawn *from a fund that is custodial in nature*, whose administrators are not protected by the Eleventh Amendment." *Mayrack*, 2026 WL 800611, at *4.

_____

[14] Indeed, the State has only returned $2.7 billion since the inception of the program, Appx116, AC ¶ 30, so for the state's funds to be implicated, the Class members' recovery in this lawsuit alone would have to ***exceed the sum total of all unclaimed property payments New Jersey has ever made twice over***.

The *Suever* court held, in the alternative, "the Controller could not lawfully use it to pay Plaintiffs the difference between the proceeds of the sale of their escheated property and what they claim that property is worth now; to do so, the Controller would by definition have to use money belonging to other owners of unclaimed property." 579 F.3d at 1060. But this does not provide a basis to dismiss Vial's case under the Eleventh Amendment. Protecting "money belonging to other" private individuals is simply not within the ambit of Eleventh Amendment. This holding is also limited to the structure of California's system. Unlike California's system, the NJUPA does not limit claimants to merely the value the state itself received from the escheatment and liquidation of their property.[15] Accordingly, *Suever*'s categorical prohibition against paying "[m]oney belonging to other" owners from the fund does not apply in New Jersey. Indeed, the State uses those funds to pay "all expenses and costs incurred by the State of New Jersey," including auditors—evidently without any concern that it is transferring private property from the rightful owner to an auditor. N.J.S.A. § 46:30B-74(c); AC ¶ 39. Moreover, much

---

[15] California and New Jersey both pass on to the owner "any dividends, interest or other increments realized or accruing on such property *at or prior to liquidation*" CAL. CIV. PROC. CODE § 1562 (emphasis added); N.J.S.A. § 46:30B-68 (similar). However, California makes clear that "[e]xcept for amounts so credited the owner is not entitled to receive income or other increments on money or other property paid or delivered to the State Controller," CCPC § 1562, whereas New Jersey also entitles owners to "interest upon the monies of the claimant for the period during which those monies were in the custody of the administrator" at a statutorily defined rate. N.J.S.A. § 46:30B-79.

of the Fund is composed of sums that can never be returned to the owners because the State does not request or receive the ownership information. N.J.S.A. § 46:30B-47 (only requiring owner information for property over $50).

In short, the district court's uncritical importation of California caselaw into a case governed by New Jersey's materially different statutory regime was error. This Court should decline to extend *Suever* and *Peters* beyond the narrow context in which they arose and should hold that the Eleventh Amendment does not bar Vial's claims for relief drawn entirely from a custodial trust fund that was never the State's money.

**B.**     **Even if State Funds Were Implicated, the *Ex Parte Young* Exception to the Eleventh Amendment Would Apply**

In a footnote, the district court held that Vial's requested relief "plainly does not fall under the *Ex parte Young* exception." Appx064, Op. at 26 n.33. In support, the district court simply cited *Suever*, 579 F.3d at 1058–59, *Taylor I*, 402 F.3d at 935, and *Merritts v. Richards*, 62 F4th 764, 772 (3d Cir. 2023).

The doctrine of *Ex parte Young* holds that "a state official is stripped of his official or representative character and thereby deprived of the State's immunity, when he commits an ongoing violation of federal law." *Waterfront Comm'n of New York Harbor v. Governor of N.J.*, 961 F.3d 234, 238 (3d Cir. 2020) (cleaned up). In *Merritts*, this Court explained "for the *Ex parte Young* exception to apply, there must be both an ongoing violation of federal law and a request for relief that can be

47

properly characterized as prospective." *Merritts*, 62 F.4th at 771. Both are satisfied here.

In *Maron*, 136 F.4th at 1333–34, the court applied *Ex parte Young* to permit claims challenging Florida's unclaimed property scheme. Like Defendants here, Florida argued that the "just compensation" relief sought was retrospective. The Eleventh Circuit rejected that argument because "the Takings Clause . . . prohibits not takings, but takings without just compensation" such that the "*lack of compensation is a part of an ongoing tort*." *Id.* at 1334 (emphasis added). As the Eleventh Circuit held, "sovereign immunity did not bar the . . . takings claim because it sought not damages but prospective relief to end an ongoing violation of federal law." *Maron*, 136 F.4th at 1334.

That reasoning is squarely applicable here. Vial requests "just compensation"—something he has not received to this day because he has not yet been restored to the same "position monetarily as he would have occupied if his property had not been taken," *Reynolds*, 397 U.S. at 16. The monetary relief sought therefore is not damages reflecting a "monetary loss resulting from a ***past breach*** of a legal duty," *Edelman v. Jordan*, 415 U.S. 651, 668 (1974) (emphasis added), but constitutionally compelled "just compensation" that Vial is currently being deprived of as part of an ongoing violation of the Fifth Amendment. This Court should adopt the reasoning in *Maron*.

Thus, even assuming the Eleventh Amendment otherwise applies to Vial's request, the *Ex parte Young* exception independently authorizes the prospective injunctive and equitable relief at the heart of this case.

## **CONCLUSION**

For the foregoing reasons, we respectfully request that the Court reverse the District Court's decision and remand for further proceedings.

May 29, 2026

Respectfully submitted,

/s/ Bret R. Vallacher
Jonathan Massey
Bret R. Vallacher, Esq.
MASSEY & GAIL LLP
1000 Maine Ave. SW
Suite 450
Washington, D.C. 20024
Telephone: (202) 650-5452
Email: bvallacher@masseygail.com

William W. Palmer, Esq.
PALMER LAW GROUP, a PLC
2443 Fair Oaks Boulevard, No. 545
Sacramento, CA 95825
Telephone: (916) 972-0761
Email: wpalmer@palmercorp.com

Kevin P. Roddy, Esq.
WILENTZ, GOLDMAN &
SPITZER, P.A.
90 Woodbridge Center Drive,
Suite 900
Woodbridge, NJ 07095
Telephone: (732) 636-8000
Email: kroddy@wilentz.com


*Attorneys for Plaintiff-Appellant*

# CERTIFICATION OF BAR MEMBERSHIP

Pursuant to Third Circuit Local Rule 28.3(d), I certify that I am a member of the Bar of the Court.

May 29, 2026

/s/ *Bret R. Vallacher*
Bret R. Vallacher

<u>**CERTIFICATION OF COMPLIANCE**</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,891 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirement of Fed. R. App. P. 32(a) (6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

This brief complies with the electronic filing requirements of Third Circuit Local Rule 31.1(c) because the text of the electronic brief is identical to the text in the paper copies, and a virus detection program has been run on the file and no virus was detected. The virus detection program utilized was Microsoft Defender.

May 29, 2026
/s/ *Bret R. Vallacher*
Bret R. Vallacher

## CERTIFICATION OF SERVICE

I certify that today, May 29, 2026, I caused to be electronically filed the foregoing Brief and Appendix Volume I and Appendix Volume II with the Clerk of the Court for the United States Court of Appeals for the Third Circuit using the Court's CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the Court's CM/ECF System.

May 29, 2026

/s/ *Bret R. Vallacher*
Bret R. Vallacher

# APPENDIX VOLUME 1

**APPENDIX**
**TABLE ON CONTENTS**

**VOLUME 1**
**IN COMPLIANCE WITH LOCLA RULE 32.2(c)**

| VOLUME 1 – IN COMPLIANCE WITH LOCAL RULE 32.2(c) | | | |
|---|---|---|---|
| ITEM | ECF NO. | DESCRIPTION | APPENDIX PAGE |
| 1 | 58 | Notice of Appeal, dated Feb. 10, 2026 | Appx001 |
| 2 | 54 | Opinion Granting Motion to Dismiss, dated Jan. 12, 2026 | Appx039 |
| 3 | 55 | Order Granting Motion to Dismiss, dated Jan, 12, 2026 | Appx068 |
| 4 | 57 | Order Entering Final Judgment, dated Feb. 10, 2026 | Appx070 |

Kevin P. Roddy, Esq.
WILENTZ, GOLDMAN & SPITZER, P.A
90 Woodbridge Center Dr., Suite 900
Woodbridge, NJ 07095
Telephone: (732) 636-8000
Email: kroddy@wilentz.com

William W. Palmer, Esq.
(*Pro Hac Vice Counsel*)
PALMER LAW GROUP, PLC
2443 Fair Oaks Boulevard, No. 545
Sacramento, CA 95825
Telephone: (916) 972-0761
Email: wpalmer@palmercorp.com

Jonathan S. Massey
Bret R. Vallacher
(*Pro Hac Vice Counsel*)
MASSEY & GAIL LLP
1000 Maine Avenue SW
Suite 450
Washington, D.C. 20024
Telephone: (202) 652-4511
Email: jmassey@masseygail.com
bvallacher@masseygail.com

*Attorneys for Plaintiff Vial and Proposed Class Members*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JAIME VIAL, individually and as representative of the heirs of Rene Correa Borquez, and on behalf of other persons similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> ELIZABETH MAHER MUOIO, in her official capacity as TREASURER OF THE STATE OF NEW JERSEY; and STEVEN HARRIS, in his official capacity as ADMINISTRATOR OF THE STATE OF NEW JERSEY UNCLAIMED PROPERTY ADMINISTRATION. <br><br> Defendants. | Case No.: 3:24-cv-11301 <br><br><br> **NOTICE OF APPEAL TO THE U.S. COURT OF APPEALS FOR THE THIRD CIRCUIT** |

Notice is hereby given that Plaintiff, Jaime Vial ("Plaintiff" or "Vial"), as an individual and legal representative of the heirs of Rene Correa Borquez, and on behalf of similarly situated members of a putative class, hereby appeals to the United States Court of Appeals for the Third Circuit, the Order and Opinion entered in this action on January 12, 2026 (ECF Nos. 54 and 55), and the Order Entering Final Judgment entered in this action on February 10, 2026 (ECF No. 57). Copies of these documents are attached hereto as Exhibits A, B, and C, respectively.

Dated: February 10, 2026          Respectfully submitted,

/s/ *Kevin P. Roddy, Esquire*
WILENTZ, GOLDMAN & SPITZER, P.A.
KEVIN P. RODDY, ESQ.
(NJSBA # 014802005)
90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ 07095
Telephone: (732) 636-8000
Email: kroddy@wilentz.com

William W. Palmer, Esq.
(*Pro Hac Vice Counsel*)
PALMER LAW GROUP, a PLC
2443 Fair Oaks Boulevard, No. 545
Sacramento, CA 95825
Telephone: (916) 972-0761
Email: wpalmer@palmercorp.com

Jonathan S. Massey, Esq.
Bret R. Vallacher, Esq.
(*Pro Hac Vice Counsel*)
MASSEY & GAIL LLP
1000 Maine Ave. SW, Suite 450
Washington, D.C. 20024
Telephone: (202) 650-5452

1

**Appx002**

## CERTIFICATE OF SERVICE

I, Kevin P. Roddy, hereby certify that on this 10th day of February 2026, filed the foregoing NOTICE OF APPEAL TO THE U.S. COURT OF APPEALS FOR THE THIRD CIRCUIT with the Clerk of Court using the CM/ECF system, which effected service on all counsel of record.

*/s/ Kevin P. Roddy, Esquire*

**Appx003**

# EXHIBIT A

NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| JAIME VIAL, individually, as representative of the heirs of Rene Correa Borquez, and on behalf of other persons similarly situated,<br><br>       Plaintiff,<br><br>       v.<br><br>ELIZABETH MAHER MUOIO, in her official capacity as TREASURER OF THE STATE OF NEW JERSEY; and STEVEN HARRIS, in his official capacity as ADMINISTRATOR OF THE STATE OF NEW JERSEY UNCLAIMED PROPERTY ADMINISTRATION,<br><br>       Defendants. | Civil Action No. 24-11301 (RK) (JBD)<br><br>**OPINION** |

**KIRSCH, District Judge**

**THIS MATTER** comes before the Court upon the Motion to Dismiss by Elizabeth Maher Muoio, in her official capacity as Treasurer of the State of New Jersey, and Steven Harris, in his official capacity as Administrator of the State of New Jersey Unclaimed Property Administration (collectively, "Defendants"), brought under Federal Rules of Civil Procedure ("Rule") 12(b)(1) and 12(b)(6). ("MTD," ECF No. 49.) Having considered the parties' submissions, the Court resolves the pending Motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, Defendants' Motion is **GRANTED**.

## I.    BACKGROUND

After Rene Correa Borquez ("Borquez") died in Chile in May 2006, his 905 shares of Exxon Corporation stock allegedly escheated to the New Jersey Unclaimed Property Administration (the "Administration") without notice. ("AC," ECF No. 45. ¶ 84–90.) Plaintiff

Jaime[1] Vial ("Plaintiff"), Borquez's descendent and "legal representative," submitted a claim for the return of this stock under the New Jersey Uniform Unclaimed Property Act, N.J. Stat. Ann. § 46:30B-1 *et seq.* (the "Act" or "NJUPA"). Although the stock had already been sold pursuant to the statute, the NJUPA allowed Plaintiff to collect—"at *any time in perpetuity,*" *Clymer v. Summit Bancorp.*, 792 A.2d 396, 400 (N.J. 2002) (emphasis added) (citing N.J. Stat. Ann. § 46:30B-77)— "the net proceeds of sale," "any dividends, interest, or other increments realized or accruing on the property at or before liquidation," and interest "for the period during which those monies were in the custody of the administrator," an amount totaling nearly $500,000, N.J. Stat. Ann. §§ 46:30B-79, -68; (AC ¶¶ 93–94.) Plaintiff, dissatisfied with this amount, brought this putative class action almost two decades after Borquez's death to seek more, as well as to enjoin the administration of the NJUPA wholesale. (ECF No. 1; *see generally* AC, Prayer for Relief.) Because this Court lacks jurisdiction to decide Plaintiff's claims, however, for the reasons set forth herein, his Amended Complaint must be dismissed.

## A.    THE NEW JERSEY UNIFORM UNCLAIMED PROPERTY ACT

New Jersey, like forty-nine states and the District of Columbia, has unclaimed property or 'escheat' laws. *See Am. Express Travel Related Servs. Co. v. Sidamon-Eristoff*, 755 F. Supp. 2d 556, 567 (D.N.J. 2010), *aff'd*, 669 F.3d 374 (3d Cir. 2012). Escheat and the related common law doctrine of *bona vacantia*—allowing states to "take control and dispose of abandoned property"— have long histories dating back to feudal English common law. *See Simon v. Weissmann*, 301 F. App'x 107, 110 (3d Cir. 2008). "As a broad principle of jurisprudence rather than as a result of the evolution of legal rules, it is clear that a state, subject to constitutional limitations, may use its

---

[1] Plaintiff's first name appears to be misspelled in the case caption on CM/ECF. The spelling as written in Plaintiff's filings is "Jaime," while the spelling on the docket is "Jamie." The Court uses the spelling as written by Plaintiff himself both here and in the caption of this Opinion.

2

legislative power to dispose of property within its reach, belonging to unknown persons." *Standard Oil Co. v. New Jersey*, 341 U.S. 428, 436 (1951). New Jersey's Unclaimed Property Administration effectuates this power through the NJUPA, N.J. Stat. Ann. § 46:30B-1 *et seq.*

In administering the NJUPA, the Administration "largely relies on self-reporting for remittance" of abandoned property. *Salvato v. Harris*, No. 21-12706, 2022 WL 1224962, at *3 (D.N.J. Apr. 26, 2022). As the Honorable Freda L. Wolfson, U.S.D.J., explained in *American Express Travel Related Services Company*:

> The laws of most states are based upon a version of the Uniform Unclaimed Property Act ("UUPA"). The Court notes that the purpose of enacting these escheat laws is to provide for the safekeeping of abandoned property and then reunite the abandoned property with its owner. In the usual course, when property is deemed abandoned, the holder of most types of property is required to attempt to contact the owner, using the name and last known address, and if possible, return the property. If the attempt is unsuccessful, the holder turns over the abandoned property to the state and provides the state with the name and last known address of the owner.[2]

755 F. Supp. 2d at 565. Under the NJUPA, these self-reporting "holders"—typically private individuals charged with holding the property of someone else—are required under the Act to annually report their possession of and, if necessary, remit unclaimed property to the Administration. N.J. Stat. Ann. § 46:30B-6(g) (defining holder); *id.* § 46:30B-46 (requiring

---

[2] The following example illustrates New Jersey's escheatment process: Jane Doe owns stock with a New Jersey-based brokerage firm. Ms. Doe would be an "owner" under the NJUPA and the brokerage firm would be a "holder." N.J. Stat. Ann. §§ 46:30B-6(g), (k). If, after three years, Ms. Doe does not sufficiently indicate her continued interest in that stock to the brokerage firm in ways indicated by the NJUPA, *id.* § 46:30B-31, and the brokerage firm is unable to communicate in certain ways with Ms. Doe, *id.* §§ 46:30B-7.1, -33, the brokerage firm must report and eventually remit Ms. Doe's stock to the NJUPA Administration, *id.* §§ 46:30B-49, -57. Now in possession of Ms. Doe's stock, the Administration must provide notice of the sale to Ms. Doe through newspaper listings and online. *Id.* §, -51; *See Search for Unclaimed Property*, N.J. Unclaimed Prop. Admin., https://unclaimedfunds.nj.gov/app/claim-search. After a one-year waiting period, the Administration must then sell the presumed-abandoned stock and hold the sale proceeds in trust for the owner. *Id.* §§ 46:30B-69, -71(c). Ms. Doe, upon learning of this escheatment and sale, may then submit a claim—"at any time in perpetuity"—with the Administration to recover the proceeds of this sale plus interest and accrued dividends. *Id.* §§ 46:30B-72, -79, -68; *Clymer,* 792 A.2d at 400.

3

Appx007

reports); *id.* § 46:30B-49 (requiring reports due November 1 of each year); *id.* § 46:30B-57 (requiring holder to remit property).

This property can include "stock or other evidence of ownership of an interest in a business association or financial organization." *Id.* § 46:30B-6(r). To determine whether an interest in a business is "abandoned," the NJUPA specifies certain triggering events that begin a three-year clock after which such property is presumed abandoned. *Id.* § 46:30B-31. Specifically, these triggering events include, among others, uncashed dividends, certain undelivered stock certificates, or with automatic reinvestment plans, a second "mailing of a statement of account or other notification or communication" returning as "undeliverable."[3] *Id.* Even if this three-year abandonment period is met, stock is not deemed abandoned if the holder has certain contact with the owner. *Id.* §§ 46:30B-7.1, -33.[4]

Between 60 to 120 days before the holder files a report addressing presumably abandoned property, the holder must "send by certified mail, and with return receipt requested, written notice to the apparent owner at the last known address informing the owner that the holder is in

---

[3] In addition to the second failed mailing or notification, Section 31 presumes that property is abandoned with automatic reinvestment plans "after the holder discontinued mailings to the apparent owner." N.J. Stat. Ann. § 46:30B-31.

[4] The NJUPA does not exhaustively list the forms of communication between owner and holder that are sufficient for property to not be presumed abandoned. NJUPA Section 31 governs when the presumption of abandonment applies to stock. N.J. Stat. Ann. § 46:30B-31. As described hereinabove, the scenarios contemplated by this section include the owner failing to take certain action with the stock or mail—"or other notification or communication"—returning as undeliverable within three years. *Id.* However, Section 31 does not list what these "other" notifications or communications include. Similarly, NJUPA Section 7.1 outlines a non-exhaustive list of owner actions that, if done, indicate the property "shall not be presumed abandoned" and will not be escheated. *Id.* § 46:30B-7.1. First, Section 7.1 specifies that the owner may communicate with the holder "in writing or by other means reflected in a contemporaneous record prepared by or on behalf of the holder," although without explaining what forms of communication are acceptable. *Id.* Second, owners can undertake some action to "indicate[] an interest in the property," which includes, *inter alia*, "owner-directed activity in the account in which the property is held." *Id.* As such, although Sections 31 and 7.1 indicate some of the options available to owners to prevent escheatment, neither appears exhaustive. Moreover, neither the NJUPA nor New Jersey caselaw defines what qualifies as a "communication" sufficient for property to not be presumed abandoned. *See id.* § 46:30B-6 (no definition for "communication").

possession" of their property if (1) that address is accurate, (2) the apparent owner's claim is not barred by the statute of limitations, and (3) the property is worth more than $50. *Id.* § 46:30B-50. The statute makes no exceptions for contacting foreign addresses or citizens outside the reach of certified mail. *See Certified Mail® - The Basics*, U.S. Postal Serv. (Sept. 26, 2025), https://faq.usps.com/s/article/Certified-Mail-The-Basics. The NJUPA requires each of these pre-escheatment notice procedures be undertaken by the *holder*, not the Administration or State of New Jersey.

If these collective outreach efforts fail and the Administration escheats the property, the NJUPA requires that most property be sold within three years of receipt, except for most securities which must be held for only one year before sale. N.J. Stat. Ann. §§ 46:30B-69, -72. When liquidated, the proceeds of these sold stocks are then held by the Treasurer and her designated Administrator in the Unclaimed Personal Property Trust Fund (the "Trust Fund"). *Id.* § 46:30B-71(c). Unless the Administrator "deems it prudent and advisable to do otherwise," 75 percent of all funds received in the Trust Fund are transferred to New Jersey's General State Fund. *Id.* The remaining 25 percent "shall be retained in the trust fund, administered and invested by the State Treasurer, and used to pay claims duly presented and allowed and all expenses and costs incurred by the State of New Jersey." *Id.* When an owner submits a claim for the return of their property, the Administrator "must appropriate from the Unclaimed Personal Property Trust Fund to administer the act and pay claims," because "all unclaimed funds are held by the Treasurer as trustee for the public interest." *Salvato*, 2022 WL 1224962, at *6 (quoting *Clymer*, 792 A.2d at 400).

To facilitate this reunion process, the NJUPA also provides owners post-escheatment notice. The Administrator is required to publish the name and address of the property owner in a

5

**Appx009**

"newspaper of general circulation in the county" of that last-known address "once a week for two consecutive weeks" by November 30 of the year following the sale of the escheated property.[5] *Id.* § 46:30B-51. Such notice, however, is only required for property valued $100 or more. *Id.* In addition, the Administrator also posts information about escheated property to its searchable Unclaimed Property database, containing similar information about the property. *Search for Unclaimed Property*, N.J. Unclaimed Prop. Admin., https://unclaimedfunds.nj.gov/app/claim-search. This database also links to MissingMoney.com, where searching owners can seek unclaimed property in a national database provided in partnership with the National Associations of State Treasurers and Unclaimed Property Administrators. *See MissingMoney.com*, https://missingmoney.com/.

The Administrator must pay valid claims from property owners seeking their escheated property. N.J. Stat. Ann. § 46:30B-77. In the event the Administrator is still in possession of an abandoned security—even after the one-year waiting period—an owner is entitled to the actual security itself. *Id.* § 46:30B-72. Furthermore, if the Administrator allows such a claim on previously liquidated stock, the owner-claimant is entitled to more than just the value at liquidation. The claimant receives "the net proceeds of sale," "any dividends, interest, or other increments realized or accruing on the property at or before liquidation," and interest "for the period during which those monies were in the custody of the administrator" at an interest rate fixed by the Administrator.[6] *Id.* §§ 46:30B-79, -68.

---

[5] The NJUPA's confidentiality provision limits the sharing of any information beyond name and address. N.J. Stat. Ann. § 46:30B-76.1.

[6] Although Plaintiff appears to suggest that the NJUPA-authorized amount "fails to account for . . . dividends[] or interest," (AC ¶ 159), Plaintiff's assertion is refuted by the language of the NJUPA, *see* N.J. Stat. Ann. §§ 46:30B-68, -79. Plaintiff does not otherwise allege that Defendants failed to pay him what he was owed pursuant to the NJUPA, and the Court need not accept Plaintiff's plainly foreclosed interpretation of the NJUPA as true at this stage. *See Baraka v. McGreevey*, 481 F.3d 187, 211 (3d Cir. 2007).

6

**Appx010**

**B.    FACTUAL BACKGROUND**

Defendants, New Jersey state officials sued in their official capacities for their respective roles in administering the NJUPA, filed the instant Motion to Dismiss Plaintiff's Amended Complaint.[7] (MTD; AC.) Plaintiff, a Chilean citizen, (AC ¶ 24), brought this putative class action on behalf of himself and as the "legal representative" of the heirs of Rene Correa Borquez ("Borquez"),[8] a Chilean citizen and lawyer, (*id.* ¶¶ 84–85.) On May 27, 2006, Borquez died testate in Chile, leaving the entirety of his estate to his brother, Hernan Correa Borquez ("Hernan"), also in Chile. (*Id.* ¶ 86.) Included in Borquez's estate were 905 shares of then-Exxon Corporation (now Exxon Mobil Corporation) stock.[9] (*Id.* ¶ 92.) Hernan died in Chile on December 22, 2007, with all of his heirs residing in Chile. (*Id.* ¶ 87.)

No one in the Borquez family received these shares. At some unspecified point following Borquez's death in 2006, the Administrator of the NJUPA,[10] "escheated Mr. Borquez's investments without providing any notice to the Borquez [f]amily." (*Id.* ¶ 89.) Plaintiff alleges that Defendants provided no notice whatsoever "before or after the escheatment" of the Exxon stock. (*Id.* ¶ 90.) After learning of the escheatment, Plaintiff, acting on behalf of all of Borquez's heirs,

---

[7] The Court accepts all factual allegations in the Amended Complaint as true for purposes of deciding the motion. *See Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).

[8] Plaintiff alleges that "[a]ll of the heirs of Mr. Borquez empowered Plaintiff Vial under Chilean law to recover Mr. Borquez's property unlawfully seized by state governments in the United States." (AC ¶ 24.) Further, Plaintiff states that the State of New Jersey and Defendants recognize him "as the rightful legal representative to seek the return of the seized property belonging to Rene Correa Borquez." (*Id.*) While Plaintiff is not specific as to what this representative capacity is under Chilean law—executor, will beneficiary, or otherwise—the Court accepts Plaintiff's assertions about his representative authority as true at this stage.

[9] Although Plaintiff explains that he currently owns stock with a New Jersey-based brokerage firm TradeUp Securities, (AC ¶ 20), he does not specify the entity responsible for holding Borquez's Exxon stock.

[10] Plaintiff does not allege when this escheatment occurred, nor does he specify who the NJUPA Administrator was when Borquez's stock was escheated. (*See* AC ¶¶ 89, 92.)

7

**Appx011**

submitted a claim with the NJUPA Administrator for the return of the Exxon stock.[11] (*See id.* ¶ 93.) On November 6, 2023, the Administrator concluded the NJUPA review process and determined that Plaintiff was owed $487,581.23.[12] (*Id.* ¶¶ 93–94.) Plaintiff received this sum two days later, but no stock. (*Id.* ¶ 94.) At some unspecified time after the escheatment, the Administration had liquidated the Exxon shares. (*Id.* ¶ 97.) Plaintiff alleges that that stock, had it not been sold, would be worth $623,936 when he initiated this lawsuit on December 19, 2024. (*Id.* ¶ 157 n.14.)

In his Amended Complaint, Plaintiff—in both his individual capacity and as representative of the Borquez estate—asserts two causes of action pursuant to 42 U.S.C. § 1983 against Defendants: a procedural due process claim under the Fourteenth Amendment and a Takings Clause claim under the Fifth and Fourteenth Amendments. (AC ¶¶ 142–63.)

Plaintiff's procedural due process claim purports to be both a facial and as-applied constitutional challenge. Specifically, Plaintiff alleges that the NJUPA—"both as applied and on its face with respect to foreign property owners like Plaintiff"—previously violated "and continues to violate" Plaintiff's due process rights by authorizing escheatment (or risking escheatment) of his property without notice. (*Id.* ¶¶ 1, 21, 144.) Because of the unnoticed escheatment and subsequent liquidation of Borquez's holdings, moreover, Plaintiff "did not receive fair compensation" for the value of Borquez's stock. (*Id.* ¶ 148.)

By contrast, Plaintiff's takings claim is only as applied to the previous taking of Borquez's Exxon stock. (*See id.* ¶ 144.) Plaintiff asserts that he "did not receive just compensation" when

---

[11] Plaintiff does not specify when he learned of the escheatment, nor when he began his "extensive efforts to recover [Borquez's] assets." (AC ¶ 93.)

[12] Under the NJUPA, claimants seeking recovery of liquidated stock are entitled to the net proceeds of the sale plus interest, as well as any dividends or other amounts that might accrue to the stock while it is in state custody. N.J. Stat. Ann. §§ 46:30B-68, -79.

8

Defendants paid out the NJUPA claim. (*Id.* ¶ 156.) Plaintiff alleges that "just compensation" required "put[ting] Plaintiff in the same position as he would have occupied if the property had not been seized and taken by the State for public use." (*Id.* ¶ 157.) Accordingly, Plaintiff asserts that Defendants undercompensated him by $136,354.77, "the difference between the value of the escheated Exxon stock at the time of the filing of the original complaint ($623,936) and the amount paid by the State in response to Plaintiff's claim, $487,581.23." (*Id.* ¶ 157 & n.14.)

Plaintiff seeks a mix of injunctive and declaratory relief to redress both constitutional injuries: (1) an injunction against Defendants preventing continued escheatment under and administration of the NJUPA, (2) an equitable accounting to identify other unconstitutionally escheated property, (3) the return ("rather than destr[uction] or liquidat[ion]") of property belonging to Plaintiff and class members, or the equivalent value had it not been seized, and (4) a declaration that "Defendants' administration of the NJUPA against Plaintiff and the Class Members in the ways outlined in this Complaint" is unconstitutional.[13] (*Id.*, Prayer for Relief ¶¶ A–F.)[14]

### C.    PROCEDURAL HISTORY

On December 19, 2024, Plaintiff filed his initial class action complaint challenging, both facially and as applied to him and the class, the constitutionality of the NJUPA's notice and compensation procedures.[15] (*See generally* ECF No. 1.) On February 3, 2025, some six weeks after

---

[13] The Amended Complaint is not specific as to which remedies pertain to which claims. In fact, Plaintiff appears to allege that he is entitled to complete relief under either claim. (*See* AC ¶¶ 148–49 (asserting that procedural due process claim entitles Plaintiff to "fair compensation for the loss of property" as well as injunction against administration of NJUPA); *id.* ¶¶ 157–62 (asserting that takings claim entitles Plaintiff to $136,354.77 and injunction against NJUPA).)

[14] Although not relevant at this stage, Plaintiff also seeks declaratory relief finding that "Defendants are financially responsible for all Class notice and the administration of Class relief." (AC, Prayer for Relief ¶ E.)

[15] In his original complaint, Plaintiff included claims for negligence against Kelmar Associates, LLC

9

filing his initial complaint, Plaintiff filed a motion for a temporary restraining order and preliminary injunction against Defendants to restrain their continued enforcement of the Act. (ECF No. 21.) The Court denied the motion for not sufficiently establishing "any of the four prongs required to demonstrate the necessity of a TRO." (ECF No. 31); *see Otsuka Pharm. Co. v. Torrent Pharms., Ltd.*, 99 F. Supp. 3d 461, 775 (D.N.J. 2015).

After a teleconference with the parties on March 4, 2025,[16] Defendants served their initial motion to dismiss on Plaintiff (but did not file it with the Court) on April 17, 2025. (ECF Nos. 39, 44.) Rather than oppose the motion, Plaintiff opted to amend his complaint pursuant to Rule 15(a)(1)(B), which he filed on May 5, 2025. (ECF Nos. 44, 45.) On August 15, 2025, Defendants filed the instant Motion, (MTD), Plaintiff opposed, ("Opp.," ECF No. 50), and Defendants replied, ("Reply," ECF No. 51). Defendants filed their motion pursuant to Rules 12(b)(1) and 12(b)(6), arguing that (1) the Court lacks subject-matter jurisdiction to hear Plaintiff's claims, (2) the Amended Complaint fails to state a claim, and (3) the Court should abstain from deciding this case "to avoid interference with [New Jersey's] efforts to maintain a comprehensive policy for regulating unclaimed property." (MTD at 2–3); *see generally Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). Defendant's MTD is now ripe for decision.[17]

---

("Kelmar"), for its alleged failure to provide "meaningful pre-deprivation notice" to Plaintiff. (ECF No. 1 ¶¶ 96–101.) On April 2, 2025, Plaintiff voluntarily dismissed all claims against Kelmar without prejudice. (ECF No. 43.)

[16] At that teleconference, the parties agreed that, given the presence of threshold, jurisdictional issues, the Court would first decide the present Motion before setting a schedule for briefing a preliminary injunction. Because the Court presently dismisses this case for lack of jurisdiction, to the extent Plaintiff is still seeking a preliminary injunction, that motion would be denied as moot without prejudice. *See, e.g., Kroger, Inc. v. O'Donnell*, No. 07-3091, 2007 WL 3232586, at *5–6 (D.N.J. Oct. 31, 2007).

[17] On August 28, 2025, Plaintiff filed a letter "Notice of Subsequent Authority" directing the Court to recent developments in relevant caselaw. (ECF No. 52.) Defendants filed a letter response. (ECF No. 53.) The Court will not consider any arguments contained in the letters, even assuming Plaintiff's Notice was itself permissible. *See Atkins v. Capri Training Ctr., Inc.*, No. 13-06820, 2014 WL 4930906, at *10 (D.N.J. Oct. 1, 2014) ("Generally, if pertinent and significant authorities come to a party's attention after the party's

10

## II.   LEGAL STANDARD

### A.   RULE 12(B)(1) OF THE FEDERAL RULES OF CIVIL PROCEDURE

Under Rule 12(b)(1), a court must grant a motion to dismiss if it lacks subject matter jurisdiction to hear the claim. Fed. R. Civ. P. 12(b)(1). In evaluating a Rule 12(b)(1) motion to dismiss, courts must first determine whether the motion "presents a 'facial' attack or a 'factual' attack on the claim at issue, because that distinction determines how the pleading must be reviewed." *Const. Party of Pa. v. Aichele*, 757 F.3d 347, 357–58 (3d Cir. 2014) (quoting *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012)). "A facial 12(b)(1) challenge, which attacks the complaint on its face without contesting its alleged facts, is like a 12(b)(6) motion in requiring the court to consider the allegations of the complaint as true." *Hartig Drug Co. v. Senju Pharm. Co.*, 836 F.3d 261, 268 (3d Cir. 2016) (internal quotation marks omitted). A factual challenge, on the other hand, "attacks allegations underlying the assertion of jurisdiction in the complaint, and it allows the defendant to present competing facts." *Id.* The "trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case" and "the plaintiff will have the burden of proof that jurisdiction does in fact exist." *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 n.3 (3d Cir. 2006) (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). "Therefore, a 12(b)(1) factual challenge strips the plaintiff of the protections and factual deference provided under 12(b)(6) review." *Hartig Drug Co.*, 836 F.3d at 268. The party invoking the federal court's jurisdiction has "the burden of proof that jurisdiction does in fact exist." *Petruska*, 462 F.3d at 302 n.3 (quoting *Mortensen*, 549 F.2d at 891).

---

brief has been filed, the party may advise the court of the relevant authority through a Notice of Supplemental Authority; however, a Notice of Supplemental Authority should not advance new arguments . . . ." (citing *Beazer E., Inc. v. Mead Corp.*, 525 F.3d 255, 264 (3d Cir. 2008))).

11

**B.    RULE 12(B)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE**

For a complaint to survive dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see Clark v. Coupe*, 55 F.4th 167, 178 (3d Cir. 2022). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. When assessing the factual allegations in a complaint, courts "disregard legal conclusions and recitals of the elements of a cause of action that are supported only by mere conclusory statements." *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 140 (3d Cir. 2023). The court accepts all allegations in the complaint as true and gives the plaintiff "the benefit of every favorable inference to be drawn therefrom." *Kulwicki v. Dawson*, 969 F.2d 1454, 1462 (3d Cir. 1992). "Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555. The defendant bringing a Rule 12(b)(6) motion bears the burden of "showing that a complaint fails to state a claim." *In re Plavix Mktg., Sales Pracs. & Prod. Liab. Litig. (No. II)*, 974 F.3d 228, 231 (3d Cir. 2020) (citing *Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016)).

In deciding a Rule 12(b)(6) motion, a court can only consider "the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). A court may also consider any document "integral to or explicitly relied upon in the complaint" when ruling on a motion to dismiss. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (cleaned up).

12

### III.    DISCUSSION

#### A.    STANDING

Defendants challenge—and the Court has an independent obligation to consider—Plaintiff's Article III standing to bring his procedural due process claim.[18] (MTD at 20–27); *Wayne Land & Min. Grp., LLC v. Del. River Basin Comm'n*, 959 F.3d 569, 574 (3d Cir. 2020). Article III limits federal courts' jurisdiction to "cases or controversies." U.S. Const. art. III, § 2. The doctrine of standing is one of the "landmarks" that identifies justiciable cases and controversies referred to in Article III. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "Standing is a question of subject matter jurisdiction." *Petroleos Mexicanos Refinacion v. M/T King A (Ex-Tbilisi)*, 377 F.3d 329, 334 (3d Cir. 2004). "Absent Article III standing, a federal court does not have subject matter jurisdiction to address a plaintiff's claims." *Taliaferro v. Darby Twp. Zoning Bd.*, 458 F.3d 181, 188 (3d Cir. 2006). To establish standing (and thus jurisdiction), a plaintiff must show that he or she "has suffered, or will suffer, an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).

In the context of a class action, only the named plaintiff must demonstrate standing. *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 361–62 (3d Cir. 2015). However, "[i]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the

---

[18] Defendants do not appear to challenge Plaintiff's standing for his second claim under the Takings Clause. (MTD at 20 (titling their discussion on standing "PLAINTIFF'S DUE PROCESS CLAIMS MUST BE DISMISSED BECAUSE PLAINTIFF LACKS ARTICLE III STANDING").) Even if they did, the Court is satisfied that Plaintiff has Article III standing for the takings claim. *See, e.g.*, *Salvato*, 2022 WL 1224962, at *6 n.5 (holding that Plaintiff had standing to bring takings claims for un-noticed escheatment under NJUPA).

13

Appx017

class." *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 634 (3d Cir. 2017) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)). The named plaintiff in a class action "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Id.*

Defendants argue that Plaintiff has not suffered any "actual or imminent injury" to assert his procedural due process claim. (MTD at 21–25.) In doing so, Defendant distinguishes between Plaintiff's standing as a representative of the Borquez estate and in his individual capacity, arguing that he lacks standing on both fronts. (*Id.*)

### 1.   *Representative Capacity Standing*

First, Defendants assert that Plaintiff does not have standing on behalf of the Borquez estate because the NJUPA Administration already paid the Borquez estate "nearly $500,000" for the escheated Exxon stock. (*Id.* at 21.) Defendants also argue that Plaintiff lacks representative standing because he "identifies no other Estate property that could potentially escheat to the UPA in the future" to indicate a forthcoming future injury to the Borquez Estate. (*Id.*)

At least as representative of the Borquez estate, Plaintiff has standing. The Supreme Court has routinely recognized that plaintiffs who suffer "a classic pocketbook injury" have an actual and concrete injury for standing. *Tyler v. Hennepin County*, 598 U.S. 631, 636 (2023) (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021)). When the Administration allegedly escheated Borquez's Exxon stock without proper notice and undercompensated him for that action, Borquez suffered precisely this actual and concrete injury. Defendants' argument to the contrary— that Plaintiff "alleges no facts supporting an inference that the stock was sold for less than fair market value or that his payment was less than the entire sale proceeds"—misapprehends what is

14

**Appx018**

required of plaintiffs for Article III standing. (Reply at 5.) Indeed, Defendants' contention instead challenges Plaintiff's argument on the *merits*; Plaintiff has established a cognizable injury to assert his representative due process claim, even if Defendants believe it lacks substance. *See Garza v. Woods*, 150 F.4th 1118, 1125 (9th Cir. 2025) ("When the government assumes physical possession of another's unclaimed property, there is no ambiguity as to its position on the status of that property. *And when it does so without providing due process or just compensation, the owner has suffered sufficient injury to confer standing to challenge the government's action.* Of course, that is not to say the owner will prevail in claiming that the government acted unlawfully, only that the owner has a sufficiently concrete stake in the dispute to satisfy Article III." (emphasis added)); *Peters v. Cohen (Peters I)*, No. 22-266, 2024 WL 645557, at *3 (E.D. Cal. Feb. 14, 2024) (holding that Plaintiff had standing to recover stock "appreciation he was not paid" under California unclaimed property law even where he had already received statutorily authorized amount), *aff'd*, No. 24-1040, 2025 WL 733237 (9th Cir. Mar. 7, 2025).

However, Plaintiff's representative standing for the past escheatment does not automatically confer standing to pursue all of his requested relief. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) ("[A] plaintiff must demonstrate standing separately for each form of relief sought."). Although that injury does allow Plaintiff to pursue his requested injunctive and declaratory relief related to the already escheated property, (AC, Prayer for Relief ¶ D), it "is insufficient to enjoin the future enforcement of the UP[A]." *Peters I*, 2024 WL 645557, at *3. It is axiomatic in standing jurisprudence that "past wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983). Plaintiff pleads no facts to indicate that there is "a sufficient likelihood" that any of *Borquez*'s property will be escheated "in

a similar way"—in fact, the Amended Complaint mentions no other property at risk at all.[19] *Id.* at 111. Accordingly, while Plaintiff's representative standing is sufficient for relief in connection with Borquez's liquidated stock under both his procedural due process and takings claims, (AC, Prayer for Relief ¶ D), it is insufficient for his sought-after injunction of the NJUPA under either claim, (*id.* ¶¶ A, B, F).

### 2.    *Personal Capacity Standing*

Nonetheless, Plaintiff asserts that he has standing to enjoin enforcement of the NJUPA in his *individual* capacity. (MTD at 22–25.) Although Plaintiff has alleged no property of his own that has been escheated under the NJUPA, Plaintiff alleges that he has personal standing to assert his claims on several grounds. Plaintiff alleges that, "in an attempt to begin repurchasing some of the property that New Jersey seized, Plaintiff has purchased (and currently owns) shares of Exxon Mobil through a brokerage called TradeUp Securities [("TradeUp")] (incorporated in New Jersey)."[20] (AC ¶ 20.) Plaintiff argues that, because of the NJUPA's deficient notice scheme, "he remains at risk" of this newly purchased stock "being escheated without notice." (*Id.*) Plaintiff

---

[19] For similar reasons, Plaintiff lacks standing to seek an equitable accounting. (AC, Prayer for Relief ¶ C.) Plaintiff alleges that, including Borquez's escheated stock, "[a]dditional property may have been seized as well—but Plaintiff would require an accounting from the State's records to determine." (*Id.* ¶ 95.) Plaintiff's nebulous purported injury is essentially a fishing expedition and is too speculative for standing purposes. *See Finkelman v. Nat'l Football League*, 810 F.3d 187, 200 (3d Cir. 2016) ("[S]peculation is not enough to sustain Article III standing."); *see also Heyer v. Experian Info. Sols. Inc.*, No. 19-15, 2019 WL 2869337, at *3 (E.D. Wis. July 3, 2019) ("Plaintiffs cannot use lawsuits as tools to test hunches."). Moreover, Plaintiff may not rely on the alleged escheatment of property from other foreign nationals in the class for his own standing to seek an equitable accounting. *In re Horizon*, 846 F.3d at 634 (citing *Lewis v. Casey*, 518 U.S. 343, 357 (1996)).

[20] Plaintiff provides no information on the amount or value of Exxon Mobil Corporation stock he purchased with TradeUp. (AC ¶ 20.) This amount is relevant to how much notice he would be entitled to under the NJUPA, as holders only have to provide pre-escheatment notice to owners of presumed abandoned property worth over $50, N.J. Stat. Ann. § 46:30B-50, and the Administration only has to provide post-escheatment for property worth over $100, *id.* § 46:30B-51. However, given the average value of Exxon Mobil Corporation stock, the Court presumes that these thresholds are met. *Exxon Mobil Corp*, CNBC (last updated January 9, 2026), https://www.cnbc.com/quotes/xom.

16

asserts that, should he pursue his intended "buy-and-hold strategy for those shares" the NJUPA's pre-escheatment notice process would fail to prevent the escheatment of his stock *exactly as it did with Borquez's stock.* (*Id.* ¶¶ 102–10; *see also id.* ¶ 107 ("Accordingly, it is certain that Plaintiff's shares would escheat to New Jersey if he subscribed to a buy-and-hold approach to investment (i.e., makes no deposits or withdrawals or asset reallocations) for three years, and does not have automatic reinvestment of dividends. That is currently Plaintiff's plan for these shares.").)

Plaintiff's "[a]llegations of possible future injury do not satisfy the requirements of Art[icle] III. A threatened injury must be 'certainly impending' to constitute an injury in fact." *Sherwin-Williams Co. v. County of Delaware,* 968 F.3d 264, 269 (3d Cir. 2020) (quoting *Whitmore v. Arkansas,* 495 U.S. 149, 158 (1990)). Plaintiff's recent purchase of Exxon stock is insufficient to confer standing for an illusory future injury. Despite Plaintiff's assertion that as a Chilean national, he "will ***certainly not*** receive notice under the NJUPA" before his current holdings are presumed abandoned, (Opp. at 27 (emphasis in original)), his Amended Complaint instead relies on a "highly attenuated chain of possibilities" that does not establish an imminent future injury, *Clapper,* 568 U.S. at 410.

Even if Plaintiff made no changes whatsoever to his investment strategy or his apparently preferred broker—TradeUp—and his shares remained subject to escheat under the NJUPA,[21] Plaintiff's theory of future injury relies on an extensive list of contingencies: (1) Because Plaintiff's asserted investment strategy would not result in unpaid dividends, (AC ¶ 20), TradeUp's "second mailing of a statement of account or other notification or communication" would have to

---

[21] Plaintiff alleges that TradeUp is incorporated in New Jersey, meaning that it would be treated as a holder expected to abide by the escheatment process of the NJUPA, (AC ¶ 102); *see* N.J. Stat. Ann. § 46:30B-10(e) (subjecting property to the NJUPA if the holder "is a domiciliary" of New Jersey and the last known address of the owner is a "foreign nation").

17

return *undeliverable*,[22] N.J. Stat. Ann. § 46:30B-31, despite Plaintiff's assertion that he provided

them his Chilean address, (AC ¶ 104); (2) Plaintiff would have to "go[] three years without

interacting" with TradeUp in one of the many ways specified by the NJUPA, (*id.* ¶ 105), including

by writing or "contemporaneous record,"[23] N.J. Stat. Ann. § 46:30B-7.1; (3) TradeUp would have

to forego sending (or, Plaintiff would have to affirmatively ignore) statutorily required pre-

escheatment notice, assuming Plaintiff's Exxon Mobil Corporation holdings are currently worth

---

[22] Alternatively, three years could pass also pass from TradeUp's decision to "discontinue[] mailings to the apparent owner," N.J. Stat. Ann. § 46:30B-31, which Plaintiff does not in any way allege TradeUp imminently plans to do with him or his account, (*see* AC ¶¶ 102–07).

[23] The complete statutory section states:

> Property shall not be presumed abandoned if within the period that the property remains unclaimed the apparent owner communicated in writing or by other means reflected in a contemporaneous record prepared by or on behalf of the holder, with the holder concerning property or the account in which the property is held, or has otherwise indicated an interest in the property. A communication with an owner by a person other than the holder or its representative who has not in writing identified the property to the owner is not an indication of interest in the property by the owner. An indication of an owner's interest in property includes:
>
> the presentment of a check or other instrument of payment of a dividend or other distribution made with respect to an account or underlying stock or other interest in a business association or financial organization or, in the case of a distribution made by electronic or similar means, evidence that the distribution has been received;
>
> owner-directed activity in the account in which the property is held, including a direction by the owner to increase, decrease, or change the amount or type of property held in the account; or
>
> the payment of a premium with respect to a property interest in an insurance policy.
>
> The application of an automatic premium loan provision or other nonforfeiture provision contained in an insurance policy does not prevent a policy from maturing or terminating if the insured has died or the insured or the beneficiary of the policy has otherwise become entitled to the proceeds before the depletion of the cash surrender value of a policy by the application of those provisions.

N.J. Stat. Ann. § 46:30B-7.1. In reply, Defendants suggests that owners can indicate interest simply receiving "an electronic distribution," or through "nominal acts like logging in to an account" associated with the property. (Reply at 7.) The NJUPA's listed indications of interest, although likely non-exhaustive, does not include Defendants' examples. Moreover, merely logging into an account or receiving an email from a broker would require far less from the owner than the other examples listed in the statute, which otherwise contemplates more affirmative acts from the owner to demonstrate interest. However, because the Court finds that Plaintiff's claim to standing is too speculative even under the plain language and given examples of the statute, it need not determine whether Defendants' suggested activities are fair interpretations of an "indication of an owner's interest." N.J. Stat. Ann. § 46:30B-7.1.

18

more than $50,[24] *id.* § 46:30B-50; (4) the Administrator's post-escheatment publication efforts would have to fail to reach Plaintiff, *id.* § 46:30B-51, and Plaintiff would have to fail to access one of the commercial databases that tracks escheated property; and (5) Plaintiff would have to fail to prevent the liquidation by submitting a claim for the return of his stock before the end of the Administrator's additional one-year waiting period,[25] *id.* § 46:30B-72.

A single break in this chain of events collapses Plaintiff's tenuous, hypothetical theory personal standing. Plaintiff's purported future injury is therefore not "certainly impending," nor is there "a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). Plaintiff's hypothesized future injury depends "on contingent future events that may not occur as anticipated, or indeed may not occur at all." *Nat'l Shooting Sports Found. v. Att'y Gen.*, 80 F.4th 215, 219 (3d Cir. 2023). For Plaintiff's predicted escheatment to occur, Plaintiff would not only have to avoid contact with TradeUp for multiple years, but he would have to affirmatively ignore all statutorily required notice from TradeUp before the stock would be even

---

[24] Plaintiff interprets this section, which requires holder to send owner notice "by certified mail[] with return receipt requested," N.J. Stat. Ann. § 46:30B-50, as not applying *at all* where foreign owners, like Plaintiff, are outside of the range of certified mail. (AC ¶¶ 16, 20, 61–62; *see id.* ¶ 81 ("Because of NJUPA's framework for distributing notice, no one with a foreign address will have received any pre or post-deprivation notice.").) The Court declines to adopt Plaintiff's interpretation of Section 50. Plaintiff offers no cases from New Jersey courts interpreting the NJUPA this way, and nothing in the plain language of the statute appears to *relieve* holders of their notice obligations to foreign owners if certified mail is not an option. Further, New Jersey courts interpreting state statutes "attempt to discern and implement the Legislature's intent." *State v. Drury*, 919 A.2d 813, 820 (N.J. 2007) (citing *State v. Reiner*, 850 A.2d 1252 (N.J. 2004)). The purpose of NJUPA Section 50 is clearly to provide "[n]otice to [the] apparent owner." N.J. Stat. Ann. § 46:30B-50. In any event, Plaintiff's interpretation of the statute—that no notice is required when certified mail is not an option—implicates constitutional due process concerns. Under New Jersey law, "[u]nless compelled to do otherwise, courts seek to avoid a statutory interpretation that might give rise to serious constitutional questions." *Silverman v. Berkson*, 661 A.2d 1266, 1268 (N.J. 1995) (citing *N.J. State Bd. of Higher Ed. v. Bd. of Dirs. of Shelton Coll.*, 448 A.2d 988, 992 (N.J. 1982)). Plaintiff also does not allege that TradeUp—the holder hypothetically responsible for sending this notice—will interpret Section 50 as Plaintiff does and send him no pre-escheatment notice by other means, even with Plaintiff's last known address. (AC ¶ 104.)

[25] As discussed, Section 72 of the NJUPA allows owners to seek the return of their stock even "after the expiration of [the one-year] period . . . if [the stock] still remain[s] in the hands of the administrator." N.J. Stat. Ann. § 46:30B-72.

presumed abandoned—let alone escheated and liquidated. (AC ¶¶ 104–07); N.J. Stat. Ann. §
46:30B-50. To the extent that Plaintiff predicts that TradeUp will not provide pre-escheatment
notice, this, too, is impermissibly speculative. *Clapper*, 568 U.S. at 414 n.5 ("[P]laintiffs bear the
burden of pleading and proving concrete facts showing that the defendant's actual action has
caused the substantial risk of harm. Plaintiffs cannot rely on speculation about 'the unfettered
choices made by independent actors not before the courts.'" (quoting *Lujan*, 504 U.S. at 562)).
This predicted course of conduct is particularly implausible given Plaintiff's assertion, mere
paragraphs later in the Amended Complaint, that he is "constantly monitor[ing]" his property out
of fear of future escheatment.[26] (*Id.* ¶ 111.) If Plaintiff were to notice the delivery of his stock to
the Administrator at any point before its liquidation, the NJUPA would allow him to recover it.
N.J. Stat. Ann. § 46:30B-72. Thus, Plaintiff's speculative series of events is insufficient to confer
standing for prospective injunctive relief. *See Peters v. Cohen* (*Peters II*), No. 24-1040, 2025 WL
733237, at *1 (9th Cir. Mar. 7, 2025) (concluding that German citizen plaintiff lacked standing to
enjoin future enforcement of California's Unclaimed Property Law for previous liquidation of his
Amazon stock).

Plaintiff also argues that the risk of escheatment-without-notice of his personal Exxon
Mobil stock *presently* injures him. Plaintiff asserts that "[b]ecause he cannot rely on [NJUPA]
notice, he is required to monitor the property continuously" to avoid escheat. (AC ¶ 111.) This,
Plaintiff suggests, requires him to "churn and monitor that property (and other property) in order
to ensure that the Administrator does not attempt to seize it." (*Id.* ¶ 108.) Because of his looming
fears of the NJUPA, Plaintiff avers that he is discouraged from acquiring "further property that

---

[26] Even when crediting Plaintiff's well-pled facts as true on a motion to dismiss, the Court "need not accept
factual claims that are internally inconsistent." *Pyatkova v. Motorcars*, No. 15-3263, 2016 WL 674862, at
*2 (D.N.J. Feb. 3, 2016) (quoting *Anthony Sterling, M.D. v. Provident Life & Accident Ins. Co.*, 519 F.
Supp. 2d 1195, 1208 (M.D. Fla. 2007)).

20

**Appx024**

might be subject to seizure." (*Id.* ¶ 112.)

These allegations of present injury, too, are insufficient to confer personal standing on Plaintiff.[27] Although plaintiffs must "clearly and specifically set forth facts sufficient" to satisfy standing on a motion to dismiss, *Hosp. Council of W. Pa. v. City of Pittsburgh*, 949 F.2d 83, 86–87 (3d Cir. 1991), courts must still "accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party," *Warth v. Seldin*, 422 U.S. 490, 502 (1975). Courts may, however, require plaintiffs to "go beyond these general allegations in the complaint and allege particularized facts supportive of its standing." *Newark Branch, N.A.A.C.P. v. Town of Harrison*, 907 F.2d 1408, 1415 (3d Cir. 1990) (citing *Warth*, 422 U.S. at 501–02). Plaintiff's bare, conclusory allegations of the "real and concrete cost[s]" he incurs "constantly monitoring his property to avoid escheat," are insufficiently concrete to confer standing.[28] (AC ¶ 111.) Moreover, Plaintiff's supposed "churn[ing] and monitor[ing]," (*id.* ¶ 108), is inconsistent with his assertion that he intends to undertake an idle, "buy-and-hold" investment strategy certain to end in escheatment, as, by his account, he does not plan to undertake the necessary efforts that would prevent escheatment under the NJUPA, (*id.* ¶ 107). Although Rule 8(d) allows Plaintiff to plead "alternative" and "inconsistent" legal theories, the Court "need not accept factual claims that are internally inconsistent." *Pyatkova v. Motorcars*, No. 15-3263, 2016 WL 674862, at *2 (D.N.J. Feb. 3, 2016) (quoting *Anthony Sterling, M.D. v. Provident Life & Accident Ins. Co.*, 519 F. Supp. 2d 1195, 1208 (M.D. Fla. 2007)). Plaintiff's two personal standing theories are plainly

---

[27] Because the Court finds that Plaintiff lacks a cognizable injury-in-fact, it does not address Defendants' related argument that Plaintiff's asserted personal injuries are self-inflicted and not traceable to Defendants' conduct. (MTD at 25–27.)

[28] Similarly, Plaintiff's assertion that the NJUPA "deters Plaintiff from acquiring further property that might be subject to seizure" is insufficient for standing. (AC ¶ 112.) Not only is not all of Plaintiff's "property in the United States" subject to escheatment under the New Jersey UPA, (*id.*), but bare "[a]llegations of a subjective 'chill,'" without specifics, are not concrete enough for standing, *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972).

21

irreconcilable and each independently fail to confer standing. Thus, Plaintiff lacks standing to assert his claims in his individual capacity, and lacks standing to enjoin the enforcement of the NJUPA,[29] (AC, Prayer for Relief ¶¶ A, B, F).

Plaintiff's reliance on *Taylor v. Westly (Taylor II)*, 488 F.3d 1197 (9th Cir. 2007) (per curiam), for personal standing is misplaced. In *Taylor II*, the Ninth Circuit held that the plaintiffs had standing to challenge the California unclaimed property law both for the risk of future escheatment and the present costs on plaintiffs "of having to constantly monitor their property." *Id.* at 1999–1200. The present case is readily distinguishable. First, the *Taylor II* plaintiffs had already *personally* suffered previous escheatment of their property. *Id.* at 1199. This meant that the Ninth Circuit evaluated their standing and the risk of a future escheatment based on the "realistic likelihood" of recurrence standard, *id.*, not whether the injury was "certainly impending" as discussed hereinabove, *Clapper*, 568 U.S. at 409 (quoting *Lujan*, 504 U.S. at 565 n.2).[30] As discussed hereinabove, Plaintiff's speculative "chain of contingencies," *id.* at 410, depends on a number actions—some by non-parties like TradeUp—that "may not occur at all." *Nat'l Shooting Sports Found.* 80 F.4th at 219. Second, in briefing their present-injury standing, the plaintiffs in *Taylor II* asserted specific and concrete costs associated with monitoring and "churning" their

---

[29] Further, even assuming, *arguendo*, Plaintiff is incurring various costs to prevent escheatment, the Third Circuit has held—at least in the data breach context—that costs incurred "prophylactically" to prevent injury are insufficient to confer standing. *See Reilly v. Ceridian Corp.*, 664 F.3d 38, 46 (3d. Cir. 2011) ("That a plaintiff has willingly incurred costs to protect against an alleged increased risk . . . is not enough to demonstrate a 'concrete and particularized' or 'actual or imminent' injury."); *see also Clapper*, 568 U.S. at 422 ("[Plaintiffs] cannot manufacture standing by incurring costs in anticipation of non-imminent harm.").

[30] In *Clapper*, the Supreme Court reversed specifically because of the Second Circuit's "objectively reasonable likelihood" standard in assessing the likelihood of future injury, finding it inconsistent with requirement that a "threatened injury must be certainly impending," *Clapper*, 568 U.S. at 410 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). Although the Ninth Circuit's standard in *Taylor II*—which notably predates *Clapper*—is applicable to the risk of repeated injury as articulated in *City of Los Angeles v. Lyons*, that standard does not apply here. *See* Curtis A. Bradley & Ernest A. Young, *Standing and Probabilistic Injury*, 122 Mich. L. Rev. 1557, 1578–88 (2024) (distinguishing *Clapper* and *Lyons*).

22

property to prevent escheatment.[31] *Id.* at 1199–1200. Here, by contrast, Plaintiff offers only conclusory assertions that specify no actual costs or burden he is undertaking to prevent escheatment. (AC ¶¶ 108, 111.)

In short, Plaintiff has standing, in his capacity as representative of the Borquez estate, to seek relief in connection with the *previous* escheatment of Borquez's Exxon stock. (*Id.*, Prayer for Relief ¶ D.) Plaintiff's standing thus only supports his claims for the return of funds he believes he is owed—relief which Plaintiff purports to seek under *both* his procedural due process claim and his takings claim.[32] (*Id.* ¶¶ 148, 157–59.) However, Plaintiff does not have standing in either his representative or individual capacity to seek an equitable accounting or prospective injunctive and declaratory relief for hypothetical *future* escheatment or ongoing *present* injury. (*Id.*, Prayer for Relief ¶¶ A, B, C, F.)

## B.    ELEVENTH AMENDMENT IMMUNITY

This leaves only Plaintiff's request, under both his procedural due process and takings claims, for compensation for Borquez's stock that was escheated under the NJUPA. (AC ¶¶ 148, 156–57.) Defendants argue that these remaining claims are barred by Eleventh Amendment sovereign immunity. The Eleventh Amendment states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one

---

[31] For example, as discussed in the *Taylor II* plaintiffs' reply brief in support of their preliminary injunction motion, some of the plaintiffs had gone so far as to take "possession of their original stock certificates" and place them in bank deposit boxes for safekeeping. Pl.'s Reply Mem. at 11, *Taylor v. Westly*, No. 01-2407 (E.D. Cal. Aug. 1, 2005), ECF No. 47 (emphasis omitted). Even that deliberate conduct was not enough to prevent escheat, as "the [California] Controller compelled the Holders to issue duplicate certificates to the Controller, which he immediately sold without notice." *Id.*

[32] Although Plaintiff does not have standing to seek the other forms of injunctive relief under either claim for the reasons discussed hereinabove, he likely could not seek it pursuant to his takings claim anyway. (AC ¶ 162 (seeking to enjoin Defendants from enforcing the NJUPA under takings claim)); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016 (1984) ("Equitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law.").

23

**Appx027**

of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Ordinarily, the Eleventh Amendment, as construed by relevant caselaw, "has been interpreted to make states generally immune from suit by private parties in federal court." *MCI Telecomm. Corp. v. Bell Atl.-Pa.*, 271 F.3d 491, 503 (3d Cir. 2001) (collecting cases). "This immunity extends to state agencies and departments." *Id.* (citing *C.H. ex rel. Z.H. v. Oliva*, 226 F.3d 198, 201 (3d Cir. 2000) (en banc)).

Sovereign immunity is subject to narrow exceptions. *See Sinico v. Barry*, No. 18-01259, 2020 WL 528765, at *5 (M.D. Pa. Feb. 3, 2020). As relevant here, the *Ex parte Young*, 209 U.S. 123 (1908), doctrine allows "suits against state *officials* in certain circumstances." *Waterfront Comm'n of N.Y. Harbor v. Governor of N.J.*, 961 F.3d 234, 238 (3d Cir. 2020) (citing *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 254–55 (2011)). "Under the *Ex parte Young* doctrine, a state official is stripped of his official or representative character and thereby deprived of the State's immunity when he commits an ongoing violation of federal law," allowing "a person who is aggrieved [to] . . . seek prospective relief by suing [that state official] in his official capacity." *Waterfront Comm'n*, 961 F.3d at 238 (cleaned up). However, the *Young* exception allows only for "prospective, declaratory, or injunctive relief governing an officer's future conduct and cannot be retrospective, such as money damages." *MCI Telecom. Corp.*, 271 F.3d at 506 (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102–03 (1984)).

Furthermore, given the structure of the NJUPA, the Eleventh Amendment is not implicated *at all* insofar as relief seeks "the return of [Plaintiff's] and the class's *own property*." *Salvato*, 2022 WL 1224962, at *4 (emphasis in original). As discussed hereinabove, the escheatment of property under the NJUPA is *custodial* in nature: unclaimed funds the Administration has escheated are "held by the Treasurer as trustee for the *public interest*," not the State of New Jersey. *Clymer*, 792

24

A.2d at 400; *Am. Exp. Travel Related Servs. Co.*, 755 F. Supp. 2d at 565 ("[T]he purpose of enacting these escheat laws is to provide for the safekeeping of abandoned property and then reunite the abandoned property with its owner."). The property never permanently escheats to the State, as owners can claim their property "at any time in perpetuity." *Clymer*, 792 A.2d at 400 (citing N.J. Stat. Ann. § 46:30B–77); *Salvato*, 2022 WL 1224962, at *5 n.4.

This distinction between "permanent" and "custodial" escheatment is critical for sovereign immunity purposes. As the Supreme Court of the United States has explained, "the vulnerability of the State's purse [i]s the most salient factor in Eleventh Amendment determinations." *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 48 (1994). Where a plaintiff simply seeks the *return* of their property, that suit is not barred by the Eleventh Amendment because "the taking of the property or the injury to it was not the action of the sovereign because [the taking was] unconstitutional or beyond the officer's statutory powers." *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 698–99 (1949) (footnote omitted). Because owners retain a "legal or equitable interest in property" escheated under the NJUPA and held by the Administration *forever*, a claim seeking the return of property is "not for 'damages' against the State." N.J. Stat. Ann. § 46:30B-6(k) (defining "owner"); *see Clymer*, 792 A.2d at 400; *Salvato*, 2022 WL 1224962, at *6; *Taylor v. Westly (Taylor I)*, 402 F.3d 924, 932 (9th Cir. 2005) ("The State of California's sovereign immunity applies to the state's money. Money that the state holds in custody for the benefit of private individuals is not the state's money, any more than towed cars are the state's cars.").

In this case, however, Plaintiff concedes that he received the proceeds of the sale of Borquez's Exxon stock. (AC ¶ 157.) Plaintiff thus does not simply seek the *return* of his property: Plaintiff requests to be put "in the same position monetarily as [he] would have occupied" but for the escheatment, "including compensation for any appreciation in the value of the property since

25

Appx029

its seizure." (*Id.*, Prayer for Relief ¶ D.) By Plaintiff's account, he "would need an additional $136,354.77 beyond what New Jersey remitted to him" to be made whole, based on the value of the Exxon stock when he filed his original complaint. (*Id.* ¶¶ 157 n.14, 159.)

The Eleventh Amendment bars such relief. Plaintiff can only circumvent New Jersey's sovereign immunity to seek his *"escheated property* and *sales proceeds from escheated property."* *Taylor I*, 402 F.3d at 932 (emphasis added). Plaintiff is "not entitled to *more* than the actual property that the State took into its possession or the proceeds of that property." *Suever v. Connell*, 579 F.3d 1047, 1059 (9th Cir. 2009) (citing *Taylor I*, 402 F.3d at 932). Plaintiff's request is one for "additional compensation," and is "indistinguishable in effect from claims for money damages against the State and, as such, are barred by the Eleventh Amendment."[33] *Peters II*, 2025 WL 733237, at *2 (quoting *Suever*, 579 F.3d at 1059); *cf. Salvato*, 2022 WL 1224962, at *4 (finding that the Eleventh Amendment did not bar recovery "insofar as Plaintiff's claims only request the return of her and the class's *own property*," whether as physical shares or proceeds from any sale thereof (citing *Edelman v. Jordan*, 451 U.S. 651, 655–57 (1974))).

Relevant case law emphasizes the distinction for sovereign immunity purposes between plaintiffs who have already recovered the proceeds of their escheated property (like Plaintiff here) and those who have not. For example, the Ninth Circuit held in *Taylor I*, *Garza v. Woods*, and *Mousseau v. Crum* that the Eleventh Amendment did not bar the plaintiffs from recovering their escheated property if the state operated under a similarly custodial unclaimed property system. *Taylor I*, 402 F.3d at 930–35 (previous California unclaimed property law); *Garza*, 150 F.4th at

---

[33] Even if framed as seeking "injunctive" relief, (AC, Prayer for Relief ¶ D), Plaintiff's remedy plainly does not fall under the *Ex parte Young* exception. *See Suever*, 579 F.3d at 1058–59; *Taylor I*, 402 F.3d at 935; *see also Merritts v. Richards*, 62 F.4th 764, 772 (3d Cir. 2023) (holding that *Ex parte Young* did not apply where plaintiff failed to show "ongoing violation of federal law" based on previous state condemnation action and "injunction to cure past injuries" was not prospective relief).

1125–26 (Arizona); *Mousseau*, No. 24-1802, 2025 WL 2437230, at \*1 (9th Cir. Aug. 25, 2025) (mem.) (Alaska). Applying the reasoning of *Taylor I*, Judge Wolfson concluded the same for stock or other property still held by the NJUPA Administrator. *See Salvato*, 2022 WL 1224962, at \*4–6. The Eleventh Circuit recently reached a similar holding with respect to Florida's custodial escheatment statute where the plaintiffs had not yet received their stock or compensation. *Maron v. Chief Fin. Officer of Fla.*, 136 F.4th 1322, 1331, 1333–34 (11th Cir. 2025).

However, in the cases in which states had returned the proceeds of liquidated property and plaintiff sought *additional* compensation—namely, as here, the appreciated value of escheated stock—courts have held that sovereign immunity bars such recovery. *See Suever*, 579 F.3d at 1058–60 (barring recovery of "the amount of the difference between the proceeds of the sale of their unclaimed property and the current market value"); *Peters II*, 2025 WL 733237, at \*2 (barring recovery of "the difference between the current market value of [plaintiff's] escheated stock and the price at which it was sold in 2018"). Here, Plaintiff seeks the same relief as that barred by the Ninth Circuit in *Suever* and *Peters*. (AC, Prayer for Relief ¶ D.)

Because Plaintiff has already received the value of Borquez's liquidated Exxon stock, his requests for further monetary relief—under both of his 42 U.S.C. § 1983 claims against state officials in their official capacities—are barred by the Eleventh Amendment. *Johnson v. Stith*, No. 14-5032, 2015 WL 4997413, at \*4 (D.N.J. Aug. 20, 2015) ("It is well settled that the Eleventh Amendment's grant of sovereign immunity applies to Section 1983 claims brought against the States." (citing *Quern v. Jordan*, 440 U.S. 332, 345 (1979))); *Segura v. Greystone Park Psychiatric Hosp.*, No. 21-11662, 2024 WL 414105, at \*7 (D.N.J. Feb. 5, 2024) ("Section 1983 claims seeking monetary damages are subject to the Eleventh Amendment sovereign immunity bar." (citing *Will*

27

**Appx031**

*v. Mich. Dep't of State Police*, 491 U.S. 58, 70–71 (1989))).[34]

Accordingly, because Plaintiff either lacks standing to assert his claims or his requested relief is barred by the Eleventh Amendment, Defendants' MTD is **GRANTED** and Plaintiff's Amended Complaint is **DISMISSED** for lack of subject matter jurisdiction. In light of the Third Circuit's decision in *Merritts v. Richards*, 62 F.4th 764, 772 n.4 (3d Cir. 2023), and in the abundance of caution, the dismissal will be **WITHOUT PREJUDICE** and the Court will grant Plaintiff leave to amend and file what would be his third operative complaint, in the event he chooses to do so. The Court declines to address the remaining issues.[35]

---

[34] Although the Third Circuit has not definitively held that Fifth Amendment Takings Clause claims brought against state officials in their official capacities under 42 U.S.C. § 1983 are barred by sovereign immunity, the "overwhelming weight of authority among the circuits" suggests that sovereign immunity is a bar where "the state provides a remedy of its own for an alleged violation." *Bldg. & Realty Inst. of Westchester & Putnam Cntys., Inc. v. New York*, Nos. 19-11285, 20-634, 2021 WL 4198332, at *9 & n.12 (S.D.N.Y. Sept. 14, 2021) (quoting *Cmty. Hous. Improvement Program v. City of New York*, 492 F. Supp. 3d 33, 40 (E.D.N.Y. 2020)) (collecting cases). In addition to providing an ability to appeal the Administrator's determination under the NJUPA itself, N.J. Stat. Ann. § 46:30B-84, New Jersey provides a remedy for unauthorized deprivations of property under the New Jersey Tort Claims Act, N.J. Stat. Ann. § 59:1-1 *et seq.*

[35] While the Court finds that it lacks jurisdiction to adjudicate Plaintiff's claims, Plaintiff's Amended Complaint likely contains other issues. As an initial matter, Plaintiff mischaracterizes part of his due process challenge of the NJUPA as a "facial" challenge. (AC ¶ 145 ("Therefore, the Statute is facially unconstitutional with respect to the category of persons (like Plaintiff) who receive no notice prior to the seizure of their property."); Opp. at 33 ("With respect to the class of foreign property owners, the Act is unconstitutional in every instance.").) This is not a facial challenge; it is as applied. *See United States v. Mitchell*, 652 F.3d 387, 405 (3d Cir. 2011) ("A party asserting a facial challenge must establish that no set of circumstances exists under which the Act would be valid. That is, [a plaintiff] would have to show that the statute is unconstitutional in all of its applications. This is the most difficult challenge to mount successfully. On the other hand, an as-applied attack does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right." (cleaned up)). Moreover, the Court notes that several cases have recognized that, given the custodial nature of the NJUPA, Plaintiff may be unable to assert a claim under the Takings Clause at all, as the escheated property is never taken for "public use." *See Garza*, 150 F.4th at 1127; *Mousseau*, 2025 WL 2437230, at *1; *Peters II*, 2025 WL 733237, at *2. *But see Knellinger v. Young*, 134 F.4th 1034, 1043–45 (10th Cir. 2025) (concluding the opposite).

28

Appx032

## CONCLUSION

For the foregoing reasons, Defendants' Motion is **GRANTED** and Plaintiff's Amended Complaint is **DISMISSED WITHOUT PREJUDICE**. An appropriate Order will accompany this Opinion.

ROBERT KIRSCH
UNITED STATES DISTRICT JUDGE

Dated: January 12, 2026

29

Appx033

# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| JAIME VIAL, individually, as representative of the heirs of Rene Correa Borquez, and on behalf of other persons similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ELIZABETH MAHER MUOIO, in her official capacity as TREASURER OF THE STATE OF NEW JERSEY; and STEVEN HARRIS, in his official capacity as ADMINISTRATOR OF THE STATE OF NEW JERSEY UNCLAIMED PROPERTY ADMINISTRATION,<br><br>Defendants. | Civil Action No. 24-11301 (RK) (JBD)<br><br>**ORDER** |

**THIS MATTER** comes before the Court upon the Motion to Dismiss of by Elizabeth Maher Muoio, in her official capacity as Treasurer of the State of New Jersey, and Steven Harris, in his official capacity as Administrator of the State of New Jersey Unclaimed Property Administration (collectively, "Defendants"). (ECF No. 49.) Having considered the parties' submissions, the Court resolves the pending Motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth in the Court's Opinion filed on this date, and for other good cause shown,

**IT IS** on this 12th day of January, 2026,

**ORDERED** that Defendants' Motion to Dismiss, (ECF No. 49), is **GRANTED**;

**ORDERED** that Plaintiff Jaime Vial's Amended Complaint, (ECF No. 45), is **DISMISSED WITHOUT PREJUDICE**;

**ORDERED** that the Clerk's Office is directed to terminate the Motion pending at Docket No. 49; and

**ORDERED** that the Clerk is directed to **CLOSE** this case.

_____
**ROBERT KIRSCH**
**UNITED STATES DISTRICT JUDGE**

2

# EXHIBIT C

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| JAIME VIAL, individually and as representative of the heirs of Rene Correa Borquez, and on behalf of other persons similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>ELIZABETH MAHER MUOIO, in her official capacity as TREASURER OF THE STATE OF NEW JERSEY; and STEVEN HARRIS, in his official capacity as ADMINISTRATOR OF THE STATE OF NEW JERSEY UNCLAIMED PROPERTY ADMINISTRATION.<br><br>    Defendants. | Case No.: 3:24-cv-11301 |

### ORDER ENTERING FINAL JUDGMENT

THIS MATTER came before the Court upon Plaintiff's Notice of Intention to Stand on the Amended Complaint and Request for Entry of Final Judgment. Upon consideration of the Notice, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that:

1. Plaintiff has elected to stand on the Amended Complaint as dismissed without prejudice by the Court's Order dated January 12, 2026 (ECF No. 55); and

2. The action is DISMISSED WITH PREJUDICE; and

3. The Clerk is directed to ENTER FINAL JUDGMENT and CLOSE the case.

SIGNED: February 9, 2026

_____
Robert Kirsch
United States District Judge

Appx038

NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| JAIME VIAL, individually, as representative of the heirs of Rene Correa Borquez, and on behalf of other persons similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>ELIZABETH MAHER MUOIO, in her official capacity as TREASURER OF THE STATE OF NEW JERSEY; and STEVEN HARRIS, in his official capacity as ADMINISTRATOR OF THE STATE OF NEW JERSEY UNCLAIMED PROPERTY ADMINISTRATION,<br><br>    Defendants. | Civil Action No. 24-11301 (RK) (JBD)<br><br>**OPINION** |

**KIRSCH, District Judge**

THIS MATTER comes before the Court upon the Motion to Dismiss by Elizabeth Maher Muoio, in her official capacity as Treasurer of the State of New Jersey, and Steven Harris, in his official capacity as Administrator of the State of New Jersey Unclaimed Property Administration (collectively, "Defendants"), brought under Federal Rules of Civil Procedure ("Rule") 12(b)(1) and 12(b)(6). ("MTD," ECF No. 49.) Having considered the parties' submissions, the Court resolves the pending Motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, Defendants' Motion is **GRANTED**.

I.    **BACKGROUND**

After Rene Correa Borquez ("Borquez") died in Chile in May 2006, his 905 shares of Exxon Corporation stock allegedly escheated to the New Jersey Unclaimed Property Administration (the "Administration") without notice. ("AC," ECF No. 45, ¶ 84–90.) Plaintiff

Jaime[1] Vial ("Plaintiff"), Borquez's descendent and "legal representative," submitted a claim for the return of this stock under the New Jersey Uniform Unclaimed Property Act, N.J. Stat. Ann. § 46:30B-1 *et seq.* (the "Act" or "NJUPA"). Although the stock had already been sold pursuant to the statute, the NJUPA allowed Plaintiff to collect—"at *any time in perpetuity,*" *Clymer v. Summit Bancorp.*, 792 A.2d 396, 400 (N.J. 2002) (emphasis added) (citing N.J. Stat. Ann. § 46:30B-77)— "the net proceeds of sale," "any dividends, interest, or other increments realized or accruing on the property at or before liquidation," and interest "for the period during which those monies were in the custody of the administrator," an amount totaling nearly $500,000, N.J. Stat. Ann. §§ 46:30B-79, -68; (AC ¶¶ 93–94.) Plaintiff, dissatisfied with this amount, brought this putative class action almost two decades after Borquez's death to seek more, as well as to enjoin the administration of the NJUPA wholesale. (ECF No. 1; *see generally* AC, Prayer for Relief.) Because this Court lacks jurisdiction to decide Plaintiff's claims, however, for the reasons set forth herein, his Amended Complaint must be dismissed.

### A.   THE NEW JERSEY UNIFORM UNCLAIMED PROPERTY ACT

New Jersey, like forty-nine states and the District of Columbia, has unclaimed property or 'escheat' laws. *See Am. Express Travel Related Servs. Co. v. Sidamon-Eristoff*, 755 F. Supp. 2d 556, 567 (D.N.J. 2010), *aff'd*, 669 F.3d 374 (3d Cir. 2012). Escheat and the related common law doctrine of *bona vacantia*—allowing states to "take control and dispose of abandoned property"— have long histories dating back to feudal English common law. *See Simon v. Weissmann*, 301 F. App'x 107, 110 (3d Cir. 2008). "As a broad principle of jurisprudence rather than as a result of the evolution of legal rules, it is clear that a state, subject to constitutional limitations, may use its

---

[1] Plaintiff's first name appears to be misspelled in the case caption on CM/ECF. The spelling as written in Plaintiff's filings is "Jaime," while the spelling on the docket is "Jamie." The Court uses the spelling as written by Plaintiff himself both here and in the caption of this Opinion.

legislative power to dispose of property within its reach, belonging to unknown persons." *Standard Oil Co. v. New Jersey*, 341 U.S. 428, 436 (1951). New Jersey's Unclaimed Property Administration effectuates this power through the NJUPA, N.J. Stat. Ann. § 46:30B-1 *et seq.*

In administering the NJUPA, the Administration "largely relies on self-reporting for remittance" of abandoned property. *Salvato v. Harris*, No. 21-12706, 2022 WL 1224962, at *3 (D.N.J. Apr. 26, 2022). As the Honorable Freda L. Wolfson, U.S.D.J., explained in *American Express Travel Related Services Company*:

> The laws of most states are based upon a version of the Uniform Unclaimed Property Act ("UUPA"). The Court notes that the purpose of enacting these escheat laws is to provide for the safekeeping of abandoned property and then reunite the abandoned property with its owner. In the usual course, when property is deemed abandoned, the holder of most types of property is required to attempt to contact the owner, using the name and last known address, and if possible, return the property. If the attempt is unsuccessful, the holder turns over the abandoned property to the state and provides the state with the name and last known address of the owner.[2]

755 F. Supp. 2d at 565. Under the NJUPA, these self-reporting "holders"—typically private individuals charged with holding the property of someone else—are required under the Act to annually report their possession of and, if necessary, remit unclaimed property to the Administration. N.J. Stat. Ann. § 46:30B-6(g) (defining holder); *id.* § 46:30B-46 (requiring

---

[2] The following example illustrates New Jersey's escheatment process: Jane Doe owns stock with a New Jersey-based brokerage firm. Ms. Doe would be an "owner" under the NJUPA and the brokerage firm would be a "holder." N.J. Stat. Ann. §§ 46:30B-6(g), (k). If, after three years, Ms. Doe does not sufficiently indicate her continued interest in that stock to the brokerage firm in ways indicated by the NJUPA, *id.* § 46:30B-31, and the brokerage firm is unable to communicate in certain ways with Ms. Doe, *id.* §§ 46:30B-7.1, -33, the brokerage firm must report and eventually remit Ms. Doe's stock to the NJUPA Administration, *id.* §§ 46:30B-49, -57. Now in possession of Ms. Doe's stock, the Administration must provide notice of the sale to Ms. Doe through newspaper listings and online. *Id.* §, -51; *See Search for Unclaimed Property*, N.J. Unclaimed Prop. Admin., https://unclaimedfunds.nj.gov/app/claim-search. After a one-year waiting period, the Administration must then sell the presumed-abandoned stock and hold the sale proceeds in trust for the owner. *Id.* §§ 46:30B-69, -71(c). Ms. Doe, upon learning of this escheatment and sale, may then submit a claim—"at any time in perpetuity"—with the Administration to recover the proceeds of this sale plus interest and accrued dividends. *Id.* §§ 46:30B-72, -79, -68; *Clymer,* 792 A.2d at 400.

3

**Appx041**

reports); *id.* § 46:30B-49 (requiring reports due November 1 of each year); *id.* § 46:30B-57 (requiring holder to remit property).

This property can include "stock or other evidence of ownership of an interest in a business association or financial organization." *Id.* § 46:30B-6(r). To determine whether an interest in a business is "abandoned," the NJUPA specifies certain triggering events that begin a three-year clock after which such property is presumed abandoned. *Id.* § 46:30B-31. Specifically, these triggering events include, among others, uncashed dividends, certain undelivered stock certificates, or with automatic reinvestment plans, a second "mailing of a statement of account or other notification or communication" returning as "undeliverable."[3] *Id.* Even if this three-year abandonment period is met, stock is not deemed abandoned if the holder has certain contact with the owner. *Id.* §§ 46:30B-7.1, -33.[4]

Between 60 to 120 days before the holder files a report addressing presumably abandoned property, the holder must "send by certified mail, and with return receipt requested, written notice to the apparent owner at the last known address informing the owner that the holder is in

---

[3] In addition to the second failed mailing or notification, Section 31 presumes that property is abandoned with automatic reinvestment plans "after the holder discontinued mailings to the apparent owner." N.J. Stat. Ann. § 46:30B-31.

[4] The NJUPA does not exhaustively list the forms of communication between owner and holder that are sufficient for property to not be presumed abandoned. NJUPA Section 31 governs when the presumption of abandonment applies to stock. N.J. Stat. Ann. § 46:30B-31. As described hereinabove, the scenarios contemplated by this section include the owner failing to take certain action with the stock or mail—"or other notification or communication"—returning as undeliverable within three years. *Id.* However, Section 31 does not list what these "other" notifications or communications include. Similarly, NJUPA Section 7.1 outlines a non-exhaustive list of owner actions that, if done, indicate the property "shall not be presumed abandoned" and will not be escheated. *Id.* § 46:30B-7.1. First, Section 7.1 specifies that the owner may communicate with the holder "in writing or by other means reflected in a contemporaneous record prepared by or on behalf of the holder," although without explaining what forms of communication are acceptable. *Id.* Second, owners can undertake some action to "indicate[] an interest in the property," which includes, *inter alia*, "owner-directed activity in the account in which the property is held." *Id.* As such, although Sections 31 and 7.1 indicate some of the options available to owners to prevent escheatment, neither appears exhaustive. Moreover, neither the NJUPA nor New Jersey caselaw defines what qualifies as a "communication" sufficient for property to not be presumed abandoned. *See id.* § 46:30B-6 (no definition for "communication").

possession" of their property if (1) that address is accurate, (2) the apparent owner's claim is not barred by the statute of limitations, and (3) the property is worth more than $50. *Id.* § 46:30B-50. The statute makes no exceptions for contacting foreign addresses or citizens outside the reach of certified mail. *See Certified Mail® - The Basics*, U.S. Postal Serv. (Sept. 26, 2025), https://faq.usps.com/s/article/Certified-Mail-The-Basics. The NJUPA requires each of these pre-escheatment notice procedures be undertaken by the *holder*, not the Administration or State of New Jersey.

If these collective outreach efforts fail and the Administration escheats the property, the NJUPA requires that most property be sold within three years of receipt, except for most securities which must be held for only one year before sale. N.J. Stat. Ann. §§ 46:30B-69, -72. When liquidated, the proceeds of these sold stocks are then held by the Treasurer and her designated Administrator in the Unclaimed Personal Property Trust Fund (the "Trust Fund"). *Id.* § 46:30B-71(c). Unless the Administrator "deems it prudent and advisable to do otherwise," 75 percent of all funds received in the Trust Fund are transferred to New Jersey's General State Fund. *Id.* The remaining 25 percent "shall be retained in the trust fund, administered and invested by the State Treasurer, and used to pay claims duly presented and allowed and all expenses and costs incurred by the State of New Jersey." *Id.* When an owner submits a claim for the return of their property, the Administrator "must appropriate from the Unclaimed Personal Property Trust Fund to administer the act and pay claims," because "all unclaimed funds are held by the Treasurer as trustee for the public interest." *Salvato*, 2022 WL 1224962, at *6 (quoting *Clymer*, 792 A.2d at 400).

To facilitate this reunion process, the NJUPA also provides owners post-escheatment notice. The Administrator is required to publish the name and address of the property owner in a

**Appx043**

"newspaper of general circulation in the county" of that last-known address "once a week for two consecutive weeks" by November 30 of the year following the sale of the escheated property.[5] *Id.* § 46:30B-51. Such notice, however, is only required for property valued $100 or more. *Id.* In addition, the Administrator also posts information about escheated property to its searchable Unclaimed Property database, containing similar information about the property. *Search for Unclaimed Property*, N.J. Unclaimed Prop. Admin., https://unclaimedfunds.nj.gov/app/claim-search. This database also links to MissingMoney.com, where searching owners can seek unclaimed property in a national database provided in partnership with the National Associations of State Treasurers and Unclaimed Property Administrators. *See MissingMoney.com*, https://missingmoney.com/.

The Administrator must pay valid claims from property owners seeking their escheated property. N.J. Stat. Ann. § 46:30B-77. In the event the Administrator is still in possession of an abandoned security—even after the one-year waiting period—an owner is entitled to the actual security itself. *Id.* § 46:30B-72. Furthermore, if the Administrator allows such a claim on previously liquidated stock, the owner-claimant is entitled to more than just the value at liquidation. The claimant receives "the net proceeds of sale," "any dividends, interest, or other increments realized or accruing on the property at or before liquidation," and interest "for the period during which those monies were in the custody of the administrator" at an interest rate fixed by the Administrator.[6] *Id.* §§ 46:30B-79, -68.

---

[5] The NJUPA's confidentiality provision limits the sharing of any information beyond name and address. N.J. Stat. Ann. § 46:30B-76.1.

[6] Although Plaintiff appears to suggest that the NJUPA-authorized amount "fails to account for . . . dividends[] or interest," (AC ¶ 159), Plaintiff's assertion is refuted by the language of the NJUPA, *see* N.J. Stat. Ann. §§ 46:30B-68, -79. Plaintiff does not otherwise allege that Defendants failed to pay him what he was owed pursuant to the NJUPA, and the Court need not accept Plaintiff's plainly foreclosed interpretation of the NJUPA as true at this stage. *See Baraka v. McGreevey*, 481 F.3d 187, 211 (3d Cir. 2007).

6

### B.   FACTUAL BACKGROUND

Defendants, New Jersey state officials sued in their official capacities for their respective roles in administering the NJUPA, filed the instant Motion to Dismiss Plaintiff's Amended Complaint.[7] (MTD; AC.) Plaintiff, a Chilean citizen, (AC ¶ 24), brought this putative class action on behalf of himself and as the "legal representative" of the heirs of Rene Correa Borquez ("Borquez"),[8] a Chilean citizen and lawyer, (id. ¶¶ 84–85.) On May 27, 2006, Borquez died testate in Chile, leaving the entirety of his estate to his brother, Hernan Correa Borquez ("Hernan"), also in Chile. (Id. ¶ 86.) Included in Borquez's estate were 905 shares of then-Exxon Corporation (now Exxon Mobil Corporation) stock.[9] (Id. ¶ 92.) Hernan died in Chile on December 22, 2007, with all of his heirs residing in Chile. (Id. ¶ 87.)

No one in the Borquez family received these shares. At some unspecified point following Borquez's death in 2006, the Administrator of the NJUPA,[10] "escheated Mr. Borquez's investments without providing any notice to the Borquez [f]amily." (Id. ¶ 89.) Plaintiff alleges that Defendants provided no notice whatsoever "before or after the escheatment" of the Exxon stock. (Id. ¶ 90.) After learning of the escheatment, Plaintiff, acting on behalf of all of Borquez's heirs,

---

[7] The Court accepts all factual allegations in the Amended Complaint as true for purposes of deciding the motion. See Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008).

[8] Plaintiff alleges that "[a]ll of the heirs of Mr. Borquez empowered Plaintiff Vial under Chilean law to recover Mr. Borquez's property unlawfully seized by state governments in the United States." (AC ¶ 24.) Further, Plaintiff states that the State of New Jersey and Defendants recognize him "as the rightful legal representative to seek the return of the seized property belonging to Rene Correa Borquez." (Id.) While Plaintiff is not specific as to what this representative capacity is under Chilean law—executor, will beneficiary, or otherwise—the Court accepts Plaintiff's assertions about his representative authority as true at this stage.

[9] Although Plaintiff explains that he currently owns stock with a New Jersey-based brokerage firm TradeUp Securities, (AC ¶ 20), he does not specify the entity responsible for holding Borquez's Exxon stock.

[10] Plaintiff does not allege when this escheatment occurred, nor does he specify who the NJUPA Administrator was when Borquez's stock was escheated. (See AC ¶¶ 89, 92.)

7

**Appx045**

submitted a claim with the NJUPA Administrator for the return of the Exxon stock.[11] (*See id.* ¶ 93.) On November 6, 2023, the Administrator concluded the NJUPA review process and determined that Plaintiff was owed $487,581.23.[12] (*Id.* ¶¶ 93–94.) Plaintiff received this sum two days later, but no stock. (*Id.* ¶ 94.) At some unspecified time after the escheatment, the Administration had liquidated the Exxon shares. (*Id.* ¶ 97.) Plaintiff alleges that that stock, had it not been sold, would be worth $623,936 when he initiated this lawsuit on December 19, 2024. (*Id.* ¶ 157 n.14.)

In his Amended Complaint, Plaintiff—in both his individual capacity and as representative of the Borquez estate—asserts two causes of action pursuant to 42 U.S.C. § 1983 against Defendants: a procedural due process claim under the Fourteenth Amendment and a Takings Clause claim under the Fifth and Fourteenth Amendments. (AC ¶¶ 142–63.)

Plaintiff's procedural due process claim purports to be both a facial and as-applied constitutional challenge. Specifically, Plaintiff alleges that the NJUPA—"both as applied and on its face with respect to foreign property owners like Plaintiff"—previously violated "and continues to violate" Plaintiff's due process rights by authorizing escheatment (or risking escheatment) of his property without notice. (*Id.* ¶¶ 1, 21, 144.) Because of the unnoticed escheatment and subsequent liquidation of Borquez's holdings, moreover, Plaintiff "did not receive fair compensation" for the value of Borquez's stock. (*Id.* ¶ 148.)

By contrast, Plaintiff's takings claim is only as applied to the previous taking of Borquez's Exxon stock. (*See id.* ¶ 144.) Plaintiff asserts that he "did not receive just compensation" when

---

[11] Plaintiff does not specify when he learned of the escheatment, nor when he began his "extensive efforts to recover [Borquez's] assets." (AC ¶ 93.)

[12] Under the NJUPA, claimants seeking recovery of liquidated stock are entitled to the net proceeds of the sale plus interest, as well as any dividends or other amounts that might accrue to the stock while it is in state custody. N.J. Stat. Ann. §§ 46:30B-68, -79.

8

Defendants paid out the NJUPA claim. (*Id.* ¶ 156.) Plaintiff alleges that "just compensation" required "put[ting] Plaintiff in the same position as he would have occupied if the property had not been seized and taken by the State for public use." (*Id.* ¶ 157.) Accordingly, Plaintiff asserts that Defendants undercompensated him by $136,354.77, "the difference between the value of the escheated Exxon stock at the time of the filing of the original complaint ($623,936) and the amount paid by the State in response to Plaintiff's claim, $487,581.23." (*Id.* ¶ 157 & n.14.)

Plaintiff seeks a mix of injunctive and declaratory relief to redress both constitutional injuries: (1) an injunction against Defendants preventing continued escheatment under and administration of the NJUPA, (2) an equitable accounting to identify other unconstitutionally escheated property, (3) the return ("rather than destr[uction] or liquidat[ion]") of property belonging to Plaintiff and class members, or the equivalent value had it not been seized, and (4) a declaration that "Defendants' administration of the NJUPA against Plaintiff and the Class Members in the ways outlined in this Complaint" is unconstitutional.[13] (*Id.*, Prayer for Relief ¶¶ A–F.)[14]

## C.   PROCEDURAL HISTORY

On December 19, 2024, Plaintiff filed his initial class action complaint challenging, both facially and as applied to him and the class, the constitutionality of the NJUPA's notice and compensation procedures.[15] (*See generally* ECF No. 1.) On February 3, 2025, some six weeks after

---

[13] The Amended Complaint is not specific as to which remedies pertain to which claims. In fact, Plaintiff appears to allege that he is entitled to complete relief under either claim. (*See* AC ¶¶ 148–49 (asserting that procedural due process claim entitles Plaintiff to "fair compensation for the loss of property" as well as injunction against administration of NJUPA); *id.* ¶¶ 157–62 (asserting that takings claim entitles Plaintiff to $136,354.77 and injunction against NJUPA).)

[14] Although not relevant at this stage, Plaintiff also seeks declaratory relief finding that "Defendants are financially responsible for all Class notice and the administration of Class relief." (AC, Prayer for Relief ¶ E.)

[15] In his original complaint, Plaintiff included claims for negligence against Kelmar Associates, LLC

9

Appx047

filing his initial complaint, Plaintiff filed a motion for a temporary restraining order and preliminary injunction against Defendants to restrain their continued enforcement of the Act. (ECF No. 21.) The Court denied the motion for not sufficiently establishing "any of the four prongs required to demonstrate the necessity of a TRO." (ECF No. 31); *see Otsuka Pharm. Co. v. Torrent Pharms., Ltd.*, 99 F. Supp. 3d 461, 775 (D.N.J. 2015).

After a teleconference with the parties on March 4, 2025,[16] Defendants served their initial motion to dismiss on Plaintiff (but did not file it with the Court) on April 17, 2025. (ECF Nos. 39, 44.) Rather than oppose the motion, Plaintiff opted to amend his complaint pursuant to Rule 15(a)(1)(B), which he filed on May 5, 2025. (ECF Nos. 44, 45.) On August 15, 2025, Defendants filed the instant Motion, (MTD), Plaintiff opposed, ("Opp.," ECF No. 50), and Defendants replied, ("Reply," ECF No. 51). Defendants filed their motion pursuant to Rules 12(b)(1) and 12(b)(6), arguing that (1) the Court lacks subject-matter jurisdiction to hear Plaintiff's claims, (2) the Amended Complaint fails to state a claim, and (3) the Court should abstain from deciding this case "to avoid interference with [New Jersey's] efforts to maintain a comprehensive policy for regulating unclaimed property." (MTD at 2–3); *see generally Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). Defendant's MTD is now ripe for decision.[17]

---

("Kelmar"), for its alleged failure to provide "meaningful pre-deprivation notice" to Plaintiff. (ECF No. 1 ¶¶ 96–101.) On April 2, 2025, Plaintiff voluntarily dismissed all claims against Kelmar without prejudice. (ECF No. 43.)

[16] At that teleconference, the parties agreed that, given the presence of threshold, jurisdictional issues, the Court would first decide the present Motion before setting a schedule for briefing a preliminary injunction. Because the Court presently dismisses this case for lack of jurisdiction, to the extent Plaintiff is still seeking a preliminary injunction, that motion would be denied as moot without prejudice. *See, e.g., Kroger, Inc. v. O'Donnell*, No. 07-3091, 2007 WL 3232586, at *5–6 (D.N.J. Oct. 31, 2007).

[17] On August 28, 2025, Plaintiff filed a letter "Notice of Subsequent Authority" directing the Court to recent developments in relevant caselaw. (ECF No. 52.) Defendants filed a letter response. (ECF No. 53.) The Court will not consider any arguments contained in the letters, even assuming Plaintiff's Notice was itself permissible. *See Atkins v. Capri Training Ctr., Inc.*, No. 13-06820, 2014 WL 4930906, at *10 (D.N.J. Oct. 1, 2014) ("Generally, if pertinent and significant authorities come to a party's attention after the party's

**Appx048**

## II.   LEGAL STANDARD

### A.   RULE 12(B)(1) OF THE FEDERAL RULES OF CIVIL PROCEDURE

Under Rule 12(b)(1), a court must grant a motion to dismiss if it lacks subject matter jurisdiction to hear the claim. Fed. R. Civ. P. 12(b)(1). In evaluating a Rule 12(b)(1) motion to dismiss, courts must first determine whether the motion "presents a 'facial' attack or a 'factual' attack on the claim at issue, because that distinction determines how the pleading must be reviewed." *Const. Party of Pa. v. Aichele*, 757 F.3d 347, 357–58 (3d Cir. 2014) (quoting *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012)). "A facial 12(b)(1) challenge, which attacks the complaint on its face without contesting its alleged facts, is like a 12(b)(6) motion in requiring the court to consider the allegations of the complaint as true." *Hartig Drug Co. v. Senju Pharm. Co.*, 836 F.3d 261, 268 (3d Cir. 2016) (internal quotation marks omitted). A factual challenge, on the other hand, "attacks allegations underlying the assertion of jurisdiction in the complaint, and it allows the defendant to present competing facts." *Id.* The "trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case" and "the plaintiff will have the burden of proof that jurisdiction does in fact exist." *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 n.3 (3d Cir. 2006) (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). "Therefore, a 12(b)(1) factual challenge strips the plaintiff of the protections and factual deference provided under 12(b)(6) review." *Hartig Drug Co.*, 836 F.3d at 268. The party invoking the federal court's jurisdiction has "the burden of proof that jurisdiction does in fact exist." *Petruska*, 462 F.3d at 302 n.3 (quoting *Mortensen*, 549 F.2d at 891).

---

brief has been filed, the party may advise the court of the relevant authority through a Notice of Supplemental Authority; however, a Notice of Supplemental Authority should not advance new arguments . . . ." (citing *Beazer E., Inc. v. Mead Corp.*, 525 F.3d 255, 264 (3d Cir. 2008))).

11

**Appx049**

### B.    RULE 12(B)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE

For a complaint to survive dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see Clark v. Coupe*, 55 F.4th 167, 178 (3d Cir. 2022). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. When assessing the factual allegations in a complaint, courts "disregard legal conclusions and recitals of the elements of a cause of action that are supported only by mere conclusory statements." *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 140 (3d Cir. 2023). The court accepts all allegations in the complaint as true and gives the plaintiff "the benefit of every favorable inference to be drawn therefrom." *Kulwicki v. Dawson*, 969 F.2d 1454, 1462 (3d Cir. 1992). "Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555. The defendant bringing a Rule 12(b)(6) motion bears the burden of "showing that a complaint fails to state a claim." *In re Plavix Mktg., Sales Pracs. & Prod. Liab. Litig. (No. II)*, 974 F.3d 228, 231 (3d Cir. 2020) (citing *Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016)).

In deciding a Rule 12(b)(6) motion, a court can only consider "the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). A court may also consider any document "integral to or explicitly relied upon in the complaint" when ruling on a motion to dismiss. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (cleaned up).

12

**Appx050**

## III.   DISCUSSION

### A.   STANDING

Defendants challenge—and the Court has an independent obligation to consider—Plaintiff's Article III standing to bring his procedural due process claim.[18] (MTD at 20–27); *Wayne Land & Min. Grp., LLC v. Del. River Basin Comm'n*, 959 F.3d 569, 574 (3d Cir. 2020). Article III limits federal courts' jurisdiction to "cases or controversies." U.S. Const. art. III, § 2. The doctrine of standing is one of the "landmarks" that identifies justiciable cases and controversies referred to in Article III. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "Standing is a question of subject matter jurisdiction." *Petroleos Mexicanos Refinacion v. M/T King A (Ex-Tbilisi)*, 377 F.3d 329, 334 (3d Cir. 2004). "Absent Article III standing, a federal court does not have subject matter jurisdiction to address a plaintiff's claims." *Taliaferro v. Darby Twp. Zoning Bd.*, 458 F.3d 181, 188 (3d Cir. 2006). To establish standing (and thus jurisdiction), a plaintiff must show that he or she "has suffered, or will suffer, an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).

In the context of a class action, only the named plaintiff must demonstrate standing. *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 361–62 (3d Cir. 2015). However, "[i]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the

---

[18] Defendants do not appear to challenge Plaintiff's standing for his second claim under the Takings Clause. (MTD at 20 (titling their discussion on standing "PLAINTIFF'S DUE PROCESS CLAIMS MUST BE DISMISSED BECAUSE PLAINTIFF LACKS ARTICLE III STANDING").) Even if they did, the Court is satisfied that Plaintiff has Article III standing for the takings claim. *See, e.g.*, *Salvato*, 2022 WL 1224962, at *6 n.5 (holding that Plaintiff had standing to bring takings claims for un-noticed escheatment under NJUPA).

13

class." *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 634 (3d Cir. 2017) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)). The named plaintiff in a class action "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Id.*

Defendants argue that Plaintiff has not suffered any "actual or imminent injury" to assert his procedural due process claim. (MTD at 21–25.) In doing so, Defendant distinguishes between Plaintiff's standing as a representative of the Borquez estate and in his individual capacity, arguing that he lacks standing on both fronts. (*Id.*)

### 1.    Representative Capacity Standing

First, Defendants assert that Plaintiff does not have standing on behalf of the Borquez estate because the NJUPA Administration already paid the Borquez estate "nearly $500,000" for the escheated Exxon stock. (*Id.* at 21.) Defendants also argue that Plaintiff lacks representative standing because he "identifies no other Estate property that could potentially escheat to the UPA in the future" to indicate a forthcoming future injury to the Borquez Estate. (*Id.*)

At least as representative of the Borquez estate, Plaintiff has standing. The Supreme Court has routinely recognized that plaintiffs who suffer "a classic pocketbook injury" have an actual and concrete injury for standing. *Tyler v. Hennepin County*, 598 U.S. 631, 636 (2023) (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021)). When the Administration allegedly escheated Borquez's Exxon stock without proper notice and undercompensated him for that action, Borquez suffered precisely this actual and concrete injury. Defendants' argument to the contrary— that Plaintiff "alleges no facts supporting an inference that the stock was sold for less than fair market value or that his payment was less than the entire sale proceeds"—misapprehends what is

14

**Appx052**

required of plaintiffs for Article III standing. (Reply at 5.) Indeed, Defendants' contention instead challenges Plaintiff's argument on the *merits*; Plaintiff has established a cognizable injury to assert his representative due process claim, even if Defendants believe it lacks substance. *See Garza v. Woods*, 150 F.4th 1118, 1125 (9th Cir. 2025) ("When the government assumes physical possession of another's unclaimed property, there is no ambiguity as to its position on the status of that property. *And when it does so without providing due process or just compensation, the owner has suffered sufficient injury to confer standing to challenge the government's action.* Of course, that is not to say the owner will prevail in claiming that the government acted unlawfully, only that the owner has a sufficiently concrete stake in the dispute to satisfy Article III." (emphasis added)); *Peters v. Cohen (Peters I)*, No. 22-266, 2024 WL 645557, at *3 (E.D. Cal. Feb. 14, 2024) (holding that Plaintiff had standing to recover stock "appreciation he was not paid" under California unclaimed property law even where he had already received statutorily authorized amount), *aff'd*, No. 24-1040, 2025 WL 733237 (9th Cir. Mar. 7, 2025).

However, Plaintiff's representative standing for the past escheatment does not automatically confer standing to pursue all of his requested relief. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) ("[A] plaintiff must demonstrate standing separately for each form of relief sought."). Although that injury does allow Plaintiff to pursue his requested injunctive and declaratory relief related to the already escheated property, (AC, Prayer for Relief ¶ D), it "is insufficient to enjoin the future enforcement of the UP[A]." *Peters I*, 2024 WL 645557, at *3. It is axiomatic in standing jurisprudence that "past wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983). Plaintiff pleads no facts to indicate that there is "a sufficient likelihood" that any of *Borquez*'s property will be escheated "in

15

a similar way"—in fact, the Amended Complaint mentions no other property at risk at all.[19] *Id.* at 111. Accordingly, while Plaintiff's representative standing is sufficient for relief in connection with Borquez's liquidated stock under both his procedural due process and takings claims, (AC, Prayer for Relief ¶ D), it is insufficient for his sought-after injunction of the NJUPA under either claim, (*id.* ¶¶ A, B, F).

### 2. *Personal Capacity Standing*

Nonetheless, Plaintiff asserts that he has standing to enjoin enforcement of the NJUPA in his *individual* capacity. (MTD at 22–25.) Although Plaintiff has alleged no property of his own that has been escheated under the NJUPA, Plaintiff alleges that he has personal standing to assert his claims on several grounds. Plaintiff alleges that, "in an attempt to begin repurchasing some of the property that New Jersey seized, Plaintiff has purchased (and currently owns) shares of Exxon Mobil through a brokerage called TradeUp Securities [("TradeUp")] (incorporated in New Jersey)."[20] (AC ¶ 20.) Plaintiff argues that, because of the NJUPA's deficient notice scheme, "he remains at risk" of this newly purchased stock "being escheated without notice." (*Id.*) Plaintiff

---

[19] For similar reasons, Plaintiff lacks standing to seek an equitable accounting. (AC, Prayer for Relief ¶ C.) Plaintiff alleges that, including Borquez's escheated stock, "[a]dditional property may have been seized as well—but Plaintiff would require an accounting from the State's records to determine." (*Id.* ¶ 95.) Plaintiff's nebulous purported injury is essentially a fishing expedition and is too speculative for standing purposes. *See Finkelman v. Nat'l Football League*, 810 F.3d 187, 200 (3d Cir. 2016) ("[S]peculation is not enough to sustain Article III standing."); *see also Heyer v. Experian Info. Sols. Inc.*, No. 19-15, 2019 WL 2869337, at *3 (E.D. Wis. July 3, 2019) ("Plaintiffs cannot use lawsuits as tools to test hunches."). Moreover, Plaintiff may not rely on the alleged escheatment of property from other foreign nationals in the class for his own standing to seek an equitable accounting. *In re Horizon*, 846 F.3d at 634 (citing *Lewis v. Casey*, 518 U.S. 343, 357 (1996)).

[20] Plaintiff provides no information on the amount or value of Exxon Mobil Corporation stock he purchased with TradeUp. (AC ¶ 20.) This amount is relevant to how much notice he would be entitled to under the NJUPA, as holders only have to provide pre-escheatment notice to owners of presumed abandoned property worth over $50, N.J. Stat. Ann. § 46:30B-50, and the Administration only has to provide post-escheatment for property worth over $100, *id.* § 46:30B-51. However, given the average value of Exxon Mobil Corporation stock, the Court presumes that these thresholds are met. *Exxon Mobil Corp*, CNBC (last updated January 9, 2026), https://www.cnbc.com/quotes/xom.

16

**Appx054**

asserts that, should he pursue his intended "buy-and-hold strategy for those shares" the NJUPA's pre-escheatment notice process would fail to prevent the escheatment of his stock *exactly as it did with Borquez's stock*. (*Id.* ¶¶ 102–10; *see also id.* ¶ 107 ("Accordingly, it is certain that Plaintiff's shares would escheat to New Jersey if he subscribed to a buy-and-hold approach to investment (i.e., makes no deposits or withdrawals or asset reallocations) for three years, and does not have automatic reinvestment of dividends. That is currently Plaintiff's plan for these shares.").)

Plaintiff's "[a]llegations of possible future injury do not satisfy the requirements of Art[icle] III. A threatened injury must be 'certainly impending' to constitute an injury in fact." *Sherwin-Williams Co. v. County of Delaware*, 968 F.3d 264, 269 (3d Cir. 2020) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). Plaintiff's recent purchase of Exxon stock is insufficient to confer standing for an illusory future injury. Despite Plaintiff's assertion that as a Chilean national, he "will ***certainly not*** receive notice under the NJUPA" before his current holdings are presumed abandoned, (Opp. at 27 (emphasis in original)), his Amended Complaint instead relies on a "highly attenuated chain of possibilities" that does not establish an imminent future injury, *Clapper*, 568 U.S. at 410.

Even if Plaintiff made no changes whatsoever to his investment strategy or his apparently preferred broker—TradeUp—and his shares remained subject to escheat under the NJUPA,[21] Plaintiff's theory of future injury relies on an extensive list of contingencies: (1) Because Plaintiff's asserted investment strategy would not result in unpaid dividends, (AC ¶ 20), TradeUp's "second mailing of a statement of account or other notification or communication" would have to

---

[21] Plaintiff alleges that TradeUp is incorporated in New Jersey, meaning that it would be treated as a holder expected to abide by the escheatment process of the NJUPA. (AC ¶ 102); *see* N.J. Stat. Ann. § 46:30B-10(e) (subjecting property to the NJUPA if the holder "is a domiciliary" of New Jersey and the last known address of the owner is a "foreign nation").

17

return *undeliverable*,[22] N.J. Stat. Ann. § 46:30B-31, despite Plaintiff's assertion that he provided them his Chilean address, (AC ¶ 104); (2) Plaintiff would have to "go[] three years without interacting" with TradeUp in one of the many ways specified by the NJUPA, (*id.* ¶ 105), including by writing or "contemporaneous record,"[23] N.J. Stat. Ann. § 46:30B-7.1; (3) TradeUp would have to forego sending (or, Plaintiff would have to affirmatively ignore) statutorily required pre-escheatment notice, assuming Plaintiff's Exxon Mobil Corporation holdings are currently worth

---

[22] Alternatively, three years could pass also pass from TradeUp's decision to "discontinue[] mailings to the apparent owner," N.J. Stat. Ann. § 46:30B-31, which Plaintiff does not in any way allege TradeUp imminently plans to do with him or his account, (*see* AC ¶¶ 102–07).

[23] The complete statutory section states:

> Property shall not be presumed abandoned if within the period that the property remains unclaimed the apparent owner communicated in writing or by other means reflected in a contemporaneous record prepared by or on behalf of the holder, with the holder concerning property or the account in which the property is held, or has otherwise indicated an interest in the property. A communication with an owner by a person other than the holder or its representative who has not in writing identified the property to the owner is not an indication of interest in the property by the owner. An indication of an owner's interest in property includes:

> the presentment of a check or other instrument of payment of a dividend or other distribution made with respect to an account or underlying stock or other interest in a business association or financial organization or, in the case of a distribution made by electronic or similar means, evidence that the distribution has been received;

> owner-directed activity in the account in which the property is held, including a direction by the owner to increase, decrease, or change the amount or type of property held in the account; or

> the payment of a premium with respect to a property interest in an insurance policy.

> The application of an automatic premium loan provision or other nonforfeiture provision contained in an insurance policy does not prevent a policy from maturing or terminating if the insured has died or the insured or the beneficiary of the policy has otherwise become entitled to the proceeds before the depletion of the cash surrender value of a policy by the application of those provisions.

N.J. Stat. Ann. § 46:30B-7.1. In reply, Defendants suggests that owners can indicate interest simply receiving "an electronic distribution," or through "nominal acts like logging in to an account" associated with the property. (Reply at 7.) The NJUPA's listed indications of interest, although likely non-exhaustive, does not include Defendants' examples. Moreover, merely logging into an account or receiving an email from a broker would require far less from the owner than the other examples listed in the statute, which otherwise contemplates more affirmative acts from the owner to demonstrate interest. However, because the Court finds that Plaintiff's claim to standing is too speculative even under the plain language and given examples of the statute, it need not determine whether Defendants' suggested activities are fair interpretations of an "indication of an owner's interest." N.J. Stat. Ann. § 46:30B-7.1.

18

**Appx056**

more than $50,[24] *id.* § 46:30B-50; (4) the Administrator's post-escheatment publication efforts would have to fail to reach Plaintiff, *id.* § 46:30B-51, and Plaintiff would have to fail to access one of the commercial databases that tracks escheated property; and (5) Plaintiff would have to fail to prevent the liquidation by submitting a claim for the return of his stock before the end of the Administrator's additional one-year waiting period,[25] *id.* § 46:30B-72.

A single break in this chain of events collapses Plaintiff's tenuous, hypothetical theory personal standing. Plaintiff's purported future injury is therefore not "certainly impending," nor is there "a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). Plaintiff's hypothesized future injury depends "on contingent future events that may not occur as anticipated, or indeed may not occur at all." *Nat'l Shooting Sports Found. v. Att'y Gen.*, 80 F.4th 215, 219 (3d Cir. 2023). For Plaintiff's predicted escheatment to occur, Plaintiff would not only have to avoid contact with TradeUp for multiple years, but he would have to affirmatively ignore all statutorily required notice from TradeUp before the stock would be even

---

[24] Plaintiff interprets this section, which requires holder to send owner notice "by certified mail[] with return receipt requested," N.J. Stat. Ann. § 46:30B-50, as not applying *at all* where foreign owners, like Plaintiff, are outside of the range of certified mail. (AC ¶¶ 16, 20, 61–62; *see id.* ¶ 81 ("Because of NJUPA's framework for distributing notice, no one with a foreign address will have received any pre or post-deprivation notice.").) The Court declines to adopt Plaintiff's interpretation of Section 50. Plaintiff offers no cases from New Jersey courts interpreting the NJUPA this way, and nothing in the plain language of the statute appears to *relieve* holders of their notice obligations to foreign owners if certified mail is not an option. Further, New Jersey courts interpreting state statutes "attempt to discern and implement the Legislature's intent." *State v. Drury*, 919 A.2d 813, 820 (N.J. 2007) (citing *State v. Reiner*, 850 A.2d 1252 (N.J. 2004)). The purpose of NJUPA Section 50 is clearly to provide "[n]otice to [the] apparent owner." N.J. Stat. Ann. § 46:30B-50. In any event, Plaintiff's interpretation of the statute—that no notice is required when certified mail is not an option—implicates constitutional due process concerns. Under New Jersey law, "[u]nless compelled to do otherwise, courts seek to avoid a statutory interpretation that might give rise to serious constitutional questions." *Silverman v. Berkson*, 661 A.2d 1266, 1268 (N.J. 1995) (citing *N.J. State Bd. of Higher Ed. v. Bd. of Dirs. of Shelton Coll.*, 448 A.2d 988, 992 (N.J. 1982)). Plaintiff also does not allege that TradeUp—the holder hypothetically responsible for sending this notice—will interpret Section 50 as Plaintiff does and send him no pre-escheatment notice by other means, even with Plaintiff's last known address. (AC ¶ 104.)

[25] As discussed, Section 72 of the NJUPA allows owners to seek the return of their stock even "after the expiration of [the one-year] period . . . if [the stock] still remain[s] in the hands of the administrator." N.J. Stat. Ann. § 46:30B-72.

presumed abandoned—let alone escheated and liquidated. (AC ¶¶ 104–07); N.J. Stat. Ann. § 46:30B-50. To the extent that Plaintiff predicts that TradeUp will not provide pre-escheatment notice, this, too, is impermissibly speculative. *Clapper*, 568 U.S. at 414 n.5 ("[P]laintiffs bear the burden of pleading and proving concrete facts showing that the defendant's actual action has caused the substantial risk of harm. Plaintiffs cannot rely on speculation about 'the unfettered choices made by independent actors not before the courts.'" (quoting *Lujan*, 504 U.S. at 562)). This predicted course of conduct is particularly implausible given Plaintiff's assertion, mere paragraphs later in the Amended Complaint, that he is "constantly monitor[ing]" his property out of fear of future escheatment.[26] (*Id.* ¶ 111.) If Plaintiff were to notice the delivery of his stock to the Administrator at any point before its liquidation, the NJUPA would allow him to recover it. N.J. Stat. Ann. § 46:30B-72. Thus, Plaintiff's speculative series of events is insufficient to confer standing for prospective injunctive relief. *See Peters v. Cohen* (*Peters II*), No. 24-1040, 2025 WL 733237, at *1 (9th Cir. Mar. 7, 2025) (concluding that German citizen plaintiff lacked standing to enjoin future enforcement of California's Unclaimed Property Law for previous liquidation of his Amazon stock).

Plaintiff also argues that the risk of escheatment-without-notice of his personal Exxon Mobil stock *presently* injures him. Plaintiff asserts that "[b]ecause he cannot rely on [NJUPA] notice, he is required to monitor the property continuously" to avoid escheat. (AC ¶ 111.) This, Plaintiff suggests, requires him to "churn and monitor that property (and other property) in order to ensure that the Administrator does not attempt to seize it." (*Id.* ¶ 108.) Because of his looming fears of the NJUPA, Plaintiff avers that he is discouraged from acquiring "further property that

---

[26] Even when crediting Plaintiff's well-pled facts as true on a motion to dismiss, the Court "need not accept factual claims that are internally inconsistent." *Pyatkova v. Motorcars*, No. 15-3263, 2016 WL 674862, at *2 (D.N.J. Feb. 3, 2016) (quoting *Anthony Sterling, M.D. v. Provident Life & Accident Ins. Co.*, 519 F. Supp. 2d 1195, 1208 (M.D. Fla. 2007)).

20

**Appx058**

might be subject to seizure." (*Id.* ¶ 112.)

These allegations of present injury, too, are insufficient to confer personal standing on Plaintiff.[27] Although plaintiffs must "clearly and specifically set forth facts sufficient" to satisfy standing on a motion to dismiss, *Hosp. Council of W. Pa. v. City of Pittsburgh*, 949 F.2d 83, 86–87 (3d Cir. 1991), courts must still "accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party," *Warth v. Seldin*, 422 U.S. 490, 502 (1975). Courts may, however, require plaintiffs to "go beyond these general allegations in the complaint and allege particularized facts supportive of its standing." *Newark Branch, N.A.A.C.P. v. Town of Harrison*, 907 F.2d 1408, 1415 (3d Cir. 1990) (citing *Warth*, 422 U.S. at 501–02). Plaintiff's bare, conclusory allegations of the "real and concrete cost[s]" he incurs "constantly monitoring his property to avoid escheat," are insufficiently concrete to confer standing.[28] (AC ¶ 111.) Moreover, Plaintiff's supposed "churn[ing] and monitor[ing]," (*id.* ¶ 108), is inconsistent with his assertion that he intends to undertake an idle, "buy-and-hold" investment strategy certain to end in escheatment, as, by his account, he does not plan to undertake the necessary efforts that would prevent escheatment under the NJUPA, (*id.* ¶ 107). Although Rule 8(d) allows Plaintiff to plead "alternative" and "inconsistent" legal theories, the Court "need not accept factual claims that are internally inconsistent." *Pyatkova v. Motorcars*, No. 15-3263, 2016 WL 674862, at *2 (D.N.J. Feb. 3, 2016) (quoting *Anthony Sterling, M.D. v. Provident Life & Accident Ins. Co.*, 519 F. Supp. 2d 1195, 1208 (M.D. Fla. 2007)). Plaintiff's two personal standing theories are plainly

---

[27] Because the Court finds that Plaintiff lacks a cognizable injury-in-fact, it does not address Defendants' related argument that Plaintiff's asserted personal injuries are self-inflicted and not traceable to Defendants' conduct. (MTD at 25–27.)

[28] Similarly, Plaintiff's assertion that the NJUPA "deters Plaintiff from acquiring further property that might be subject to seizure" is insufficient for standing. (AC ¶ 112.) Not only is not all of Plaintiff's "property in the United States" subject to escheatment under the New Jersey UPA, (*id.*), but bare "[a]llegations of a subjective 'chill,'" without specifics, are not concrete enough for standing, *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972).

21

**Appx059**

irreconcilable and each independently fail to confer standing. Thus, Plaintiff lacks standing to assert his claims in his individual capacity, and lacks standing to enjoin the enforcement of the NJUPA,[29] (AC, Prayer for Relief ¶¶ A, B, F).

Plaintiff's reliance on *Taylor v. Westly (Taylor II)*, 488 F.3d 1197 (9th Cir. 2007) (per curiam), for personal standing is misplaced. In *Taylor II*, the Ninth Circuit held that the plaintiffs had standing to challenge the California unclaimed property law both for the risk of future escheatment and the present costs on plaintiffs "of having to constantly monitor their property." *Id.* at 1999–1200. The present case is readily distinguishable. First, the *Taylor II* plaintiffs had already *personally* suffered previous escheatment of their property. *Id.* at 1199. This meant that the Ninth Circuit evaluated their standing and the risk of a future escheatment based on the "realistic likelihood" of recurrence standard, *id.*, not whether the injury was "certainly impending" as discussed hereinabove, *Clapper*, 568 U.S. at 409 (quoting *Lujan*, 504 U.S. at 565 n.2).[30] As discussed hereinabove, Plaintiff's speculative "chain of contingencies," *id.* at 410, depends on a number actions—some by non-parties like TradeUp—that "may not occur at all." *Nat'l Shooting Sports Found.* 80 F.4th at 219. Second, in briefing their present-injury standing, the plaintiffs in *Taylor II* asserted specific and concrete costs associated with monitoring and "churning" their

---

[29] Further, even assuming, *arguendo*, Plaintiff is incurring various costs to prevent escheatment, the Third Circuit has held—at least in the data breach context—that costs incurred "prophylactically" to prevent injury are insufficient to confer standing. *See Reilly v. Ceridian Corp.*, 664 F.3d 38, 46 (3d. Cir. 2011) ("That a plaintiff has willingly incurred costs to protect against an alleged increased risk . . . is not enough to demonstrate a 'concrete and particularized' or 'actual or imminent' injury."); *see also Clapper*, 568 U.S. at 422 ("[Plaintiffs] cannot manufacture standing by incurring costs in anticipation of non-imminent harm.").

[30] In *Clapper*, the Supreme Court reversed specifically because of the Second Circuit's "objectively reasonable likelihood" standard in assessing the likelihood of future injury, finding it inconsistent with requirement that a "threatened injury must be certainly impending," *Clapper*, 568 U.S. at 410 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). Although the Ninth Circuit's standard in *Taylor II*—which notably predates *Clapper*—is applicable to the risk of repeated injury as articulated in *City of Los Angeles v. Lyons*, that standard does not apply here. *See* Curtis A. Bradley & Ernest A. Young, *Standing and Probabilistic Injury*, 122 Mich. L. Rev. 1557, 1578–88 (2024) (distinguishing *Clapper* and *Lyons*).

property to prevent escheatment.[31] *Id.* at 1199–1200. Here, by contrast, Plaintiff offers only conclusory assertions that specify no actual costs or burden he is undertaking to prevent escheatment. (AC ¶¶ 108, 111.)

In short, Plaintiff has standing, in his capacity as representative of the Borquez estate, to seek relief in connection with the *previous* escheatment of Borquez's Exxon stock. (*Id.*, Prayer for Relief ¶ D.) Plaintiff's standing thus only supports his claims for the return of funds he believes he is owed—relief which Plaintiff purports to seek under *both* his procedural due process claim and his takings claim.[32] (*Id.* ¶¶ 148, 157–59.) However, Plaintiff does not have standing in either his representative or individual capacity to seek an equitable accounting or prospective injunctive and declaratory relief for hypothetical *future* escheatment or ongoing *present* injury. (*Id.*, Prayer for Relief ¶¶ A, B, C, F.)

### B.    ELEVENTH AMENDMENT IMMUNITY

This leaves only Plaintiff's request, under both his procedural due process and takings claims, for compensation for Borquez's stock that was escheated under the NJUPA. (AC ¶¶ 148, 156–57.) Defendants argue that these remaining claims are barred by Eleventh Amendment sovereign immunity. The Eleventh Amendment states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one

---

[31] For example, as discussed in the *Taylor II* plaintiffs' reply brief in support of their preliminary injunction motion, some of the plaintiffs had gone so far as to take "possession of their original stock certificates" and place them in bank deposit boxes for safekeeping. Pl.'s Reply Mem. at 11, *Taylor v. Westly*, No. 01-2407 (E.D. Cal. Aug. 1, 2005), ECF No. 47 (emphasis omitted). Even that deliberate conduct was not enough to prevent escheat, as "the [California] Controller compelled the Holders to issue duplicate certificates to the Controller, which he immediately sold without notice." *Id.*

[32] Although Plaintiff does not have standing to seek the other forms of injunctive relief under either claim for the reasons discussed hereinabove, he likely could not seek it pursuant to his takings claim anyway. (AC ¶ 162 (seeking to enjoin Defendants from enforcing the NJUPA under takings claim)); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016 (1984) ("Equitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law.").

23

**Appx061**

of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Ordinarily, the Eleventh Amendment, as construed by relevant caselaw, "has been interpreted to make states generally immune from suit by private parties in federal court." *MCI Telecomm. Corp. v. Bell Atl.-Pa.*, 271 F.3d 491, 503 (3d Cir. 2001) (collecting cases). "This immunity extends to state agencies and departments." *Id.* (citing *C.H. ex rel. Z.H. v. Oliva*, 226 F.3d 198, 201 (3d Cir. 2000) (en banc)).

Sovereign immunity is subject to narrow exceptions. *See Sinico v. Barry*, No. 18-01259, 2020 WL 528765, at *5 (M.D. Pa. Feb. 3, 2020). As relevant here, the *Ex parte Young*, 209 U.S. 123 (1908), doctrine allows "suits against state *officials* in certain circumstances." *Waterfront Comm'n of N.Y. Harbor v. Governor of N.J.*, 961 F.3d 234, 238 (3d Cir. 2020) (citing *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 254–55 (2011)). "Under the *Ex parte Young* doctrine, a state official is stripped of his official or representative character and thereby deprived of the State's immunity when he commits an ongoing violation of federal law," allowing "a person who is aggrieved [to] . . . seek prospective relief by suing [that state official] in his official capacity." *Waterfront Comm'n*, 961 F.3d at 238 (cleaned up). However, the *Young* exception allows only for "prospective, declaratory, or injunctive relief governing an officer's future conduct and cannot be retrospective, such as money damages." *MCI Telecom. Corp.*, 271 F.3d at 506 (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102–03 (1984)).

Furthermore, given the structure of the NJUPA, the Eleventh Amendment is not implicated *at all* insofar as relief seeks "the return of [Plaintiff's] and the class's *own property*." *Salvato*, 2022 WL 1224962, at *4 (emphasis in original). As discussed hereinabove, the escheatment of property under the NJUPA is *custodial* in nature: unclaimed funds the Administration has escheated are "held by the Treasurer as trustee for the *public interest*," not the State of New Jersey. *Clymer*, 792

24

A.2d at 400; *Am. Exp. Travel Related Servs. Co.*, 755 F. Supp. 2d at 565 ("[T]he purpose of enacting these escheat laws is to provide for the safekeeping of abandoned property and then reunite the abandoned property with its owner."). The property never permanently escheats to the State, as owners can claim their property "at any time in perpetuity." *Clymer*, 792 A.2d at 400 (citing N.J. Stat. Ann. § 46:30B–77); *Salvato*, 2022 WL 1224962, at *5 n.4.

This distinction between "permanent" and "custodial" escheatment is critical for sovereign immunity purposes. As the Supreme Court of the United States has explained, "the vulnerability of the State's purse [i]s the most salient factor in Eleventh Amendment determinations." *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 48 (1994). Where a plaintiff simply seeks the *return* of their property, that suit is not barred by the Eleventh Amendment because "the taking of the property or the injury to it was not the action of the sovereign because [the taking was] unconstitutional or beyond the officer's statutory powers." *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 698–99 (1949) (footnote omitted). Because owners retain a "legal or equitable interest in property" escheated under the NJUPA and held by the Administration *forever*, a claim seeking the return of property is "not for 'damages' against the State." N.J. Stat. Ann. § 46:30B-6(k) (defining "owner"); *see Clymer*, 792 A.2d at 400; *Salvato*, 2022 WL 1224962, at *6; *Taylor v. Westly (Taylor I)*, 402 F.3d 924, 932 (9th Cir. 2005) ("The State of California's sovereign immunity applies to the state's money. Money that the state holds in custody for the benefit of private individuals is not the state's money, any more than towed cars are the state's cars.").

In this case, however, Plaintiff concedes that he received the proceeds of the sale of Borquez's Exxon stock. (AC ¶ 157.) Plaintiff thus does not simply seek the *return* of his property: Plaintiff requests to be put "in the same position monetarily as [he] would have occupied" but for the escheatment, "including compensation for any appreciation in the value of the property since

25

**Appx063**

its seizure." (*Id.*, Prayer for Relief ¶ D.) By Plaintiff's account, he "would need an additional $136,354.77 beyond what New Jersey remitted to him" to be made whole, based on the value of the Exxon stock when he filed his original complaint. (*Id.* ¶¶ 157 n.14, 159.)

The Eleventh Amendment bars such relief. Plaintiff can only circumvent New Jersey's sovereign immunity to seek his "*escheated property* and *sales proceeds from escheated property.*" *Taylor I*, 402 F.3d at 932 (emphasis added). Plaintiff is "not entitled to *more* than the actual property that the State took into its possession or the proceeds of that property." *Suever v. Connell*, 579 F.3d 1047, 1059 (9th Cir. 2009) (citing *Taylor I*, 402 F.3d at 932). Plaintiff's request is one for "additional compensation," and is "indistinguishable in effect from claims for money damages against the State and, as such, are barred by the Eleventh Amendment."[33] *Peters II*, 2025 WL 733237, at *2 (quoting *Suever*, 579 F.3d at 1059); *cf. Salvato*, 2022 WL 1224962, at *4 (finding that the Eleventh Amendment did not bar recovery "insofar as Plaintiff's claims only request the return of her and the class's *own property*," whether as physical shares or proceeds from any sale thereof (citing *Edelman v. Jordan*, 451 U.S. 651, 655–57 (1974))).

Relevant case law emphasizes the distinction for sovereign immunity purposes between plaintiffs who have already recovered the proceeds of their escheated property (like Plaintiff here) and those who have not. For example, the Ninth Circuit held in *Taylor I*, *Garza v. Woods*, and *Mousseau v. Crum* that the Eleventh Amendment did not bar the plaintiffs from recovering their escheated property if the state operated under a similarly custodial unclaimed property system. *Taylor I*, 402 F.3d at 930–35 (previous California unclaimed property law); *Garza*, 150 F.4th at

---

[33] Even if framed as seeking "injunctive" relief, (AC, Prayer for Relief ¶ D), Plaintiff's remedy plainly does not fall under the *Ex parte Young* exception. *See Suever*, 579 F.3d at 1058–59; *Taylor I*, 402 F.3d at 935; *see also Merritts v. Richards*, 62 F.4th 764, 772 (3d Cir. 2023) (holding that *Ex parte Young* did not apply where plaintiff failed to show "ongoing violation of federal law" based on previous state condemnation action and "injunction to cure past injuries" was not prospective relief).

1125–26 (Arizona); *Mousseau*, No. 24-1802, 2025 WL 2437230, at *1 (9th Cir. Aug. 25, 2025) (mem.) (Alaska). Applying the reasoning of *Taylor I*, Judge Wolfson concluded the same for stock or other property still held by the NJUPA Administrator. *See Salvato*, 2022 WL 1224962, at *4– 6. The Eleventh Circuit recently reached a similar holding with respect to Florida's custodial escheatment statute where the plaintiffs had not yet received their stock or compensation. *Maron v. Chief Fin. Officer of Fla.*, 136 F.4th 1322, 1331, 1333–34 (11th Cir. 2025).

However, in the cases in which states had returned the proceeds of liquidated property and plaintiff sought *additional* compensation—namely, as here, the appreciated value of escheated stock—courts have held that sovereign immunity bars such recovery. *See Suever*, 579 F.3d at 1058–60 (barring recovery of "the amount of the difference between the proceeds of the sale of their unclaimed property and the current market value"); *Peters II*, 2025 WL 733237, at *2 (barring recovery of "the difference between the current market value of [plaintiff's] escheated stock and the price at which it was sold in 2018"). Here, Plaintiff seeks the same relief as that barred by the Ninth Circuit in *Suever* and *Peters*. (AC, Prayer for Relief ¶ D.)

Because Plaintiff has already received the value of Borquez's liquidated Exxon stock, his requests for further monetary relief—under both of his 42 U.S.C. § 1983 claims against state officials in their official capacities—are barred by the Eleventh Amendment. *Johnson v. Stith*, No. 14-5032, 2015 WL 4997413, at *4 (D.N.J. Aug. 20, 2015) ("It is well settled that the Eleventh Amendment's grant of sovereign immunity applies to Section 1983 claims brought against the States." (citing *Quern v. Jordan*, 440 U.S. 332, 345 (1979))); *Segura v. Greystone Park Psychiatric Hosp.*, No. 21-11662, 2024 WL 414105, at *7 (D.N.J. Feb. 5, 2024) ("Section 1983 claims seeking monetary damages are subject to the Eleventh Amendment sovereign immunity bar." (citing *Will*

27

**Appx065**

*v. Mich. Dep't of State Police*, 491 U.S. 58, 70–71 (1989))).[34]

Accordingly, because Plaintiff either lacks standing to assert his claims or his requested relief is barred by the Eleventh Amendment, Defendants' MTD is **GRANTED** and Plaintiff's Amended Complaint is **DISMISSED** for lack of subject matter jurisdiction. In light of the Third Circuit's decision in *Merritts v. Richards*, 62 F.4th 764, 772 n.4 (3d Cir. 2023), and in the abundance of caution, the dismissal will be **WITHOUT PREJUDICE** and the Court will grant Plaintiff leave to amend and file what would be his third operative complaint, in the event he chooses to do so. The Court declines to address the remaining issues.[35]

---

[34] Although the Third Circuit has not definitively held that Fifth Amendment Takings Clause claims brought against state officials in their official capacities under 42 U.S.C. § 1983 are barred by sovereign immunity, the "overwhelming weight of authority among the circuits" suggests that sovereign immunity is a bar where "the state provides a remedy of its own for an alleged violation." *Bldg. & Realty Inst. of Westchester & Putnam Cntys., Inc. v. New York*, Nos. 19-11285, 20-634, 2021 WL 4198332, at *9 & n.12 (S.D.N.Y. Sept. 14, 2021) (quoting *Cmty. Hous. Improvement Program v. City of New York*, 492 F. Supp. 3d 33, 40 (E.D.N.Y. 2020)) (collecting cases). In addition to providing an ability to appeal the Administrator's determination under the NJUPA itself, N.J. Stat. Ann. § 46:30B-84, New Jersey provides a remedy for unauthorized deprivations of property under the New Jersey Tort Claims Act, N.J. Stat. Ann. § 59:1-1 *et seq.*

[35] While the Court finds that it lacks jurisdiction to adjudicate Plaintiff's claims, Plaintiff's Amended Complaint likely contains other issues. As an initial matter, Plaintiff mischaracterizes part of his due process challenge of the NJUPA as a "facial" challenge. (AC ¶ 145 ("Therefore, the Statute is facially unconstitutional with respect to the category of persons (like Plaintiff) who receive no notice prior to the seizure of their property."); Opp. at 33 ("With respect to the class of foreign property owners, the Act is unconstitutional in every instance.").) This is not a facial challenge; it is as applied. *See United States v. Mitchell*, 652 F.3d 387, 405 (3d Cir. 2011) ("A party asserting a facial challenge must establish that no set of circumstances exists under which the Act would be valid. That is, [a plaintiff] would have to show that the statute is unconstitutional in all of its applications. This is the most difficult challenge to mount successfully. On the other hand, an as-applied attack does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right." (cleaned up)). Moreover, the Court notes that several cases have recognized that, given the custodial nature of the NJUPA, Plaintiff may be unable to assert a claim under the Takings Clause at all, as the escheated property is never taken for "public use." *See Garza*, 150 F.4th at 1127; *Mousseau*, 2025 WL 2437230, at *1; *Peters II*, 2025 WL 733237, at *2. *But see Knellinger v. Young*, 134 F.4th 1034, 1043–45 (10th Cir. 2025) (concluding the opposite).

28

## CONCLUSION

For the foregoing reasons, Defendants' Motion is **GRANTED** and Plaintiff's Amended Complaint is **DISMISSED WITHOUT PREJUDICE**. An appropriate Order will accompany this Opinion.

ROBERT KIRSCH
UNITED STATES DISTRICT JUDGE

<u>Dated</u>: January 12, 2026

29

**Appx067**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

JAIME VIAL, individually, as representative
of the heirs of Rene Correa Borquez, and on
behalf of other persons similarly situated,

      Plaintiff,

      v.

ELIZABETH MAHER MUOIO, in her
official capacity as TREASURER OF THE
STATE OF NEW JERSEY; and STEVEN
HARRIS, in his official capacity as
ADMINISTRATOR OF THE STATE OF
NEW JERSEY UNCLAIMED PROPERTY
ADMINISTRATION,

      Defendants.

Civil Action No. 24-11301 (RK) (JBD)

**ORDER**

**THIS MATTER** comes before the Court upon the Motion to Dismiss of by Elizabeth Maher Muoio, in her official capacity as Treasurer of the State of New Jersey, and Steven Harris, in his official capacity as Administrator of the State of New Jersey Unclaimed Property Administration (collectively, "Defendants"). (ECF No. 49.) Having considered the parties' submissions, the Court resolves the pending Motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth in the Court's Opinion filed on this date, and for other good cause shown,

      **IT IS** on this 12th day of January, 2026,

      **ORDERED** that Defendants' Motion to Dismiss, (ECF No. 49), is **GRANTED**;

      **ORDERED** that Plaintiff Jaime Vial's Amended Complaint, (ECF No. 45), is **DISMISSED WITHOUT PREJUDICE**;

**ORDERED** that the Clerk's Office is directed to terminate the Motion pending at Docket No. 49; and

**ORDERED** that the Clerk is directed to **CLOSE** this case.

_____
ROBERT KIRSCH
UNITED STATES DISTRICT JUDGE

2

**Appx069**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

JAIME VIAL, individually and as
representative of the heirs of Rene Correa
Borquez, and on behalf of other persons
similarly situated,

     Plaintiff,

v.

ELIZABETH MAHER MUOIO, in her
official capacity as TREASURER OF THE
STATE OF NEW JERSEY; and STEVEN
HARRIS, in his official capacity as
ADMINISTRATOR OF THE STATE OF
NEW JERSEY UNCLAIMED
PROPERTY ADMINISTRATION.

     Defendants.

Case No.: 3:24-cv-11301

## ORDER ENTERING FINAL JUDGMENT

THIS MATTER came before the Court upon Plaintiff's Notice of Intention to Stand on the

Amended Complaint and Request for Entry of Final Judgment. Upon consideration of the Notice,

the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby

ORDERED AND ADJUDGED that:

1. Plaintiff has elected to stand on the Amended Complaint as dismissed without prejudice

by the Court's Order dated January 12, 2026 (ECF No. 55); and

2. The action is DISMISSED WITH PREJUDICE; and

3. The Clerk is directed to ENTER FINAL JUDGMENT and CLOSE the case.

SIGNED: February 9, 2026

                                         Robert Kirsch
                             United States District Judge

Appx070