# IN THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

JAIME VIAL, individually, as representative of the heirs of Rene Correa Borquez, and on behalf of other persons similarly situated,
Plaintiff-Appellant,

v.

AARON BINDER, in his official capacity as Treasurer of the State of New Jersey; STEVEN HARRIS, in his official capacity as Administrator of the State of New Jersey Unclaimed Property Administration,
Defendants-Appellees.

_____

Appeal from the United States District Court for the
U.S. District Court of New Jersey,
Case No. 3:24-cv-11301, Judge Robert Kirsch

_____

## APPENDIX IN SUPPORT OF OPENING BRIEF OF PLAINTIFF-APPELLANT
## VOLUME 2 (APPX071–APPX285)

William W. Palmer, Esq.
Palmer Law Group, a PLC
2443 Fair Oaks Boulevard, No. 545
Sacramento, CA 95825
Telephone: (916) 972-0761

Kevin P. Roddy, Esq.
Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ 07095
Telephone: (732) 636-8000

Jonathan S. Massey, Esq.
Bret R. Vallacher, Esq.
Massey & Gail LLP
1000 Maine Ave. SW, Suite 450
Washington, D.C. 20024
Telephone: (202) 652-4511

May 29, 2026                    *Attorneys for Plaintiff-Appellant*

# APPENDIX
# TABLE ON CONTENTS

## VOLUME 2

| VOLUME 2 | | | |
|---|---|---|---|
| ITEM | ECF NO. | DESCRIPTION | APPENDIX PAGE |
| 5 | | Docket Report for Case No. 3:24-cv-11301 | Appx071 |
| 6 | 1 | Complaint, dated Dec. 19, 2024 | Appx080 |
| 7 | 45 | Amended Complaint, dated May 5, 2025 | Appx108 |
| 8 | 49 | State of New Jersey's Motion to Dismiss the Amended Complaint, dated June 4, 2025 | Appx148 |
| 9 | 50 | Plaintiff's Opposition to Motion to Dismiss, dated July 7, 2025 | Appx206 |
| 10 | 51 | State's Reply Brief in Support of Its Motion to Dismiss, dated Aug. 15, 2025 | Appx256 |
| 11 | 56 | Plaintiff's Notice of Intention to Stand on the Amended Complaint and Request for Entry of Final Judgment, dated Feb. 9, 2026 | Appx280 |

**Query**     **Reports**     **Utilities**     **Help**     **Log Out**

<span style="color:green">APPEAL</span>,<span style="color:blue">CLOSED</span>

# U.S. District Court
## District of New Jersey [LIVE] (Trenton)
### CIVIL DOCKET FOR CASE #: 3:24-cv-11301-RK-JBD

ESTATE OF RENE CORREA BORQUEZ v. MUOIO et al          Date Filed: 12/19/2024
Assigned to: Judge Robert Kirsch                                       Date Terminated: 01/12/2026
Referred to: Magistrate Judge J. Brendan Day                Jury Demand: Plaintiff
Case in other court: Third Circuit, 26-01301                     Nature of Suit: 440 Civil Rights: Other
Cause: 42:1983 Civil Rights Act                                          Jurisdiction: Federal Question

**Plaintiff**

**ESTATE OF RENE CORREA**                    represented by     **KSENIYA LEZHNEV**
**BORQUEZ**                                                                           Wilentz, Goldman & Spitzer
*Jamie Vial, as Representative of the heirs of*                 90 Woodbridge Center Drive
*Rene Correa Borquez and on behalf of other*                Ste 900
*persons similarly situated*                                               Woodbridge, NJ 07095
                                                                                          347-749-5140
                                                                                          Email: klezhnev@wilentz.com
                                                                                          *ATTORNEY TO BE NOTICED*

                                                                                          **KEVIN PETER RODDY**
                                                                                          WILENTZ, GOLDMAN & SPITZER, PA
                                                                                          90 WOODBRIDGE CENTER DRIVE
                                                                                          SUITE 900
                                                                                          BOX 10
                                                                                          WOODBRIDGE, NJ 07095
                                                                                          (732) 855-6402
                                                                                          Email: kroddy@wilentz.com
                                                                                          *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**ELIZABETH MAHER MUOIO**                 represented by     **VALERIE A. HAMILTON**
*in her official capacity as TREASURER OF*                     OFFICE OF THE ATTORNEY GENERAL
*THE STATE OF NEW JERSEY*                                      OF NJ
                                                                                          TREASURY - REVENUE, ESTATES &
                                                                                          TAXATION SECTION
                                                                                          RICHARD J. HUGHES JUSTICE
                                                                                          COMPLEX
                                                                                          25 MARKET STREET
                                                                                          PO BOX 106
                                                                                          TRENTON, NJ 08625-0106
                                                                                          609-900-3012
                                                                                          Fax: 609-777-3515
                                                                                          Email: Valerie.Hamilton@law.njoag.gov

Appx071

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

## Defendant

**STEVEN HARRIS**
*in his official capacity as ADMINISTRATOR*
*OF THE STATE OF NEW JERSEY*
*UNCLAMIED PROPERTY*
*ADMINISTRATION*

represented by **VALERIE A. HAMILTON**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

## Defendant

**KELMAR ASSOCIATES, LLC**
*TERMINATED: 04/02/2025*

represented by **ELIZABETH ANN CARBONE**
COLE SCHOTZ PC
25 MAIN STREET
COURT PLAZA NORTH
HACKENSACK, NJ 07601
201-489-3000
Email: ecarbone@coleschotz.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**WARREN A. USATINE**
COLE SCHOTZ P.C.
25 MAIN STREET
P.O. BOX 800
HACKENSACK, NJ 07601
(201) 525-6233
Fax: 201-489-1536
Email: wusatine@coleschotz.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/19/2024 | 1 | COMPLAINT against STEVEN HARRIS, KELMAR ASSOCIATES, LLC, ELIZABETH MAHER MUOIO ( Filing and Admin fee $ 405 receipt number ANJDC-15889270) with JURY DEMAND, filed by RENE CORREA BORQUEZ. (Attachments: # 1 Civil Cover Sheet)(RODDY, KEVIN) (Entered: 12/19/2024) |
| 12/19/2024 | | Judge Robert Kirsch and Magistrate Judge J. Brendan Day added. (dmr3) (Entered: 12/19/2024) |
| 12/19/2024 | 2 | SUMMONS ISSUED as to All Defendants. Attached is the official court Summons, please fill out Defendant and Plaintiffs attorney information and serve. (dmr3) (Entered: 12/19/2024) |
| 12/23/2024 | 3 | SUMMONS Returned Executed by JAIME VIAL. KELMAR ASSOCIATES, LLC served on 12/20/2024, answer due 1/10/2025. (RODDY, KEVIN) (Entered: 12/23/2024) |
| 12/27/2024 | 4 | SUMMONS Returned Executed by JAIME VIAL. STEVEN HARRIS served on 12/23/2024, answer due 1/13/2025. (RODDY, KEVIN) (Entered: 12/27/2024) |
| 12/27/2024 | 5 | SUMMONS Returned Executed by JAIME VIAL. ELIZABETH MAHER MUOIO served on 12/23/2024, answer due 1/13/2025. (RODDY, KEVIN) (Entered: 12/27/2024) |

**Appx072**

| 01/07/2025 | 6 | MOTION for Leave to Appear Pro Hac Vice *by Jonathan S. Massey, Esq.* by JAIME VIAL. (Attachments: # 1 Declaration of Jonathan S. Massey, Esq., # 2 Exhibit A Cert of Good Standing, # 3 Exhibit B Bar Admissions, # 4 Declaration of Kevin P. Roddy, Esq., # 5 Text of Proposed Order)(RODDY, KEVIN) (Entered: 01/07/2025) |
|---|---|---|
| 01/07/2025 | | Set Deadlines as to 6 MOTION for Leave to Appear Pro Hac Vice *by Jonathan S. Massey, Esq.*. Motion set for 2/3/2025 before Magistrate Judge J. Brendan Day. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (kht) (Entered: 01/07/2025) |
| 01/07/2025 | 7 | MOTION for Leave to Appear Pro Hac Vice *by Bret R. Vallacher, Esq.* by JAIME VIAL. (Attachments: # 1 Declaration of Bret Vallacher Esq., # 2 Exhibit A Cert of Good Standing, # 3 Exhibit B Bar Admissions, # 4 Declaration of Kevin P. Roddy, Esq., # 5 Text of Proposed Order)(RODDY, KEVIN) (Entered: 01/07/2025) |
| 01/07/2025 | | Set Deadlines as to 7 MOTION for Leave to Appear Pro Hac Vice *by Bret R. Vallacher, Esq.*. Motion set for 2/3/2025 before Magistrate Judge J. Brendan Day. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (amv) (Entered: 01/07/2025) |
| 01/08/2025 | 8 | MOTION for Leave to Appear Pro Hac Vice *By Matthew E. Layden, Esq.* by JAIME VIAL. (Attachments: # 1 Declaration of Michael Layden, Esq., # 2 Exhibit A Cert of Good Standing, # 3 Exhibit B Bar Admissions, # 4 Declaration of Kevin P. Roddy, Esq., in Support, # 5 Text of Proposed Order)(RODDY, KEVIN) (Entered: 01/08/2025) |
| 01/08/2025 | 9 | Exhibit to 6 Motion for Leave to Appear Pro Hac Vice, *(Revised Exh B Bar Admissions)* by JAIME VIAL. (RODDY, KEVIN) (Entered: 01/08/2025) |
| 01/08/2025 | 10 | Exhibit to 7 Motion for Leave to Appear Pro Hac Vice, *(Revised Exh B Bar Admissions)* by JAIME VIAL. (RODDY, KEVIN) (Entered: 01/08/2025) |
| 01/10/2025 | | Set Deadlines as to 8 MOTION for Leave to Appear Pro Hac Vice *By Matthew E. Layden, Esq.*. Motion set for 2/3/2025 before Magistrate Judge J. Brendan Day. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (jal, ) (Entered: 01/10/2025) |
| 01/10/2025 | 11 | STIPULATION re 1 Complaint */ Stipulation and Order Extending Defendant Kelmar Associates, LLC's Time to Answer, Move, or Otherwise Respond to the Complaint* by KELMAR ASSOCIATES, LLC. (CARBONE, ELIZABETH) (Entered: 01/10/2025) |
| 01/10/2025 | 12 | NOTICE of Appearance by ELIZABETH ANN CARBONE on behalf of KELMAR ASSOCIATES, LLC (CARBONE, ELIZABETH) (Entered: 01/10/2025) |
| 01/10/2025 | 13 | NOTICE of Appearance by WARREN A. USATINE on behalf of KELMAR ASSOCIATES, LLC (USATINE, WARREN) (Entered: 01/10/2025) |
| 01/14/2025 | 14 | ORDER Granting 6 Motion for Leave to Appear Pro Hac Vice as to JONATHAN S. MASSEY, ESQ. Signed by Magistrate Judge J. Brendan Day on 1/14/2025. (amv) (Entered: 01/14/2025) |
| 01/14/2025 | 15 | ORDER Granting 7 Motion for Leave to Appear Pro Hac Vice as to BRET R. VALLACHER, ESQ. Signed by Magistrate Judge J. Brendan Day on 1/14/2025. (amv) |

**Appx073**

| | | |
|---|---|---|
| | | (Entered: 01/14/2025) |
| 01/14/2025 | 16 | ORDER Granting 8 Motion for Leave to Appear Pro Hac Vice as to MATTHEW E. LAYDEN, ESQ. Signed by Magistrate Judge J. Brendan Day on 1/14/2025. (amv) (Entered: 01/14/2025) |
| 01/14/2025 | 17 | WAIVER OF SERVICE Returned Executed by JAIME VIAL. STEVEN HARRIS waiver sent on 1/13/2025, answer due 3/14/2025. (RODDY, KEVIN) (Entered: 01/14/2025) |
| 01/14/2025 | 18 | WAIVER OF SERVICE Returned Executed by JAIME VIAL. ELIZABETH MAHER MUOIO waiver sent on 1/13/2025, answer due 3/14/2025. (RODDY, KEVIN) (Entered: 01/14/2025) |
| 01/17/2025 | 19 | MOTION for Leave to Appear Pro Hac Vice *by William W. Palmer, Esq.* by JAIME VIAL. (Attachments: # 1 Declaration of William Palmer, Esq.In Support, # 2 Exhibit A - Cert of Good Standing, # 3 Exhibit B - Bar Admissions, # 4 Declaration of Kevin P. Roddy, Esq., in Support, # 5 Text of Proposed Order)(RODDY, KEVIN) (Entered: 01/17/2025) |
| 01/17/2025 | | Set Deadlines as to 19 MOTION for Leave to Appear Pro Hac Vice *by William W. Palmer, Esq.*. Motion set for 2/18/2025 before Magistrate Judge J. Brendan Day. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (amv) (Entered: 01/17/2025) |
| 01/24/2025 | 20 | MOTION for Leave to Appear Pro Hac Vice *of Ryan P. McManus, Esq. and John M. Stephan, Esq.* by KELMAR ASSOCIATES, LLC. (Attachments: # 1 Declaration of Ryan P. McManus, Esq. in Support of Motion, # 2 Exhibit A to Declaration of Ryan P. McManus, Esq., # 3 Declaration of John M. Stephan, Esq. in Support of Motion, # 4 Exhibit A to Declaration of John M. Stephan, Esq., # 5 Declaration of Elizabeth A. Carbone, Esq. in Support of Motion, # 6 Text of Proposed Order)(CARBONE, ELIZABETH) (Entered: 01/24/2025) |
| 01/24/2025 | | Set Deadlines as to 20 MOTION for Leave to Appear Pro Hac Vice *of Ryan P. McManus, Esq. and John M. Stephan, Esq.*. Motion set for 2/18/2025 before Magistrate Judge J. Brendan Day. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (amv) (Entered: 01/24/2025) |
| 02/03/2025 | 21 | MOTION for Temporary Restraining Order *And Preliminary Injunction* by JAIME VIAL. (Attachments: # 1 Memorandum In Support of Motion for Temporary Restraining Order and Preliminary Injunction, # 2 Declaration of Jaime Vial in Support with Exh. A thru I, # 3 Declaration of Cherese Bayani in Support with Exh, # 4 Declaration of Expert Witness Jan Peters in Support, # 5 Text of Proposed Order)(RODDY, KEVIN) (Entered: 02/03/2025) |
| 02/03/2025 | | Pro Hac Vice fee received as to JONATHAN S. MASSEY AND MATTHEW E. LAYDEN: $ 500, receipt number TRE142395 (dmr3) (Entered: 02/03/2025) |
| 02/04/2025 | 22 | STIPULATION AND ORDER Extending Defendant Kelmar's time to answer, move, or otherwise respond to the Complaint up to and including 2/10/2025. Signed by Magistrate Judge J. Brendan Day on 2/4/2025. (amv) (Entered: 02/04/2025) |
| 02/04/2025 | | Pro Hac Vice fee received as to BRET R. VALLACHER: $ 250, receipt number TRE142428 (dmr3) (Entered: 02/04/2025) |
| 02/05/2025 | 23 | Notice of Request by Pro Hac Vice Jonathan S. Massey, Esq. to receive Notices of Electronic Filings. (RODDY, KEVIN) (Main Document 23 replaced on 2/7/2025) (mlh, ). |

Appx074

| | | |
|---|---|---|
| | | (Entered: 02/05/2025) |
| 02/05/2025 | 24 | Notice of Request by Pro Hac Vice Matthew E. Layden, Esq. to receive Notices of Electronic Filings. (RODDY, KEVIN) (Main Document 24 replaced on 2/7/2025) (mlh, ). (Entered: 02/05/2025) |
| 02/05/2025 | 25 | Notice of Request by Pro Hac Vice Bret R. Vallacher, Esq. to receive Notices of Electronic Filings. (RODDY, KEVIN) (Main Document 25 replaced on 2/7/2025) (mlh, ). (Entered: 02/05/2025) |
| 02/05/2025 | | CLERK'S QUALITY CONTROL MESSAGE - The 25 "NOTICE OF REQUEST BY PRO HAC VICE" filed by KEVIN PETER RODDY on 2/5/2025 was uploaded prior to being flattened. Before uploading fillable forms to ECF you must flatten the file to prevent other users from manipulating or editing the information. The easiest way to flatten a PDF form is by selecting Print to PDF and saving the flattened form, other PDF software may differ. Please visit our website under Flattening PDF Forms for guidance. Please email a flattened version to ecfhelp@njd.uscourts.gov for replacement on the docket. (mlh) (Entered: 02/05/2025) |
| 02/05/2025 | | CLERK'S QUALITY CONTROL MESSAGE - The 23 NOTICE OF REQUEST BY PRO HAC VICE and 24 NOTICE OF REQUEST BY PRO HAC VICE filed by KEVIN RODDY on 2/5/2025 were uploaded prior to being flattened. Before uploading fillable forms to ECF you must flatten the file to prevent other users from manipulating or editing the information. The easiest way to flatten a PDF form is by selecting Print to PDF and saving the flattened form, other PDF software may differ. Please visit our website under Flattening PDF Forms for guidance. Please email a flattened version to ecfhelp@njd.uscourts.gov for replacement on the docket. (dmr3, ) (Entered: 02/05/2025) |
| 02/05/2025 | 26 | NOTICE of Appearance by VALERIE A. HAMILTON on behalf of ELIZABETH MAHER MUOIO, STEVEN HARRIS (HAMILTON, VALERIE) (Entered: 02/05/2025) |
| 02/05/2025 | 27 | Letter from State Defendants Requesting Pre-Motion Conference. (Attachments: # 1 Garza v Woods Unpub Opinion, # 2 Peters v. Cohen Unpub Opinion, # 3 Certificate of Service) (HAMILTON, VALERIE) (Entered: 02/05/2025) |
| 02/07/2025 | 28 | TEXT ORDER: Parties are hereby advised that a *Telephone Conference* has been scheduled for **10:30 a.m. on Tuesday, February 11, 2025**. Participants are directed to dial 855-244-8681 and when prompted, enter meeting ID 2303 040 4763 followed by ##. So Ordered by Judge Robert Kirsch on 02/07/2025. (pdm) (Entered: 02/07/2025) |
| 02/07/2025 | | Pro Hac Vice counsel, JONATHAN MASSEY, ESQ., MATTHEW LAYDEN, ESQ. and BRET R. VALLACHER, ESQ., has been added to receive Notices of Electronic Filing. Pursuant to L.Civ.R. 101.1, only local counsel are entitled to sign and file papers, enter appearances and receive payments on judgments, decrees or orders. (mlh) (Entered: 02/07/2025) |
| 02/10/2025 | 29 | Letter from Elizabeth A. Carbone, Esq. requesting a pre-motion conference re 1 Complaint. (CARBONE, ELIZABETH) (Entered: 02/10/2025) |
| 02/11/2025 | 30 | Minute Entry for proceedings held before Judge Robert Kirsch: *Telephone Conference* held on 2/11/2025. Order to follow. (Court Reporter, Paula Horovitz (609-815-2755)) (pdm) (Entered: 02/11/2025) |
| 02/11/2025 | 31 | TEXT ORDER: This matter comes before the Court on Plaintiff's Motion for a Temporary Restraining Order ("TRO") and Preliminary Injunction ("PI"). (ECF No. 21 .) For the reasons stated on the record during today's teleconference, the Court finds that Plaintiffs have not sufficiently established any of the four prongs required to demonstrate the necessity of a TRO. Accordingly, the Motion for a TRO is DENIED. All parties are |

Appx075

| | | |
|---|---|---|
| | | directed to meet and confer by February 18, 2025, and submit a joint letter to the Court by February 25, 2025, which should advise the Court of the parties' proposal to adjudicate the PI and putative Motion to Dismiss. |
| | | The parties are further advised that a *Telephone Conference* has been scheduled for **11:30 a.m. on Tuesday, March 4, 2025**. Participants are directed to dial 855-244-8681 and when prompted, enter meeting ID 2303 040 4763 followed by ##. In the meantime, all deadlines for Defendants to respond to the Complaint pursuant to Fed. R. Civ. P. are hereby STAYED. So Ordered by Judge Robert Kirsch on 02/11/2025. (pdm) (Entered: 02/11/2025) |
| 02/11/2025 | | Set Hearings: *Telephone Conference* set for 3/4/2025 at 11:30 a.m. (pdm) (Entered: 02/11/2025) |
| 02/11/2025 | 32 | ORDER granting 19 Motion for Leave to Appear Pro Hac Vice as to *William Palmer, Esq.* Signed by Magistrate Judge J. Brendan Day on 2/11/2025. (cry) (Entered: 02/11/2025) |
| 02/11/2025 | 33 | ORDER granting 20 Motion for Leave to Appear Pro Hac Vice as to *Ryan P. McManus, Esq. and John M. Stephan, Esq.* Signed by Magistrate Judge J. Brendan Day on 2/11/2025. (cry) (Entered: 02/11/2025) |
| 02/13/2025 | 34 | NOTICE of Appearance by KSENIYA LEZHNEV on behalf of ESTATE OF RENE CORREA BORQUEZ (LEZHNEV, KSENIYA) (Entered: 02/13/2025) |
| 02/24/2025 | 35 | Letter from Counsel for Plaintiff. (RODDY, KEVIN) (Entered: 02/24/2025) |
| 02/24/2025 | 36 | LETTER ORDER granting a three day extension of time until 2/28/2025 for the parties to submit a joint status letter. Signed by Judge Robert Kirsch on 2/24/2025. (kht) (Entered: 02/24/2025) |
| 02/26/2025 | | Pro Hac Vice fee received as to RYAN P. MCMANUS and JOHN M. STEPHAN: $ 500, receipt number TRE142793 (dmr3) (Entered: 02/26/2025) |
| 02/28/2025 | | Set/Reset Hearings: The *Telephone Conference* scheduled for Tuesday, March 4, has been rescheduled for **2:00 p.m.** Participants are directed to dial 855-244-8681 and when prompted, enter meeting ID 2303 040 4763 followed by ##. (pdm) (Entered: 02/28/2025) |
| 02/28/2025 | | Set/Reset Hearings: *Telephone Conference* reset for 2:00 p.m. on 3/4/2025.(pdm) (Entered: 02/28/2025) |
| 02/28/2025 | 37 | Letter from /Joint Letter from all parties / Elizabeth A. Carbone, Esq. re 31 Order on Motion for TRO,,,,. (Attachments: # 1 Exhibit A to Joint Letter)(CARBONE, ELIZABETH) (Entered: 02/28/2025) |
| 03/04/2025 | 38 | Minute Entry for proceedings held before Judge Robert Kirsch: *Telephone Conference* held on 3/4/2025. Order to follow. (Court Reporter, Paula Horovitz (609-815-2755)) (pdm) (Entered: 03/04/2025) |
| 03/04/2025 | 39 | TEXT ORDER: This matter comes before the Court on the parties' filing of a joint status letter. (ECF No. 37 .) Pursuant to the Court's direction at today's teleconference, the Court authorizes the filing of Defendants' Motion to Dismiss. The parties are directed to refrain from filing any motion papers on the docket until all briefing is exchanged. Accordingly, Defendants shall first serve its motion on Plaintiff within forty-five (45) days. Thereafter, Plaintiff shall file its opposition on Defendants by May 5, 2025. Then, Defendants shall serve their reply papers by May 12, 2025. Once all papers have been served, movant shall, within seven (7) days thereafter, file the moving papers, the opposition papers, and the reply papers simultaneously under three separate docket entries. So Ordered by Judge Robert Kirsch on 03/04/2025. (pdm) (Entered: 03/04/2025) |

**Appx076**

| | | |
|---|---|---|
| 03/06/2025 | 40 | Transcript of Teleconference held on 2/11/2025, before Judge Robert Kirsch. Court Reporter/Transcriber: Paula Horovitz (609-815-2755). **NOTICE REGARDING (1) REDACTION OF PERSONAL IDENTIFIERS IN TRANSCRIPTS AND (2) MOTION TO REDACT AND SEAL:** The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this Transcript to comply with Fed.R.Civ.P.5.2(a) (personal identifiers). Parties seeking to redact and seal this Transcript, or portions thereof, pursuant to L.Civ.R. 5.3(g) must e-file a Motion to Redact and Seal utilizing the event `Redact and Seal Transcript/Digital Recording`. Redaction Request to Court Reporter/Transcription Agency due, but not filed, by 3/27/2025. Redacted Transcript Deadline set for 4/7/2025. Release of Transcript Restriction set for 6/4/2025. (amv) (Entered: 03/06/2025) |
| 03/06/2025 | | Pro Hac Vice fee as to William Palmer, Esq $ 250, receipt number CAM15360 (kes, ) (Entered: 03/06/2025) |
| 03/07/2025 | 41 | Notice of Request by Pro Hac Vice William W. Palmer, Esq. to receive Notices of Electronic Filings. (RODDY, KEVIN) (Main Document 41 replaced on 3/7/2025) (amv). (Entered: 03/07/2025) |
| 03/07/2025 | | Pro Hac Vice counsel, WILLIAM PALMER, has been added to receive Notices of Electronic Filing. Pursuant to L.Civ.R. 101.1, only local counsel are entitled to sign and file papers, enter appearances and receive payments on judgments, decrees or orders. (amv) (Entered: 03/07/2025) |
| 03/07/2025 | | CLERK'S QUALITY CONTROL MESSAGE - The Notice 41 filed by KEVIN RODDY on 3/7/2025 was uploaded prior to being flattened. Before uploading fillable forms to ECF you must flatten the file to prevent other users from manipulating or editing the information. The easiest way to flatten a PDF form is by selecting Print to PDF and saving the flattened form, other PDF software may differ. Please visit our website under Flattening PDF Forms for guidance. Your document has been corrected. This message is for informational purposes only. (amv) (Entered: 03/07/2025) |
| 04/02/2025 | 42 | NOTICE of Voluntary Dismissal *Without Prejudice* by ESTATE OF RENE CORREA BORQUEZ (RODDY, KEVIN) (Entered: 04/02/2025) |
| 04/02/2025 | 43 | STIPULATION AND ORDER of Voluntary dismissal as to Defendant Kelmar Associates, LLC without prejudice. Signed by Judge Robert Kirsch on 4/2/2025. (jal, ) (Entered: 04/02/2025) |
| 04/21/2025 | 44 | Letter from Plaintiff. (RODDY, KEVIN) (Entered: 04/21/2025) |
| 05/05/2025 | 45 | AMENDED COMPLAINT against STEVEN HARRIS, ELIZABETH MAHER MUOIO, filed by ESTATE OF RENE CORREA BORQUEZ.(RODDY, KEVIN) (Entered: 05/05/2025) |
| 05/06/2025 | 46 | TEXT ORDER: Consistent with the parties' proposed briefing schedule, the Court directs the parties as follows: the parties are directed to refrain from filing any motion papers on the docket until all briefing is exchanged. Defendants shall first serve its motion on Plaintiff by June 4, 2025. Thereafter, Plaintiff shall file its opposition on Defendants by July 7, 2025. Then, Defendants shall serve their reply papers by August 1, 2025. Once all papers have been served, movant shall, within seven (7) days thereafter, file the moving papers, the opposition papers, and the reply papers simultaneously under three separate docket entries. So Ordered by Judge Robert Kirsch on 05/06/2025. (pdm) (Entered: 05/06/2025) |
| 07/29/2025 | 47 | APPLICATION/PETITION for Extension of Time to File Reply Brief for by All Defendants. (HAMILTON, VALERIE) (Entered: 07/29/2025) |

Appx077

| 07/29/2025 | 48 | LETTER ORDER granting request for an extension of time until 8/15/2025 to file reply brief. Signed by Judge Robert Kirsch on 7/29/2025. (mlh) (Entered: 07/29/2025) |
|---|---|---|
| 08/15/2025 | 49 | MOTION to Dismiss , MOTION to Dismiss for Lack of Jurisdiction *or for Abstention* by STEVEN HARRIS, ELIZABETH MAHER MUOIO. Responses due by 7/7/2025. (Attachments: # 1 Brief, # 2 Text of Proposed Order, # 3 Certificate of Service) (HAMILTON, VALERIE) (Entered: 08/15/2025) |
| 08/15/2025 | 50 | BRIEF in Opposition filed by MATTHEW LAYDEN, ESQ., JONATHAN MASSEY, ESQ., WILLIAM PALMER, BRET R. VALLACHER, ESQ. re 49 MOTION to Dismiss MOTION to Dismiss for Lack of Jurisdiction *or for Abstention (with Certificate of Service)* (HAMILTON, VALERIE) (Entered: 08/15/2025) |
| 08/15/2025 | 51 | REPLY BRIEF to Opposition to Motion filed by All Defendants re 49 MOTION to Dismiss MOTION to Dismiss for Lack of Jurisdiction *or for Abstention* (Attachments: # 1 Certificate of Service)(HAMILTON, VALERIE) (Entered: 08/15/2025) |
| 08/18/2025 | | Set Deadlines as to 49 MOTION to Dismiss MOTION to Dismiss for Lack of Jurisdiction *or for Abstention*. Motion set for 9/15/2025 before Judge Robert Kirsch. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (jal, ) (Entered: 08/18/2025) |
| 08/28/2025 | 52 | Letter from Kevin P. Roddy to the Honorable Robert Kirsch USDJ re Notice of Subsequent Authority. (RODDY, KEVIN) (Entered: 08/28/2025) |
| 09/10/2025 | 53 | RESPONSE re 52 Letter. (HAMILTON, VALERIE) (Entered: 09/10/2025) |
| 01/12/2026 | 54 | OPINION filed. Signed by Judge Robert Kirsch on 1/12/2026. (jjc) (Entered: 01/13/2026) |
| 01/12/2026 | 55 | ORDER granting 49 Motion to Dismiss; that Plaintiff's Amended complaint is DISMISSED WITHOUT PREJUDICE. ***CIVIL CASE TERMINATED;. Signed by Judge Robert Kirsch on 1/12/2026. (jjc) (Entered: 01/13/2026) |
| 02/09/2026 | 56 | NOTICE by ESTATE OF RENE CORREA BORQUEZ *OF INTENTION TO STAND ON THE AMENDED COMPLAINTAND REQUEST FOR ENTRY OF FINAL JUDGMENT* (Attachments: # 1 Text of Proposed Order)(RODDY, KEVIN) (Entered: 02/09/2026) |
| 02/10/2026 | 57 | ORDER ENTERING FINAL JUDGMENT: Judgment entered in favor of Defendants ELIZABETH MAHER MUOIO and STEVEN HARRIS, against Plaintiff ESTATE OF RENE CORREA BORQUEZ; this action is DISMISSED with prejudice and the Clerk is directed to CLOSE the case. Signed by Judge Robert Kirsch on 2/9/2026. (sms2) Modified on 2/13/2026 (dmr3). (Entered: 02/10/2026) |
| 02/10/2026 | 58 | NOTICE OF APPEAL by ESTATE OF RENE CORREA BORQUEZ. Filing fee $ 605, receipt number ANJDC-17083387. The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (Attachments: # 1 Exhibit A -Opinion, # 2 Exhibit B - Order, # 3 Exhibit C - Order Entering Final Judgment)(RODDY, KEVIN) (Entered: 02/10/2026) |
| 02/12/2026 | 59 | USCA Case Number 26-1301 for 58 Notice of Appeal (USCA), filed by ESTATE OF RENE CORREA BORQUEZ. USCA Case Manager Ginelle (Document Restricted - Court Only) (ca3gch) (Entered: 02/12/2026) |

Appx078

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 05/29/2026 06:41:07 | | | |
| **PACER Login:** | brvgov12 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:24-cv-11301-RK-JBD Start date: 1/1/1980 End date: 5/29/2026 |
| **Billable Pages:** | 8 | **Cost:** | 0.80 |

**Appx079**

Kevin P. Roddy, Esq.
WILENTZ, GOLDMAN & SPITZER, P.A.
90 Woodbridge Center Dr., Suite 900
Woodbridge, NJ  07095
Telephone:  (732) 636-8000
Facsimile:   (732) 726-6686
Email: kroddy@wilentz.com

William W. Palmer, Esq.
(To Be Admitted *Pro Hac Vice*)
PALMER LAW GROUP, PLC
2443 Fair Oaks Boulevard, No. 545
Sacramento, CA 95825
Telephone:  (916) 972-0761
Facsimile:  (916) 972-0877
Email: wpalmer@palmercorp.com

Jonathan S. Massey
(To Be Admitted *Pro Hac Vice*)
Bret R. Vallacher
(To Be Admitted *Pro Hac Vice*)
Matthew E. Layden
(To Be Admitted *Pro Hac Vice*)
MASSEY & GAIL LLP
1000 Maine Avenue, S.W. Suite 450
Washington, DC 20024
Telephone:  (202) 652-4511
Email: jmassey@masseygail.com
bvallacher@masseygail.com
mlayden@masseygail.com
**Attorneys for Plaintiff and Proposed Class**

1

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JAIME VIAL, as representative of the heirs of Rene Correa Borquez and on behalf of other persons similarly situated,<br><br>        Plaintiffs,<br><br>        v.<br><br>ELIZABETH MAHER MUOIO, in her official capacity as TREASURER OF THE STATE OF NEW JERSEY; STEVEN HARRIS, in his official capacity as ADMINISTRATOR OF THE STATE OF NEW JERSEY UNCLAIMED PROPERTY ADMINISTRATION; and KELMAR ASSOCIATES, LLC,<br><br>        Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND COMPENSATORY AND PUNITIVE DAMAGES**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, Jaime Vial ("Plaintiff" or "Vial"), as legal representative of the heirs of Rene Correa Borquez, brings this proposed class action on behalf of himself and all others similarly situated (the putative "Class") against Defendants, (a) Elizabeth Maher Muoio, in her official capacity as Treasurer of the State of New Jersey, 125 West State Street, Trenton, NJ; (b) Steven Harris, in his official capacity as Administrator of the State of New Jersey Unclaimed Property Administration (the "Administrator"), 50 West State Street, Trenton, NJ; and (c) Kelmar Associates, LLC, 500 Edgewater Drive, Wakefield, MA, and hereby alleges as follows:

## INTRODUCTION

1.      This proposed class action challenges, as applied and facially, the constitutionality of New Jersey's escheatment scheme enacted in the New Jersey Uniform Unclaimed Property Act, N.J. Stat. Ann. § 46:30B-1 *et seq.*, and other rules set forth in unpublished manuals, regulations, and practices (the "Act" or the "NJUPA").

2

2.       "The purpose of unclaimed property laws is to provide for the safekeeping of abandoned property and then to reunite the abandoned property with its owner." *American Exp. Travel Related Services, Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 365 (3d Cir. 2012).  New Jersey has stated that the NJUPA is aimed at "protecting consumers."   *New Jersey Retail Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 398 (3d Cir. 2012).

3.       However, the NJUPA operates to frustrate this avowed statutory purpose.  Under the NJUPA, the Administrator appropriates the supposedly "abandoned" property of purportedly "unknown" persons without any prior notice in many instances, auctions it or otherwise sells it off, and retains the proceeds for the State of New Jersey's own use.  The property in question includes stock, contents of safe deposit boxes, retirement accounts, wages, refunds, deposits, gift cards, and many other forms of property.   The NJUPA deems property to be "abandoned" following a short period of inactivity and fails to provide constitutionally adequate notice – indeed, no notice at all in most instances – before the Administrator takes and permanently destroys the property.

4.       The NJUPA is generally considered to be one of the nation's most aggressive abandoned property statutes.  The Council on State Taxation ("COST") graded all 50 states based on the aggressiveness of their abandoned property laws.  New Jersey, along with California and Louisiana, received the COST's *lowest* grade: a "D."[1]

5.       Currently, the Administrator holds over an estimated **$6 billion**[2] in supposedly "unclaimed" property[3] owned by such famous persons as the pop star Taylor Swift, the award-

---

[1]       https://www.cost.org/globalassets/cost/state-tax-resources-pdf-pages/cost-studies-articles-reports/cost-scorecard--the-best-and-worst-of-state-unclaimed-property-laws-october-2013.pdf.

[2]       New Jersey law allows for the release only of the property owner's name and address. Therefore, just as it is for the private owners, it is difficult or impossible for the public to determine how much unclaimed property, at any time, is in the custody of the State of New Jersey.

[3]       New Jersey Department of the Treasury, nj.gov/treasury,

**Appx082**

winning actress Meryl Streep, Governor Phil Murphy, and businesses associated with President-elect Donald J. Trump.  The State of New Jersey deems all such persons "unknown" and purports to be unable to reunite these persons with the "unclaimed" property it has appropriated from them.

6.      Plaintiff is a citizen and resident of Chile who received no notice at all before his property (securities with substantial market value) was unconstitutionally seized and taken by the Administrator under the NJUPA.  The NJUPA contains no provision for direct mail notice or individualized notice whatsoever to overseas property owners like the Plaintiff alerting them that their property has been deemed "abandoned" and is subject to seizure by the State.  In addition, the NJUPA provides for no direct mail or other form of individualized notice to property owners in connection with the State's seizure of their property where the property in question is valued at less than $50.

7.      Plaintiff contacted the Administrator in an attempt to recover the property seized and taken by the State, but after years of delay, the Administrator grudgingly provided Plaintiff with only a fraction of the property's actual value.  The Administrator refuses to provide Plaintiff with adequate relief.  Absent the relief sought in this lawsuit, Plaintiff and the putative Class have no way to protect themselves against unnoticed property seizures.

8.      Because the NJUPA is unconstitutional both on its face and as applied, Plaintiff brings this action to secure prospective declaratory and injunctive relief, including injunctive relief requiring Defendant to return the property belonging to each Plaintiff and Class Member or otherwise put them in the same position monetarily as they would have occupied if the property had not been unconstitutionally seized and taken by the Administrator.

---

https://www.nj.gov/treasury/news/2023/08212023.shtml#:~:text=Searching%20and%20filing%20claims%20on,being%20safeguarded%20by%20the%20State (last accessed Dec. 17, 2024).

**Appx083**

9.     Plaintiff also sues Kelmar Associates, LLC ("Kelmar"), the private auditor that provides administrative services to the State of New Jersey in connection with the NJUPA. Kelmar negligently performed the services it provided under the NJUPA. Kelmar has a strong profit motive to identify as much "abandoned" property as possible and to provide as little notice as possible to property owners under the NJUPA.

## JURISDICTION AND VENUE

10.     This action is brought under 42 U.S.C. § 1983 and alleges that Defendants Muoio and Harris violated the constitutional rights of Plaintiff and all other similarly situated persons under the Due Process Clause of the Fourteenth Amendment and the Takings Clause of the Fifth Amendment (incorporated against the states under the Fourteenth Amendment).  This Court has subject matter jurisdiction of the claims against Defendants Muoio and Harris under 28 U.S.C. §§ 1331 and 1343.  This Court has subject matter jurisdiction of the claims against Kelmar under 28 U.S.C. §§ 1332(a)(2) and 1367.

11.     A substantial part of the events or omissions giving rise to the claims here at issue occurred in this District.  Because the property seized by the Administrator is situated herein, venue is proper in this District under 28 U.S.C. § 1391(b)(2).

## PARTIES

12.     Plaintiff is a Chilean engineer and legal representative of the estate of Rene Correa Borquez ("Borquez").  All of the heirs of Borquez empowered Plaintiff under Chilean law to recover Borquez's property unlawfully seized by state governments in the United States.  Plaintiff has submitted the requisite claim, was paid, and is recognized by the State of New Jersey as the rightful legal representative to seek the return of the seized property belonging to Borquez.

**Appx084**

13.    Defendant Muoio is the Treasurer of the State of New Jersey and is responsible for managing the State's financial resources and operations.  Defendant Muoio's headquarters is located at 125 West State Street, Trenton, New Jersey.

14.    Defendant Harris is the Administrator of the New Jersey Unclaimed Property Administration and is responsible for the enforcement and administration of the Act.  Defendant Harris's office is located at 50 West State Street, 6th Floor, Trenton, New Jersey.

15.    Defendant Kelmar provides administrative services to the State of New Jersey in connection with the NJUPA.  On information and belief, Kelmar is incorporated in Massachusetts and has its principal place of business at 500 Edgewater Drive Suite 525, Wakefield, MA 01880.

## ALLEGATIONS

### A.  Statutory Background of New Jersey's Unclaimed Property Act

16.    Traditionally, abandoned property or "escheatment" statutory schemes applied to real property and tangible personal property belonging to persons who died intestate with no descendent, relative, or other valid claimant to the estate.  In these situations, the property truly was abandoned and ownerless (*bona vacantia*).

17.    It was not until the mid-Twentieth Century that states such as New Jersey began to expand unclaimed property laws to include certain types of intangible property, including, in particular, unclaimed bank deposits and brokerage accounts.  State governments soon realized that unclaimed intangible property could represent a significant source of revenue for the state.

18.    The NJUPA departs from the historic function of abandoned property laws.  Instead of being limited to property owned by persons who have died intestate or disappeared, the statute applies to any property meeting the technical definition of "abandonment."  The Act does not use the traditional understanding of "abandonment" – *i.e.,* the knowing and voluntary "relinquishing of a right or interest of never reclaiming it."  Black's Law Dictionary (12th ed. 2024).  Moreover,

6

the NJUPA departs from its avowed statutory purpose of seeking to reunite owners with their lost property.

19.     Instead, the property is deemed "abandoned" under the Act according to certain dormancy thresholds specified in the statute.  As a general rule, property is presumed "abandoned" if it is dormant for one to five years with no activity by the owner.  *See, e.g.*, N.J. Stat. Ann. §§ 46:30B-28.1 to 46:30B-45.

20.     New Jersey uses a short, three-year "dormancy" period to determine whether a securities account may be deemed dormant and, therefore, "abandoned." N.J. Stat. Ann. § 46:30B-7 (generally "all property, including any income or increment derived therefrom, less any lawful charges, whether located in this State or another state, that is held, issued, owing in the ordinary course of a holder's business and has remained unclaimed by the owner for more than three years after it became payable or distributable is presumed abandoned").  Thus, if an account is inactive for three years – for example, if a customer is using a buy-and-hold approach to investment, makes no deposits or withdrawals, receives no dividends (which is not uncommon for many "blue chip" stocks) for three years – the account can be listed as "abandoned."  This three-year rule applies to checks, certified checks, credit memos, dividends, money orders, savings accounts, non-governmental bonds, traveler's checks, shares, bonds, commissions, and all other intangible property.

21.     The NJUPA requires that financial institutions and other entities holding so-called "abandoned" property transfer it to the New Jersey State Unclaimed Property Administration (the "Administration"), led by the Administrator.  Such property includes supposedly "dormant" stock and bond accounts, savings accounts, uncashed payroll checks, unredeemed customer or vendor credits, and unused gift cards or gift certificates.

**Appx086**

22.    Telephone calls or verbal contact with an owner do not by themselves prevent property from being deemed "abandoned."  Nor does internal activity such as service charges, crediting of interest and dividends, automatic dividend reinvestment, and automatic withdrawals prevent property from being deemed abandoned.

23.    As part of the State's relentless campaign to fill its coffers with "abandoned" property, the Act contains strong penalties coercing property holders, including banks and other entities, to report as much "abandoned" property as possible to the Administration.  Such entities are required, subject to severe penalties, to submit "holder reports" annually to the Administration listing all "abandoned" property they hold.  Such reports must include details on the property and remittance to the Administration of the escheated property.

24.    Starting in the late 1990s and continuing into the early 2000s, New Jersey and other States dramatically increased their enforcement efforts.  This surge in audit activity was largely due to the proliferation of private contract audit firms compensated by the states on a contingent-fee basis – typically, 10 to 15 percent of any unclaimed property identified in the audit.  Such a fee structure provides a profit incentive to such firms to take aggressive positions in these audits.  Further, these contingent-fee audit firms are often staffed by former accountants and consultants with far greater expertise in unclaimed property matters than their client states, which led many states to defer almost entirely to the positions taken by these firms in audits.

25.    Defendant Kelmar is the auditor for the State of New Jersey.  As alleged herein, Kelmar has a strong profit motive to identify as much "abandoned" property as possible and to provide as little notice as possible to property owners under the NJUPA.  This profit motive gives Kelmar an incentive to perform its duties negligently under the Statute.

**Appx087**

26.    The use of contingent fee audits (which, of course, creates financial incentives for aggressive and unconstitutional seizures of property) is inconsistent with the stated purpose of unclaimed property laws, which is to return property to its rightful owner.  Thus, instead of protecting the rights of the "true owners," the Act represents a new form of escheatment that views unclaimed property law as a revenue generator for the State of New Jersey.

27.    As explained below, the NJUPA combines these aggressive definitions of "abandoned" and "unknown" with constitutionally inadequate notice to the true owners (which has the effect of further increasing state revenue).

**B.    NJUPA's Constitutionally Inadequate Pre-Deprivation Notice Procedures**

28.    The NJUPA provides different amounts of notice depending on the commercial value of the property and where the property owner is located.

29.    For property in excess of $50, the holder of the property must send, by certified mail with return receipt requested, a written notice to the apparent owner at their last known address informing them that the holder will be turning over their property to the State of New Jersey.  N.J. Stat. Ann. § 46:30B-50.  This written notice must be sent at least 60 days before (but not more than 120 days before) filing the abandoned property report to the State.  *Id.*

30.    The NJUPA provides for individualized notice in only one form, a letter posted by certified mail.  *See* N.J. Stat. Ann. § 46:30B-50.  But the United States Postal Service only offers certified mail within the United States, apart from service to U.S. military and diplomatic installations.  Thus, the Act contain no individualized notice provision for individuals with addresses located outside the United States.  There is no provision in the NJUPA providing for notice to property owners who do not live in the United States.

31.    For property valued at $100 or more, the NJUPA provides for—in addition to the certified letter required by N.J. Stat. Ann. § 46:30B-50—the publication of the name and last

9

**Appx088**

known addresses (if any) in a newspaper circulating in the New Jersey county of that last known address at least once per week for two consecutive weeks. Or "[i]f the address is outside this State, the notice shall be published in the county in which the holder of the property has its principal place of business within this State." N.J. Stat. Ann. § 46:30B-51. Thus, published notice is never provided outside the State of New Jersey, regardless of where the owner of the property resides or previously resided.

32. Moreover, a resident of Chile (like Plaintiff) would have no access to local New Jersey newspapers, which are written in English, and no reason to look there to review publication notice. The newspaper notice under the NJUPA is meaningless to Plaintiff and other foreign property owners, as well as those in other states.

33. For "abandoned" property valued at less than $50, the Act does not require banks and other financial services institutions to provide any notice at all to its rightful owner before transferring it to the Administration. N.J. Stat. Ann. § 46:30B-50.

34. "Abandoned" property is then seized by the Administration under the supervision of the Administrator, who acts as property custodian. Property holders (such as financial services institutions) must transfer cash via checks or electronic funds transfers.

C. **NJUPA's Constitutionally Inadequate Post-Deprivation Notice**

35. After property is transferred to the Administration, the Act continues to deny owners any meaningful notice, even after they have been deprived of their property. Such property may be transferred to the Administration without any individualized or published notice to its rightful owners.

36. Under the NJUPA, "the state assumes custody and responsibility for the safekeeping of the property." N.J. Stat. Ann. § 46:30B-61. The Administrator manages an unclaimed property trust fund, which under the NJUPA is "administered and invested by the State

10

**Appx089**

Treasurer, and used to pay claims duly presented and allowed and all expenses and costs incurred by the State of New Jersey."   N.J. Stat. Ann. § 46:30B-74(a).

37.     After the seizure, New Jersey places the owner's name and last known address on a searchable Internet website (https://unclaimedfunds.nj.gov/app/claim-search) that property owners may visit if they know it.  However, many property owners (like Plaintiff) are unaware of the website.  And the NJUPA does not require the State to post on the website a description of the property, the value of the property (or even a range of values), and other critical identifying information.

38.     The website fails to provide the constitutionally required prior notice *before* property is seized.  Such an approach to notice shifts the burden from government to the owners to ferret out the information on their property after it has been seized by the State.  Indeed, it defies common sense to expect out-of-state or foreign owners (like Plaintiff) to search a New Jersey website when they and their property have no nexus with New Jersey.

39.     Moreover, the website is rife with technical limitations.  It provides only a property ID, number, but not a description of the property, making it impossible for owners to know the nature or value of the property at issue, or when it was seized.  The website hides vital identifying information from the owner.

40.     In addition, it is especially difficult to reclaim property if the property is listed with last name first, if the name is misspelled or abbreviated, or if a nickname is used (such as "Bill" for "William" or "Dave" for "David"), or if the property is listed by the name of the institution holding it, rather than the individual owner.

41.     Further, the Administration may reject claims if, for example, it deems their supporting documentation inadequate based on the unpublished or verbal claims process.

**Appx090**

Moreover, with no notice, many individuals are unaware that their property has been transferred to the Administration or of the procedure for seeking its return.  Accordingly, property owners are highly unlikely to avail themselves of this procedure and, in fact, only a small portion of seized property is ever returned.  Finally, as a practical matter, the private property is often sold or destroyed before this limited information is posted to the website.

42.    After providing totally inadequate notice before property is seized, the Act provides "the administrator *shall*, within three years after the receipt of abandoned property, sell it to the highest bidder at public sale in whatever municipality in the state affords in the judgment of the administrator the most favorable market for the property involved."  N.J. Stat. Ann. § 46:30B-69 (emphasis added).  This section includes exceptions for property of sufficiently low value that sale would be, in the judgment of the administrator, unprofitable.  *Id.*  There is also a further requirement that notice of the sale be published "at least three weeks in advance of sale, in a newspaper of general circulation in the county in which the property is to be sold." *Id.*  This notice requirement is directed at the location of the sale and is, in essence, no more than an advertisement of the State's sale.

43.    The Act generally requires that seized property be held for at least one year before it may be sold.  N.J. Stat. Ann. § 46:30B-71.[4]  Thus, ordinarily, seized property will be sold at some point between one year and three years after it is seized.

---

[4]    There is a significant carve out to the one-year hold requirement: the Administrator may sell a security before the one-year hold period expires if it "considers it to be in the best interest of the State to do otherwise."  N.J. Stat. Ann. § 46:30B-71; *see also* N.J. Stat. Ann. § 46:30B-72 (including the same carve out for the sale of securities but providing a small exception allowing for payment of the value of sold securities at the time of the claim if a claim is made *during* the one-year period that the security should ordinarily have been held).  This exception is so broad as to render the one-year hold requirement meaningless in terms of restrictive power.  In this context, the best interest of the State could simply mean that it is an administrative burden to keep track of some number of securities.

**Appx091**

44.     The sales provision applies to all types of property, including securities. The Act requires that "[s]ecurities listed on an established stock exchange shall be sold at prices prevailing at the time of sale on the exchange.  Other securities may be sold over the counter at prices prevailing at the time of sale or by any other method the administrator considers advisable."  N.J. Stat. Ann. § 46:30B-70.

45.     Obviously, the sale of securities is highly sensitive to the time of the sale.  A sale at the wrong moment (let alone the wrong year) could mean a significant difference in realized profits.  Under the Act, "[w]henever property other than money is paid or delivered to the administrator under this chapter, the owner is entitled to receive from the administrator any dividends, interest, or other increments realized or accruing on the property at or before liquidation or conversion thereof into money."  N.J. Stat. Ann. § 46:30B-68.  But after the sale is complete, a successful claimant is entitled only to "the net proceeds of the sale," N.J. Stat. Ann. § 46:30B-79, and the NJUPA denies interest to the property owner after the sale or conversion of property by the State.  *See id.; id.* at § 46:30B-68.

**D.  Judicial Concerns Regarding Unclaimed Property Laws**

46.     The NJUPA, along with unclaimed property laws in other states, has been trending in the wrong direction for over thirty years because such laws have been greatly expanded in unconstitutional ways to generate revenue for states, at the expense of both owners and putative holders of unclaimed property.

47.     In 2016, two Justices of the U.S. Supreme Court – Justices Alito and Thomas – expressed constitutional concern about state abandoned property laws in a separate opinion concurring in the denial of certiorari in a case presenting the question whether unclaimed property laws "provide[] property owners with constitutionally sufficient notice before escheating their financial assets."  *Taylor v. Yee*, ___ U.S. ___, 136 S. Ct. 929, 929 (2016).  These Justices

13

explained that "[t]he Due Process Clause requires States to give adequate notice before seizing private property.  When a State is required to give notice, it must do so through processes 'reasonably calculated' to reach the interested party – here, the property owner." *Id.* (citation omitted).

48.     In that case, Justices Alito and Thomas explained that because the seizure of private property is no small thing, notification procedures may not be empty rituals: "[P]rocess which is a mere gesture is not due process.'  Whether the means and methods employed by a State to notify owners of a pending escheat meet the constitutional floor is an important question." *Id.* (citations omitted).  The Justices noted that "[i]n recent years, States have shortened the periods during which property must lie dormant before being labeled abandoned and subject to seizure." *Id.* at 930.  The Justices cited New York as an example and observed that it recently shortened its dormancy period from as long as 15 years to merely three years.  *Id.*  "This trend—combining shortened escheat periods with minimal notification procedures—raises important due process concerns.  As advances in technology make it easier and easier to identify and locate property owners, many States appear to be doing less and less to meet their constitutional obligation to provide adequate notice before escheating private property.  Cash-strapped States undoubtedly have a real interest in taking advantage of truly abandoned property to shore up state budgets. But they also have an obligation to return property when its owner can be located.  To do that, States must employ notification procedures designed to provide the pre-escheat notice the Constitution requires." *Id.* These Justices concluded that "the constitutionality of current state escheat laws is a question that may merit review in a future case." *Id.*

49.     Judge Richard Posner of the Seventh Circuit Court of Appeals described a three-year dormancy period for determining abandonment as "a period so short as to present a serious

14

**Appx093**

question whether it is consistent with the requirement in the Fourteenth Amendment that property not be taken without due process of law, implying adequate notice and opportunity to contest." *Cerajeski v. Zoeller*, 735 F.3d 577, 582 (7th Cir. 2013).

50.    In *Taylor v. Westly*, 488 F.3d 1197 (9th Cir. 2007), the Ninth Circuit Court of Appeals held that an injunction should be issued against California's Unclaimed Property law for violations of the U.S. Constitution similar to those alleged in this case. *Id.* at 1200–02.

**E.  New Jersey Seizes Borquez's Property Without Notice and Provides Inadequate Compensation**

51.    Borquez was a Chilean lawyer with many significant investments.  He died testate in Chile on May 27, 2006.  Borquez left the entirety of his estate to his brother, Hernan Correa Borquez, who also resided in Chile.

52.    Hernan Correa Borquez died testate in Chile.  His heirs all reside in the country of Chile.  Indeed, there is no nexus between the members of the Borquez family and the State of New Jersey.  No member of the Borquez family has ever resided in New Jersey.

53.    Plaintiff is the legal representative of the estate of Hernan Correa Borquez and, through him, of the estate of Borquez.  Plaintiff brings this suit on behalf of himself and the other heirs of Hernan Correa Borquez; through Hernan Correa Borquez, they are the heirs to Borquez and his significant investments.

54.    Borquez owned various stocks in financial services accounts across the United States.  His name and address in Chile were associated with all of the accounts, and it would have been practicable to give him and his heirs individualized notice as to the stocks he owned.

55.    Borquez owned property that was seized by the Administrator without notice.  For example, he purchased Exxon stock (later Exxon Mobil stock) that was seized by the Administrator:

**Appx094**

| Date of Purchase | Number of shares | Number today after stock splits |
| --- | --- | --- |
| July 22, 1977 | 100 | 1,600 |
| May 16, 1981 | 100 | 800 |
| August 14, 1987 | 200 | 1,600 |
| April 11, 1997 | 400 | 1,600 |
| March 13, 2000 | 105 | 210 |
| **Total** | 905 | 5,810 |

56.     Additional property may have been seized as well.  Neither Plaintiff, any heir, nor any other representative of Borquez's or his brother's estates received *any* notice that the Administration had seized the above property. No written notice was received pursuant to N.J. Stat. Ann. § 46:30B-50, nor was any published notice received pursuant to N.J. Stat. Ann. § 46:30B-51.  Had the Administrator provided Borquez or his heirs notice that she would seize the property, they could have acted to prevent that seizure.

57.     Plaintiff, as representative of all of the heirs of Borquez, contacted the Administrator requesting the return of the property.  Plaintiff provided the Administrator with complete documentation in support of the claim, including account information, proof of stock ownership, a copy of Borquez's Succession/Will, and the identification of each of his heirs. Plaintiff completed the claims process.

58.     By check dated November 8, 2023, Plaintiff received the sum of $487,581.23 from the Administrator regarding Borquez's Exxon Mobil stock. The final sum received by Plaintiff is grossly inadequate and reflects the unnoticed sale of Plaintiff's stock.  It does not include dividends or post-sale interest, fails to reflect the market value of the stock (approximately $603,000 as of

the November 8, 2023 opening price), and fails to put Plaintiff in the same position monetarily as he would have occupied if the property had not been seized and taken by the Administrator. The Administrator has refused to provide Plaintiff with adequate relief.

59. Currently, Plaintiff and the Borquez family members own other stocks and property, such as bank accounts, that they do not wish to be subject to Defendants' unnoticed property seizure process. Yet Plaintiffs and Class Members have no way to protect themselves from the NJUPA as it currently operates to cause irreparable harm to the public.

60. Plaintiff continues to suffer ongoing injury from the NJUPA. Plaintiff is the owner of and legal representative for additional other property potentially vulnerable to seizure and taking under the NJUPA. He is required to monitor that property continuously in order to ensure that the Administrator does not attempt to seize it. He is incurring, and will continue to incur, the real and concrete cost of having to constantly monitor his property to avoid escheat, including retention of counsel in the United States.

61. The NJUPA deters Plaintiff from acquiring further property that might be subject to seizure under the NJUPA. Absent the NJUPA, Plaintiff would take concrete steps toward the acquisition of other property in the United States.

62. Plaintiff's legal claims did not fully accrue until Plaintiff ultimately received the final sum from the Director.

63. Plaintiff's extensive communications with Defendants tolled any applicable statute of limitations.

64. Further, Defendants' acts, omissions, misrepresentations, and practices also tolled or equitably estopped any limitations period. Through such acts, omissions, misrepresentations, and practices, Defendants were able to conceal from Plaintiffs and Class the material facts

17
**Appx096**

involving their property.  Even though Defendants were under common law and statutory duties, Defendants intentionally and/or negligently failed altogether to provide publication and direct mail notice to Plaintiffs and Class regarding the seizure of their private funds and property.  Based on Defendants' breach of their statutory and constitutional obligations to notify Plaintiffs (among other things), Defendants are estopped from asserting a statute of limitations and have waived any such defense.

## CLASS ACTION ALLEGATIONS

65.    Plaintiff brings this lawsuit as a class action pursuant to Federal Rules of Civil Procedure 23(a); (b)(1); (b)(2); (b)(3); and/or (c)(4), on behalf of himself and all others similarly situated as members of a class of all persons and entities owning purportedly "abandoned" property transferred to the Administrator under color of the Act within the applicable statute of limitations who were denied constitutionally adequate notice under the NJUPA because they did not reside in the United States, the value of the property at issue was less than $50, or for any other prescribed in the NJUPA as construed by Defendant.  Plaintiff reserves the right to amend the Class definition if discovery and further investigation reveal that any Class should be expanded, divided into additional subclasses under Rule 23(c)(5), or modified in any other way.

66.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used in individual actions alleging the same claims.

67.    This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Federal Rule of Civil Procedure 23 and satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of its provisions.

**Appx097**

68.    Although the exact number, identity, and location of persons in the proposed Class is readily discernible based on the Administrator's records, upon information and belief, the number of members in the proposed Class will be more than 1,000 persons.  Therefore, those persons in the Class are so numerous that joinder of the entire proposed Class is impractical.

69.    Accordingly, the disposition of the claims of Class members in a single action will provide substantial benefits to all parties and to the Court.  Class members may be readily notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

70.    The claims of the Plaintiff are typical of the claims of the other Class members in that the representative Plaintiff, like all Class members, has had property taken by the Administrator without constitutionally adequate notice. Plaintiff, like all Class members, has been damaged by Defendants' misconduct in that they have incurred similar or identical losses relating to the taken property.  Further, the factual bases of Defendants' misconduct are common to all Class members and represent a common thread of misconduct resulting in injury to all Class members.

71.    Plaintiff is a member of the proposed Class will fairly and adequately represent and protect the interests of the Class.  Plaintiff has retained counsel with substantial experience in complex litigation, including class actions involving issues identical or similar to those raised in this action. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so.  Neither Plaintiff nor his counsel have interests adverse to those of the Class.

72.    There are questions of law and fact common to all members of the proposed Class, including whether the Administrator complied with the Takings Clause of the Fifth Amendment

**Appx098**

and the Due Process Clause of the Fourteenth Amendment by seizing and taking Plaintiff's property without constitutionally required prior notice.

73. In short, Plaintiff's claims are typical of those of the members of the proposed Class, who are subject to the same deprivations of their property and rights, and there is a well-defined commonality of interest in this case's questions of law and fact.

74. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff and Class members have all suffered and will continue to suffer economic harm and damage as a result of the Administrator's unlawful and wrongful conduct, which was directed toward Class members and the public as a whole, rather than specifically or uniquely against any individual Class members.

75. The Administrator has acted in a uniform manner with respect to Plaintiff and Class members. Because his duties to comply with the Constitution apply equally to each person in the proposed Class, the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Administrator.

76. Absent a class action, most Class members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of many of the individual Class members' claims (particularly those whose property was valued at less than $50), it is likely that only a few Class members could afford to seek legal redress for Defendant's misconduct. Absent a class action, Class members will continue to incur damages, and Defendants' misconduct will continue without effective remedy.

**Appx099**

77. Class treatment in this Court will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication by providing common answers to the common questions of constitutionality that predominate in this action.

78. Class-wide declaratory, equitable, and injunctive relief is appropriate under Rule 23(b)(1) and/or (b)(2) because the Administrator has acted on grounds that apply generally to the class, and inconsistent adjudications with respect to the Administrator's liability would establish incompatible standards and substantially impair or impede the ability of Class members to protect their interests. Class-wide relief and Court supervision under Rule 23 assures fair, consistent, and equitable treatment and protection of all Class members, and uniformity and consistency in the Administrator's discharge of his duties to administer the NJUPA in accordance with the Constitution. Defendant's actions and threatened actions deprived, are depriving, and will deprive Plaintiff and the members of the proposed Class of their constitutional rights on grounds generally applicable to all, thereby making appropriate declaratory and injunctive relief with regard to the proposed Class as a whole.

## **FIRST CLAIM FOR RELIEF**

**(Against Defendants Muoio and Harris; U.S. Const. Fourteenth Amendment § 1 - Due Process Clause: 42 U.S.C. § 1983)**

79. The allegations set forth above are incorporated into this claim by reference as though set forth in full here.

80. The Fourteenth Amendment, Section 1, of the United States Constitution provides, in part, "nor shall any State deprive any person of life, liberty, or property, without due process of law. . . ." A claim alleging violation(s) of this federal right may be brought under 42 U.S.C. § 1983.

**Appx100**

81.     Under the color of law provided by the Act, Defendants have violated (and continue to violate) the Plaintiff's right to due process through the enforcement and administration of the Act by depriving him of his property without due process.

82.     In every instance that the Act allows the Administrator to seize property without notice, it allows the Administrator to violate the constitutional rights of Plaintiff and Class Members.  Therefore, the Act is facially unconstitutional.

83.     Neither the Plaintiff nor any other heirs of Borquez received notice that the Administration seized Borquez's property.

84.     Plaintiff, as well as the owners of existing property, have a constitutionally protected property interest in the private property that they own and that is seized by the State of New Jersey under the processes described herein.  Defendants deprived Plaintiff and other property owners of their constitutionally protected property interests by seizing their property without notice and due process.

85.     Plaintiff did not receive fair compensation or interest for the loss of property.  The recovery Plaintiff has received from the Administrator is grossly inadequate. It fails to reflect the market value of the stock and fails to put Plaintiff in the same position monetarily as he would have occupied if the property had not been seized and taken by the State.

86.     Unless Defendants are enjoined from continuing to enforce and administer the Act, they will continue to violate the constitutional rights of Plaintiff and others.

87.     Plaintiff and Class Members have no plain, speedy, adequate remedy at law; therefore, injunctive relief from this Court is the only means available to them to protect the rights guaranteed to Plaintiffs and the Class members by the Fourteenth Amendment's Due Process Clause.

22

**Appx101**

## SECOND CLAIM FOR RELIEF

**(Against Defendants Muoio and Harris; U.S. Const., Fifth Amendment - Takings Clause: 42 U.S.C. § 1983)**

88.     The allegations set forth above are incorporated into this claim by reference as though set forth in full.

89.     The Fifth Amendment to the United States Constitution provides, in part, that "[n]o person shall . . . . be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."  The Fourteenth Amendment incorporates the Takings Clause and applies it to the State of New Jersey.  *See Chicago Burlington and Quincy R.R. v. City of Chicago*, 166 U.S. 226 (1897).  The Takings Clause is enforceable via an action brought under 42 U.S.C. § 1983.

90.     Under the color of law provided by the Act, Defendants have violated (and continues to violate) Plaintiff's right under the Fifth Amendment through their enforcement and administration of the Act by taking Plaintiff's property without just compensation.

91.     Plaintiff did not receive just compensation for the loss of his property.  The recovery Plaintiff has received from the Administrator is grossly inadequate.  It fails to reflect the market value of the stock and fails to put Plaintiff in the same position monetarily as he would have occupied if the property had not been seized and taken by the State.

92.     Further, once a stock is liquidated, the Administrator fails to pay interest on the private property that is seized and taken, and the nonpayment of interest is itself a separate violation of the Takings Clause.

93.     Defendants are acting in the capacity of a private trustee and custodian of private funds.  Their unlawful takings of private property had no valid public use or purpose.

23

**Appx102**

94.     Unless Defendants are enjoined from continuing to enforce and administer the Act, they will continue to violate the constitutional rights of Plaintiff and other Class Members for the foreseeable future.

95.     Plaintiff and Class Members have no plain, speedy, adequate remedy at law; therefore, injunctive relief from this Court is the only means available to them to protect the rights guaranteed to Plaintiffs and the Class members by the Fifth Amendment's Takings Clause.

## THIRD CLAIM FOR RELIEF

### (Negligence Against Defendant Kelmar)

96.     Defendant Kelmar had a duty to act reasonably to ensure that the property of Plaintiff and his predecessors in interest was not identified as "abandoned" under the NJUPA when it was not in fact "abandoned."

97.     Defendant Kelmar had a duty to act reasonably to ensure that Plaintiff and his predecessors in interest received timely and meaningful pre-deprivation notice before his property was seized and taken under the NJUPA.

98.     Defendant Kelmar had a further duty to act reasonably to ensure that Plaintiff and his predecessors in interest received timely and meaningful post-deprivation notice to enable him to timely recover his property after it was seized and taken under the NJUPA.

99.     Defendant Kelmar breached those duties. Plaintiff and his predecessors in interest received no notice at all before the property was unconstitutionally seized and taken by the Administrator under the NJUPA.

100.    Defendant Kelmar's breach proximately caused damage to Plaintiff.  The property would not have been seized if it had been properly identified as not "abandoned."  Plaintiff and his

**Appx103**

predecessors in interest would have taken steps to prevent the seizure, taking, and liquidation of the property if they had received timely and meaningful pre-deprivation or post-deprivation notice.

101.   Defendant Kelmar has a strong profit motive to identify as much "abandoned" property as possible and to provide as little notice as possible to property owners under the NJUPA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

A. Declaratory relief declaring that the enforcement and administration of the NJUPA against Plaintiff and the Class Members by the Defendants violate the Fifth and Fourteenth Amendments of the United States Constitution;

B. Injunctive relief enjoining the Defendants from enforcing or administering the NJUPA unconstitutionally against Plaintiff and Class Members;

C. Injunctive relief enjoining the Defendants from selling or disposing of property already seized under the DUPL or held by private auditors and holders under their direction and control;

D. Injunctive relief requiring an accounting by the Defendants to identify class members potentially entitled to individualized relief;

E. Injunctive relief requiring the Defendants to return the property belonging to each Plaintiff and Class Member or otherwise put them in the same position monetarily as they would have occupied if the property had not been seized and taken, with interest and with compensation for any appreciation in the value of the property since its seizure;

F. Compensatory and punitive damages against Defendant Kelmar;

G. Prejudgment and post-judgment interest;

**Appx104**

H.  An award of attorney's fees and costs under 42 U.S.C. § 1988; and

I.  Such other and further relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

**Appx105**

Respectfully Submitted,

DATED: December 19, 2024

WILENTZ, GOLDMAN & SPITZER, P.A.

By: /s/ Kevin P. Roddy
      KEVIN P. RODDY, ESQ. (NJSBA # 014802005

90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ  07095
Telephone:  (732) 636-8000
Facsimile:   (732) 726-6686
Email: kroddy@wilentz.com

William W. Palmer, Esq. (To Be Admitted *Pro Hac Vice*)
PALMER LAW GROUP, PLC
2443 Fair Oaks Boulevard, No. 545
Sacramento, CA 95825
Telephone:  (916) 972-0761
Facsimile:  (916) 972-0877
Email: wpalmer@palmercorp.com

Jonathan Massey (To Be Admitted *Pro Hac Vice*)
Bret R. Vallacher (To Be Admitted *Pro Hac Vice*)
Matthew Layden (To Be Admitted *Pro Hac Vice*)
MASSEY & GAIL LLP
The Wharf
1000 Maine Avenue, S.W.
Suite 450
Washington, DC 20024
Telephone: (202) 652-4511

**Attorneys for Plaintiff**

27

**Appx106**

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**
JAIME VIAL, as representative of the heirs of
RENE CORREA BORQUEZ

**DEFENDANTS**
ELIZABETH MAHER MUOIO

**(b)** County of Residence of First Listed Plaintiff    Chile
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Mercer
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Kevin P. Roddy, Esq., Wilentz Goldman & Spitzer, PA, 90 Woodbridge Center Drive, Woodbridge NJ 07095 732.636.8000

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* | |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* | |

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☒ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*    Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** ☐ 310 Airplane | **PERSONAL INJURY** ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | Personal Injury Product Liability | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **PERSONAL PROPERTY** ☐ 370 Other Fraud | | ☐ 830 Patent ☐ 835 Patent - Abbreviated New Drug Application | ☐ 430 Banks and Banking ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 371 Truth in Lending | **LABOR** | ☐ 840 Trademark | ☐ 460 Deportation ☐ 470 Racketeer Influenced and |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 880 Defend Trade Secrets Act of 2016 | Corrupt Organizations ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer Protection Act |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 550 Civil Rights ☐ 555 Prison Condition ☐ 560 Civil Detainee - Conditions of Confinement | ☐ 465 Other Immigration Actions | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from Another District *(specify)*  ☐ 6 Multidistrict Litigation - Transfer  ☐ 8 Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. Section 1983
Brief description of cause:
Challenge to constitutionality of N.J. Escheatment Statute

**VII. REQUESTED IN COMPLAINT:**
☒ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.
DEMAND $
1,000,000+
CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

**VIII. RELATED CASE(S) IF ANY**
*(See instructions):*
JUDGE _____    DOCKET NUMBER _____

DATE
12/19/2024

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

**Appx107**

Kevin P. Roddy, Esq.
WILENTZ, GOLDMAN & SPITZER, P.A.
90 Woodbridge Center Dr., Suite 900
Woodbridge, NJ 07095
Telephone: (732) 636-8000
Facsimile: (732) 726-6686
Email: kroddy@wilentz.com

William W. Palmer, Esq.
(*Pro Hac Vice Counsel*)
PALMER LAW GROUP, PLC
2443 Fair Oaks Boulevard, No. 545
Sacramento, CA 95825
Telephone: (916) 972-0761
Facsimile: (916) 972-0877
Email: wpalmer@palmercorp.com

Jonathan S. Massey
Bret R. Vallacher
Matthew E. Layden
(*Pro Hac Vice Counsel*)
MASSEY & GAIL LLP
1000 Maine Avenue SW
Suite 450
Washington, D.C. 20024
Telephone: (202) 652-4511
Email: jmassey@masseygail.com
bvallacher@masseygail.com
mlayden@masseygail.com

*Attorneys for Plaintiff Vial and Proposed Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JAIME VIAL, individually, as representative of the heirs of Rene Correa Borquez, and on behalf of other persons similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>ELIZABETH MAHER MUOIO, in her official capacity as TREASURER OF THE STATE OF NEW JERSEY; and STEVEN HARRIS, in his official capacity as ADMINISTRATOR OF THE STATE OF NEW JERSEY UNCLAIMED PROPERTY ADMINISTRATION.<br><br>    Defendants. | **AMENDED CLASS ACTION COMPLAINT**<br><br><br><br>**Case No.: 3:24-cv-11301** |

**Appx108**

Plaintiff, Jaime Vial ("Plaintiff" or "Vial"), brings this proposed class action on behalf of himself individually, as legal representative of the heirs of Rene Correa Borquez, and as representative of a putative class of similarly situated individuals (the putative "Class") against Defendant Steven Harris, in his official capacity as Administrator of the State of New Jersey Unclaimed Property Administration (the "Administrator"), 50 West State Street, Trenton, NJ, and Defendant Elizabeth Maher Muoio, in her official capacity as Treasurer of the State of New Jersey, 125 West State Street, Trenton, NJ (collectively, "Defendants"), and hereby alleges as follows:

## INTRODUCTION

1.      This proposed class action challenges the constitutionality of New Jersey's escheatment scheme set forth in the New Jersey Uniform Unclaimed Property Act, N.J. Stat. Ann. § 46:30B-1 *et seq.*, (hereinafter the "NJUPA" or the "Statute") and other rules set forth in unpublished manuals, rules, and practices, both as applied and on its face with respect to foreign property owners like Plaintiff, who systematically will not receive constitutionally adequate notice under the Statute prior to the seizure of their property.

2.      The NJUPA's purported purpose is to reunite property that has been deemed "abandoned" in the custody of a business with its rightful owner. *See Mission Statement*, UNCLAIMED PROPERTY ADMINISTRATION, https://www.nj.gov/treasury/unclaimed-property/aboutunclaim.shtml#:~:text=The%20New%20Jersey%20Unclaimed%20Property,acts%20as%20a%20custodian%20until (last visited April 1, 2025) [Permalink: https://perma.cc/66D8-Q7CN] ("The [Unclaimed Property Administration's] goal is to return this property to the rightful owner and/or heirs.").

3.      To be clear: In this lawsuit, Plaintiff does **not** challenge the ability of New Jersey, as sovereign, to escheat abandoned property as a general matter, so long as it satisfies constitutional requirements.

1

#95274284.1

**Appx109**

4.      Rather, this lawsuit is aimed squarely at the ways in which the NJUPA has been weaponized (through both statutory design and implementation) to make such escheatment more frequent and reunification less likely for the purposes of generating revenue.

5.      Every year, hundreds of thousands of properties are seized by New Jersey, but only a fraction of them are returned.[1]

6.      The massive delta between seized property and returned property is a feature—not a bug. As a result of it, the Administrator of the State of New Jersey Unclaimed Property Administration ("UPA") currently holds **over $6 billion** in purportedly "unclaimed" property.[2] This supposedly "unclaimed" property is in fact owned by such famous persons as Bruce Springsteen, Sanda Bullock, Dennis Rodman, Governor Phil Murphy, and businesses associated with President Donald J. Trump. The State is purportedly unable to reunite these persons with the "unclaimed" property it has appropriated from them.

7.      As the Third Circuit Court of Appeals has observed: "in recent years, state escheat laws have come under assault for being exploited to raise revenue rather than reunite abandoned property with its owners." *Plains All Am. Pipeline L.P. v. Cook*, 866 F.3d 534, 536 (3d Cir. 2017).

8.      And as Justices Alito and Thomas have similarly observed: "Cash-strapped States undoubtedly have a real interest in taking advantage of truly abandoned property to shore up state budgets." *Taylor v. Yee*, 136 S. Ct. 929, 930 (2016). However, "[i]n recent years, States have

---

[1] *See* New Jersey Dep't of Treasury, *Treasury News Release for August 21, 2023*, WWW.NJ.GOV, https://www.nj.gov/treasury/news/2023/08212023.shtml (last visited April 1, 2025) [Permalink: https://perma.cc/PHJ7-ZJG6] ("A total of 236,845 records that were reported to the State in the past year" but there were only "73,686 claims filed with the agency.").
[2] *See* New Jersey Dep't of Treasury, *Treasury News Release for August 21, 2023*, WWW.NJ.GOV, https://www.nj.gov/treasury/news/2023/08212023.shtml (last visited April 1, 2025) [Permalink: https://perma.cc/PHJ7-ZJG6].

2

shortened the periods during which property must lie dormant before being labeled abandoned and subject to seizure." *Id*. The Justices cited New York as an example and observed that it recently shortened its dormancy period from as long as 15 years to merely three years. *Id.*[3]

9.      The Justices further observed that states were "combining shortened escheat periods with minimal notification procedures" in such a way that "raises important due process concerns." *Id*. Specifically, these Justices explained that the Due Process Clause imposes a "constitutional obligation" on the states "to **provide adequate notice before escheating private property**." *Id.* (emphasis added). They further explained that "[w]hen a State is required to give notice, it must do so through processes 'reasonably calculated' to reach the interested party – here, the property owner." *Id.* (citation omitted). "[P]rocess which is a mere gesture is not due process," but rather states "must employ notification procedures designed to provide the **pre-escheat notice** the Constitution requires." *Id.* (emphasis added).

10.      In *Taylor v. Westly*, 488 F.3d 1197 (9th Cir. 2007), the Ninth Circuit Court of Appeals held that a district court abused its discretion in failing to issue an injunction against California's Unclaimed Property Law for violating the U.S. Constitution in ways similar to those alleged in this case. *Id.* at 1200–02.

11.      In fact, the NJUPA is generally considered to be one of the nation's most aggressive abandoned property statutes. The Council on State Taxation ("COST") graded all 50 states based

---

[3] Judge Richard Posner of the Seventh Circuit Court of Appeals similarly described a three-year dormancy period for determining abandonment as "a period so short as to present a serious question whether it is consistent with the requirement in the Fourteenth Amendment that property not be taken without due process of law, implying adequate notice and opportunity to contest." *Cerajeski v. Zoeller*, 735 F.3d 577, 582 (7th Cir. 2013).

3

on the aggressiveness of their abandoned property laws. New Jersey, along with California and Louisiana, received the COST's *lowest* grade: a "D."[4]

12.     In accordance with the constitutional issues identified by Justices Alito and Thomas, Judge Posner, and other jurists, Plaintiff simply asks the Court to require New Jersey to provide constitutionally "adequate notice **before** escheating private property," *Taylor*, 136 S. Ct. at 930, as well as restore Plaintiff (and the putative class) to the positions they would have been but-for New Jersey's unconstitutional actions.

13.     Plaintiff is a citizen and resident of Chile who received **no notice at all** before his (and his family's) Exxon Mobil shares were seized and taken by Defendants under the NJUPA.

14.     The State of New Jersey does not provide direct mail notice or any individualized notice whatsoever to property owners alerting them that the State is seizing their property.

15.     Rather the State's pre-deprivation notice obligation has been delegated to holders of property (banks, brokerages, etc.). However, even the holders' notice obligation **categorically exempts notice** for property owners living outside of the United States, or its military and diplomatic installations (such as Plaintiff).

16.     Specifically, NJUPA requires holders to provide notice by certified mail, N.J. Stat. Ann. § 46:30B-50. However, the United States Postal Service does not offer certified mail outside of the United States (apart from service to U.S. military and diplomatic installations).[5]

---

[4] Douglas L. Lindholm and Ferdinand S. Hogroian, *The Best and Worst of State Unclaimed Property Laws: Cost Scorecard on State Unclaimed Property Statutes*, COUNCIL ON STATE TAXATION, https://www.cost.org/globalassets/cost/state-tax-resources-pdf-pages/cost-studies-articles-reports/cost-scorecard--the-best-and-worst-of-state-unclaimed-property-laws-october-2013.pdf (last accessed on March 9, 2025).

[5] *See* United States Postal Service, *Certified Mail® - The Basics*, WWW.USPS.COM, https://faq.usps.com/s/article/Certified-Mail-The-Basics (last accessed April 24, 2025) [Permalink: https://perma.cc/Q9EA-X8TX?type=image] ("Certified Mail items may be sent to

4

Accordingly, neither the State nor holders provide direct mail notice, or any individualized notice, to overseas property owners alerting them that their property has been deemed "abandoned" and is subject to seizure by the State.

17.     The only notice provided by New Jersey to property owners is in the form of newspaper publication inserts—however, those are **published only in local New Jersey newspapers, and only *after* the property has been escheated**. *See* N.J. Stat. Ann. § 46:30B-51. Out-of-state property owners such as Plaintiff (who is a resident of Chile) would have no practicable access to such local New Jersey newspaper notice. But even for property owners who did happen across a newspaper notice, they could not glean from it the nature of the seized property or even its value because the newspaper inserts listed only names (sometimes misspelled, partial, or omitted entirely) and partial addresses of property owners.

18.     For years, the Borquez Family (directly and through agents) have been diligently working to determine which states in the United States seized their property, and to secure that property. Plaintiff contacted the Administrator in an attempt to recover the property seized and taken by the State, but after much delay, the Administrator provided Plaintiff with only a fraction of the property's actual value on November 8, 2023.

19.     As explained in Section D below, but for New Jersey's unnoticed seizure and liquidation of those stocks, the Borquez Family would have had stocks of Exxon Mobil Corporation worth over $623,936 instead of the $487,581.23 returned.  But the Administrator refuses to make Plaintiff whole for this constitutionally-deficient seizure.

---

U.S. possessions and territories"); *id.* ("Certified Mail is not available with International mail but may be mailed to APO (Army Post Office), FPO (Fleet Post Office), and DPO (Diplomatic Post office) locations").

#95274284.1

**Appx113**

20.     Plaintiff has not only lost over a hundred thousand dollars from New Jersey's no-notice escheatment of his family's stocks, but he remains at risk of other of his securities being escheated without notice under the NJUPA. For example, in an attempt to begin repurchasing some of the property that New Jersey seized, Plaintiff has purchased (and currently owns) shares of Exxon Mobil through a brokerage called TradeUp Securities (incorporated in New Jersey). These stocks are subject to escheatment in New Jersey (just like they were the last time they were seized). Plaintiff plans to pursue a buy-and-hold strategy regarding these stocks, meaning he plans to do nothing else with them or the brokerage account, including by allowing any dividends to accrue in the account without re-investing them (automatically or otherwise). Accordingly, absent injunctive relief from this Court, they will be escheated by New Jersey. And because he lives outside the delivery area for certified mail, they will be escheated without notice once more.

21.     Because the NJUPA is unconstitutional both as applied and on its face with respect to the category of persons (like Plaintiff) who received no notice prior to the seizure of their property, Plaintiff brings this action to secure prospective relief, requiring the state to "employ notification procedures designed to provide the **pre-escheat notice** the Constitution requires," *Taylor*, 136 S. Ct. at 930, and requiring Defendants to return the property belonging to each Plaintiff and Class Member, or otherwise put them in the same position as they would have occupied if the property had not been unconstitutionally seized and taken by the Administrator.

## JURISDICTION AND VENUE

22.     This action is brought under 42 U.S.C. § 1983 and alleges that the Defendants violated, and will continue to violate, the constitutional rights of Plaintiff and all other similarly situated persons under the Due Process Clause of the Fourteenth Amendment and the Takings Clause of the Fifth Amendment (incorporated against the states under the Fourteenth Amendment). This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

6

#95274284.1

**Appx114**

23.     A substantial part of the events or omissions giving rise to the claims here at issue occurred in this District. The property seized by the Administrator is situated herein. Therefore, venue is proper in this District under 28 U.S.C. § 1391(b)(2).

## PARTIES

24.     Plaintiff Jaime Vial is a Chilean engineer and legal representative of the estate of Rene Correa Borquez. All the heirs of Mr. Borquez empowered Plaintiff Vial under Chilean law to recover Mr. Borquez's property unlawfully seized by state governments in the United States. Plaintiff Vial submitted the requisite claims, was paid, and is recognized by the State as the rightful legal representative to seek the return of the seized property belonging to Rene Correa Borquez. Jamie Vial is also the owner of shares of Exxon Mobil via a brokerage called TradeUp Securities (incorporated in New Jersey), which are at risk of escheatment under the Act.

25.     Defendant Muoio is the Treasurer of the State of New Jersey and is responsible for managing the State's financial resources and operations. Defendant Muoio's headquarters is located at 125 West State Street, Trenton, New Jersey.

26.     Defendant Harris is the Administrator of the New Jersey Unclaimed Property Administration and is responsible for the enforcement and administration of the Act. Defendant Harris's office is located at 50 West State Street, 6th Floor, Trenton, New Jersey.

## FACTUAL ALLEGATIONS

### A.  Background on New Jersey's Unclaimed Property Act

27.     Traditionally, abandoned property or "escheatment" statutory schemes applied to real property and tangible personal property belonging to persons who died intestate with no descendent, relative, or other valid claimant to the estate. In these situations, the property truly was abandoned and ownerless (*bona vacantia*).

7

#95274284.1

**Appx115**

28.     It was not until the mid-twentieth century that states such as New Jersey began to expand unclaimed property laws to include certain types of intangible property, including unclaimed bank deposits and brokerage accounts. State governments soon realized that unclaimed intangible property could represent a significant source of revenue for the state.

29.     Unclaimed property liquidations generate **hundreds of millions** in revenue for New Jersey every year. The State currently has over **$6 billion** in supposedly "unclaimed" property. Simply put, a staggering amount of private property is being seized, liquidated, and employed for public use.

30.     Between fiscal years 2022–2024, the State has had to return approximately $628.48 million—which was the result of 233,734 successful claims from property owners seeking to claw back their properties. Since the inception of the program, it has returned more than $2.7 billion in property that had not in fact been abandoned.[6]

31.     The NJUPA requires every business doing business in New Jersey—including banks with safety deposit boxes and companies that issue shares (even those held in a retirement account)—to deliver property to the State once that property is deemed "abandoned." *See* N.J. Stat. Ann. §§ 46:30B-46; 46:30B-57.[7]

---

[6] *See* New Jersey Department of the Treasury, *July 30, 2024 Press Release*, WWW.NJ.GOV, https://www.nj.gov/treasury/news/2024/07302024.shtml#:~:text=(TRENTON)%20%2D%20For %20the%20third,claims%20paid%20by%20the%20agency (last accessed April 15, 2025) [Permalink: https://perma.cc/C246-4LFJ].

[7] In its public messaging to holders regarding their obligations, the "State of New Jersey's Unclaimed Property Administration (UPA) would like to remind **all businesses with an operating presence in the State of New Jersey** of their obligation to report abandoned or unclaimed funds to the UPA." *See* Holder Reporting Reminder, New Jersey Unclaimed Property, https://www.nj.gov/treasury/unclaimed-property/pdf/HolderReportingReminder.pdf (last accessed April 25, 2025) [Permalink: https://perma.cc/ZRN6-7ST7]. While the Act does not use the phrase "doing business in New Jersey" as such, that is its reach. *See* N.J. Stat. Ann. §§ 46:30B-46 (requiring any holder with property subject to custody under the Act to submit a report to the

#95274284.1

32.     The NJUPA does not use the traditional understanding of "abandonment," i.e., the "relinquishing of a right or interest with the intention of never reclaiming it." Abandonment Definition, Black's Law Dictionary (12th ed. 2024), *available* at Westlaw. Instead, different types of property—ranging from contents of safe-deposit boxes to stocks, retirement accounts, pension plans, savings accounts, wages, refunds, deposits, and gift cards—are presumed "abandoned" under the Act according to certain dormancy thresholds specified in the statute.

33.     New Jersey uses a short, three-year "dormancy" period to determine whether most types of property may be deemed dormant and, therefore, "abandoned." N.J. Stat. Ann. § 46:30B-7 (generally "all property, including any income or increment derived therefrom, less any lawful charges, whether located in this State or another state, that is held, issued, owing in the ordinary course of a holder's business and has remained unclaimed by the owner for more than three years after it became payable or distributable is presumed abandoned").

34.     The same period applies to securities. *See* N.J. Stat. Ann. § 46:30B-31 (Presumption of Abandonment for "[s]tock or other interest in a business association).[8] Thus, if an account is

---

Administrator); N.J. Stat. Ann. §§ 46:30B-10 (showing conditions required to property to be subject to custody, including a last known address in New Jersey or the holder being domiciled in New Jersey). Thus, any business that holds the property of someone with a New Jersey address, or last known address in New Jersey, or an unknown or foreign address where the holder is domiciled in New Jersey, is subject to the requirements of the NJUPA.

[8] The NJUPA section on the dormancy period for the escheatment of securities states:

> Stock or other interest in a business association, including a debt obligation other than a bearer bond or original issue discount bond, is presumed abandoned: three years after the earlier of the date of an unpresented instrument issued to pay interest or a dividend or other cash distribution, or the date of issue of an undelivered stock certificate issued as a stock dividend, split, or other distribution; or if a dividend or other distribution has not been paid on the stock or other interest for three consecutive years, or the stock or other interest is held pursuant to a plan that provides for the automatic reinvestment of dividends or other distributions, three years after the date of the second mailing of a statement of account or other

inactive for three years—for example, if a customer is using a buy-and-hold approach to investment, makes no deposits or withdrawals, receives no dividends (which is not uncommon for many "blue chip" stocks) for three years—the contents of the account are subject to escheatment to the Administrator. *See id.* This three-year period also applies to checks, certified checks, credit memos, dividends, money orders, savings accounts, non-governmental bonds, traveler's checks, shares, bonds, commissions, and all other intangible property.[9]

35.    In essence, the three-year period runs from the holder's last interaction with the apparent owner. If a stockowner goes three years without making a written communication concerning the property or account, or "by other means reflected in a contemporaneous record," or a presentment of an instrument of payment, or other activity in the account (like a deposit or withdrawal), *see* N.J. Stat. Ann. § 46:30B-7.1, the period runs. Telephone calls or verbal contact with an owner do not by themselves prevent property from being deemed "abandoned." *See* N.J. Stat. Ann. § 46:30B-7.1. Nor does internal activity such as service charges prevent property from being deemed abandoned. *See id.*

36.    Indeed, in the case of an account that automatically reinvests dividends or other distributions, the Act calls for escheatment either after two statements or other notifications have been returned as undeliverable or "three years . . . after the holder discontinued mailings to the apparent owner." N.J. Stat. Ann. § 46:30B-31. This provision has the potential to leave the terms of escheatment entirely in the hands of the holder and its policies on account communications.

---

notification or communication that was returned as undeliverable, or after the holder discontinued mailings to the apparent owner, whichever is earlier.

N.J. Stat. Ann. § 46:30B-31.

[9] There are various presumptions for other forms of property. *See* N.J. Stat. Ann. §§ 46:30B-28.1 – 46:30B-45.

37.     In sum, if an account is not active in the ways specified in the NJUPA for three years—for example, if a customer is using a buy-and-hold approach to investment (i.e., makes no deposits or withdrawals or asset reallocations) for three years—the account would be deemed "abandoned" and the holder must report it and send it to the State.

38.     As part of the State's relentless campaign to fill its coffers with "abandoned" property, the NJUPA contains strong penalties coercing property holders, including financial institutions, to escheat as much "abandoned" property as possible to the UPA. *See, e.g.*, N.J. Stat. Ann. § 46:30B-103 (failure to timely deliver property to the Administrator subjects holder to a penalty interest rate of 10 percent above the annual rate of discount); N.J. Stat. Ann. § 46:30B-104 (failure to timely remit payment, property, or the report to Administrator is subject to "a civil penalty of $200 for each day the report, payment, or delivery is withheld, or the duty is not performed, up to a maximum of $100,000" in addition to the interest owed under § 46:30B-103); N.J. Stat. Ann. § 46:30B-105 (*willful* failure to remit payment, property, or the report subjects the holder to "a penalty of $1,000 for each day the report, payment, or delivery is withheld, or the duty is not performed, up to a maximum of $250,000, plus 25% of the value of any property that should have been but was not reported" in addition to the interest owed under § 46:30B-103).

39.     These penalties pose a real risk to any holder who would otherwise err on the side of retaining the property. Starting in the late 1990s, States like New Jersey dramatically increased their enforcement efforts by hiring private contract firms to audit holders. These audit firms are compensated on a contingent-fee basis—typically, 10 to 15 percent of any unclaimed property seized. (Fees for the seizure of property are paid not by the individual property owner but by other property owners under the NJUPA.) Such a fee structure provides a profit incentive to auditors to

**Appx119**

aggressively seize as much property as possible and to minimize the provision of notice that would enable private owners to prevent seizure of their property.

40.     At the same time, the holder is immunized for escheating the property. *See* N.J. Stat. Ann. §§ 46:30B-60.1–61.

41.     As a result of these incentives, holders are much more likely to escheat property even if it is questionable or borderline (for which they will be immunized)—or else they would face stiff penalties following an aggressive audit.

42.     Abandoned property is then seized by the Administration under the supervision of the Administrator, *see* N.J. Stat. Ann. §§ 46:30B-57; 46:30B-60.1, who acts as property custodian, *see generally* N.J. Stat. Ann. § 46:30B-74 (requiring the establishment of trust funds to pay claims and expenses of trust administration).

43.     Under the NJUPA, "the state assumes custody and responsibility for the safekeeping of the property." N.J. Stat. Ann. § 46:30B-61.

44.     After property is seized, the Act provides that "the administrator shall, within three years after the receipt of abandoned property, sell it to the highest bidder at public sale in whatever municipality in the state affords in the judgment of the administrator the most favorable market for the property involved." N.J. Stat. Ann. § 46:30B-69 (emphasis added). This section includes exceptions for property of sufficiently low value that the sale would be, in the judgment of the administrator, unprofitable. *Id.* There is also a further requirement that notice of the sale be published "at least three weeks in advance of sale, in a newspaper of general circulation in the county in which the property is to be sold." *Id.*

45.     Securities are treated somewhat differently in that they may be sold "on an established stock exchange," as opposed to in a public sale. N.J. Stat. Ann. § 46:30B-70. In

#95274284.1

**Appx120**

addition, the Act generally requires that seized securities be held for at least one year before it may be sold. N.J. Stat. Ann. § 46:30B-71.

46.     However, there is a significant carve out to the one-year hold requirement: the Administrator may sell a security before the one-year hold period expires if it "considers it to be in the best interest of the State to do otherwise." N.J. Stat. Ann. § 46:30B-71; *see also* N.J. Stat. Ann. § 46:30B-72 (including the same carve out for the sale of securities but providing a small exception allowing for payment of the value of sold securities at the time of the claim if a claim is made during the one-year period that the security should ordinarily have been held). This exception is so broad as to render the one-year hold requirement meaningless in terms of restrictive power. In this context, the best interest of the State could simply mean that it is an administrative burden to keep track of some number of securities.

47.     The sales provision applies to all types of property, including securities. The Act further requires that "[s]ecurities listed on an established stock exchange shall be sold at prices prevailing at the time of sale on the exchange. Other securities may be sold over the counter at prices prevailing at the time of sale or by any other method the administrator considers advisable." N.J. Stat. Ann. § 46:30B-70.

48.     The value of securities is highly dependent on the time of the sale. A sale at the wrong moment (let alone the wrong year) could mean a significant difference in realized profits. Under the Act, "[w]henever property other than money is paid or delivered to the administrator under this chapter, the owner is entitled to receive from the administrator any dividends, interest, or other increments realized or accruing on the property at or before liquidation or conversion thereof into money." N.J. Stat. Ann. § 46:30B-68. But after the sale is complete, a successful claimant is entitled only to the net proceeds of the sale plus certain interest at a rate set by the

13

Administrator, N.J. Stat. Ann. § 46:30B-79. That is to say, the amounts that would have accrued to the owner of a security but for the intervention of the Administrator (whether appreciation or dividends) are lost after the security is sold.

49.     The NJUPA provides owners no compensation for the appreciation in the property's value that would have inured to the owner but for the State's involvement. When securities are transferred out of the owner's name by the state, certain rights associated with ownership are lost, such as the right to vote his or her shares in important matters of corporate governance, the right to vote his or her shares in important matters of corporate governance, or the ability to sell the securities. Despite depriving owners of these rights associated with stock ownership, NJUPA provides no compensation for the deprivation of these rights.

50.     The escheated property, once converted into cash, is deposited into a trust fund. The Administrator manages the unclaimed property trust fund, which under the NJUPA is "administered and invested by the State Treasurer, and used to pay claims duly presented and allowed and all expenses and costs incurred by the State of New Jersey." N.J. Stat. Ann. § 46:30B-74(c).

51.     Despite the custodial framework of the fund, the NJUPA permits the State to use unclaimed property for public purposes. *See* N.J. Stat. Ann. § 46:30B-74(a)–(c) (permitting transfer of 75% of all escheated funds to the General State Fund).[10] As the NJUPA makes clear, seventy-five percent of the money that is deposited in the various unclaimed property trust funds is put to public use in the General State Fund. *See id.*

---

[10] Abandoned child support funds are deposited into the Unclaimed Child Support Trust Fund and are handled differently. *See generally* N.J. Stat. Ann. § 46:30B-74(d).

14

52.     In theory, claimants may submit claim forms seeking the return of certain types of property by mail or online. However, only a small portion of seized property is ever returned. As explained in Sections B and C below, however, the NJUPA "combin[es the above] shortened escheat periods with minimal notification procedures" in such a way that "raises important due process concerns," *Taylor*, 136 S. Ct. at 930—which has the intended effect of reducing the likelihood of reuniting seized properties with their owners.

**B.  NJUPA's Pre-Deprivation Notice Is Constitutionally Inadequate**

53.     The Due Process Clause of the Constitution requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections" before they are deprived of property. *Mullane*, 339 U.S. at 314.

54.     The NJUPA also subjects to escheatment the assets of holders that are domiciled in New Jersey under certain circumstances. N.J. Stat. Ann. § 46:30B-10(c). However, most people do not know, for example, if the company that issued them shares happens to be domiciled in New Jersey. Moreover, whether a company is domiciled in New Jersey is a fact that can change without notice. As a result, owners living outside of New Jersey would have no reason to suspect that their shares would be sent to the Administrator and liquidated.  But even with this surprisingly long reach, NJUPA does not provide reasonable efforts to provide owners notice before New Jersey seizes their property.

55.     The NJUPA provides different levels of notice depending on the commercial value of the property and where its owner is located.

56.     The State of New Jersey does not provide direct mail notice or any individualized notice whatsoever to property owners alerting them that the State is seizing their property.

15

#95274284.1

**Appx123**

57.    For "abandoned" property valued at less than $50, the Act does not require the State or holders to provide any notice at all to its rightful owner before transferring it to the Administration, and the State itself provides no notice under any circumstances. *See* N.J. Stat. Ann. § 46:30B-50.

58.    For property in excess of $50, the **holder** of the property must send, by certified mail with return receipt requested, a written notice to the apparent owner at their last known address informing them that the holder will be turning over their property to the State of New Jersey. N.J. Stat. Ann. § 46:30B-50.  The holder is relieved from this requirement if the claim of the apparent owner is barred by the applicable statute of limitations or if the holder "has in its records an address for the apparent owner" which those same records "disclose to be inaccurate." *Id.*

59.    This written notice must be sent at least 60 days before (but not more than 120 days before) the filing of the holder's abandoned property report with the State. *Id.* Accordingly, even where notice is sent and received, property owners are guaranteed just a couple of months to receive this notice and attempt to prevent their property from being escheated.

60.    Although NJUPA imposes this requirement on the holder the State neither enforces it nor assists with it;[11] and frequently the result is no pre-deprivation notice whatsoever. *See generally* N.J. Stat. Ann. §§ 46:30B-50–51. Crucially, by removing the State—with its superior resources and databases rife with contact information of various owners—from involvement in this notice process, NJUPA has deliberately deviated from a process "'reasonably calculated' to reach the interested party—here, the property owner," *Taylor*, 136 S. Ct. at 930.

---

[11] In fact, the NJUPA relieves holders of all liability with respect to the delivered property once property is transferred to the Administrator. *See* N.J. Stat. Ann. § 46:30B-61.

16

61.     More importantly, NJUPA provides for individualized notice in only one form: a letter posted by certified mail. *See* N.J. Stat. Ann. § 46:30B-50. But the United States Postal Service only offers the product Certified Mail within the United States (apart from service to U.S. military and diplomatic installations).[12]

62.     Thus, the Act contains no individualized notice provision that is even possible (much less "reasonably calculated") to reach individuals (like Plaintiff) with addresses located outside of the United States.

63.     The State simply takes the property in question without any individual notice, N.J. Stat. Ann. §§ 46:30B-50.1–52—in direct contravention of the *Mullane* Court's command that notice be "reasonably calculated, under all the circumstances, to apprise interested parties" before they are deprived of property, 339 U.S. at 314.

### C. NJUPA's Post-Deprivation Notice Is Constitutionally Inadequate

64.     The NJUPA continues to deny owners meaningful notice, even after their property has been seized.

65.     For property valued at $100 or more, NJUPA provides for dense, lengthy newspaper publication inserts that were **published only in local New Jersey newspapers—and only after the property had been escheated**. *See* N.J. Stat. Ann. § 46:30B-51 (for property other than that reported by life insurance companies, the Act requires the Administrator "cause a notice to be published not later than November 30 of the year next following the year in which abandoned

---

[12] *See* United States Postal Service, *Certified Mail® - The Basics*, www.usps.com, https://faq.usps.com/s/article/Certified-Mail-The-Basics (last accessed April 24, 2025) [Permalink: https://perma.cc/Q9EA-X8TX?type=image] ("Certified Mail is not available with International mail but may be mailed to APO (Army Post Office), FPO (Fleet Post Office), and DPO (Diplomatic Post office) locations").

17

property has been paid or delivered to the administrator"); N.J. Stat. Ann. § 46:30B-53 (published notice is only required for property valued at $100 or more).

66.    Published notice is *never* provided outside the State of New Jersey, regardless of where the owner of the property is believed to have resided. *See* N.J. Stat. Ann. § 46:30B-51 (notice must be published in a newspaper circulating in the New Jersey county of that last known address or "[i]f the address is outside this State, the notice shall be published in the county in which the holder of the property has its principal place of business within this State").

67.    An out-of-state resident, let alone a foreign resident (like Plaintiff), would have no access to local New Jersey newspapers and no reason to look there to review published notice. Thus, the newspaper notice under the NJUPA is meaningless to Plaintiff and other property owners residing out-of-state. Notice published in local New Jersey newspapers is in no way "'reasonably calculated' to reach the interested party – here, the property owner," *Taylor*, 136 S. Ct. at 930. But even for property owners who did happen across a newspaper notice, they could not glean from it the nature of the seized property or even its value because the newspaper inserts listed only names and addresses of property owners. *See* N.J. Stat. Ann. § 46:30B-52.

68.    The Act states that published notice is *not* required for property valued at "less than $100 unless the administrator considers their publication to be in the public interest." N.J. Stat. Ann. § 46:30B-53. Because published notice is the only post-deprivation notice the NJUPA requires, there is effectively no post-deprivation notice at all for property valued at less than $100.

69.    After the seizure, New Jersey places the owner's name and last known address on a purportedly searchable Internet website (https://unclaimedfunds.nj.gov/app/claim-search) that property owners may visit, if they are aware of its existence. But it defies common sense to expect

#95274284.1

**Appx126**

out-of-state or foreign owners (like Plaintiff) to search a New Jersey website when they and their property have no nexus with New Jersey.

70.    But *even if* owners know to search for their property in New Jersey, and *even if* their property is posted, finding property on the website is *still* hobbled by the website itself in multiple ways.

71.    First, NJUPA does not require the State to post the value of the property on the website (or even a range of values)—rather the Administrator need not post any information other than names and last known address identifiers of persons appearing from the records. *See* N.J. Stat. Ann. § 46:30B-76.1. Accordingly, owners could not glean from the website the nature of the seized property, from what entity it was seized, when it was seized, nor even a vague idea of its value.

72.    Second, the website frequently contains partial names and facially incomplete address information. For just one example, one owner is listed as "John John" (third from the top, below, along with many other John Johns) with no last name and an address that simply states, "John" in the city of Hackensack. The only information that can be gleaned from this entry is that someone named John, who may have once resided in Hackensack, has some unclaimed property held by the state.

| Select an Action | Owner Name | Co-Owner Name | Street Address | City | Zip Code | Property ID |
|---|---|---|---|---|---|---|
| CLAIM | JOHN JOHN | | 30 SMRDL ST | SPOTSWOOD | 08884 | 39518338 |
| CLAIM | JOHN JOHN | | 127 WOTSON | AVE | 07018 | 1101637 |
| CLAIM | JOHN JOHN | | JOHN | HACKENSACK | 07601 | 14978358 |
| CLAIM | JOHN JOHN | | 527 MARION ST | TEANECK | 07666 | 27837148 |

73.    On information and belief, the Unclaimed Property website information is not cross-referenced against owner information in any of the State's databases. That might have been helpful to owners such as "John John" of "Hackensack."

19

74.      And it might have been helpful to "Athan Jon," whose entry has no real name nor any address information whatsoever. Other information in the records of the holder, or the State, could illuminate who this person (presumably named Jonathan) is and where his property could be returned.



| Select an Action | Owner Name | Co-Owner Name | Street Address | City | Zip Code | Property ID |
|---|---|---|---|---|---|---|
| CLAIM | ATHAN JON | | NONE | NONE | NOZIP | 31282472 |

75.      On information and belief, at least hundreds of thousands of properties will never be claimed by their rightful owners because there is no way to discern who the rightful owner is from the website.

76.      It is especially difficult to reclaim property if the property is listed with the first name in place of a last name, or if the name is misspelled or abbreviated, or if a nickname is used. See the two screenshotted entries below in which the name "Jose" is the only name provided, and, presumably, the owner's last name is listed as the street address (no actual street address appears).

| CLAIM | JOSE JOSE | | RAMOS | PASSAIC | 07055 | 16986730 |
|---|---|---|---|---|---|---|
| CLAIM | JOSE | | GRAY | PATERSON | 07501 | 34549209 |

77.      It is even more difficult—if not impossible—to reclaim property that is erroneously listed by the name of the institution holding it, rather than the individual owner. Yet, this also happens with great frequency. The screenshotted examples below are representative of the problem (the Washington Boulevard addresses in Jersey City are JP Morgan corporate offices).



| CLAIM | MORGAN JP | | 575 WASHINGTON BLVD FL 9 | JERSY CITY | 07310 | 22444730 |
|---|---|---|---|---|---|---|

20

**Appx128**

| | | | | | |
|---|---|---|---|---|---|
| CLAIM | MORGAN BROKER DEA JP | | 480 WASHINGTON BLVD FL 10 | JERSEY CITY | 07310 | 38850339 |
| CLAIM | MORGAN BROKER DEA JP | | 480 WASHINGTON BLVD FL 10 | JERSEY CITY | 07310 | 38850334 |
| CLAIM | MORGAN CHASE BANK JP | | 121 WOOD CREST ROAD | CHERRY HILL | 08003 | 41104531 |
| CLAIM | MORGAN CHASE BANK JP | | 480 WASHINGTON BLVD FL 10 | JERSEY CITY | 07310 | 38850340 |
| CLAIM | ARA AT JP MORGAN CHASE | | 130 BELMONT DR | SOMERSET | 08873 | 19813242 |
| CLAIM | CHASE BANK NA JP MORGAN M | | PO BOX 47020 | DORAVILLE | 30362 | 20299758 |
| CLAIM | CO JP MORGAN CHASE BANK NA | | PO BOX 50000 DEPT 6583 | NEWARK | 07101 | 33293606 |

78.      Although, in theory, claimants may submit claim forms seeking the return of certain types of property by mail or online, it is difficult or impossible for owners to reclaim their property because key identifying information is unavailable on the website, and because the Administrator fails to verify owner information with the other State of New Jersey databases.

79.      In addition to these errors, there are a variety of foreign addresses that appear on the website. These individuals are obviously not domiciled in New Jersey and would have no reason to assume their property had been escheated to the state.

80.      Instead of consulting its own databases—or using common sense—to screen for and correct obviously erroneous addresses (such as "Los Angeles, United Kingdom"), the State does nothing, allowing it to keep their property.

| Select an Action | Owner Name | Co-Owner Name | Street Address | City | Zip Code | Property ID |
|---|---|---|---|---|---|---|
| CLAIM | EDWARDS JOHN M | | 16 GUINEVERE WAY EXETER EX4 8L | UNITED KINGDOM | 08540 | 18223061 |
| CLAIM | JOHN WHITEBROOK | MARKEY J WHITEBROOK | 81 WESTERN ROAD | LONDON UNITED KINGDOM | 00000 | 33903184 |
| CLAIM | MARTIN JOHN | MARTIN BARBARA E | BEEHIVE COTTAGE NEW ROAD | BLAKENEY UNITED KINGDOM | 07090 | 21313104 |
| CLAIM | JOHN ROBERTSON | | WELLERS PLACE FARM HOLT END LA | BENTWORTH UNITED KINGD | 00000 | 38574073 |
| CLAIM | JOHN M CLEESE | | 125 S BARRINGTON PLACE | LOS ANGELES UNITED KING | 90049 | 33901983 |

21

**Appx129**

81. Because of NJUPA's framework for distributing notice, no one with a foreign address will have received any pre or post-deprivation notice. *See generally* N.J. Stat. Ann. § 46:30B-50–52.

82. Failing to verify names and addresses in any way is akin to a government officer who has "prepared a stack of letters to mail [and] handed them to the postman, and then watched as the departing postman accidentally dropped the letters down a storm drain." *Jones v. Flowers*, 547 U.S. 220, 229 (2006). In that scenario, "one would certainly expect the [officer] to prepare a new stack of letters and send them again." *Id.* After all, no one "desirous of actually informing the owners would simply shrug his shoulders as the letters disappeared and say 'I tried.'" *Id.* "Failure to follow up would be unreasonable, despite the fact that the letters were reasonably calculated to reach their intended recipients when delivered to the postman." *Id.* No letter with an international destination, sent via a service that does not deliver internationally, can be said to be reasonably calculated to reach its intended recipient. The same is true of those directed to addresses that do not exist. And the same is true of published notice in a newspaper that has no chance of being seen by the individual to be noticed.

83. This lax approach to notice reflects a "process which is a mere gesture"—which is therefore "not due process," *Taylor*, 136 S. Ct. at 930.

**D. New Jersey Seized Plaintiff's Property Without Notice, Used It For Public Purposes, and Provided Inadequate Compensation**

84. As explained above, Plaintiff is the legal representative of the estate of Hernan Correa Borquez and, through him, of the estate of Rene Correa Borquez.

85. Mr. Rene Correa Borquez was a Chilean lawyer with many significant investments, including various stocks in financial services accounts across the United States. His name and address in Chile were associated with all of his accounts. If notice had been sent to his address, he

22

and/or his heirs would have received it. Indeed, notices from the companies he invested in (for example concerning dividends) were received by the Borquez Family until New Jersey seized the shares. Therefore, it would have been eminently practicable for New Jersey to give him and his heirs individualized notice as to the stocks Mr. Borquez owned.

86.    He died testate in Chile on May 27, 2006. Mr. Borquez left the entirety of his estate to his brother, Hernan Correa Borquez, who also resided in Chile.

87.    Hernan Correa Borquez died in Chile on December 22, 2007. His heirs (the "Borquez Family") all reside in the country of Chile.

88.    Indeed, there is **no** nexus between the members of the Borquez Family and the State of New Jersey. No member of the family has ever resided in New Jersey.

89.    Yet, New Jersey later escheated Mr. Borquez's investments without providing any notice to the Borquez Family.

90.    No written or published notice was ever received—before or after the escheatment.

91.    New Jersey did not conduct any investigations or inquiries regarding the Borquez's accounts to determine the name or address of the owners or otherwise alert them that their property was being escheated and then liquidated.

92.    Mr. Rene Correa Borquez owned 905 shares of stock in Exxon Corp. (now Exxon Mobil Corp.) that were seized by the Administrator.

93.    Mr. Vial, as representative of all the heirs of Rene Correa Borquez, submitted a claim and supporting documentation to New Jersey. Following extensive efforts to recover his assets, including paying $112,144 to a firm to recover those assets, the State of New Jersey provided him a letter concluding its administrative process with a determination of the amounts owed on November 6, 2023.

#95274284.1

**Appx131**

94.     On November 8, 2023, Plaintiff received the sum of $487,581.23 from the State for those shares.

95.     Additional property may have been seized as well—but Plaintiff would require an accounting from the State's records to determine.

96.     Neither Plaintiff, any heir, nor any other representative of Mr. Rene Borquez's or his brother's estates received *any* notice that the Administrator had seized the above property. No written or published notice was ever received. Had the Administrator provided Mr. Borquez or his heirs notice that he would seize the property, they would have acted to prevent that seizure.

97.     But for New Jersey's unnoticed seizure and liquidation of those stocks, the Borquez Family would have had stocks of Exxon Mobil Corporation worth over $623,936 instead of the $487,581.23 returned.

98.     Accordingly, the final sum received by Plaintiff is grossly inadequate because it fails to put Plaintiff in the same position monetarily as he would have occupied if his property had not been seized and taken by the State without constitutionally required notice.

99.     Plaintiff is entitled to no less than the current market value of the seized property, as of the filing of his original Complaint.

100.    But the Administrator refuses to make Plaintiff whole for this unconstitutional seizure of hundreds of thousands in private property.

**E.   Plaintiff Has Property That Is Likely To Be Escheated To New Jersey Without Notice Under the NJUPA**

101.    Plaintiff continues to suffer ongoing injury from the NJUPA in three ways: (1) he has additional property that is likely to be escheated without notice; (2) he must make efforts to prevent that, which is its own injury; and (3) he is deterred from acquiring additional property because of the unclaimed property regime.

#95274284.1

**Appx132**

102.    Plaintiff is the owner of and legal representative for additional property vulnerable to seizure and taking under the NJUPA. For example, in an attempt to begin repurchasing some of the property New Jersey seized, Plaintiff has purchased (and currently owns) shares of Exxon Mobile via Tradeup Securities (which is a New Jersey corporation).

103.    The NJUPA provides that property may be subject to escheat if "[t]he holder is a domiciliary" of New Jersey and the "last known address . . . of the apparent owner is in a state that does not provide by law for the escheat or custodial taking of the property," N.J. Stat. Ann. § 46:30B-10(d). The NJUPA defines "holder" as "a person, wherever organized or domiciled, who is the original obligor indebted to another on an obligation . . ." N.J. Stat. Ann. § 46:30B-6(g).

104.    Plaintiff holds his Exxon shares at a brokerage called TradeUp Securities, which is a New Jersey corporation. Plaintiff's address on file with Tradeup, the relevant holder here, would be in Chile—not a state with an escheat law within the meaning of Section 46:30B-10(d). And Plaintiff intends to pursue a buy-and-hold strategy for those shares, doing nothing with them while they appreciate for years to come. Thus, because Plaintiff's last known address is not in a "state" that would escheat his property, the NJUPA would require TradeUp to escheat the property to New Jersey, as a New Jersey domiciliary. *See State v. Garford Trucking*, 4 N.J. 346, 351, 72 A.2d 851, 854 (1950) ("A corporation created and existing under the laws of New Jersey may have a 'commercial domicile' or 'business situs' elsewhere for taxation and other purposes; but it is nonetheless domiciled and resident in the state of its creation . . .").

105.    As is relevant to Plaintiff, stocks are deemed "abandoned" if the owner goes three years without interacting with the holder or the account in such a way that the NJUPA specifies. *See* N.J. Stat. Ann. §§ 46:30B-7–7.1.

25

**Appx133**

106.     As a result, if a stockowner goes three years without making a written communication concerning the property or account, or an oral communication contemporaneously recorded concerning the property or account, or a presentment of an instrument of payment, or other activity in the account (such as a deposit of withdrawal), N.J. Stat. Ann. § 46:30B-7.1, or if dividends are automatically reinvested, three years after the second statement or other account notification is returned as undeliverable or after the holder discontinued mailings, N.J. Stat. Ann. § 46:30B-31, the NJUPA requires his broker to remit all of the owner's stocks to the state, N.J. Stat. Ann. § 46:30B-57.

107.     Accordingly, it is certain that Plaintiff's shares would escheat to New Jersey if he subscribed to a buy-and-hold approach to investment (i.e., makes no deposits or withdrawals or asset reallocations) for three years, and does not have automatic reinvestment of dividends. That is currently Plaintiff's plan for these shares.

108.     To avoid escheat, Plaintiff would be required to churn and monitor that property (and other property) in order to ensure that the Administrator does not attempt to seize it.

109.     Plaintiff reasonably believes he will not receive pre-deprivation notice from the State for the reasons described in Section B, above.

110.     Plaintiff will not receive notice (even post-escheatment) for the reasons described in Section C, above.

111.     Because Plaintiff cannot rely on notice, he is required to monitor that property continuously in order to ensure that the State does not attempt to seize it. He is incurring, and will continue to incur, the real and concrete cost of having to constantly monitor his property to avoid escheat, including retention of counsel in the United States. The Ninth Circuit recognized the

#95274284.1

burden of "having to continually monitor [one's] property" as the sort of injury establishing standing to seek prospective relief and meriting an injunction. *Taylor II*, 488 F.3d at 1200.

112.    Finally, the NJUPA deters Plaintiff from acquiring further property that might be subject to seizure under the NJUPA. Absent the NJUPA, Plaintiff would take concrete steps toward the acquisition of additional property in the United States that would be subject to the NJUPA. This represents an additional injury suffered by Plaintiff.

### F.    The Relief Sought Would Not Implicate the Eleventh Amendment

113.    Sovereign immunity would not bar the relief Plaintiff (and the class) seek. As explained in greater detail below, Plaintiff seeks prospective declaratory and injunctive relief, including alterations to the way that NJUPA is administered to ensure notice is provided in a manner that complies with constitutional requirements (falling squarely within the *Ex parte Young* exception).

114.    And Plaintiff, on behalf of himself and the putative Class (defined below), seeks an accounting and the return of their own escheated property in the possession of the State. New Jersey holds the escheated property in a custodial trust until claimed by the owner or the owner's successor in interest. N.J. Stat. Ann. § 46:30B-61. Accordingly, the Eleventh Amendment likewise does not bar such relief. *See Suever v. Connell*, 439 F.3d 1142, 1147 (9th Cir. 2006) ("Claims requesting the return of individuals' property are less likely to offend a state's sovereign immunity than claims requesting the payment of government funds.").

115.    Even for the seized property that New Jersey has liquidated, sovereign immunity does not apply.

116.    The Administrator manages an unclaimed property trust fund, which under the NJUPA is "administered and invested by the State Treasurer, and used to pay claims duly presented and allowed and all expenses and costs incurred by the State of New Jersey." N.J. Stat. Ann. §

27

46:30B-74(c). Twenty-five percent of the escheated funds *must* remain in that trust fund, according to statute, and does not become part of the "General State Fund." *Id.*

117.    Indeed, because the revenue for unclaimed property in New Jersey is managed in a trust fund, relief in this case would not implicate the State's general fund. Indeed, the money paid to Plaintiff was from a separate account called "UNCLAIMED PERSONAL PROPERTY TR FD."

118.    "The purpose of all escheat laws is not only to enrich the State but to put into active use funds that are unclaimed and lying dormant. Yet, escheat statutes should be distinguished from custodial statutes which make the State a custodian of the abandoned property, subject to delivery to those who prove ownership or a right to possession." *Salvato v. Harris*, No. CV 21-12706 (FLW), 2022 WL 1224962, at *6 (D.N.J. Apr. 26, 2022) (quoting *Commonwealth of Penna. v. Kervick*, 114 N.J. Super. 1, 8 (Ch. Div. 1971), *rev'd on other grounds* 60 N.J. 289 (1972). The NJUPA is decidedly of the latter category. First, "the mechanics of the [NJ]UPA, specifically the placement of collected abandoned funds in a separate trust account, confirms the custodial nature of New Jersey's unclaimed property laws." *Salvato*, 2022 WL 1224962, at *6. Second, Defendants admitted in *Salvato* that "when property is transferred to the State under the auspices of the UPA, the 'funds [are held] in perpetuity for the true owner[.]'" *Id.*

119.    The custodial purpose of the NJUPA is also the self-selected "Mission Statement" of the New Jersey Unclaimed Property Administration: "The New Jersey Unclaimed Property Statute ensures that property owners never relinquish the right to this property and the UPA only acts as a custodian until the property is returned."[13]

---

[13] New Jersey Unclaimed Property Administration, *About Section*,  WWW.NJ.GOV, https://www.nj.gov/treasury/unclaimed-property/aboutunclaim.shtml#:~:text=The%20Newu %20Jersey%20Unclaimed%20Property,acts%200b20as%20a%20custodian%20until (last accessed April 15, 2025) [Permalink: https://perma.cc/66D8-Q7CN].

120.   These facts, combined with the fact that NJUPA permits these reimbursements to be made at any time, demonstrate the custodial trust nature of the proceeds from the liquidations of unclaimed property. *See Suever*, 439 F.3d at 1147 ("the Eleventh Amendment did not apply to funds that had been escheated, but not permanently escheated, because the State held such funds in custodial trust for the benefit of property owners—the funds were not State funds"); *see also Am. Exp. Travel Related Servs., Inc. Sidamon-Eristoff*, 669 F.3d 359, 365 (3d Cir. 2012) (explaining that unclaimed property laws "require that once property has been deemed abandoned, the holder turn it over to the state while the original property owner still maintains the right to the property").

121.   Plaintiff and Class Members seek to be made whole from funds explicitly and purposefully set aside in a custodial trust separate from New Jersey's treasury.

**G. The Statutes Of Limitations Have Not Run, And In Any Case Have Been Tolled**

122.   Plaintiff's legal claims did not fully accrue until November 8, 2023, when the Administrator issued its final sum from the Unclaimed Property Administration, thus making a final determination. Prior to that date, Plaintiff did not know the total amount he would receive from the property that was taken—and therefore did not know that he would not be made whole. At the absolute earliest, the statute of limitations would run from November 6, 2023, the date of the letter from the State indicating what amounts would be paid from which shares.

123.   Moreover, prior to that point, Plaintiff was actively engaged in an administrative process to retrieve the escheated shares, including by submitting more information and paperwork as requested. As a result, even if the claims accrued earlier, they were tolled by the constant communications between the State and Plaintiff (and his agents) to satisfy the requirements the State posed on Plaintiff to grant the claims.

29

124.     Plaintiff's extensive communications with the Administration (including through counsel, asset tracing firms, and other entities)—before *and after* that incomplete payment—tolled any applicable statute of limitations.

125.     Further, Defendants' acts, omissions, misrepresentations, and practices also tolled or equitably estopped any limitations period. Through such acts, omissions, misrepresentations, and practices, Defendants were able to conceal from Plaintiffs and Class the material facts involving their property. Based on Defendants' breach of their statutory and constitutional obligations to notify Plaintiffs (among other things), Defendants are estopped from asserting a statute of limitations and have waived any such defense.

<u>**CLASS ACTION ALLEGATIONS**</u>

126.     Plaintiff re-alleges and incorporates by reference herein all the allegations contained above.

127.     Plaintiff brings this lawsuit as a class action pursuant to Federal Rules of Civil Procedure 23(a); (b)(1); (b)(2); (b)(3); and/or (c)(4), on behalf of himself and all others similarly situated as members of a class of all persons and entities owning purportedly "abandoned" property transferred to Defendants under color of the NJUPA within the applicable statute of limitations who were denied constitutionally adequate pre-seizure notice under the NJUPA because they resided outside of the United States.

128.     Plaintiff reserves the right to amend the Class definition if discovery and further investigation reveal that any Class should be expanded, divided into additional subclasses under Rule 23(c)(5), or modified in any other way.

129.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of their claims on a class-wide basis using the same evidence as would be used in individual actions alleging the same claims.

#95274284.1

**Appx138**

130.    This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Federal Rule of Civil Procedure 23 and satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of its provisions.

131.    Although the exact number, identity, and location of persons in the proposed Class are readily discernible based on Defendant's records, upon information and belief, the number of members in the proposed Class will be more than 1,000 persons. Therefore, those persons in the Class are so numerous that joinder of the entire proposed Class is impractical.

132.    Accordingly, the disposition of the claims of Class members in a single action will provide substantial benefits to all parties and to the Court. Class members may be readily notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

133.    The claims of the Plaintiff are typical of the claims of the other Class members in that the representative Plaintiff, like all Class members, has had property taken by Defendant without constitutionally adequate notice. Plaintiff, like all Class members, has been damaged by Defendants' misconduct in that they have incurred similar or identical losses relating to the taken property. Furthermore, the factual bases of Defendants' misconduct are common to all Class members and represent a common thread of misconduct resulting in injury to all Class members.

134.    Plaintiff is a member of the proposed Class and will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel with substantial experience in complex litigation, including class actions involving issues identical or similar to those raised in this action. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither Plaintiff nor his counsel have interests adverse to those of the Class.

31

135.    There are questions of law and fact common to all members of the proposed Class, including whether the Defendant complied with the Takings Clause of the Fifth Amendment and the Due Process Clause of the Fourteenth Amendment by seizing and taking Plaintiff's property without constitutionally required prior notice.

136.    Plaintiff's claims are typical of those of the members of the proposed Class, who are subject to the same deprivations of their property and rights, and there is a well-defined commonality of interest in this case's questions of law and fact.

137.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff and Class members have all suffered and will continue to suffer economic harm and damage as a result of Defendant's unlawful and wrongful conduct, which was directed toward Class members and the public as a whole, rather than specifically or uniquely against any individual Class members.

138.    Defendant has acted in a uniform manner with respect to Plaintiff and Class members. Because Defendant's duties to comply with the Constitution apply equally to each person in the proposed Class, the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

139.    Absent a class action, most Class members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of many of the individual Class members' claims, it is likely that only a few Class members could afford to seek legal redress for Defendant's misconduct. Absent a class action, Class members will continue to incur damages, and Defendants' misconduct will continue without effective remedy.

32

#95274284.1

**Appx140**

140.   Class treatment in this Court will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication by providing common answers to the common questions of constitutionality that predominate this action.

141.   Class-wide declaratory, equitable, and injunctive relief is appropriate under Rule 23(b)(1) and/or (b)(2) because Defendant has acted on grounds that apply generally to the class, and inconsistent adjudications with respect to the Defendant's liability would establish incompatible standards and substantially impair or impede the ability of Class members to protect their interests. Class-wide relief and Court supervision under Rule 23 assures fair, consistent, and equitable treatment and protection of all Class members, and uniformity and consistency in Defendant's discharge of their duties to carry out his duties in accordance with the Constitution. Defendant's actions and threatened actions deprived, are depriving, and will deprive Plaintiff and the members of the proposed Class of their constitutional rights on grounds generally applicable to all, thereby making appropriate declaratory and injunctive relief with regard to the proposed Class as a whole.

## FIRST CLAIM FOR RELIEF

**(U.S. Const. Fourteenth Amendment § 1 - Due Process Clause:
42 U.S.C. § 1983 – All Defendants)**

142.   The allegations set forth above are incorporated into this claim by reference as though set forth in full here.

143.   The Fourteenth Amendment, Section 1, of the United States Constitution provides, in part, "nor shall any State deprive any person of life, liberty, or property, without due process of law. . . ." A claim alleging violation(s) of this federal right may be brought under 42 U.S.C. § 1983.

33

144. Under the color of law provided by the Statute, the Administrator has violated (and continues to violate) the Plaintiff's right to due process through the enforcement and administration of the Statute by depriving him of his property without due process.

145. In every instance that the Statute allows the Administrator to seize property without notice, it allows the Administrator to violate the constitutional rights of Plaintiff and Class members. Therefore, the Statute is facially unconstitutional with respect to the category of persons (like Plaintiff) who receive no notice prior to the seizure of their property.

146. Neither the Plaintiff nor any other heirs of Mr. Borquez received notice of the seizure of Mr. Borquez's property.

147. Plaintiff, as well as the owners of existing property, have a constitutionally protected property interest in the private property that they own and that is seized by the Administrator as described herein. Defendant deprived Plaintiff and other property owners of their constitutionally protected property interests by seizing their property without notice and due process.

148. Plaintiff did not receive fair compensation for the loss of property. The recovery Plaintiff has received from the Office of Unclaimed Property is grossly inadequate. It fails to reflect the market value of the stock and fails to put Plaintiff in the same position monetarily as he would have occupied if the property had not been seized and taken by the State.

149. Unless the Administrator is enjoined from continuing to enforce and administer the Statute, she will continue to violate the constitutional rights of Plaintiff and Class members.

150. Plaintiff and Class Members have no plain, speedy, adequate remedy at law; therefore, injunctive relief from this Court is the only means available to them to protect the rights

#95274284.1

**Appx142**

guaranteed to Plaintiff and the Class members by the Fourteenth Amendment's Due Process Clause.

## SECOND CLAIM FOR RELIEF

**(U.S. Const., Fifth Amendment - Takings Clause: 42 U.S.C. § 1983 – All Defendants)**

151. The allegations set forth above are incorporated into this claim by reference as though set forth in full.

152. The Fifth Amendment to the United States Constitution provides, in part, that "[n]o person shall . . . . be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." The Fourteenth Amendment incorporates the Takings Clause and applies it to New Jersey. *See Chicago Burlington and Quincy R.R. v. City of Chicago*, 166 U.S. 226 (1897). The Takings Clause is enforceable via an action brought under 42 U.S.C. § 1983.

153. Under the color of law provided by the NJUPA, Defendants have violated (and continue to violate) Plaintiff's rights under the Takings Clause through their enforcement and administration of the NJUPA by taking Plaintiff's property without just compensation.

154. On information and belief, New Jersey employed the proceeds from Plaintiff's unclaimed property for public use. *See* N.J. Stat. Ann. § 46:30B-74(c).

155. "When a state directly appropriates private property, it is considered a per se taking, and the state has a duty to compensate the owner." *Am. Exp. Travel Related Servs., Inc.*, 669 F.3d at 370 (3d Cir. 2012).

156. Plaintiff did not receive just compensation for the loss of his property.

#95274284.1

**Appx143**

157.    The recovery Plaintiff has received from the Office of Unclaimed Property is grossly inadequate by at least **$136,354.77**.[14] As explained in Section D, above, the amount New Jersey finally returned fails to put Plaintiff in the same position as he would have occupied if the property had not been seized and taken by the State for public use. Yet, the Fifth Amendment commands that when property is appropriated by the States, "the owner is to be put in the same position monetarily as he would have occupied if his property had not been taken." *United States v. Reynolds*, 397 U.S. 14, 16 (1970).

158.    It was only because the State Escheator liquidated Plaintiff's equities (without taking *__any__* steps to provide him notice) that the State is unable to comply with his request for the return of his shares.

159.    And it is only because of the grossly inadequate recovery which fails to account for appreciation, dividends, or interest, that Plaintiff cannot be made whole by simply repurchasing all of the seized shares. Indeed, in order to repurchase all of the seized shares, Plaintiff would need an additional $136,354.77 beyond what New Jersey remitted to him.

160.    Further, Defendants fail to pay interest on the private property that is seized and taken, and the nonpayment of interest is itself a separate violation of the Takings Clause.

161.    Defendants are acting in the capacity of a private trustee and custodian of private funds.

162.    Unless Defendants are enjoined from continuing to enforce and administer the Statute, they will continue to violate the constitutional rights of Plaintiff and other Class Members for the foreseeable future.

---

[14] This represents the difference between the value of the escheated Exxon stock at the time of the filing of the original complaint ($623,936) and the amount paid by the State in response to Plaintiff's claim, $487,581.23.

36

163.    Plaintiff and Class Members have no plain, speedy, adequate remedy at law; therefore, injunctive relief from this Court is the only means available to them to protect the rights guaranteed to Plaintiff and the Class members by the Fifth Amendment's Takings Clause.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class Members, respectfully request that the Court grant certification of the proposed Class, including the designation of Plaintiff as the named representative of the Class, the appointment of the undersigned as Class Counsel, and the designation of any appropriate subclasses, under the applicable provisions of Federal Rule of Civil Procedure 23, and that the Court enter judgment in their favor and against Defendants as follows:

A.    An order enjoining Defendants from seizing property under the NJUPA currently owned by Plaintiff without first providing the "pre-escheat notice the Constitution requires" through a process "'reasonably calculated' to reach the interested party—here, the property owner." *Taylor*, 136 S. Ct. at 930.

B.    An order enjoining Defendants from continuing to administer the NJUPA in violation of the Fifth and Fourteenth Amendments of the United States Constitution by seizing property from property owners without first providing them the "pre-escheat notice the Constitution requires" through a process "'reasonably calculated' to reach the interested party— here, the property owner." *Taylor*, 136 S. Ct. at 930.

C.    An equitable accounting to identify the properties seized from Plaintiff and the Class Members without constitutionally adequate notice because those amounts are unknown and cannot be ascertained without information within the exclusive knowledge of the State;

D.    Injunctive and equitable relief requiring Defendants to return (rather than destroy or liquidate) the property belonging to each Plaintiff and Class Member that is still in the State's

37

possession, or otherwise put Plaintiff and Class Members in the same position monetarily as they would have occupied if the property had not been unconstitutionally seized and taken, including compensation for any appreciation in the value of the property since its seizure;

E.    A declaration that Defendants are financially responsible for all Class notice and the administration of Class relief;

F.    A declaration that Defendants' administration of the NJUPA against Plaintiff and the Class Members in the ways outlined in this Complaint violates the Fifth and Fourteenth Amendments of the United States Constitution;

G.    An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

H.    An award of costs and attorneys' fees, as allowed by 42 U.S.C. § 1988;

I.    Leave to amend this Complaint to conform to the evidence produced at trial; and

J.    Such other or further relief as the Court may deem appropriate, just, and equitable.

38

#95274284.1

**Appx146**

Respectfully Submitted,

DATED: May 5, 2025

By:/s/ Kevin P. Roddy, Esq.
WILENTZ, GOLDMAN & SPITZER, P.A.
KEVIN P. RODDY, ESQ. (NJSBA # 014802005)
90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ 07095
Telephone: (732) 636-8000
Facsimile: (732) 726-6686
Email: kroddy@wilentz.com

William W. Palmer, Esq.
(*Pro Hac Vice Counsel*)
PALMER LAW GROUP, PLC
2443 Fair Oaks Boulevard, No. 545
Sacramento, CA 95825
Telephone: (916) 972-0761
Facsimile: (916) 972-0877
Email: wpalmer@palmercorp.com

Jonathan S. Massey
Bret R. Vallacher
Matthew E. Layden
(*Pro Hac Vice Counsel*)
MASSEY & GAIL LLP
1000 Maine Avenue SW
Suite 450
Washington, D.C. 20024
Telephone: (202) 652-4511
Email: jmassey@masseygail.com

*Attorneys for Plaintiff*

39

#95274284.1

**Appx147**

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 106
Trenton, New Jersey 08625

*Attorney for Elizabeth Maher Muoio,*
*Treasurer of the State of New Jersey,*
*and Steven Harris, Administrator of*
*the New Jersey Unclaimed Property*
*Administration*

By:    Valerie A. Hamilton
       Deputy Attorney General
       NJ Bar ID No. 018201995
       (609) 376-3256
       Valerie.Hamilton@law.njoag.gov

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ESTATE OF RENE CORREA BORQUEZ, Jaime Vial, representative of the heirs of Rene Correa Borquez and on behalf of those similarly situated, | ) ) ) ) | Hon. Robert Kirsch, U.S.D.J. Hon. J. Brendan Day, U.S.M.J. |
| | ) | |
| Plaintiff, | ) ) | Case No. 3:24-cv-11301-RK-JBD |
| v. | ) ) ) | |
| ELIZABETH MAHER MUOIO, in her official capacity as Treasurer of the State of New Jersey; STEVEN HARRIS, in his official capacity as Administrator of the State of New Jersey Unclaimed Property Administration; and KELMAR ASSOCIATES, LLC. | ) ) ) ) ) ) ) ) | Return Date:  August 18, 2025  **NOTICE OF DEFENDANTS' MOTION PURSUANT TO FED. R. CIV. P. 12(b)(1) AND (6) TO DISMISS THE AMENDED COMPLAINT WITH PREJUDICE** |
| | ) | |
| Defendants. | ) | |

**Appx148**

TO:

Clerk of the Court
Clarkson S. Fisher U.S. Courthouse
402 East State Street
Trenton, NJ 08608

William Palmer, Esq.
Palmer Law Group
2443 Fair Oaks Blvd, No. 545
Sacramento, CA 05825
E: wpalmer@palmercorp.com
*Attorney for Plaintiff*

Kevin P. Roddy, Esq.
Kseniya Lezhnev, Esq.
Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Dr., Box 10
Woodbridge, NJ 07095
E: kroddy@wilentz.com
    klezhnev@wilentz.com
*Attorney for Plaintiff*

Jonathan Massey, Esq.
Bret R. Vallacher, Esq.
Matthew E. Layden, Esq.
Massey & Gail, LLP
1000 Maine Avenue, SW
Suite 450
Washington, DC 20024
E:  jmassey@masseygail.com
    bvallacher@masseygail.com
    mlayden@masseygail.com
*Attorney for Plaintiff*

**PLEASE TAKE NOTICE** that on August 18, 2025, or as soon thereafter as counsel may be heard, the undersigned, Matthew J. Platkin, Attorney General of New Jersey (Valerie A. Hamilton, Deputy Attorney General, appearing), on behalf of Defendants, Elizabeth Maher Muoio, in her official capacity as Treasurer of the State of New Jersey, and Steven Harris, in his official capacity as Administrator of the State of New Jersey Unclaimed Property Administration (the "Defendants"), shall move before the Honorable Robert Kirsch, United States District Judge, Court Room 4E, in the Clarkson S. Fisher U.S. Courthouse, 402 East State Street, Trenton, NJ 08608, for an order dismissing Plaintiff's

2

**Appx149**

Amended Complaint, with prejudice, for lack of subject matter jurisdiction and failure to state a claim upon which relief may be granted ("Motion").

PLEASE TAKE FURTHER NOTICE that, in support of the Motion, the undersigned will rely on the attached Brief and authorities cited therein.

PLEASE TAKE FURTHER NOTICE that a proposed form of Order is also enclosed.

PLEASE TAKE FURTHER NOTICE that, if you wish to oppose the relief requested in the enclosed Motion, you must do so in writing.  Opposition papers must be served in the manner and within the time fixed by the Court in its Text Order dated May 6, 2025 (Docket No. 46).

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY


By: /s/ Valerie A. Hamilton
Valerie A. Hamilton
Deputy Attorney General


Dated:  June 4, 2025

3

**Appx150**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ESTATE OF RENE CORREA BORQUEZ, Jaime Vial, individually, as representative of the heirs of Rene Correa Borquez, and on behalf of other persons similarly situated, | ) ) ) ) ) | Hon. Robert Kirsch, U.S.D.J. Hon. J. Brendan Day, U.S.M.J. |
| Plaintiff, | ) ) | Case No. 3:24-cv-11301-RK-JBD |
| v. | ) ) | |
| ELIZABETH MAHER MUOIO, in her official capacity as Treasurer of the State of New Jersey, and STEVEN HARRIS, in his official capacity as Administrator of the State of New Jersey Unclaimed Property Administration, | ) ) ) ) ) ) ) | Return Date:  August 18, 2025 |
| Defendants. | ) | |

---

## BRIEF IN SUPPORT OF DEFENDANTS' MOTION PURSUANT TO FED. R. CIV. P. 12(b)(1) AND (6) TO DISMISS PLAINTIFF'S CLASS ACTION COMPLAINT WITH PREJUDICE

---

MATTHEW J. PLATKIN
Attorney General of New Jersey
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 106
Trenton, New Jersey 08625

*Attorney for Defendants*

On the Brief:
  Valerie A. Hamilton
  Deputy Attorney General

**Appx151**

## TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ............................................................................. iii

PRELIMINARY STATEMENT ........................................................................1

PROCEDURAL HISTORY ...............................................................................3

STATEMENT OF FACTS .................................................................................4

    A. New Jersey Unclaimed Property Laws ....................................................4

    B. Plaintiff's Allegations ............................................................................9

LEGAL STANDARD ......................................................................................11

ARGUMENT ..................................................................................................12

POINT I –   PLAINTIFF'S AMENDED COMPLAINT IS BARRED
            BY THE ELEVENTH AMENDMENT AND MUST BE
            DISMISSED…………………………...…………………………...12

POINT II –  PLAINTIFF'S DUE PROCESS CLAIMS MUST BE
            DISMISSED BECAUSE PLAINTIFF LACKS ARTICLE III
            STANDING AND PLAINTIFF'S AMENDED COMPLAINT
            FAILS TO STATE AN ACTIONABLE CLAIM. …..……………...20

        A.    Plaintiff Lacks Article III Standing ....………………………20

            1.    Plaintiff Fails to Allege an "Actual" or "Imminent"
                Injury. .........................................................................20

            2.    Plaintiff Cannot Show Traceability .............................25

        B.    Plaintiff's "As Applied" Claim is Time-Barred ......................27

        C.    Plaintiff Cannot Succeed on His Facial Claim
            Against the Act. …………………….............................. 31

POINT III –    PLAINTIFF'S TAKINGS CLAIM MUST BE
               DISMISSED BECAUSE PLAINTIFF HAS
               ALREADY BEEN PAID ALL SUMS DUE
               ON HIS CLAIM.………….…………..…………….…………33

POINT IV –     THIS COURT SHOULD ABSTAIN FROM
               EXERCISING JURISDICTION AND
               DISMISS THIS CASE………..……………………………… 36

CONCLUSION  .......................................................................................40

**Appx153**

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

All. for Hippocratic Med.,
   602 U.S. 367 (2024) ................................................................................ 23, 27

Armstrong v. United States,
   364 U.S. 40 (1960) ........................................................................................ 34

Ashcroft v. Iqbal,
   556 U.S. 662 (2009) .................................................................................. 11, 17

Bell Atl. Corp. v. Twombly,
   550 U.S. 544 (2007) ........................................................................................ 12

Bethel v. Jendoco Constr. Corp.,
   570 F.2d 1168 (3d Cir. 1978) ......................................................................... 28

Beverly Enters., Inc. v. Trump,
   182 F.3d 183 (3d Cir. 1999) ........................................................................... 10

Blanciak v. Allegheny Ludlum Corp.,
   77 F.3d 690 (3d Cir. 1996) ............................................................................. 15

Burgos v. State,
   222 N.J. 175 (2015) ......................................................................................... 8

Chico Serv. Station, Inc. v. Sol Puerto Rico Ltd.,
   633 F.3d 20 (1st Cir. 2011) ............................................................................ 39

Chiropractic Am. v. LaVecchia,
   180 F.3d 99 (3d Cir. 1999) ........................................................................ 36, 37

Clapper v. Amnesty Int'l USA,
   568 U.S. 398 (2013) ................................................................................ passim

Clymer v. Summit Bancorp,
   171 N.J. 57 (2002) ...................................................................................... 6, 38

Coello v. DiLeo,
   43 F.4th 346 (3d Cir. 2022) ............................................................................ 28

Cordoba v. DIRECTV, LLC,
   942 F.3d 1259 (11th Cir. 2019) ...................................................................... 26

iii

**Appx154**

Dani v. Miller,
   374 P.3d 779 (Okla. 2016) ................................................................... 32

Dillow v. Garity,
   2024 U.S. Dist. LEXIS 80917 (E.D. Pa. May 3, 2024) .................................... 35

Edelman v. Jordan,
   415 U.S. 651 (1974) ............................................................................ 14

Estate of Lagano v. Bergen Cnty. Prosecutor's Office,
   769 F.3d 850 (3d Cir. 2014) ................................................................... 28

Express Travel Related Servs. Co. v. Sidamon-Eristoff,
   755 F. Supp.2d 556 (D.N.J. 2010) ........................................................... 34

FDIC v. Sweeney,
   136 F.3d 216 (1st Cir. 1998) .................................................................. 39

Frasier-Kane v. City of Philadelphia,
   517 F. App'x 104 (3d Cir. 2013) ............................................................. 30

Freeman v. State,
   347 N.J. Super. 11 (App. Div. 2002) ....................................................... 29

Garza v. Woods,
   2023 U.S. Dist. LEXIS 153721 *25 (D. Ariz. Aug. 30, 2023) ........................ 19

Genty v. Resolution Tr. Corp.,
   937 F.2d 899 (3d Cir. 1991) ................................................................... 28

Gerlach v. Rokita,
   95 F.4th 493 (7th Cir. 2024) .................................................................. 19

Gould Elecs., Inc. v. U.S.,
   220 F.3d 169 (3d Cir. 2000) ................................................................... 11

Hafer v. Melo,
   502 U.S. 21 (1991) ............................................................................. 19

Kach v. Hose,
   589 F.3d 626 (3d Cir. 2009) ............................................................ 27, 28

Knick v. Twp. of Scott,
   588 U.S. 180 (2019) ............................................................................ 17

iv

**Appx155**

L.A. v. Lyons,
    461 U.S. 95 (1983) ........................................................................... 21

Laird v. Tatum,
    408 U.S. 1 (1972) ............................................................................. 24

Lapides v. Bd. of Regents,
    535 U.S. 613 (2002) ......................................................................... 13

Light v. Davis,
    No. 23-2785, 2024 U.S. App. LEXIS 23107 (3d Cir. Sept. 11, 2024) ............. 24

Lujan v. Defenders of Wildlife,
    504 U.S. 555 (1992) ......................................................................... 21

MacNamara v. Hess,
    67 Fed. App'x 139 ........................................................................... 27

Montgomery v. De Simone,
    159 F.3d 120 (3d Cir. 1998) ........................................................ 28, 29

Murthy v. Missouri,
    144 S. Ct. 1972 (2024) ..................................................................... 20

N.J. Retail Merchs. Ass'n v. Sidamon-Eristoff,
    669 F.3d 374 (3d Cir.) ................................................................. 6, 13

Narrigan v. Goldberg,
    2025 U.S. Dist. LEXIS 54966 (D. Mass. Mar. 25, 2025) ............................. 17

Nekrilov v. City of Jersey City,
    45 F.4th 662 (3d Cir. 2022) .............................................................. 34

New Orleans Public Service, Inc. v. Council of City of New Orleans,
    491 U.S. 350 (1989) .................................................................... 37, 38

Ostuni v. WaWa's Mart,
    532 F. App'x 110 (3d Cir. 2013) ......................................................... 28

O'Shea v. Littleton,
    414 U.S. 488 (1974) ......................................................................... 21

PennEast Pipeline Co., LLC v. N.J.,
    594 U.S. 482 (2021) ......................................................................... 13

v

**Appx156**

Peters v. Cohen,
  2025 U.S. App. LEXIS 5343 (9th Cir. Mar. 7, 2025) ................................. 25, 35

Plains All Pipeline L.P. v. Cook,
  866 F.3d 534 (3d Cir. 2017) ........................................................................ 20

Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.,
  506 U.S. 139 (1993) ..................................................................................... 17

Quackenbush v. Allstate Ins. Co.,
  517 U.S. 706 (1996) ..................................................................................... 36

Riley v. Simmons,
  45 F.3d 764 (3d Cir. 1995) .......................................................................... 37

Roche v. Aetna, Inc.,
  2023 U.S. Dist. LEXIS 77263 (D.N.J. April 30, 2023) ...................................... 9

Salvato v. Harris,
  Civil Action No. 21-12706, Docs. 84, 85 (D.N.J. Dec. 18, 2023)..................... 33

Sameric Corp. v. City of Phila.,
  142 F.3d 582 (3d Cir. 1998) ........................................................................ 27

Seminole Tribe of Fla. v. Fla. Dep't of Revenue,
  750 F.3d 1238 (11th Cir. 2014) ................................................................... 15

Seven Up Pete Venture v. Schweitzer,
  523 F.3d 948 (9th Cir. 2008) ....................................................................... 18

Sherwin-Williams Co. v. Cnty. of Delaware,
  968 F.3d 264 (3d Cir. 2020) ........................................................................ 23

Standard Oil Co. v. State of N.J., by Parsons,
  341 U.S. 428 (1951) ....................................................................................... 6

State by Richman v. Sperry & Hutchinson Co.,
  23 N.J. 38 (1956) ........................................................................................... 5

State v. Elsinore Shore Assocs.,
  249 N.J. Super. 403 (App. Div. 1991) ............................................................. 5

Suever v. Connell,
  439 F.3d 1142 (9th Cir. 2006) ..................................................................... 15

**Appx157**

Suever v. Connell ("Suever II")
    579 F.3d 1047 (9th Cir. 2009) ........................................................ 16, 35

Susan B. Anthony List v. Driehaus,
    573 U.S. 149 (2014) ............................................................................ 23

Taylor v. Westly,
    402 F.3d 924 (9th Cir. 2005) .............................................................. 18

Texaco, Inc. v. Short,
    454 U.S. 516 (1982) ...................................................................... 32, 35

U.S. v. Kubrick,
    444 U.S. 111 (1979) ...................................................................... 28, 29

U.S. v. Mitchell,
    652 F.3d 387 (3d Cir. 2011) ............................................................... 31

U.S. v. Salerno,
    481 U.S. 739 (1987) ............................................................................ 31

United Servs. Automobile Ass'n v. Muir,
    792 F.2d 356 (3d Cir. 1986) ............................................................... 39

Va. Office for Prot. & Advocacy v. Stewart,
    563 U.S. 247 (2011) ............................................................................ 17

Wallace v. Kato,
    549 U.S. 384 (2017) ............................................................................ 27

Wash. State Grange v. Wash. State Repub. Party,
    522 U.S. 442 (2008) ............................................................................ 31

Waterfront Comm'n of N.Y. Harbor v. Governor of N.J.,
    961 F.3d 234 (3d Cir. 2020) ................................................... 13, 17, 19

Will v. Mich. Dep't of State Police,
    491 U.S. 58 (1989) .............................................................................. 14

Ex parte Young,
    209 U.S. 123 (1908) ..................................................... 13, 16, 17, 18

Zimmerman v. City of Austin,
    881 F.3d 378 (5th Cir. 2018) ............................................................. 26

vii

**Appx158**

**Statutes**

42 U.S.C. § 1983 ............................................................................ 14, 27, 28, 30

N.J.S.A. 2A:14-2 ........................................................................................ 28

N.J.S.A. 46:30B-1 to -109 ........................................................................ 1, 5

N.J.S.A. 46:30B-6(a) .................................................................................. 8

N.J.S.A. 46:30B-6(g) .................................................................................. 5

N.J.S.A. 46:30B-7.1 .............................................................................. 7, 32

N.J.S.A. 46:30B-31 ............................................................................... 7, 22

N.J.S.A. 46:30B-47 ..................................................................................... 6

N.J.S.A. 46:30B-49 ..................................................................................... 6

N.J.S.A. 46:30B-50 ............................................................................ 7, 24, 32

N.J.S.A. 46:30B-51 ............................................................................... 9, 32

N.J.S.A. 46:30B-57 ..................................................................................... 6

N.J.S.A. 46:30B-68 .................................................................................... 33

N.J.S.A. 46:30B-72 .................................................................................... 33

N.J.S.A. 46:30B-74 ............................................................................. 6, 8, 16

N.J.S.A. 46:30B-75 ..................................................................................... 8

N.J.S.A. 46:30B-77 ............................................................................... 7, 24

N.J.S.A. 46:30B-79 ........................................................................... 8, 33, 35

N.J.S.A. 46:30B-80 ..................................................................................... 8

N.J.S.A. 46:30B-84 .................................................................................... 38

**Rules**

Fed. R. Civ. P. 12(b)(1) .................................................................... passim

Fed. R. Civ. P. 12(b)(6) .................................................................... passim

N.J. Ct. Rule 2:4-1(b) ................................................................................ 38

**Appx159**

**Other**

K. Reed Mayo, Virginia's Acquisition of Unclaimed and Abandoned Property, 27 Wm. & Mary L. Rev. 409 (1986) ............................................................. 4, 5

U.S. Const. amend. V ..................................................................... passim

U.S. Const. amend. XI ....................................................................passim

U.S. Const. amend. XIV ................................................................. passim

**Appx160**

## PRELIMINARY STATEMENT

Rene Correa Borquez ("Borquez") was a Chilean man who owned stock in Exxon Mobil. After he died, the stock was presumed abandoned by operation of law and reported to the New Jersey Unclaimed Property Administrator ("UPA") in 2012. Pursuant to New Jersey's Uniform Unclaimed Property Act, N.J.S.A. 46:30B-1 to -109 (the "Act"), the UPA held the stock for one year, and then liquidated it. In November 2023, Jaime Vial ("Vial" or "Plaintiff"), as representative of the heirs of Borquez and indirect representative of Borquez's estate, recovered $487,581.23 in sale proceeds, dividends and interest, but alleges that he is owed additional sums to compensate him for the value of the stock as of the date Plaintiff commenced this action in December 2024.

Plaintiff brings claims against the State Treasurer and the UPA in their official capacities (collectively, the "Defendants"), challenging, facially and as applied, the constitutionality of the Act. Plaintiff alleged the Act affords inadequate notice to foreign property owners, including Borquez's heirs, before and after property is remitted to the UPA, in violation of the Due Process Clause of the Fourteenth Amendment. Plaintiff further alleged that the Act results in a "taking" in violation of the Fifth Amendment when the UPA returns the liquidated value of stock to the owner's heir, rather than the value at which the stock currently trades.

1

**Appx161**

Rather than respond to Defendants' motion to dismiss the original complaint, Plaintiff filed an Amended Class Action Complaint (the "Amended Complaint") that joins Vial as an individual plaintiff in this case based on his recent personal acquisition of Exxon Mobil stock.  In lieu of answer, Defendants now move for an order dismissing the Amended Complaint in its entirety with prejudice, pursuant to Fed. R. Civ. P. 12(b)(1) and (6).

Plaintiff's First Claim for Relief, which alleges that the Act violates the Fourteenth Amendment's Due Process Clause, fails whether it is predicated on Plaintiff's alleged personal property or former estate property.  First, Plaintiff's facial challenge fails because the Act is not unconstitutional in all of its applications (and Plaintiff does not allege that it is).  Second, this Court lacks jurisdiction to determine the Borquez estate's "as applied" challenge to the Act because the statute of limitations on such a claim ran, and it is time-barred.  Further, neither the Borquez estate nor Vial has standing to challenge the Act because neither can demonstrate an actual or imminent injury that is fairly traceable to Defendants' conduct.  Plaintiff has not identified any Borquez estate property that could escheat to the UPA in the future.  And despite purchasing Exxon shares in a post-filing attempt to manufacture jurisdiction, Vial lacks standing because any alleged injury is too speculative, and his claims are unripe.

2

**Appx162**

Plaintiff's Second Claim for Relief challenging the adequacy of the payment made to the Borquez estate on Fifth Amendment grounds must also be dismissed. This is at its core a claim for damages, which is barred by sovereign immunity pursuant to the Eleventh Amendment. Furthermore, applicable case law is clear that Borquez is not entitled to receive <u>more</u> funds than the UPA held for him.

Finally, even if this Court has jurisdiction, the Court should abstain from exercising it in this case to avoid interference with the State's efforts to maintain a comprehensive policy for regulating unclaimed property and in deference to available state-based avenues for pursuing challenges to such policy. For these reasons, each detailed more fully below, Defendants' motion to dismiss Plaintiff's Amended Complaint with prejudice should be granted.

## PROCEDURAL HISTORY

On December 19, 2024, Plaintiff, purporting to act as legal representative of Borquez's heirs and a putative class, filed the original complaint. <u>See</u> Doc. 1. The complaint asserted two causes of action: <u>first</u>, that the Act, facially and as applied to Plaintiff and the putative class, violates the Due Process Clause of the Fourteenth Amendment; and <u>second</u>, that Defendants underpaid Plaintiff's claim for return of property in violation of the Takings Clause of the Fifth Amendment. <u>Ibid.</u> Plaintiff then moved for a temporary restraining order ("TRO") and preliminary injunction.

3

**Appx163**

See Doc. 21. The motion was supported by the Declaration of Jaime Vial ("Vial Decl.") and appended exhibits. See Doc. 21-2.

On February 11, 2025, this court entered a text order denying Plaintiff's request for a TRO. See Doc. 31. By text order dated March 4, 2025, the Court authorized the filing of a motion to dismiss Plaintiff's complaint and established a briefing schedule. See Doc. 39. Plaintiff's request for a preliminary injunction is being held in abeyance pending determination of Defendants' motion to dismiss.

On April 17, 2025, Defendants served Plaintiff with a motion to dismiss the original Complaint. In response, Plaintiff amended the complaint on May 5, 2025. See Doc. 45. By text order dated May 6, 2025, the Court established a briefing schedule for Defendants' motion to dismiss the Amended Complaint. See Doc. 46. Defendants seek dismissal of the Amended Complaint with prejudice.

## STATEMENT OF FACTS

### A. New Jersey Unclaimed Property Laws

A brief history and background of unclaimed property, statutory requirements, and the State's program is helpful to understanding this case. The concept of escheat traces to feudal times in England when title to land reverted to the lord or Crown when a landowner died without heirs. K. Reed Mayo, Virginia's Acquisition of Unclaimed and Abandoned Property, 27 Wm. & Mary L. Rev. 409 (1986). These concepts were exported to the United States and, in the first half of the twentieth

4

**Appx164**

century, many jurisdictions began to escheat personal property in addition to real property.  New Jersey was one of those states.  See State by Richman v. Sperry & Hutchinson Co., 23 N.J. 38, 42 (1956) (noting that L. 1946, c. 155, authorized the escheat of personal property).

Following World War II, the National Conference of Commissioners on Uniform State Laws ("National Conference") drafted the first "model acts" governing the disposition of unclaimed personal property.  27 Wm. & Mary L. Rev. at 417-18.  In 1989, New Jersey adopted the National Conference's 1981 Model Act, which, as amended, is the statute at issue in this case.  N.J.S.A. 46:30B-1 to -109.  In contrast to prior law, the Act provides that title to unclaimed property does not vest in the State, but rather remains vested in the owner, with the State acting as a custodian while holding this property.  As a result, "[t]he question is no longer whether the owner shall forfeit the property to the State as it had been when there was an absolute escheat, but rather whether the State or the holder shall have use of the property until the owner claims it and whether the State or the holder shall enjoy the windfall if the owner never claims it."[1]  State v. Elsinore Shore Assocs., 249 N.J. Super. 403, 406 (App. Div. 1991).

---

[1]  Under the Act, companies and individuals who hold and have an obligation to return another's property are called "holders."  N.J.S.A. 46:30B-6(g).

Under the Act, the State takes custody of unclaimed property (sometimes called "custodial escheat") and may use it for public purposes unless a rightful owner files a properly documented claim.  N.J.S.A. 46:30B-74 (describing UPA's use of unclaimed funds); Standard Oil Co. v. State of N.J., by Parsons, 341 U.S. 428, 436 (1951) (until the owner appears, states may use abandoned property for the "general good"); N.J. Retail Merchs. Ass'n v. Sidamon-Eristoff, 669 F.3d 374, 387 (3d Cir.) (recognizing that state unclaimed property laws "work[] to remedy the 'broad and general social . . . problem' of reuniting abandoned property with its owners"), cert. denied sub nom., Sidamon-Eristoff v. N.J. Food Council, 568 U.S. 978 (2012); Clymer v. Summit Bancorp, 171 N.J. 57, 67 (2002) (noting strong public policy in favor of custodial escheat and legislative intent to permit the State full use of the property while in state custody).

If there has been no communication between the holder and property owner and the property goes unused for a specific "dormancy period," holders are not permitted to retain property which does not belong to them.  Instead, the unused property is "presumed abandoned," and holders annually "report" and "remit" the property to the appropriate State or territory.  N.J.S.A. 46:30B-47 (form and contents of the report); N.J.S.A. 46:30B-49 (reports due November 1 of each year); N.J.S.A. 46:30B-57 (remittance of property).

6

**Appx166**

Stock is generally presumed abandoned after three years of certain triggering events, such as three uncashed dividends, undelivered stock certificates after a merger or split, or with automatic dividend reinvestment plans, after a second mailing is returned undeliverable. N.J.S.A. 46:30B-31. Even if the dormancy period is met, property is not deemed abandoned if the holder has a writing or other contemporaneous record of contact with the owner. N.J.S.A. 46:30B-7.1.

Prior to reporting and remitting property, the holder is obligated by statute to:

> Not more than 120 days nor less than 60 days before filing the report . . . send by certified mail, and with return receipt requested, written notice to the apparent owner at the last known address informing the owner that the holder is in possession of property subject to this chapter if:
>
> a.  The holder has in its records an address for the apparent owner which the holder's records do not disclose to be inaccurate;
> b.  The claim of the apparent owner is not barred by the statute of limitations; and
> c.  The property has a value of $50.00 or more.
>
> [N.J.S.A. 46:30B-50.]

At any time, an owner may file a claim for unclaimed property. N.J.S.A. 46:30B-77. If validated, the claim is approved, and the State must pay or deliver the property, or the net sale proceeds of any property sale (such as shares of stock). N.J.S.A. 46:30B-79. The State also pays interest "for the period during which those monies were in the custody of the administrator" at a rate fixed by the UPA

7

**Appx167**

(historically, the interest paid on the State's cash management fund), permitting the money earned by the State to be paid to the owners.  N.J.S.A. 46:30B-79 and -80.

By statute, all unclaimed funds are held by the Treasurer, acting through the designated administrator.  N.J.S.A. 46:30B-6(a).  Most collected funds are placed in the Unclaimed Personal Property Trust Fund (the "Fund"), with certain limited types placed in other funds, and invested by the Treasurer.  N.J.S.A. 46:30B-74 and -75.

Unclaimed funds held by the Treasurer are not outside the State Treasury.  The Legislature still must appropriate funds necessary to administer the Act and pay claims.  See L. 2024, c. 22 ("[t]here are appropriated, from revenues from escheated property under the various escheat acts, such amounts as may be necessary to administer such acts and such amounts as may be required for refunds"); Burgos v. State, 222 N.J. 175, 183 (2015) (finding that the fiscal pillars of the New Jersey constitution prevent any binding effect of "[e]fforts to dedicate monies through legislative acts other than the annual appropriations act").

To facilitate the reunion of property with its owner, the name and address of the owner of all property valued over $10 is posted to the UPA's searchable website[2] and a national database (MissingMoney.com) and included in the UPA's newspaper

---

[2] https://unclaimedfunds.nj.gov/app/claim-search (last visited June 4, 2025).

**Appx168**

notices.  N.J.S.A. 46:30B-51.  The UPA also hosts various public outreach events to encourage property owners to claim their property.[3]

### B.    Plaintiff's Allegations

Borquez died on May 27, 2006, and left the entirety of his estate to his brother, Hernan Correa Borquez ("Hernan"), who later died testate on December 22, 2007. Doc. 45 ("Am. Compl.") ¶¶ 86-87.  Vial is a citizen and resident of Chile and alleges that he is the legal representative of Hernan's estate, and an indirect representative "through [Hernan], of the estate of Rene Correa Borquez."  Id. at ¶ 84.

The Amended Complaint alleges that, during his lifetime, Borquez purchased 905 shares of Exxon Mobil stock (id. at ¶ 92), and that Borquez's name and address were associated with his accounts (id. at. ¶ 85).  Plaintiff further alleges that neither Borquez nor his heirs received notice that Borquez's property would be remitted to the State.  Id. at ¶¶ 85, 89-91.  Plaintiff asserts that he initiated the claims process to recover Borquez's property in December 2016 (id. at ¶¶ 18, 93; Vial Decl. ¶ 15 and Exh. I), and completed it on November 6, 2023, when the UPA approved the claim. Am. Compl. ¶ 93.[4]  The State paid $487,581.23 to Plaintiff, representing all sums held by the UPA on account of Borquez's Exxon Mobil stock.  Am. Compl. ¶ 94.

---

[3] https://www.nj.gov/treasury/unclaimed-property/pdf/OutreachEvents2025.pdf (last visited June 4, 2025).

[4]  This court may take judicial notice of court dockets and docket entries.  Roche v. Aetna, Inc., No. 1:22-cv-00607-NLH-EAP, 2023 U.S. Dist. LEXIS 77263, *9

9

**Appx169**

The Amended Complaint contains new allegations that Vial, individually, has opened an account at a New Jersey brokerage firm that holds his newly-acquired shares in Exxon Mobil. Id. at ¶¶ 102, 104. Vial alleges that the address on file for his account is in Chile, and that he intends to pursue a buy-and-hold strategy for those shares, "doing nothing with them . . . for years to come." Id. at ¶ 104. Vial further alleges that he does not have automatic reinvestment of dividends earned on the shares, and it is his "current plan" to make no deposits, withdrawals, or asset reallocations in the account for three years. Id. at ¶ 107.

Vial makes two claims for relief. The First Claim for Relief alleges that the Act is unconstitutional both facially and as applied to Plaintiff under the Due Process Clause due to inadequate notice of the custodial escheat of property. Id. at ¶¶ 145-147. Vial alleges the Act does not require individualized notice to property owners outside the United States (id. at ¶¶ 61-63) and does not provide for publication notice outside New Jersey (id. at ¶ 66). Vial also complains that property can be difficult to identify and claim through the UPA's website. Id. at ¶¶ 71-77, 80.

In his Second Claim for Relief, Plaintiff alleges that Borquez's estate received inadequate payment when the State paid its claim, violating the Takings Clause.

---

(D.N.J. April 30, 2023) (citation omitted). Consideration of judicially noticeable facts does not convert a motion to dismiss into a motion for summary judgment. Id. at *8; Beverly Enters., Inc. v. Trump, 182 F.3d 183, 190 n.3 (3d Cir. 1999) (holding that a court may consider "matters of public record" on a motion to dismiss without converting the motion to one for summary judgment).

10

**Appx170**

Am. Compl. ¶¶ 151-163.  Plaintiff demands that Borquez's heirs be put in the same position financially as if Borquez's stock had not been remitted to UPA and liquidated.  Id. at ¶ 157.  Plaintiff further alleges that the failure to pay interest on owners' claims also violates the Takings Clause.  Id. at ¶ 160.

## LEGAL STANDARD

A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) may arise as either a facial challenge to the court's jurisdiction, or a factual challenge.  Gould Elecs., Inc. v. U.S., 220 F.3d 169, 176 (3d Cir. 2000).  A court assessing a facial challenge to its jurisdiction "must only consider the allegations of the complaint and documents referenced therein and attached thereto."  Ibid.  In this matter, Plaintiff fails to demonstrate that this Court has jurisdiction over the controversy because Plaintiff lacks standing and the Eleventh Amendment bars the claims.  Therefore, Plaintiff's claims should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1), with prejudice.

With regard to motions under Rule 12(b)(6), two main principles underlie the analysis.  First, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  Ashcroft v. Iqbal, 556 U.S. 662 (2009).  Instead, legal conclusions "must be supported by factual allegations" in order to be "entitled to the assumption of truth."  Id. at 679.  Second, "only a complaint that states a plausible claim for relief survives a motion to

11

**Appx171**

dismiss." Ibid.; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  A claim is plausible on its face when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678 (citing Twombly, 550 U.S. at 556).

In this case, as set forth below, Plaintiff's facial challenge fails as a matter of law because the Act is not unconstitutional in all its applications.  Plaintiff's "as applied" due process claim is time-barred, and must be dismissed, with prejudice, pursuant to Fed. R. Civ. P. 12(b)(6).  Further, Plaintiff's Amended Complaint fails to state a claim as a matter of law, which is a sufficient and independent grounds for dismissal under Rule 12(b)(6).

## ARGUMENT

### POINT I

**PLAINTIFF'S AMENDED COMPLAINT IS BARRED BY THE ELEVENTH AMENDMENT AND MUST BE DISMISSED.**

This court lacks subject matter jurisdiction over Plaintiff's claims based on Eleventh Amendment sovereign immunity, and the Amended Complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1).  The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI.  Under the Eleventh Amendment, the State is generally immune

12

**Appx172**

from citizen suits in federal court.  Lapides v. Bd. of Regents, 535 U.S. 613, 618 (2002).  The State may be sued in federal court "only in limited circumstances," specifically if: (1) the State "unequivocally expressed" its "consent to suit;" (2) Congress "abrogate[d] state sovereign immunity under the Fourteenth Amendment;" or (3) the State "agreed to suit in the 'plan of the Convention,' which is shorthand for 'the structure of the original Constitution itself.'"  PennEast Pipeline Co., LLC v. N.J., 594 U.S. 482, 500 (2021) (citations omitted).  Finally, under the narrow doctrine of Ex parte Young, 209 U.S. 123 (1908), state officials may be sued in federal court for prospective relief under the "fiction" that their "ongoing violation of federal law" strips them of their "official or representative character" and deprives them "of the State's immunity."  Waterfront Comm'n of N.Y. Harbor v. Governor of N.J., 961 F.3d 234, 238 (3d Cir. 2020) (quotations omitted), cert. denied, 142 S. Ct. 561 (2021).

None of these exceptions to Eleventh Amendment immunity apply here.  As to the first and third exceptions, the State has not consented to this lawsuit, and nothing in the plan of the Convention or structure of the original Constitution suggest that the State has consented to suit in federal court for these alleged constitutional violations.  Plaintiff does not (and could not) cite any waiver by the State of its Eleventh Amendment immunity.  See N.J. Retail Merchs., 669 F.3d at 388 (noting

13

**Appx173**

that sovereign immunity would bar a claim for return of funds if a federal court found a state unclaimed property statute to be unconstitutional).

As to the second exception, Congress has not abrogated the State's sovereign immunity under the Fourteenth Amendment. Plaintiff alleges that this court has jurisdiction over this case under 42 U.S.C. § 1983 (Am. Compl. ¶ 22), but it is well-established that Section 1983 does not authorize damages claims against a State or a State employee sued in their official capacity. See Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989) ("neither a State nor its officials acting in their official capacities are 'persons' under § 1983"). Any damages award against the State Treasurer or UPA acting in their official capacities would be paid out of the State Treasury, and such relief is barred by the Eleventh Amendment. See Edelman v. Jordan, 415 U.S. 651, 677 (1974) ("a federal court's remedial power, consistent with the Eleventh Amendment, . . . may not include a retroactive award which requires the payment of funds from the state treasury").

Here, Plaintiff's demand to be put "in the same position monetarily as they would have occupied" if the property had not been remitted to UPA and liquidated, "including compensation for any appreciation in the value of the property" is, in effect, a claim for damages, notwithstanding Plaintiff's denomination of the relief as "injunctive and equitable" in nature. See Prayer for Relief ¶ D. An injunction directing the payment of money would have the same impact upon the State Treasury

14

**Appx174**

as entry of a judgment for monetary relief.  Both are barred by the Eleventh Amendment.  Blanciak v. Allegheny Ludlum Corp., 77 F.3d 690, 697 (3d Cir. 1996) ("[R]elief that essentially serves to compensate a party injured in the past by the action of a state official, even though styled as something else, is barred by the Eleventh Amendment."); Seminole Tribe of Fla. v. Fla. Dep't of Revenue, 750 F.3d 1238, 1244-45 (11th Cir. 2014) (when prospective relief is the "functional equivalent of money damages," sovereign immunity bars the claim).

In the Amended Complaint, Plaintiff alleges that the Eleventh Amendment does not bar this suit because he and the putative class seek "the return of their own escheated property in the possession of the State." Am. Compl. ¶ 114.  Plaintiff cites Suever v. Connell, 439 F.3d 1142, 1147 (9th Cir. 2006) as support (ibid.), but that case law is inapposite here.  The Amended Complaint identifies no property that UPA is holding for any Plaintiff, including Borquez and Vial, individually.  Further, all of the funds the UPA held on account of Borquez's Exxon Mobil stock were returned to Plaintiff on November 8, 2023, when the State paid over the entire sale proceeds received by the UPA upon sale of Borquez's stock, together with dividends accrued before the stock was sold, and interest earned while Borquez's property was in UPA's custody.  Am. Compl. ¶ 94; Vial Decl. (Doc. 21-2) at Exhs. G and H.  Any additional payment sought by Plaintiff would necessarily have to come from the State Treasury.  Such relief is clearly barred by the Eleventh Amendment.  See

15

**Appx175**

Suever v. Connell ("Suever II"), 579 F.3d 1047, 1059 (9th Cir. 2009) ("state sovereign immunity clearly precludes Plaintiffs from successfully obtaining more than [return of their escheated principal and the sales proceeds therefrom]") (emphasis in original).

Plaintiff also suggests that, rather than making demand on the State Treasury, UPA could simply raid other funds it holds for other property owners. See Am. Compl. ¶ 116 (alleging that the State Treasury is not affected since certain funds are not remitted to the General Fund, but are retained by the Treasurer to pay owner claims). First, as explained above (p. 8), the Fund remains subject to annual appropriation by the Legislature, and thus Plaintiff's characterization is inaccurate. See L. 2024, c. 22. Second, the invasion of funds held for other property owners ultimately would impact the Treasury, since the State would be called upon to expend revenue to make the other owners whole when they filed a claim with the UPA. N.J.S.A. 46:30B-74 (providing for establishment of four trust funds to hold unclaimed property). Here, the UPA has already returned to Plaintiff all monies the UPA held for Borquez, and thus Plaintiff's demand for additional money is barred by the Eleventh Amendment.

Nor can Plaintiff rely on Ex parte Young, 209 U.S. at 159-60, to avoid Defendants' Eleventh Amendment immunity in this case. To fit within the narrow exception of Ex parte Young, a plaintiff must "allege[] an ongoing violation of

16

**Appx176**

federal law and seek[] relief properly characterized as prospective." Va. Office for Prot. & Advocacy v. Stewart, 563 U.S. 247, 255 (2011)(quotation omitted); Waterfront Comm'n, 961 F.3d at 238 (Ex parte Young exception is narrowly construed); Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 146 (1993) (Ex parte Young exception "applies only to prospective relief").

As a matter of law, a Takings Clause claim is not properly asserted against a state official in federal court under the Ex parte Young exception because injunctive relief is only appropriate where monetary damages are inadequate to compensate for an injury. Narrigan v. Goldberg, No. 24-10107, 2025 U.S. Dist. LEXIS 54966, *15 (D. Mass. Mar. 25, 2025). The text of the Takings Clause expressly contemplates an adequate remedy at law in the form of "just compensation." U.S. Const. amend. V. According to the Supreme Court, "[a]s long as just compensation remedies are available—as they have been for nearly 150 years—injunctive relief [on Takings Clause claims] will be foreclosed." Knick v. Twp. of Scott, 588 U.S. 180, 205 (2019); Narrigan, 2025 U.S. Dist. LEXIS 54966 at *11-12.

Furthermore, the Amended Complaint does not allege any facts establishing a non-speculative, plausible claim for prospective relief to the Plaintiff, whether acting as representative of the Borquez heirs or individually. Iqbal, 556 U.S. at 679. Because Borquez is deceased, Plaintiff's allegations necessarily concern past violations (i.e., the alleged failure to provide adequate pre-escheat notice and

17

**Appx177**

inadequate payment when the property was reclaimed) for which Plaintiff seeks retrospective damages (i.e., "fair compensation" equal to "the market value of the stock" so that Plaintiff is "put . . . in the same position monetarily as he would have occupied if the property had not been seized and taken by the State."). Am. Compl. ¶ 148. Such allegations do not state a claim under Ex parte Young. See Seven Up Pete Venture v. Schweitzer, 523 F.3d 948, 956 (9th Cir. 2008) (holding that a claim for damages for the unconstitutional denial of just compensation under the Fifth Amendment cannot qualify as available prospective relief under Ex parte Young, and is therefore barred by the Eleventh Amendment), cert. denied, 555 U.S. 885 (2008); Taylor v. Westly, 402 F.3d 924, 935 (9th Cir. 2005) (finding plaintiffs' claims for compensation for alleged taking did not fall within the Ex parte Young exception to sovereign immunity because "such claims are in practical effect indistinguishable in many aspects from an award of damages against the State," which is prohibited under the Eleventh Amendment). Though there may be circumstances in which a property owner could allege an ongoing violation and seek prospective, non-monetary relief within the narrow doctrine established in Ex parte Young, Plaintiff is not such an owner because he lacks standing for the reasons set forth in Point II.A below.

Finally, the Eleventh Amendment generally prohibits suits in which relief is effectively sought against the State, even if nominally brought against state officials.

18

**Appx178**

Waterfront Comm'n, 961 F.3d at 239; Hafer v. Melo, 502 U.S. 21, 25 (1991) (claims against state officials acting in their official capacity "should be treated as suits against the State."). Plaintiff's Amended Complaint does not plausibly allege facts for which the Borquez estate could assert a due process claim. Borquez is deceased, and as to him, there is no "ongoing" due process violation. The UPA paid Borquez's claim, and the Amended Complaint identifies no other property Borquez owned that may plausibly escheat under the Act. Moreover, Plaintiff's "as applied" due process and takings claims seek retrospective damages for the alleged underpayment of Plaintiff's claim for the value of Borquez's Exxon stock. This court lacks jurisdiction over such damage claims under the Eleventh Amendment, and Plaintiff's Amended Complaint should be dismissed in its entirety. See Gerlach v. Rokita, 95 F.4th 493 (7th Cir. 2024) (affirming dismissal of complaint challenging Indiana's unclaimed property law under Takings Clause due to sovereign immunity); Garza v. Woods, No. CV-22-01310-PHX-JJT, 2023 U.S. Dist. LEXIS 153721 *25 (D. Ariz. Aug. 30, 2023) (holding that, due to Eleventh Amendment immunity, district court lacked jurisdiction over claims seeking money damages arising from state's implementation of unclaimed property laws).

19

**Appx179**

## POINT II

### PLAINTIFF'S DUE PROCESS CLAIMS MUST BE DISMISSED BECAUSE PLAINTIFF LACKS ARTICLE III STANDING AND PLAINTIFF'S AMENDED COMPLAINT FAILS TO STATE AN ACTIONABLE CLAIM.

#### A.   Plaintiff Lacks Article III Standing.

"Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" Murthy v. Missouri, 144 S. Ct. 1972, 1985 (2024). "A proper case or controversy exists only when at least one plaintiff … show[s] that she has suffered, or will suffer, an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" Id. at 1985-86 (quoting Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013)).  Plaintiff "bears the burden of establishing these elements." Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).  He cannot do so.  Plaintiff cannot show standing because he has not pleaded fact demonstrating an "actual" or "imminent" injury, and he cannot establish traceability.  To the extent Plaintiff relies on events he fears might come to pass, his claims are purely speculative.

#### 1.   Plaintiff Fails to Allege an "Actual" or "Imminent" Injury.

To establish Article III standing, a plaintiff must show "actual or imminent" injury.  Clapper, 568 U.S. at 409; Plains All Pipeline L.P. v. Cook, 866 F.3d 534, 541 (3d Cir. 2017) (plaintiff must demonstrate "a substantial threat of real harm").  "Although imminence is concededly a somewhat elastic concept, it cannot be

20

stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is <u>certainly</u> impending." <u>Lujan</u>, 504 U.S. at 565 n.2 (internal quotation marks omitted) (emphasis in original). Allegations of <u>possible</u> future injury are insufficient to constitute injury in fact. <u>Clapper</u>, 568 U.S. at 409. "Past wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy." <u>L.A. v. Lyons</u>, 461 U.S. 95, 103 (1983). A plaintiff must show "a sufficient likelihood that he will again be wronged in a similar way." <u>Id.</u> at 111; <u>O'Shea v. Littleton</u>, 414 U.S. 488, 496 (1974) (plaintiff must establish a "real and immediate threat of repeated injury").

In this case, Plaintiff's Amended Complaint must be dismissed because the Borquez estate and Vial lack an actual or imminent injury. Following Vial's claim for all property belonging to Borquez in UPA's custody, the UPA paid the Borquez estate nearly $500,000, consisting of sale proceeds, dividends, and interest accrued while Borquez's property was in the UPA's custody. The Amended Complaint identifies no other Estate property that could potentially escheat to the UPA in the future. Plaintiff has failed to allege any actual or imminent harm that may befall the Borquez estate. Therefore, Plaintiff lacks standing to sue in his capacity as representative of the Borquez heirs.

**Appx181**

Vial similarly lacks standing to sue in his individual capacity. Vial claims to have opened a personal brokerage account at TradeUp Securities, in which he holds Exxon Mobil shares.[5] Am. Compl. ¶¶ 20, 102, and 104. He alleges that the address on file for his brokerage account is in Chile, and that he intends to "pursue a buy-and-hold strategy regarding these stocks, meaning he plans to do nothing else with them or the brokerage account, . . . including by allowing any dividends to accrue in the account without re-investing them (automatically or otherwise)." Id. at ¶ 20. He alleges that it is his "current plan" to make no deposits, withdrawals, or asset reallocations in the brokerage account for three years. Id. at ¶ 107. Vial alleges that, if he follows this plan, "it is certain that Plaintiff's shares would escheat to New Jersey." Am. Compl. ¶ 107.

Stock is generally presumed abandoned three years after certain triggering events, such as three uncashed dividends, undelivered stock certificates after a merger or split, or with automatic dividend reinvestment plans, after a second mailing is returned undeliverable. N.J.S.A. 46:30B-31. Plaintiff's investment plan would not result in uncashed dividends. He alleges the dividends would accrue in the account. Am. Compl. ¶ 20. If Vial provides TradeUp with his correct address, no statements or other mail from TradeUp will be returned undeliverable. Dividends

---

[5] Notably, Plaintiff's new factual allegations only came after Defendants raised standing problems with Plaintiff's original complaint.

will accrue as cash in Vial's TradeUp account.  Vial's decision not to reinvest dividends would not, in itself, result in escheat of Vial's shares.

Any possibility that Vial's Exxon shares could escheat to the UPA in the future is too speculative and remote to confer standing.  Plaintiff's individual challenge to the Act must be dismissed because his claims are unripe, he has suffered no injury-in-fact, and the court therefore lacks Article III jurisdiction.  See Susan B. Anthony List v. Driehaus, 573 U.S. 149, 157 n.5 (2014) ("The doctrines of standing and ripeness 'originate' from the same Article III limitation," and in this case "boil down to the same question.").  To satisfy Article III's injury-in-fact requirement, a claimed injury "must be actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon."  All. for Hippocratic Med., 602 U.S. 367, 381 (2024); see also Sherwin-Williams Co. v. Cnty. of Delaware, 968 F.3d 264, 269 (3d Cir. 2020) ("Allegations of possible future injury do not satisfy the requirements of Art. III.  A threatened injury must be 'certainly impending' to constitute injury in fact." (citation omitted)).

In this case, Plaintiff's individual claims are premised upon the speculative fear that his stock may someday be delivered into the UPA's custody.  Plaintiff alleges that he monitors his property continuously to ensure that it is not deemed abandoned and remitted to the UPA, and that the Act deters him from acquiring property in the United States.  Am. Compl. ¶¶ 111-112.  These allegations do not

23

**Appx183**

articulate an injury-in-fact and are too speculative to confer Article III standing. Laird v. Tatum, 408 U.S. 1, 13-14 (1972) ("Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm"); Light v. Davis, No. 23-2785, 2024 U.S. App. LEXIS 23107, *2 (3d Cir. Sept. 11, 2024) (vacating district court order for lack of jurisdiction because appellant's claims challenging state's unclaimed property statute were unripe because harm would only come after multiple contingencies occurred, including that plaintiff would actually make a claim to the property).

Plaintiff's individual claim depends upon several highly speculative events. They include the fact that Plaintiff must not deviate from his "current" investment plan for at least three years. He must fail to act upon pre-escheat notices provided by TradeUp—including additional notifications not mandated by the Act, but which TradeUp may provide to Vial. N.J.S.A. 46:30B-50. Vial's stock must actually be reported and remitted to UPA, Vial must fail to claim the property within one year of escheat (which would allow him to recover his stock before liquidation), and Vial must then demonstrate that such remittance injured him in a concrete way. N.J.S.A. 46:30B-77.

Plaintiff's current stock ownership does not even come close to establishing standing given the number of events that must occur before Plaintiff could sustain any injury and the fact that Plaintiff may easily prevent escheat (e.g., by writing a

24

**Appx184**

letter to the holder every 3 years, as Plaintiff concedes in Paragraph 35 of the Amended Complaint).  Clapper, 568 U.S. at 409 ("[W]e have repeatedly reiterated that "threatened injury must be certainly impending to constitute injury in fact," and that "[a]llegations of possible future injury" are not sufficient [to confer standing].") (emphasis in original); Peters v. Cohen, No. 24-1040, 2025 U.S. App. LEXIS 5343, *2-3 (9th Cir. Mar. 7, 2025) (concern over the possibility the Controller may seek to reach stocks located in his German brokerage account is too speculative to confer standing).  Plaintiff's argument presents an overly expansive for Article III standing. Under Plaintiff's logic, every foreign owner of any property located in New Jersey would have standing from the moment of purchase.

The Amended Complaint should be dismissed under Rule 12(b)(1) because Plaintiff has failed to allege an "actual" or "imminent" injury, and therefore he lacks standing to challenge the Act.

### 2.      Plaintiff Cannot Show Traceability.

To satisfy the traceability element of standing, a plaintiff must establish that his injury "likely was caused . . . by the defendant's conduct."  All for Hippocratic Med., 602 U.S. at 382.  This requirement "is central to Article III standing," id. at 383, and ensures that Plaintiff "cannot manufacture standing merely by inflicting harm on themselves" and then blaming the government. Clapper, 568 U.S. at 416. Such "self-inflicted" injuries are insufficient to satisfy Article III.  Id. at 418.

25

**Appx185**

Claims often fail based on a plaintiff's failure to take simple action to avoid a result they seek to challenge. Take a well-known example: unwanted telemarketing calls. Consumers are entitled to protection from these calls, but they have to do something first: request to be placed on the do-not call registry. If a consumer fails to do that, he cannot blame the telemarketer—the alleged injury is traceable to his own omission, not the telemarketer's action. Cordoba v. DIRECTV, LLC, 942 F.3d 1259, 1271-72 (11th Cir. 2019); see, e.g., Zimmerman v. City of Austin, 881 F.3d 378 (5th Cir. 2018) (plaintiff did not have standing to challenge campaign financing law because his injury was self-inflicted; he could have simply not accepted donations that put him over the limit). Just as a consumer could not neglect taking basic steps to avoid injury and then blame the telemarketer, a property owner who can easily avoid escheat of property (e.g., by simply logging into the brokerage account) cannot properly fault the escheat statute. Lack of traceability is readily apparent from the face of the Amended Complaint, when Plaintiff acknowledges that escheat may be prevented simply by making any written communication with the holder once every three years. Am. Compl. ¶ 35.

Here, even if Vial's planned investment strategy could result in escheat of his property, any harm sustained by him would be self-inflicted and thus preclude him from invoking Article III jurisdiction. Vial has voluntarily chosen an investment strategy and dedicated himself to act in ways he believes will cause him harm and

26

**Appx186**

provide him with the desired standing to challenge the Act.  Am. Compl. ¶¶ 20, 104, and 107.  But any harm suffered would be self-inflicted and thus preclude him from invoking Article III jurisdiction.  See Clapper, 568 U.S. at 418.

The traceability requirement is not a mere technicality.  It serves an important purpose, by "screening out" plaintiffs who would like to litigate against the government because they have a "strong moral, ideological, or policy objection to" what the government is doing, but are not actually suffering any injury traceable to government action.  All. for Hippocratic Med., 602 U.S. at 382-83.  Because Vial has tried to manufacture standing by manipulating and changing the original facts, any injury sustained arises from that conduct is not traceable to Defendants.  Vial's due process claims must be dismissed pursuant to Rule 12(b)(1).

**B.     Plaintiff's "As Applied" Claim is Time-Barred.**

Plaintiff's procedural due process claim is barred by the statute of limitations and must be dismissed.  "It is well established that the states' statutes of limitations for personal injury actions apply to all actions brought under Section 1983." MacNamara v. Hess, 67 Fed. App'x 139, 143 (3d Cir. 2003) (citing Sameric Corp. v. City of Phila., 142 F.3d 582, 599 (3d Cir. 1998)); Wallace v. Kato, 549 U.S. 384, 387-88 (2017) (holding federal law governs when § 1983 claim accrues, while state law governs the limitations period); Kach v. Hose, 589 F.3d 626, 634 (3d Cir. 2009) (limitations period for a § 1983 claim is "governed by the personal injury tort law of

27

the state where the cause of action arose."). New Jersey law provides a two-year statute of limitations for personal injury actions. N.J.S.A. 2A:14-2; Coello v. DiLeo, 43 F.4th 346, 352 (3d Cir. 2022) (applying New Jersey's two-year statute of limitations to § 1983 claim); Estate of Lagano v. Bergen Cnty. Prosecutor's Office, 769 F.3d 850, 859-60 (3d Cir. 2014) (dismissing § 1983 claim for alleged Fourth Amendment violation because two-year limitations period began to run when plaintiff first knew of search and seizure).

Claims not filed within the limitations period must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim. Ostuni v. WaWa's Mart, 532 F. App'x 110, 111-12 (3d Cir. 2013); Bethel v. Jendoco Constr. Corp., 570 F.2d 1168, 1174 (3d Cir. 1978) (defendant's motion to dismiss may be granted where "the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations").

Under federal law, a claim accrues when a plaintiff "knows or has reason to know of the injury which is the basis of the section 1983 action." Montgomery v. De Simone, 159 F.3d 120, 126 (3d Cir. 1998), citing Genty v. Resolution Tr. Corp., 937 F.2d 899, 919 (3d Cir. 1991); Kach, 589 F.3d at 634 (§ 1983 claim accrues when a "reasonable person should have known" of an injury). Accrual of a claim is not dependent upon whether the plaintiff knows of his legal right to sue. U.S. v. Kubrick, 444 U.S. 111, 122 (1979). Rather, it is sufficient that a plaintiff is aware

**Appx188**

that he has been injured and who has inflicted the alleged injury.  Ibid.  Nor does a plaintiff's ignorance of his legal rights toll the limitations period.  Freeman v. State, 347 N.J. Super. 11, 22 (App. Div. 2002); Montgomery, 159 F.3d at 126 (rejecting argument that claims for false arrest and false imprisonment did not accrue until plaintiff's criminal charges were resolved in her favor because plaintiff reasonably knew of injury at time of arrest).  "A claimant 'armed with the facts about the harm done to him can protect himself by seeking advice.'"  Freeman, 347 N.J. Super. at 22 (quoting Kubrick, 444 U.S. at 123).

In this case, Vial claims his due process rights under the Fourteenth Amendment were violated when he and the other heirs of Borquez were not provided pre-escheat notice that Borquez's stock was to be remitted to the UPA.  Am. Compl. ¶ 89.  Vial avers that he first sought recovery of Borquez's property by making inquiry through MissingMoney.com on December 15, 2016.  Id. at ¶ 18; Vial Decl. (Doc. 21-2) at Exh. I (email confirmation of claim); see also Vial Decl. ¶ 12 (describing consultation with attorney in 2016); id. at ¶ 15 (describing attempt to reclaim property in December 2016); id. at ¶ 16 (averring that Vial communicated with the UPA "for years" regarding Borquez's property).  Thus, in December 2016, Vial knew or should have known that the State was holding Borquez's property and that he and other heirs allegedly had not received prior notice of its remittance. Accordingly, the two-year limitations period for asserting a due process claim under

29

**Appx189**

§ 1983 expired, at the latest, two years after Vial's MissingMoney.com inquiry—on December 15, 2018. Yet, it was not until December 2024–six years later—that Vial commenced this action alleging a due process violation for lack of notice. Vial's complaint was filed six years too late, and therefore, must be dismissed.

Plaintiff's allegation that the limitations period should be tolled during the period in which he communicated with the UPA regarding Borquez's property until receipt of payment on the claim (Am. Compl. ¶¶ 123-125) is without merit. Equitable tolling is an extraordinary remedy applied sparingly and only in rare situations. Frasier-Kane v. City of Philadelphia, 517 F. App'x 104, 106 (3d Cir. 2013). Under federal law, equitable tolling has been recognized in three circumstances: (i) when the defendant actively misleads the plaintiff about the cause of action; (ii) when extraordinary circumstances prevent the plaintiff from asserting the claim; or (iii) when the plaintiff timely files in the wrong forum. Ibid. Plaintiff does not meet any of these stringent requirements for tolling. Plaintiff has not pled any facts suggesting that the UPA induced or tricked him or otherwise prevented from asserting his rights, or that Plaintiff timely asserted his rights in the wrong forum. Plaintiff consulted with legal counsel and filed a claim on MissingMoney.com in December 2016. Plaintiff's claims regarding Borquez's property are clearly time-barred. The applicable two-year statute of limitations expired no later than December 15, 2018, and Plaintiff has not pleaded any valid

30

**Appx190**

basis for equitable tolling. Since the statute of limitations defense is readily apparent from Plaintiff's pleadings, Plaintiff's due process claim should be dismissed, with prejudice, pursuant to Fed. R. Civ. P. 12(b)(6).

### C.    Plaintiff Cannot Succeed on His Facial Claim Against the Act.

Even if Plaintiff had standing to challenge the Act (he does not) and even if his claims were not time barred (they are), Plaintiff's facial challenge to the Act fails. A facial challenge to a statute is the most difficult challenge to assert successfully. See U.S. v. Mitchell, 652 F.3d 387, 405 (3d Cir. 2011) (citing U.S. v. Salerno, 481 U.S. 739, 745 (1987)). It requires Plaintiff to establish that no set of circumstances exists under which the statutory provision would be valid. Ibid. Plaintiff, therefore, must show that the Act "is unconstitutional in all of its applications." Ibid. (quoting Wash. State Grange v. Wash. State Repub. Party, 522 U.S. 442, 449 (2008)). Plaintiff does not and cannot make such a showing.

First, Plaintiff's facial challenge to the Act fails because Plaintiff does not allege that the Act is unconstitutional in all instances. Plaintiff's only allegation about the purported facial unconstitutionality of the Act is contained in Paragraph 145 of the Amended Complaint. It alleges the Act is "facially unconstitutional with respect to the category of persons (like Plaintiff) who receive no notice prior to the seizure of their property." Am. Compl. ¶ 145 (emphasis added).

31

**Appx191**

Second, the Act provides for notice to property owners. The Act's statutory scheme is straightforward. The Act requires holders to mail notice to property owners at the last known address prior to custodial escheat for all property valued over $50. N.J.S.A. 46:30B-50. Absent a response, the holder reports and remits such property to the UPA. N.J.S.A. 46:30B-7.1. Upon remittance, the UPA posts owner information for all property valued over $10 on the UPA's searchable website and a national database (MissingMoney.com) and publishes notices in newspapers in accordance with the Act. N.J.S.A. 46:30B-51. These procedures satisfy due process. As the Supreme Court stated in Texaco, Inc. v. Short:

> It has long been established that "laws [must] give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly," . . , but it has never been suggested that each citizen must in some way be given specific notice of the impact of a new statute on his property before that law may affect his property rights.
>
> [454 U.S. 516, 535-36 (1982) (internal citation omitted).]

There, the Supreme Court rejected a requirement for direct, individualized notice when property was to permanently lapse and revert to the State.

The Act provides for individualized notice to be provided by the holder prior to remittance to the custodial escheat of the UPA. It further provides for publication notice and listing of property upon the UPA's website. Courts in this jurisdiction and elsewhere have held that unclaimed property laws satisfy the Constitution's due process requirements. See Dani v. Miller, 374 P.3d 779, 794 (Okla. 2016)

32

**Appx192**

(determining that Uniform Unclaimed Property Act as enacted by Oklahoma to be consistent with due process); <u>Salvato v. Harris</u>, Civil Action No. 21-12706, Docs. 84 and 85 (D.N.J. Dec. 18, 2023) (opinion and order granting summary judgment to UPA on as applied due process claim).  Stock owners also have the ability to obtain the relief sought by the Plaintiff (<u>e.g.</u>, return of the stock) if the owner files a claim within the statutorily prescribed time period prior to sale.  N.J.S.A. 46:30B-72 (providing for Administrator to hold stock for one year before sale).  And, even if the owner does not file a claim prior to sale, he can still obtain the value of the stock as of the time it was sold by the UPA, including pre-sale dividends (N.J.S.A. 46:30B-68) and interest upon the monies held in the UPA's custody (N.J.S.A. 46:30B-79).  Plaintiff cannot demonstrate that the Act is unconstitutional in all of its applications.  Therefore, Plaintiff's due process claim should be dismissed with prejudice.

<b>POINT III</b>

**PLAINTIFF'S TAKINGS CLAIM MUST BE DISMISSED BECAUSE PLAINTIFF HAS ALREADY BEEN PAID ALL SUMS DUE ON HIS CLAIM.**

In the Second Claim for Relief, Plaintiff alleges Defendants violated the Takings Clause of the Fifth Amendment when paying Plaintiff's claim for recovery of funds held by the UPA for Borquez.  Plaintiff's claim fails as a matter of law and must be dismissed under Rule 12(b)(6).

33

<b>Appx193</b>

The Takings Clause provides that "private property [shall not] be taken for public use, without just compensation."  U.S. Const. amend. V.  The purpose of the Takings Clause is to uphold the principle that the government should not single out isolated individuals to bear excessive burdens, even in support of an important public good.  When this happens, the payment of "just compensation" provides a means of removing any special burden.  Thus, in <u>Armstrong v. United States</u>, 364 U.S. 40, 49 *(1960)*, the Supreme Court wrote the Takings Clause "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."

"To succeed on a takings claim, a plaintiff must demonstrate that the state's action affected its 'legally cognizable property interest.'"  <u>Express Travel Related Servs. Co. v. Sidamon-Eristoff</u>, 755 F. Supp.2d 556, 577 (D.N.J. 2010); <u>see also</u> <u>Nekrilov v. City of Jersey City</u>, 45 F.4th 662, 669 (3d Cir. 2022) ("A threshold determination in any takings case is whether the plaintiff has asserted a legally cognizable property interest.").  Plaintiff cannot make this showing.

On November 8, 2023, the State paid $487,581.23 to Plaintiff, representing all of the money held on account of Borquez's Exxon Mobil stock, including dividends and interest.  Nevertheless, Plaintiff seeks additional sums so that he will be in the same monetary position as he would have occupied if the property had not been remitted to the State.  Am. Compl. ¶ 157.  Case law is clear that Plaintiff has

34

**Appx194**

no cognizable property interest in the value that Borquez's stock would otherwise have been worth if it had not been abandoned by Borquez and escheated to the State. See Suever II, 579 F.3d at 1060 (declaring that "plaintiffs are not entitled to recover anything beyond the actual cash proceeds that the Controller realized upon liquidating their non-cash escheated  property."); Peters, 2025 U.S. App. LEXIS 5343, at *3-4 (seeking "the difference between the current market value of his escheated stock and the price at which it was sold in 2018 . . . is plainly foreclosed under our precedent"); Dillow v. Garity, No. CV 22-1852, 2024 U.S. Dist. LEXIS 80917, *16 (E.D. Pa. May 3, 2024) ("it does not make sense to require the government to be financially liable for this intervening period before an owner comes forward to claim his property" because, under Texaco, the government need not "compensate the owner for the consequences of his own neglect.").

Similarly, Plaintiff's allegation that "Defendants fail to pay interest" to property owners for the time that such owner's property is in UPA's custody also fails as a matter of law.  The Act expressly provides for the payment of interest to property owners who claim their property from the UPA.  See N.J.S.A. 46:30B-79 ("At the time a claim is allowed, the administrator shall pay to the claimant interest upon the monies of the claimant for the period during which those monies were in the custody of the administrator.").  The Amended Complaint even cites to the applicable statutory provision, then inexplicably alleges Defendants fail to pay

35

**Appx195**

interest.  Compare Am. Compl. ¶¶ 48 and 160.  Plaintiff received over $52,000 in interest when the UPA paid the Borquez estate's claim.  Compare Vial Decl., Exh. G (valuing Borquez's property at $434,435.02) with Vial Decl., Exh. H (check paid to Plaintiff, in the amount of $487,054.84).  Therefore, Plaintiff's Second Claim for Relief must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim.

**POINT IV**

**THIS COURT SHOULD ABSTAIN FROM EXERCISING JURISDICTION AND DISMISS THIS CASE.**

Under the doctrine of Burford abstention, a district court should decline to exercise jurisdiction when doing so would "clearly serve an important countervailing interest." Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 716 (1996) (summarizing the various abstention doctrines).  Like other abstention doctrines, the Burford exception "come[s] within the rubric of comity, or the idea 'that certain matters are of state concern to the point where federal courts should hesitate to intrude; and they may also concern judicial 'economy,' the notion that courts should avoid making duplicate efforts or unnecessarily deciding difficult questions." Chiropractic Am. v. LaVecchia, 180 F.3d 99, 103 (3d Cir. 1999) (affirming a District Court abstention and dismissal of federal constitutional challenges to state law).  The Burford abstention doctrine provides:

36

**Appx196**

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.
>
> [New Orleans Public Service, Inc. v. Council of City of New Orleans ("NOPSI"), 491 U.S. 350, 361 (1989) (internal citations and quotations omitted).]

Burford abstention "calls for a two-step analysis." Riley v. Simmons, 45 F.3d 764, 771 (3d Cir. 1995) (citing NOPSI). The first step asks whether "timely and adequate state-court review" is available. Ibid. The second step requires a court to examine: "(1) whether the particular regulatory scheme involves a matter of substantial public concern; (2) whether it is the sort of complex technical regulatory scheme to which the Burford abstention doctrine usually is applied; and (3) whether federal review of a party's claims would interfere with the state's efforts to establish and maintain a coherent regulatory policy." Chiropractic Am., 180 F.3d at 105 (citations and quotations omitted). Abstention, and thus dismissal, is appropriate because all Burford factors are present here.

First, New Jersey statutes provide both state administrative and judicial paths for redress for any dispute regarding Borquez's unclaimed property. The Act and New Jersey Court Rules establish the means and time period within which an

**Appx197**

aggrieved party may appeal the UPA's determination.  N.J.S.A. 46:30B-84 ("A person whose claim has been denied by the administrator in whole or in part may appeal the final decision to the Appellate Division of the Superior Court of New Jersey"); N.J. Court Rule 2:4-1(b) (providing for 45-day period to appeal).  Despite clear available procedures, Vial chose to ignore this path.

Second, regulating unclaimed property has long been considered an area decidedly within state control and of local concern.  The Act "bear[s] on policy problems of substantial public import whose importance transcends the result in the case [now] at bar[.]"  NOPSI, 491 U.S. at 361.  The Legislature has expressed its policy choice that property that appears to be abandoned or unclaimed by its owner after a defined dormancy period should not sit forever on the books of private holders that are closed to the public, but should be reported and transferred to the State's custody.  See Clymer, 171 N.J. at 67 (noting strong public policy favoring custodial escheat and legislative intent to permit the State full use of the property in State custody).

Plaintiff's own allegations show why this suit bears on important policy matters that "transcend[ ] the result" in this particular case.  NOPSI, 491 U.S. at 361.  The relief sought by Plaintiff would affect the unclaimed property of "more than 1,000 persons" (Am. Compl. ¶ 131) both in and outside New Jersey, with an interest in an alleged $6 billion (id. at ¶ 6), which greatly exceeds the small sums of property

retained by the UPA. By seeking injunctive relief that requires return of property, interest, and appreciation in value (Prayer for Relief ¶ D), Plaintiff asks the court to effectively assume the UPA's duty of reuniting unclaimed property with its rightful owners, which necessarily would require it to establish and administer a claims process for determining whether each putative class member is, in fact, the actual owner of the property.

Third, federal court review of Plaintiff's claims would interfere with the State's efforts to establish and maintain a coherent regulatory policy. Federal review would undermine the State's administrative process by replacing the UPA with the district court as the arbiter in thousands of class member claims and the distribution of an alleged $6 billion in unclaimed property held in the State treasury. See FDIC v. Sweeney, 136 F.3d 216, 219 (1st Cir. 1998) (noting that the Burford doctrine avoids the "danger" of differing decisions by "state officials and judges or by federal judges"); Chico Serv. Station, Inc. v. Sol Puerto Rico Ltd., 633 F.3d 20, 29 (1st Cir. 2011) (noting that Burford abstention is appropriate where "federal review risks having the district court become the regulatory decision-making center") (quotations omitted).

Further, this case thus involves more than "merely . . . reading and construing a statute," and therefore abstention is appropriate. United Servs. Automobile Ass'n v. Muir, 792 F.2d 356, 365 (3d Cir. 1986). The Court should abstain from hearing

39

**Appx199**

this matter under the <u>Burford</u> doctrine and dismiss the litigation on jurisdictional grounds pursuant to Rule 12(b)(1).

## CONCLUSION

For the reasons above, Defendants request that the Court grant the within motion and dismiss Plaintiff's Amended Complaint, in its entirety, with prejudice.

Respectfully submitted,

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY


By: /s/ Valerie A. Hamilton
Valerie A. Hamilton (#018201995)
Deputy Attorney General

Dated:  June 4, 2025

**Appx200**

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 106
Trenton, New Jersey 08625

*Attorney for Elizabeth Maher Muoio,*
*Treasurer of the State of New Jersey,*
*and Steven Harris, Administrator of*
*the New Jersey Unclaimed Property*
*Administration*

By:   Valerie A. Hamilton
      Deputy Attorney General
      NJ Bar ID No. 018201995
      (609) 376-3256
      Valerie.Hamilton@law.njoag.gov

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ESTATE OF RENE CORREA BORQUEZ, Jaime Vial, representative of the heirs of Rene Correa Borquez and on behalf of those similarly situated, | Hon. Robert Kirsch, U.S.D.J. Hon. J. Brendan Day, U.S.M.J. |
| Plaintiff, | Case No. 3:24-cv-11301-RK-JBD |
| v. | |
| ELIZABETH MAHER MUOIO, in her official capacity as Treasurer of the State of New Jersey; STEVEN HARRIS, in his official capacity as Administrator of the State of New Jersey Unclaimed Property Administration; and KELMAR ASSOCIATES, LLC. | Return Date: August 18, 2025 **ORDER GRANTING DEFENDANTS' MOTION PURSUANT TO FED. R. CIV. P. 12(b)(1) AND (6) TO DISMISS THE AMENDED COMPLAINT** |
| Defendants. | **WITH PREJUDICE** |

**Appx201**

This matter having come before the Court on Notice of Motion filed by Matthew J. Platkin, Attorney General of New Jersey (Valerie Hamilton, Deputy Attorney General, appearing) on behalf of Defendants, Elizabeth Maher Muoio, in her official capacity as Treasurer of the State of New Jersey, and Steven Harris, in his official capacity as Administrator of the State of New Jersey Unclaimed Property Administration (collectively, "Defendants"), for an order dismissing Plaintiff's Amended Complaint with prejudice; and notice having been given to all parties, and in consideration of the submissions and for good cause shown,

IT IS on this _____ day of _____, 2025,

HEREBY ORDERED as follows:

1.    Defendants' motion to dismiss the Amended Complaint for lack of subject matter jurisdiction and failure to state a claim is GRANTED.

2.    Plaintiff's Amended Complaint is DISMISSED WITH PREJUDICE.

3.    This Order shall be served on all parties via ECF.

_____
HON. ROBERT KIRSCH, U.S.D.J.

**Appx202**

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 106
Trenton, New Jersey 08625

*Attorney for Elizabeth Maher Muoio,*
*Treasurer of the State of New Jersey,*
*and Steven Harris, Administrator of*
*the New Jersey Unclaimed Property*
*Administration*

By:    Valerie A. Hamilton
       Deputy Attorney General
       NJ Bar ID No. 018201995
       (609) 376-3256
       Valerie.Hamilton@law.njoag.gov

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ESTATE OF RENE CORREA BORQUEZ, Jaime Vial, representative of the heirs of Rene Correa Borquez and on behalf of those similarly situated, | Hon. Robert Kirsch, U.S.D.J. Hon. J. Brendan Day, U.S.M.J. |
| Plaintiff, | Case No. 3:24-cv-11301-RK-JBD |
| v. | |
| ELIZABETH MAHER MUOIO, in her official capacity as Treasurer of the State of New Jersey; STEVEN HARRIS, in his official capacity as Administrator of the State of New Jersey Unclaimed Property Administration; and KELMAR ASSOCIATES, LLC. | Return Date: August 18, 2025 **CERTIFICATION OF SERVICE OF DEFENDANTS' MOTION PURSUANT TO FED. R. CIV. P. 12(b)(1) AND (6) TO DISMISS THE AMENDED COMPLAINT WITH PREJUDICE** |
| Defendants. | |

**Appx203**

VALERIE HAMILTON, of full age, hereby certifies as follows:

1.    I am employed as a Deputy Attorney General with the State of New Jersey's Department of Law and Public Safety, Division of Law.  I am assigned to represent Defendants, Elizabeth Maher Muoio, in her official capacity as Treasurer of the State of New Jersey, and Steven Harris, in his official capacity as Administrator of the State of New Jersey Unclaimed Property Administration (the "Defendants"), in this matter.

2.    I hereby certify that on June 4, 2025, I caused the Notice of Motion to Dismiss, Brief in Support thereof, proposed Order, and this Certification of Service, prepared on behalf of the Defendants, to be served by First Class Mail, postage prepaid, and by electronic mail, upon the following:

> Kevin P. Roddy, Esq.
> Kseniya Lezhnev, Esq.
> Wilentz, Goldman & Spitzer, P.A.
> 90 Woodbridge Center Dr., Box 10
> Woodbridge, NJ 07095
> E: kroddy@wilentz.com
>    klezhnev@wilentz.com
> *Attorney for Plaintiff*

> William Palmer, Esq.
> Palmer Law Group
> 2443 Fair Oaks Blvd, No. 545
> Sacramento, CA 05825
> E: wpalmer@palmercorp.com
> *Attorney for Plaintiff*

**Appx204**

Jonathan Massey, Esq.
Bret R. Vallacher, Esq.
Matthew E. Layden, Esq.
Massey & Gail, LLP
1000 Maine Avenue, SW
Suite 450
Washington, DC 20024
E:  jmassey@masseygail.com
    bvallacher@masseygail.com
    mlayden@masseygail.com
*Attorney for Plaintiff*

3.     I certify that the foregoing statements made by me are true.  I am

aware that if any of the foregoing statements made by me are willfully false, I am

subject to punishment.

 /s/ Valerie A. Hamilton
Valerie A. Hamilton
Deputy Attorney General
New Jersey Bar ID # 018201995

Dated:  June 4, 2025

3

**Appx205**



**KEVIN P. RODDY, ESQ.**

T: 732.855.6402
F: 732.726.6686
kroddy@wilentz.com

90 Woodbridge Center Drive
Suite 900 Box 10
Woodbridge, NJ 07095-0958
732.636.8000

July 7, 2025

<u>**Via Electronic Mail**</u>

Valerie Hamilton, Esq.
Deputy Attorney General
State of New Jersey – Office of the Attorney General
25 Market Street
Trenton, NJ 08625-0106

      Re:        *Vial v. Muoio,* Case No. 3:24-cv-11301-RK-JBD (D/N.J.)

Dear Valerie:

      In accordance with the procedures specified by Judge Kirsch in his Text Order dated May 6, 2025 (ECF No. 46), enclosed for service upon you is a copy of Plaintiff's Answering Brief in Opposition to Defendants' Motion to Dismiss Amended Complaint.  In accordance with those procedures, the enclosed brief has not been filed with the Court but is hereby served upon your office for response.

                    WILENTZ, GOLDMAN & SPITZER, P.A.
                    By:___*Kevin P. Roddy*_____
                        KEVIN P. RODDY
                    Counsel for Plaintiffs

Enclosure
cc:    Kseniya Lezhnev, Esq.
       William Palmer, Esq.
       Jonathan Massey, Esq.
       Bret Vallacher, Esq.
       Matthew Layden, Esq.
       (all via e-mail with enclosure)

Kevin P. Roddy
WILENTZ, GOLDMAN & SPITZER, P.A
90 Woodbridge Center Dr., Suite 900
Woodbridge, NJ 07095
Telephone: (732) 636-8000
Email: kroddy@wilentz.com

William W. Palmer
(*Pro Hac Vice Counsel*)
PALMER LAW GROUP, PLC
2443 Fair Oaks Boulevard, No. 545
Sacramento, CA 95825
Telephone: (916) 972-0761
Email: wpalmer@palmercorp.com

Jonathan S. Massey
Bret R. Vallacher
Matthew E. Layden
(*Pro Hac Vice Counsel*)
MASSEY & GAIL LLP
1000 Maine Ave. SW,
Suite 450
Washington, D.C. 20024
Telephone: (202) 652-4511
Email: jmassey@masseygail.com
bvallacher@masseygail.com
mlayden@masseygail.com

*Attorneys for Plaintiff Vial and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JAIME VIAL, individually, as representative of the heirs of Rene Correa Borquez, and on behalf of other persons similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ELIZABETH MAHER MUOIO, in her official capacity as TREASURER OF THE STATE OF NEW JERSEY; and STEVEN HARRIS, in his official capacity as ADMINISTRATOR OF THE STATE OF NEW JERSEY UNCLAIMED PROPERTY ADMINISTRATION.<br><br>    Defendants. | **PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO MOTION TO DISMISS AMENDED COMPLAINT**<br><br><br>**Case No.: 3:24-cv-11301** |

Appx207

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................ 1

COUNTER-STATEMENT OF FACTS .................................................. 7

ARGUMENT .................................................................... 10

I.    THE ELEVENTH AMENDMENT DOES NOT BAR PLAINTIFF'S CLAIMS.............. 11

    A.    Plaintiff, On Behalf Of The Proposed Class Seeks Return Of Their Property.............................................................. 11

    B.    The Unclaimed Property Fund Contains Private Property Held In Trust By the State, Not Public Money................................ 12

    C.    The Requested Relief Is Permissible Under *Ex parte Young*............. 19

II.   PLAINTIFF HAS STANDING TO SUE .................................... 21

    A.    Plaintiff Has Alleged an Actual and Imminent Injury.................. 21

    B.    Plaintiff's Injury Is Fairly Traceable to Defendants' Actions............ 29

III.  PLAINTIFF'S NOTICE CLAIMS ARE TIMELY ............................. 31

IV.   PLAINTIFF BRINGS A FACIAL CHALLENGE TO THE NJUPA WITH RESPECT TO FOREIGN PROPERTY OWNERS................................... 33

V.    PLAINTIFF HAS PROPERLY STATED A TAKINGS CLAIM................. 33

VI.   BURFORD ABSTENTION IS INAPPLICABLE TO THIS CASE................ 37

CONCLUSION ................................................................. 40

i

**Appx208**

## TABLE OF AUTHORITIES

**Cases**

*31 Foster Child. v. Bush,*
  329 F.3d 1255 (11th Cir. 2003)..................................................................23

*Accord Pic-A-State Pa., Inc. v. Reno,*
  76 F.3d 1294 (3d Cir. 1996)......................................................................29

*Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff,*
  669 F.3d 359 (3d Cir. 2012)................................................................15, 33

*Bruni v. City of Pittsburgh,*
  824 F.3d 353 (3d Cir. 2016)...................................................................3, 32

*Calderon v. U.S. Dep't of Agric., Food & Nutrition Serv.,*
  756 F. Supp. 181 (D.N.J. 1990) ...............................................................32

*Chiropractic Am. v. LaVecchia,*
  180 F.3d 99 (3d Cir. 1999).......................................................................40

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) .................................................................................26

*Cordoba v. DIRECTV, LLC,*
  942 F.3d 1259 (11th Cir. 2019).................................................................30

*Empire Abrasive Equip. Co., LP v. Acceptance Ins. Co.,*
  302 F. Supp. 3d 687 (E.D. Pa. 2018) ........................................................38

*Ethypharm S.A. France v. Abbott Labs.,*
  707 F.3d 223 (3d Cir. 2013)......................................................................11

*Ex parte Young,*
  209 U.S. 123 (1908) .................................................................4, 19, 20, 21

*Fuentes v. Shevin,*
  407 U.S. 67 (1972) ...................................................................................25

*Garza v. Woods,*
  No. 22-01310-PHX-JJT, 2023 WL 5608414 (D. Ariz. Aug. 30, 2023) ...........16

ii

*Gerlach v. Rokita,*
    95 F.4th 493 (7th Cir. 2024)..................................................................................... 16

*Hess v. Port Auth. Trans-Hudson Corp.,*
    513 U.S. 30 (1994) .................................................................................................. 18

*Jones v. Flowers,*
    547 U.S. 220 (2006) ............................................................................................ 2, 27

*Knellinger v. Young,*
    134 F.4th 1034 (10th Cir. 2025)........................................................................... 5, 22

*Knick v. Township of Scott, Pa.,*
    588 U.S.180 (2019) .................................................................................................. 34

*Knick v. Twp. of Scott, Pennsylvania,*
    588 U.S. 180 (2019) ................................................................................................. 16

*Marathon Petroleum Corp. v. Sec'y of Fin. for Del.,*
    876 F.3d 481 (3d Cir. 2017)...................................................................................... 1

*Maron v. Chief Fin. Officer of Fla.,*
    136 F.4th 1322 (11th Cir. 2025)........................................................................... 5, 21

*Massachusetts v. E.P.A.,*
    549 U.S. 497 (2007) ................................................................................................. 22

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010) ............................................................................................ 28, 29

*Mullane v. Cent. Hanover Bank & Trust Co.,*
    339 U.S. 306 (1950) ............................................................................................... 2, 9

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans,*
    491 U.S. 350 (1989) ............................................................................................ 37, 39

*Olson v. United States,*
    292 U.S. 246 (1934) ................................................................................................. 34

*Pennell v. City of San Jose,*
    485 U.S. 1 (1988) ..................................................................................................... 23

**Appx210**

*Peters v. Cohen,*
No. 24-1040, 2025 WL 733237 (9th Cir. Mar. 7, 2025)..............................26, 35

*Ross v. Meese,*
818 F.2d 1132 (4th Cir. 1987)..........................................................................25

*Salvato v. Harris,*
No. CV 21-12706 (FLW), 2022 WL 1224962
(D.N.J. Apr. 26, 2022)................................................................................passim

*Schmidt v. Skolas,*
770 F.3d 241 (3d Cir. 2014).............................................................................32

*State v. Garford Trucking, Inc.,*
72 A.2d 851 (1950) ..........................................................................................24

*Suever v. Connell,*
439 F.3d 1142 (9th Cir. 2006)...............................................................11, 14, 35

*Taylor v. Chiang,*
CIV. S-01-2407 WBS GGH, 2007 WL 1628050
(E.D. Cal. June 1, 2007)..............................................................................26, 35

*Taylor v. Westly,*
402 F.3d 924, 932 (9th Cir. 2005).........................................................14, 15, 35

*Taylor v. Westly,*
488 F.3d 1197 (9th Cir. 2007).......................................................................6, 28

*Taylor v. Yee,*
136 S. Ct. 929 (2016) .........................................................................................1

*Texaco, Inc. v. Short,*
454 U.S. 516 (1982) .........................................................................................36

*TransUnion LLC v. Ramirez,*
594 U.S. 413 (2021) ......................................................................................5, 22

*Tyler v. Hennepin Cnty., Minnesota,*
598 U.S. 631 (2023) ....................................................................................22, 36

*United Servs. Auto. Ass'n v. Muir,*
792 F.2d 356 (3d Cir. 1986)..............................................................................39

iv

**Appx211**

*United States v. 564.54 Acres Land*,
   441 U.S. 506 (1979) .................................................................................. 34, 35

*United States v. James Daniel Good Real Prop.*,
   510 U.S. 43 (1993) ........................................................................................ 2

*United States v. Reynolds*,
   397 U.S. 14 (1970) ........................................................................ 3, 12, 34, 35

*Univ. of Md. at Balt. v. Peat Marwick Main & Co.*,
   923 F.2d 265 (3d Cir. 1991) ........................................................................ 39

*Va. Office for Prot. & Advoc. v. Stewart*,
   563 U.S. 247 (2011) .................................................................................... 20

*Village of Elk Grove Village v. Evans*,
   997 F.2d 328 (7th Cir. 1993) ...................................................................... 23

*W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*,
   712 F.3d 165 (3d Cir. 2013) .......................................................................... 6

*Waterfront Comm'n of New York Harbor v. Governor of N.J.*,
   961 F.3d 234 (3d Cir. 2020) ........................................................................ 20

*Zimmerman v. City of Austin, Tex.*,
   881 F.3d 378 (5th Cir. 2018) ...................................................................... 30

**Statutes**

42 U.S.C. § 1983 .............................................................................................. 37

N.J.S.A. § 46:30B-1 ........................................................................................... 1

N.J.S.A. § 46:30B-6 .......................................................................................... 24

N.J.S.A. § 46:30B-7 ............................................................................................ 8

N.J.S.A. § 46:30B-7.1 .................................................................................. 24, 26

N.J.S.A. § 46:30B-10 ........................................................................................ 24

N.J.S.A. § 46:30B-31 ................................................................................ 8, 24, 26

N.J.S.A. § 46:30B-46 ........................................................................................... 7

v

**Appx212**

N.J.S.A. § 46:30B-50 .................................................................................... 8

N.J.S.A. § 46:30B-50.1 ................................................................................. 9

N.J.S.A. § 46:30B-51 ................................................................................. 8, 9

N.J.S.A. § 46:30B-52 .................................................................................... 9

N.J.S.A. § 46:30B-57 ................................................................................. 7, 8

N.J.S.A. § 46:30B-60.1 ................................................................................. 8

N.J.S.A. § 46:30B-61 ................................................................................. 4, 8

N.J.S.A. § 46:30B-74 ............................................................................. passim

N.J.S.A. § 46:30B-77 ............................................................................. 13, 15

**Other Authorities**

United States Postal Service, Certified Mail® - The Basics, WWW.USPS.COM,
https://faq.usps.com/s/article/Certified-Mail-The-Basics
(last accessed April 24, 2025) ........................................................................... 9

Warren E. Buffett, *Chairman's Letter* (1996), available at
https://www.berkshirehathaway.com/letters/1996.html .................................... 36

**Appx213**

## INTRODUCTION AND SUMMARY OF ARGUMENT

This proposed class action challenges the constitutionality of New Jersey's escheatment scheme set forth in the New Jersey Uniform Unclaimed Property Act, N.J.S.A. § 46:30B-1 et seq. (hereinafter the "NJUPA" or the "Statute"), both as applied to Plaintiff and on its face with respect to other foreign property owners, who are systematically denied constitutionally adequate notice under the Statute prior to the seizure of their property.

The Third Circuit has warned that, "in recent years, state escheat laws have come under assault for being exploited to raise revenue rather than to safeguard abandoned property for the benefit of its owners." *Marathon Petroleum Corp. v. Sec'y of Fin. for Del.*, 876 F.3d 481, 488 (3d Cir. 2017) (internal quotation marks and citation omitted). Justices of the U.S. Supreme Court have expressed constitutional concern about state unclaimed property laws. *See Taylor v. Yee*, 136 S. Ct. 929, 930 (2016) (Alito, J., joined by Thomas, J., concurring in the denial of certiorari) ("This trend—combining shortened escheat periods with minimal notification procedures—raises important due process concerns [regarding States'] constitutional obligation to provide adequate notice before escheating private property.").

Plaintiff is a citizen and resident of Chile who received **no notice at all** before his (and his family's) Exxon Mobil shares were seized and taken by Defendants

1

**Appx214**

under the NJUPA. *See* Amended Complaint, ECF No. 45, (hereinafter "AC") ¶ 13. Plaintiff seeks to vindicate his and his proposed Class members' constitutional right to notice "reasonably calculated, under all the circumstances, to apprise" them of New Jersey's seizure of their property before the deprivation occurs. *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *see also United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53 (1993) ("The right to prior notice and a hearing is central to the Constitution's command of due process.").

As explained in the Amended Complaint, Plaintiff and proposed Class members are categorically denied ***any*** pre-escheat notice whatsoever because the NJUPA delegates New Jersey's prior notice obligation to holders and commands them to provide notice only by certified mail, which is entirely unavailable for overseas owners. AC ¶¶ 58–63. But the Supreme Court has instructed that following a process the government knows will not result in actual notice, does not "relieve[] the State of its constitutional obligation to provide adequate notice." *Jones v. Flowers*, 547 U.S. 220, 232 (2006); *see id.* at 229 ("If the Commissioner prepared a stack of letters to mail to delinquent taxpayers, handed them to the postman, and then watched as the departing postman accidentally dropped the letters down a storm drain, one would certainly expect the Commissioner's office to prepare a new stack of letters and send them again."); *id.* at 232 (rejecting the "Commissioner's position that he must do nothing more when the notice is promptly returned 'unclaimed'").

2

**Appx215**

Defendants' motion to dismiss whistles past the graveyard, entirely ignoring this glaring flaw in New Jersey's escheatment regime which categorically denies pre-escheat notice to the entire Class.

Plaintiff also seeks to vindicate his and his proposed Class members' constitutional rights under the Fifth Amendment Takings Clause to be put in the "same position monetarily as [they] would have occupied if [their] property had not been taken." *United States v. Reynolds*, 397 U.S. 14, 16 (1970). But for New Jersey's unnoticed seizure and liquidation of the Borquez Family's Exxon Mobil stocks, Plaintiff would own property valued at over $623,936 instead of the $487,581.23 returned by Defendants. AC ¶ 97.

Defendants' arguments to protect this lucrative but unconstitutional scheme are unavailing—and impermissibly rely on assertions neither found in the Amended Complaint nor otherwise judicially noticeable. *See, e.g.,* Motion to Dismiss, (hereinafter "MTD") at 15. Contrary to Defendants' assertions, the Third Circuit has repeatedly made clear that this Court ***cannot*** consider declarations or testimony on a motion to dismiss. *See Bruni v. City of Pittsburgh*, 824 F.3d 353, 361 (3d Cir. 2016) (reversing grant of motion to dismiss because the "District Court here based its decision to dismiss not only upon the allegations in the Complaint but also, it appears, upon testimony given at the hearing and the supplemental declarations filed

3

**Appx216**

by" plaintiffs).   Plaintiff's claims survive the pleading stage for the reasons explained throughout this memorandum and outlined briefly below:

The Eleventh Amendment does not bar Plaintiff's claims, which are remedied through prospective declaratory and injunctive relief, including alterations to the way that the NJUPA is administered to ensure notice is provided in a manner that complies with constitutional requirements (falling squarely within the *Ex parte Young* exception). *See* AC ¶¶ 113–21. In addition, Plaintiff seeks an accounting and the return of his own escheated property in the possession of the State. AC ¶ 114. New Jersey holds the escheated property in a custodial trust until claimed by the owner or the owner's successor in interest. N.J.S.A. § 46:30B-61. Currently, Defendants hold over $6 billion in purportedly "unclaimed" property. AC ¶ 6. Thus, Plaintiff can be made whole without paying out a penny of public money. AC ¶¶ 116–17. A court in this District has already flatly rejected Defendants' argument, holding that "the Eleventh Amendment does not bar Plaintiff's claims for return of her own property under the UPA, because such claims are not for 'damages' against the State." *Salvato v. Harris*, No. CV 21-12706 (FLW), 2022 WL 1224962, at *6 (D.N.J. Apr. 26, 2022). Judge Wolfson opined that "the mechanics of the [NJ]UPA, specifically the placement of collected abandoned funds in a separate trust account, confirms the custodial nature of New Jersey's unclaimed property laws." *Id.* Defendants admitted in *Salvato* that "when property is transferred to the State under

4

**Appx217**

the auspices of the UPA, the 'funds [are held] <u>in perpetuity for the true owner</u>[.]'" *Id.* (citing Defendant's Salvato Brief at 38) (emphasis original). The Eleventh Circuit also recently rejected the State of Florida's sovereign immunity objection in a similar case. *Maron v. Chief Fin. Officer of Fla.*, 136 F.4th 1322, 1333 (11th Cir. 2025). In short, the Eleventh Amendment is no bar to the relief sought.

Plaintiff has Article III standing because he has suffered a classic pocketbook injury in the form of a loss of more than $100,000. AC ¶ 97. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) ("If a defendant has caused physical or **monetary injury** to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III." (emphasis added)). Both the Tenth and Eleventh Circuits have recently rejected similar standing arguments in unclaimed property cases. *Maron*, 136 F.4th at 1329–31; *Knellinger v. Young*, 134 F.4th 1034, 1042 (10th Cir. 2025). Defendants' arguments to the contrary are not only wrong but would require this Court to impermissibly consider Defendants' factual assertions that are neither in the Amended Complaint nor judicially noticeable.

Plaintiff also has standing to sue for prospective relief because, unless he acts to prevent it, additional property he holds will be seized again without notice due to the constitutionally inadequate notice provisions in the NJUPA. AC ¶¶ 119–128. Defendants suggest that Plaintiff could avoid this injury by undertaking additional activities, such as monitoring or churning his account, *see* MTD at 26–27, but as the

5

**Appx218**

Ninth Circuit recognized, "the injuries suffered by plaintiffs include not only those attendant to having their property escheated without notice, but also include . . . the cost of having to constantly monitor their property to avoid escheat," including by "*'churning' their property so that it stays active and avoids escheat*," *Taylor v. Westly*, 488 F.3d 1197, 1199–1200 (9th Cir. 2007) (emphasis added).

Plaintiff's claims are timely because he filed suit within two years of the November 2023 final determination of his administrative claim—which started running the statute of limitations. AC ¶ 122. Despite the Amended Complaint's explicit reliance on this date, Defendants *entirely ignore this fact.* Instead, Defendants rely on irrelevant contentions—not found in the Amended Complaint—pertaining to when Plaintiff first began taking steps on his Kafkaesque journey to retrieve property seized from thousands of miles away by a state to which he had no nexus. Even if those allegations were relevant (and they are not), this Court may not consider them. *See W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*, 712 F.3d 165, 172 (3d Cir. 2013) (An "amended pleading supersedes the original pleading" such that "facts not incorporated into the amended pleading . . . cannot be considered by the court on a motion to dismiss the amended complaint." (cleaned up)).

Plaintiff has suffered a taking because his property was seized by the State without the payment of just compensation. *See generally* AC ¶¶ 84–100.

6

**Appx219**

Defendants' arguments to the contrary again impermissibly rely on facts not found in the Amended Complaint. At bottom, if New Jersey "wishes to avoid defending against § 1983 suits for unclaimed property, it may always decide voluntarily to revise its laws or practices with respect to unclaimed property" to ensure just compensation. *Knellinger v. Young*, 134 F.4th 1034, 1045 (10th Cir. 2025).

And, finally, *Burford* abstention is inapplicable to straightforward federal claims that test the constitutionality of a state law like the NJUPA. Ironically, Defendants' *Burford* abstention argument also rests on the "available state-based avenues," MTD at 3, that Plaintiff pursued until he secured a final decision in November 2023. Thus, Defendants contend that the state law administrative process is so critical that wholesale abstention is warranted to protect it. At the same time, according to Defendants, for the purpose of determining timeliness, the claimant should have *immediately* filed suit in federal court to be timely, rather than exhausting the administrative avenue for relief first. This Court should not allow Defendants to have it both ways.

## COUNTER-STATEMENT OF FACTS

Plaintiff rests on the allegations in the Amended Complaint, but includes here a shortened statement of facts, both for this Court's convenience and to highlight the facts most relevant to issues raised in the Motion to Dismiss:

The NJUPA requires every business doing business in New Jersey—including

7

**Appx220**

banks with safety deposit boxes and companies that issue shares (even those held in a retirement account)—to deliver property to the State once that property is deemed "abandoned." *See* N.J.S.A. §§ 46:30B-46; 46:30B-57. New Jersey uses a short, three-year "dormancy" period to determine whether most types of property may be deemed dormant and, therefore, "abandoned." N.J.S.A. § 46:30B-7. The same period applies to securities. *See* N.J.S.A. § 46:30B-31.

If an account is not active in the ways specified in the NJUPA for three years—for example, if a customer is using a buy-and-hold approach to investment (i.e., does nothing, makes no deposits or withdrawals or asset reallocations) for three years—the account would be deemed "abandoned" and the holder must report it and escheat it to the State. *Id.* The holder is immunized for escheating the property. *See* N.J.S.A. §§ 46:30B-60.1–61.

Abandoned property is then seized by the Administration under the supervision of the Administrator, *see* N.J.S.A. §§ 46:30B-57; 46:30B-60.1, who acts as property custodian, *see generally* N.J.S.A. § 46:30B-74 (requiring the establishment of trust funds to pay claims and expenses of trust administration).

Although the NJUPA imposes this requirement on the holder, the State neither enforces it nor assists with it, and frequently the result is no pre-deprivation notice whatsoever. *See generally* N.J.S.A. §§ 46:30B-50–51.

8

**Appx221**

The NJUPA provides for pre-escheat notice to be given in only one form: the holder must send a letter by certified mail to the owner. N.J.S.A. § 46:30B-50. However, the United States Postal Service only offers the product Certified Mail within the United States (apart from service to U.S. military and diplomatic installations). *See* AC ¶ 16 & n.5 (citing United States Postal Service, Certified Mail® - The Basics, WWW.USPS.COM, https://faq.usps.com/s/article/Certified-Mail-The-Basics (last accessed April 24, 2025) [Permalink: https://perma.cc/Q9EA-X8TX?type=image]). Thus, the Act does not require pre-escheat notice that can even possibly reach individuals like Plaintiff and the proposed Class members, who have addresses located outside of the United States. By simply block-quoting the NJUPA provision on individual notice, Defendants essentially concede this point. *See* MTD at 7.

In those scenarios, the State simply takes the property in question without any pre-escheat notice, N.J.S.A. §§ 46:30B-50.1–52, in direct contravention of the *Mullane* Court's command that notice be "reasonably calculated, under all the circumstances, to apprise interested parties" before they are deprived of property, 339 U.S. at 314. Moreover, published notice—which only occurs after the escheatment—is *never* provided outside the State of New Jersey, regardless of where the owner of the property is believed to have resided. *See* N.J.S.A. § 46:30B-51. The

**Appx222**

newspaper inserts list only the names and addresses of property owners; there are no descriptions of property or values. *See* N.J.S.A. § 46:30B-52.

The NJUPA provides owners no compensation for the appreciation in the property's value that would have inured to the owner but for the State's involvement. *See* AC ¶ 49. "When securities are transferred out of the owner's name by the state, certain rights associated with ownership are lost, such as the right to vote his or her shares in important matters of corporate governance, the right to vote his or her shares in important matters of corporate governance, or the ability to sell the securities." *Id.* Despite depriving owners of these rights associated with stock ownership, the NJUPA provides no compensation for the deprivation of these rights. *Id.*

Defendants imply that unclaimed property funds are held in the state treasury. *See* MTD at 8. This is incorrect. In fact, once liquidated into cash, the proceeds of the escheated property are deposited into a custodial trust fund. *See* N.J.S.A. § 46:30B-74(c) (explaining the Administrator manages the unclaimed property trust fund, which is "used to pay claims duly presented and allowed and all expenses and costs incurred by the State of New Jersey"). Although seventy-five percent (75%) of the fund may be transferred to the General State Fund, the **remaining 25% must remain in the unclaimed property fund**. *See* N.J.S.A. § 46:30B-74(a)–(c).

## ARGUMENT

10

**Appx223**

## I.    THE ELEVENTH AMENDMENT DOES NOT BAR PLAINTIFF'S CLAIMS

Defendants primarily argue that this suit is barred by the Eleventh Amendment by myopically focusing on only one of the ten remedies sought: the request for the proposed Class to be put "in the same position monetarily as they would have occupied" if the property had not been taken. *See* MTD at 14 (citing only AC Prayer for Relief ¶ D). However, the Prayer for Relief has *ten paragraphs* labeled A through J. *See* AC ¶¶ A–J. Defendants' motion fails to address, and therefore waives, arguments concerning the vast majority of them.[1] Defendants not only ignore the other relief sought, but their arguments are factually and legally incorrect for multiple reasons.

### A.    Plaintiff, On Behalf Of The Proposed Class Seeks Return Of Their Property

Defendants acknowledge that under *Suever v. Connell*, 439 F.3d 1142, 1147 (9th Cir. 2006), a lawsuit seeking return of one's own property is **not** barred by the Eleventh Amendment, but instead Defendants argue that this caselaw is inapposite because there is "no property that UPA is holding for any Plaintiff, including Borquez and Vial." MTD at 15. That is incorrect.

At the outset, it's worth pointing out that this is a Class action complaint on behalf of "all persons and entities owning purportedly 'abandoned' property

---

[1] *See Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223, 231 n. 13 (3d Cir. 2013) ("[A]n issue is waived unless a party raises it in its opening brief").

11

**Appx224**

transferred to Defendants under color of the NJUPA within the applicable statute of limitations who were denied constitutionally adequate pre-seizure notice under the NJUPA because they resided outside of the United States." AC ¶ 127. Moreover, the Amended Complaint explains that "Mr. Rene Correa Borquez was a Chilean lawyer with many significant investments, including various stocks in financial services accounts across the United States," AC ¶ 85, and although Plaintiff is aware that Exxon stock was seized, AC ¶ 92, "[a]dditional property may have been seized as well—but Plaintiff would require an accounting from the State's records to determine," AC ¶ 95. This is precisely why Plaintiff seeks an "equitable accounting to identify the properties seized from Plaintiff and the Class Members without constitutionally adequate notice because those amounts are unknown and cannot be ascertained without information within the exclusive knowledge of the State." AC, Prayer for Relief ¶ C.

### B. The Unclaimed Property Fund Contains Private Property Held In Trust By the State, Not Public Money

Defendants next argue that Plaintiff may not seek to put "in the same position monetarily as they would have occupied" if the property had not been taken, MTD at 14, despite the Supreme Court's holding that the Fifth Amendment commands that "the owner is to be put in the same position monetarily as he would have occupied if his property had not been taken," *United States v. Reynolds*, 397 U.S. 14, 16 (1970). Defendants present three arguments, but none has merit.

12

**Appx225**

Defendants' first argument is that the Eleventh Amendment applies because the Fund "remains subject to annual appropriation by the Legislature." MTD at 16. However, Judge Wolfson has previously considered this fact and did not deem it dispositive: "[A]lthough the Legislature still must appropriate from the Unclaimed Personal Property Trust Fund to administer the act and pay claims, all unclaimed funds are held by the Treasurer as trustee for the public interest." *Salvato v. Harris*, No. CV 21-12706 (FLW), 2022 WL 1224962, at *6 (D.N.J. Apr. 26, 2022) (internal quotation marks and citation omitted).

In *Salvato*, the Court held that the Eleventh Amendment was not implicated by the suit for return of property after seizure under the NJUPA because the NJUPA is a custodial statute (as opposed to a true escheatment scheme) that held funds in trust and did not implicate the state treasury. 2022 WL 1224962, at *5 ("the [NJ]UPA provides for custodial escheat as opposed to absolute escheat"). Critically, the Court observed that the NJUPA allows for claims to be made for the return of property at any time. *Id.* at *5 (citing N.J.S.A. § 46:30B-77). And Defendants actually conceded this point in *Salvato*, "stating that when property is transferred to the State under the auspices of the UPA, the 'funds [are held] in perpetuity for the true owner[.]" *Id.* (citing Defendant's *Salvato* Brief at 38) (emphasis original). Indeed, as Defendants now concede, "the Act provides that title to unclaimed

13

**Appx226**

property does not vest in the State, but rather remains vested in the owner, with the State acting as custodian while holding his property." MTD at 5.

After analyzing the structure of the NJUPA, this Court found that the Act's creation of a "separate trust account" for abandoned funds "confirms the custodial nature of New Jersey's unclaimed property laws." *Salvato,* 2022 WL 1224962 at *6. "Unless the Administrator deems it 'prudent and advisable,' 75% of all funds received are transferred to the State's General Fund." *Id.* (quoting N.J.S.A. § 46:30B-74). "The remaining portion, however, is 'retained in the trust fund, administered and invested by the State Treasurer, and used to pay claims duly presented and allowed and all expenses and costs incurred by the State of New Jersey.'" *Id.* (quoting N.J.S.A. § 46:30B-74(c) ). As a result, twenty-five percent of the escheated funds must remain in that trust fund and may not be transferred to the "General State Fund." *Id.*

Other courts have similarly held that the Eleventh Amendment does not bar constitutional claims for the return of improperly seized property that is held in trust and has not been permanently escheated. *See, e.g., Taylor v. Westly,* 402 F.3d 924, 932 (9th Cir. 2005) ("Money that the state holds in custody for the benefit of private individuals is not the state's money, any more than towed cars are the state's cars."); *see also Suever,* 439 F.3d at 1147 ("the Eleventh Amendment did not apply to funds that had been escheated, but not permanently escheated, because the State held such

14

**Appx227**

funds in custodial trust for the benefit of property owners—the funds were not State funds"); *Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 365 (3d Cir. 2012) (explaining that unclaimed property laws "require that once property has been deemed abandoned, the holder turn it over to the state while the original property owner still maintains the right to the property").

In *Taylor*, the Ninth Circuit used similar reasoning to reach an identical result regarding California's unclaimed property statute. 402 F.3d at 930–35. The Ninth Circuit reasoned that "[t]he California statutes distinguish between 'escheat' and 'permanent escheat.' Where the property has not 'permanently' escheated to the state, the state's Unclaimed Property Law sets up a custodial escheat system." *Id.* at 930. The *Taylor* Court concluded that, as a result, "money, even if in the general fund, is not held free and clear by the State of California, but subject to retransfer if the property is later found not to be permanently escheated." *Id.* at 931.

The NJUPA's unclaimed property fund is similarly custodial in nature. Regardless of when property is sold, and regardless of how much is transferred to the State's general fund, the remainder must be "retained in the trust fund, administered and invested by the State Treasurer, and used to pay claims duly presented and allowed and all expenses and costs incurred by the State of New Jersey." N.J.S.A. § 46:30B-74(c) . A person can claim their abandoned property at any time, and there is no provision in the NJUPA that would limit the ability to claim

15

**Appx228**

said property or its proceeds—even *after* its technical passage to the general fund (something not sought here). *See* N.J.S.A. § 46:30B-77; *see also* MTD at 7–8. The cases Defendants cite are also unhelpful to their position.[2]

Defendants' second argument is that returning the fair market value of Plaintiff's property to him would be akin to "raid[ing] other funds [the State] holds for other property owners." MTD at 16. But the argument effectively concedes the Eleventh Amendment point    it assumes that the property in the unclaimed property fund is private property belonging to *other private individuals*, not public money. But just as critically, it is a wholly speculative argument that provides no basis for

---

[2] Defendants cite *Gerlach v. Rokita*, 95 F.4th 493 (7th Cir. 2024) (MTD at 19), but that case involved a claim for compensatory relief that plaintiff herself described as "damages," *id.* at 501 n.5, and a claim for prospective relief that was moot. It did not involve the kind of claims presented here, nor did it address the situation where the State's unclaimed property fund is purely custodial, like New Jersey's. It did not consider the reasoning of *Salvato* with respect to the Eleventh Amendment.    Nor did it discuss the Supreme Court's holding in *Knick v. Twp. of Scott, Pennsylvania*, 588 U.S. 180, 202 (2019) ("We conclude that a government violates the Takings Clause when it takes property without compensation, and that a property owner may bring a Fifth Amendment claim under § 1983 at that time . . . [and] because the violation is complete at the time of the taking, pursuit of a remedy in federal court need not await any subsequent state action").

Defendants also cite *Garza v. Woods*, No. 22-01310-PHX-JJT, 2023 WL 5608414 (D. Ariz. Aug. 30, 2023), but that case makes clear that Arizona's unclaimed property law is different from New Jersey's in crucial aspects. The Arizona statute "mandat[es] deposit of almost all the abandoned monies received in the general fund or trust funds unrelated to unclaimed property for use by the State, as well as not explicitly providing for the retention of individual title to the abandoned property until permanent escheatment occurs." *Id.* at *5. The NJUPA is completely different.

16

**Appx229**

dismissal at this stage. The fund contains over $6 billion, AC ¶ 6, and the State has made no showing that all of it will be claimed. Indeed, the State uses the fund to pay bounties to auditors (evidently without any fear that it is transferring private property from the rightful owner to an auditor) and "all expenses and costs incurred by the State of New Jersey." N.J.S.A. § 46:30B-74(c). If anything, the State's argument is a point for consideration at the remedial phase of this case, not at the outset on a Motion to Dismiss.

Defendants' third argument is related, but even more factually and legally meritless. Defendant contends that if Plaintiff and the proposed Class were made whole, it might exhaust the Fund to the point that the "State would be called upon to expend revenue to make the other owners whole when they filed a claim with the UPA." MTD at 16. There is no basis in the record or anywhere (much less the Amended Complaint) for this assertion. Moreover, it is contradicted by Defendants' own public statements, as outlined in the Amended Complaint: Defendants currently hold over $6 billion in purportedly unclaimed property, AC ¶ 6, and have only returned $2.7 billion since the inception of the program, AC ¶ 30. In other words, for Defendants' concern to come to fruition, the Class members' recovery in this lawsuit alone would have to *__exceed the sum total of all unclaimed property payments New Jersey has ever made twice over__*. Indeed, Defendants' fear is further contradicted by the fact that 75% of the unclaimed property collected flows into the

17

**Appx230**

General State Fund, N.J.S.A. § 46:30B-74, which reflects a massive recurring surplus of collections exceeding payments on claims and expenses.

It is true that the surpluses overflowing from the Unclaimed Property Fund would otherwise eventually end up benefiting New Jersey's budget. But binding precedent from the Supreme Court makes clear that this benefit is insufficient to cloak the Unclaimed Property Fund with the protections of the Eleventh Amendment. For example, in *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30 (1994), the Supreme Court held that the Port Authority Trans-Hudson Corporation was not cloaked with Eleventh Amendment immunity even though it "dedicates at least some of its surplus to public projects which the States themselves might otherwise finance." *Id.* at 50. In that case, the Port Authority argued that a judgment against it "produces an effect equivalent to the impact of a judgment directly against the State" because it reduces the "Authority's surplus available to fund such projects" such that the State would otherwise have to pick up the tab. *Id.* But the Supreme Court rejected the argument:

> This reasoning misses the mark. A charitable organization may undertake rescue or other good work which, in its absence, we would expect the State to shoulder. But none would conclude, for example, that in times of flood or famine the American Red Cross, to the extent it works for the public, acquires the States' Eleventh Amendment immunity. **The proper focus is not on the use of profits or surplus, but rather is on losses and debts.** If the expenditures of the enterprise exceed receipts, is the State in fact obligated to bear and pay the resulting indebtedness

18

**Appx231**

of the enterprise? **When the answer is "No"—both legally and practically—then the Eleventh Amendment's core concern is not implicated.**

*Id.* at 51 (emphases added).

Here, Plaintiff and the proposed Class can be made whole without resorting to the "public funds" in the State's treasury. Given that New Jersey has over $6 billion in unclaimed properties "waiting to be claimed," it is simply implausible to suggest that the Unclaimed Property Fund lacks the resources to make Plaintiff and the proposed Class whole without resort to the state treasury.

The relief sought here would stem from the unclaimed property fund. AC ¶ 121; *see also* AC ¶¶ 115–121. For the reasons discussed above, recovery from this fund, which is distinct from the State treasury and which uses only income derived from the properties it escheats and liquidates, does not run afoul of the Eleventh Amendment. Moreover, such a recovery is entirely consistent with the purpose and the framework of the fund because it is supposed to be "used to pay claims duly presented and allowed and all expenses and costs incurred by the State of New Jersey." N.J.S.A. § 46:30B-74(c).

**C.    The Requested Relief Is Permissible Under *Ex parte Young***

Even if the Court finds that the unclaimed fund implicated the Eleventh Amendment, the *Ex parte Young* exception applies. The doctrine of *Ex parte Young* holds that 'a state official is stripped of his official or representative character' and

19

**Appx232**

thereby deprived of the State's immunity, *Ex parte Young*, 209 U.S. 123, 159–60 (1908), when he commits an 'ongoing violation of federal law.'" *Waterfront Comm'n of New York Harbor v. Governor of N.J.*, 961 F.3d 234, 238 (3d Cir. 2020) (quoting *Va. Office for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 254–55 (2011). Defendants admit that "there may be circumstances in which a property owner could allege an ongoing violation and seek prospective, non-monetary relief within the narrow doctrine established in *Ex parte Young*." MTD at 18.

This is just such a case where *Ex parte Young* relief is available. Plaintiff seeks prospective injunctive relief falling squarely within the *Ex parte Young* exception, including alterations to the way that the NJUPA is administered to ensure notice is provided in a manner that complies with due process requirements. *See* AC Prayer for Relief ¶ A–B (New Jersey should provide notice "reasonably calculated" to reach owners prior to seizing property).

Plaintiff, on behalf of himself and the proposed Class, "seeks an accounting and the return of their own escheated property in the possession of the State." AC ¶ 114. The Eleventh Amendment does not bar such relief, as nothing sought by the Amended Complaint can fairly be called damages against the State. Even for the seized property that New Jersey has liquidated or moved to its general fund, sovereign immunity does not apply because Plaintiff explicitly seeks to be made whole not from the treasury but from the Unclaimed Personal Property Trust Fund,

*see* AC ¶ 121, which is statutorily designed for cases such as this; as it is explicitly "used to pay claims duly presented and allowed and all expenses and costs incurred by the State of New Jersey," N.J.S.A. § 46:30B-74(c).

The Eleventh Circuit recently resolved a similar issue in favor of Plaintiff's position here. *See Maron v. Chief Fin. Officer of Fla.*, 136 F.4th 1322, 1333–34 (11th Cir. 2025). Like Defendants here, the state of Florida argued that the prospective relief the *Maron* plaintiffs requested was a request for retrospective relief. *Id.* at 1333. The Eleventh Circuit rejected that argument and held that the *Ex parte Young* exception applied to the state's seizure of a refund owed to the *Maron* plaintiffs because they had "alleged an ongoing violation of federal law—that the State has appropriated their refund and failed to give them just compensation. And they sought prospective relief—that the district court declare a part of the Act unconstitutional for precluding recovery of just compensation and that it order the State to pay just compensation when they later file a claim." *Id.* That same reasoning is squarely applicable here.

## II.    PLAINTIFF HAS STANDING TO SUE

### A.    Plaintiff Has Alleged an Actual and Imminent Injury

Defendants argue that Plaintiff lacks standing and his claims are unripe due to the absence of an actual or imminent injury. MTD at 21. Defendants' argument (a) ignores allegations showing that injury has *already* occurred, (b) mischaracterizes

21

**Appx234**

allegations demonstrating a sufficient likelihood of *future* injury, and (c) overlooks that efforts necessary to avoid future injury (such as the monitoring and "churning" alleged here) constitute *present* injury for the purposes of Article III.

First, and most glaringly, Defendants entirely fail to grapple with the allegations that Plaintiff has *already* suffered textbook Article III injury. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) ("If a defendant has caused physical or **monetary injury** to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III." (emphasis added)); *Knellinger v. Young*, 134 F.4th 1034, 1042 (10th Cir. 2025) ("[A]n uncompensated taking is a classic example of a financial harm sufficient to confer standing.") (citing *Tyler v. Hennepin Cnty., Minnesota*, 598 U.S. 631, 636–37 (2023)). Specifically, Defendants ignore the crux of Plaintiff's claim: that he has received only $487,581.23 from the Administrator for stocks worth at least $623,936, reflecting a six-figure monetary loss. *See* AC ¶¶ 84–100.

Second, the Amended Complaint contains allegations demonstrating a sufficient likelihood of future injury, *id.* ¶¶ 101–12, which need not be a certainty. Indeed, "even a small probability of injury is sufficient to create a case or controversy—to take a suit out of the category of the hypothetical—provided of course that the relief sought would, if granted, reduce the probability." *Massachusetts v. E.P.A.*, 549 U.S. 497, 526 n.23 (2007) (quoting *Village of Elk*

**Appx235**

*Grove Village v. Evans*, 997 F.2d 328, 329 (7th Cir. 1993)). And where "the threatened acts that will cause injury are authorized or part of a policy," as is the case here, "it is significantly more likely that the injury will occur again." *31 Foster Child. v. Bush*, 329 F.3d 1255, 1266 (11th Cir. 2003).

For example, in *Pennell*, the Supreme Court found that landlords had standing to enjoin a city ordinance that would prohibit rent increases found to cause an "unreasonably severe financial or economic hardship" on tenants—even though the landlords had not shown several future events: (1) that they intended to raise their rents to the point of causing unreasonably severe hardship; (2) that the tenants would challenge those increases; or (3) that the city's officials would find against the landlords. *Pennell v. City of San Jose,* 485 U.S. 1, 6 (1988). The Supreme Court nevertheless held that the *Pennell* plaintiffs demonstrated a "realistic danger of sustaining a direct injury as a result of the statute's operation," which was sufficient for Article III standing. *Id.* at 8. Here, even more so than in *Pennell*, there is a "realistic danger" that harm will occur. Specifically, the operative complaint explains that "Plaintiff continues to suffer ongoing injury from the NJUPA in three ways: (1) he has additional property that is likely to be escheated without notice; (2) he must make efforts to prevent that, which is its own injury; and (3) he is deterred from acquiring additional property because of the unclaimed property regime." AC

23

**Appx236**

¶ 101; *see also id.* ¶¶ 97, 102–112. Defendants' arguments as to all three injuries are cursory and unavailing.

Regarding the future injury: The Amended Complaint alleges that "Plaintiff is the owner of and legal representative for additional property vulnerable to seizure and taking under the NJUPA." *Id.* ¶ 102. "Plaintiff holds his Exxon shares at a brokerage called TradeUp Securities, which is a New Jersey corporation." *Id.* ¶ 104. "Plaintiff's address on file with Tradeup, the relevant holder here, would be in Chile—not a state with an escheat law within the meaning of Section 46:30B-10(d)." *Id.* "And Plaintiff intends to pursue a buy-and-hold strategy for those shares, doing nothing with them while they appreciate for years to come." *Id.* Thus, because Plaintiff's last known address is not in a "state" that would escheat his property, the NJUPA will require TradeUp (a New Jersey Domiciliary) to escheat the property. *Id. See State v. Garford Trucking, Inc.,* 72 A.2d 851, 854 (1950) ("A corporation created and existing under the laws of New Jersey may have a 'commercial domicile' or 'business situs' elsewhere for taxation and other purposes; but it is nonetheless domiciled and resident in the state of its creation . . .")." *Id.*[3]

---

[3] Property may be subject to escheat under the NJUPA if "the holder is a domiciliary" of New Jersey and the "last known address . . . of the apparent owner is in a state that does not provide by law for the escheat or custodial taking of the property," N.J.S.A. § 46:30B-10(d). "Holder" is defined as "a person, wherever organized or domiciled, who is the original obligor indebted to another on an obligation." N.J.S.A. § 46:30B-6(g).

24

Critically, under the NJUPA, stocks are deemed abandoned if a stockowner goes three years without making a written communication concerning the property or account, or an oral communication contemporaneously recorded concerning the property or account, or a presentment of an instrument of payment, or other activity in the account like automatic dividend reinvestment. *See* N.J.S.A. §§ 46:30B-7.1, 46:30B-31. Accordingly, it is ***certain that Plaintiff's shares will escheat*** to New Jersey unless Plaintiff takes action regarding his property in such a way that New Jersey requires to toll escheatment. *See generally* AC ¶¶ 104–07. And, as explained in the amended complaint and fact section above, it is at least very likely that Plaintiff—who lives in Santiago, Chile—will not receive notice before (or after) that escheatment.

This demonstrates a sufficient likelihood of two forms of future harm. First, "the denial of a constitutional right"—here, the seizure of property without pre-deprivation notice reasonably calculated to reach owners—"constitutes irreparable harm," *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987). No post-deprivation process nor even a "damage award can undo the fact that the arbitrary taking that was subject to the right of procedural due process has already occurred." *Fuentes v. Shevin*, 407 U.S. 67, 82 (1972). Second, "[w]hen [the government] takes custody of property pursuant to the [unclaimed property law], even temporarily, certain rights associated with ownership are lost which are not compensable in money damages."

25

**Appx238**

*Taylor v. Chiang*, CIV. S-01-2407 WBS GGH, 2007 WL 1628050, at *2 (E.D. Cal. June 1, 2007). For example, "the owner is deprived of the right to vote his or her shares in important matters of corporate governance." *Id.*

Nothing about these harms "depends upon several highly speculative events." MTD at 24. Defendants cite *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) and *Peters v. Cohen*, No. 24-1040, 2025 WL 733237 (9th Cir. Mar. 7, 2025). But *Clapper* found it too speculative that a government department would decide to seek permission of "the Foreign Intelligence Surveillance Court" to access their private communications, something the challenged law did not require said department to do. *Clapper*, 568 U.S. at 413. Here, not only has the State already seized Plaintiff's property, but the NJUPA *requires* the Administrator to seize Plaintiff's property again if he simply allows his shares to sit in his TradeUp account for longer than three years without additional action. *See* NJSA. §§ 46:30B-7.1; 46:30B-31. And the *Peters* court questioned the likelihood that California would seize shares of stock in a **_German_** brokerage account. *Peters*, 2025 WL 733237, at *1. TradeUp is a New Jersey corporation on which the NJUPA unquestionably imposes escheatment obligations, AC ¶ 104, and New Jersey has previously seized Exxon stocks from Plaintiff before.

Defendants argue that for harm to befall Plaintiff (1) he must fail to act upon pre-escheat notices provided by TradeUp—including additional notifications not

26

**Appx239**

mandated by the Act, but which TradeUp might extra-legally provide to Vial; (2) Vial's stock must actually be reported and remitted to UPA; (3) Vial must fail to claim the property within one year of escheat (which would allow him to recover his stock before liquidation); and (4) Vial must then demonstrate that such remittance injured him in a concrete way. MTD at 24.

But this argument rests on an assumption that ignores the crux of this case: Plaintiff—as an overseas owner—will ***certainly not*** receive notice under the NJUPA. The only pre-escheat notice required is that holders should send notice via certified mail, but that is unavailable overseas. AC ¶¶ 61–63. And the post-escheat publication notice is only made in New Jersey newspapers. AC ¶ 65. This argument also impermissibly speculates (with no basis) that TradeUp will issue notices to Plaintiff that do not comply with the NJUPA despite the NJUPA imposing no such obligation. *See* MTD at 22–23. In short, injury will occur even if all involved comply with the statute—and Defendants' argument only demonstrates the importance of due process.

Defendants further argue that "Plaintiff may easily prevent escheat . . . by writing a letter to the holder every 3 years," *id.* at 24–25 (citations omitted). But a "party's ability to take steps to safeguard its interests does not relieve the State of its constitutional obligation," *Flowers*, 547 U.S. at 232 [BVI](internal quotation marks and citations omitted). More importantly, requiring that Plaintiff take actions he

27

**Appx240**

otherwise would not take, or else have his property seized without adequate notice, proves *present* injury and, therefore, standing because it means Plaintiff would be forced to take efforts to prevent the future injury from occurring. The Ninth Circuit recognized Article III standing for this reason in an unclaimed property case: "the injuries suffered by plaintiffs include not only those attendant to having their property escheated without notice, but also include . . . the cost of having to constantly monitor their property to avoid escheat," including by "'churning' their property so that it stays active and avoids escheat," *Taylor v. Westly*, 488 F.3d 1197, 1199–1200 (9th Cir. 2007).

The Supreme Court has also recognized that a risk of future injury—even one predicated on future events that may not occur—creates *present injury* in the form of prevention efforts. For example, in *Monsanto Co. v. Geertson Seed Farms*, a group of conventional alfalfa growers sought injunctive relief against an agency decision to deregulate genetically engineered alfalfa. 561 U.S. 139, 152 (2010). They claimed that deregulation would harm them because their neighbors might plant the genetically engineered seed, the bees might obtain pollen from the neighbors' plants, and then the bees might (harmfully) contaminate their own conventional alfalfa with the genetically modified gene. *Id.* Without expressing views about the probability of future contamination harm coming to pass, the Supreme Court found standing because the plaintiffs would suffer *present* harm by trying to avoid or mitigate the

28

**Appx241**

threat. *Id.* at 154–55. The plaintiffs "would have to conduct testing to find out whether and to what extent their crops have been contaminated" and take other "measures to minimize the likelihood of potential contamination." *Id.* The Court held: "Such harms, which respondents ***will suffer even if their crops are not actually infected*** with the Roundup Ready gene, are sufficiently concrete to satisfy the injury-in-fact prong of the constitutional standing analysis." *Id.* at 155 (emphasis added). In sum, the fact that Plaintiff is compelled to monitor or churn his property to *prevent* escheatment demonstrates *current harm. Accord Pic-A-State Pa., Inc. v. Reno*, 76 F.3d 1294, 1300 (3d Cir. 1996) (plaintiffs had standing due to law creating need to change their "business practices").

### B.   Plaintiff's Injury Is Fairly Traceable to Defendants' Actions

Defendants make the strained argument that Plaintiff's injury here is self-inflicted and, thus, not fairly traceable to the State. MTD at 25–27. They argue that Plaintiff could have avoided the harm the State inflicted by taking one of the actions the NJUPA specifies to reset the timer on escheat. *Id.* at 26. But Plaintiff cannot be faulted for not taking specific action to avoid an unconstitutional statute in a state thousands of miles away to which they have no nexus—particularly when Plaintiff has received no notice. As explained above, Defendants' argument merely confirms standing, because it is another way of demonstrating that the NJUPA imposes a

29

**Appx242**

burden to take certain steps (such as monitoring or churning an account) in order to avoid unconstitutional seizure of property without notice.

Defendants' argument primarily rests on two inapposite cases: *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259 (11th Cir. 2019), and *Zimmerman v. City of Austin, Tex.*, 881 F.3d 378 (5th Cir. 2018). Neither case supports their position. *Cordoba* found that a consumer who fails to place her name on the do not call registry cannot trace the injury of telemarketing calls to the telemarketers. *Cordoba*, 942 F.3d at 1271–72. But in that case, the violation was specifically limited to when telemarketers "solicit[ed] residential telephone subscribers who have registered their numbers" on the National Do Not Call Registry. *Id.* at 1265. In other words, the statute itself required the consumer to register first, and that registration is what made the soliciting calls illegal in the first place. Therefore, the injury was not "fairly traceable to the challenged action of the defendant," *id.* at 1268, without that prerequisite being fulfilled. Here, by contrast, there is no requirement that a property owner do *anything* for the State to have constitutional due process notice obligations.

*Zimmerman* too is inapposite. In that case, a candidate challenged a campaign contribution limit, but he "did not take steps towards reaching or exceeding the aggregate limit of the kind that would demonstrate a serious intent to violate the statute." 881 F.3d at 389. Because there was no evidence that he would have been able to raise and accept a sufficient number of donations to face even possible

30

**Appx243**

prosecution, he failed to show an injury fairly traceable to the challenged law. *Id.* at 390. Plaintiff is not in a position like Zimmerman, who had only alleged only half of what would bring him into conflict with the challenged law. Plaintiff's property has *already* been seized by the State (*see* AC ¶¶ 84–93), the NJUPA has already denied him just compensation (*id.* ¶ 97), and he has shown that the NJUPA creates an actual and non-speculative risk that his injury will recur in the future with respect to his remaining Exxon Mobil stock held in Tradeup, *id.* ¶¶ 102–07.

### III.    PLAINTIFF'S NOTICE CLAIMS ARE TIMELY

The Amended Complaint contains an entire section titled "The Statutes of Limitations Have Not Run, And In Any Case Have Been Tolled." AC ¶¶ 122–25. In that section, Plaintiff explained, *inter alia*, that his "legal claims did not fully accrue until November 8, 2023, when the Administrator issued its final sum from the Unclaimed Property Administration, thus making a final determination." *Id.* ¶ 122. "Prior to that date, Plaintiff did not know the total amount he would receive from the property that was taken—and therefore did not know that he would not be made whole." *Id.* "At the absolute earliest, the statute of limitations would run from November 6, 2023, the date of the letter from the State indicating what amounts would be paid from which shares." *Id.*

Defendants ignore all of these allegations and impermissibly rely on facts not found in the Amended Complaint to assert that the statute of limitations began in

31

**Appx244**

2016, because "in December 2016, Vial knew or should have known that the State was holding Borquez's property and that he and other heirs allegedly had not received prior notice of its remittance." MTD at 29 (citing ECF No. 21-2 ¶¶ 12, 15, 16, 18 (Vial Decl. in Support of PI Motion). But the Third Circuit has repeatedly made clear that this Court cannot consider such materials on a motion to dismiss. *See Bruni v. City of Pittsburgh*, 824 F.3d 353, 361 (3d Cir. 2016) (reversing grant of motion to dismiss because the "District Court here based its decision to dismiss not only upon the allegations in the Complaint but also, it appears, upon testimony given at the hearing and the supplemental declarations filed by" plaintiffs). In short, when "the pleading does not reveal when the limitations period began to run . . . the statute of limitations cannot justify Rule 12 dismissal." *Schmidt v. Skolas*, 770 F.3d 241, 251 (3d Cir. 2014) (cleaned up).

In any case, the statute of limitations clock did not start until the administrative process culminated in a final determination. As explained in the Amended Complaint, "Plaintiff was actively engaged in an administrative process to retrieve the escheated shares, including by submitting more information and paperwork as requested." AC ¶ 123. That process did not conclude until Plaintiff received the State's determination letter in November 2023. *See, e.g., Calderon v. U.S. Dep't of Agric., Food & Nutrition Serv.*, 756 F. Supp. 181, 184–85 n.4 (D.N.J. 1990) (the statute of limitations ran from the "final notice of determination in this matter").

32

**Appx245**

Until that time, it was not clear whether Plaintiff would recover or the extent of his recovery. Indeed, if Plaintiff had filed this lawsuit in 2018 (when Defendants now argue the statute of limitations expired), Defendants would doubtlessly have argued that the claims were unripe because the Administrator had not yet issued a final decision with respect to the compensation he would receive.

## IV. PLAINTIFF BRINGS A FACIAL CHALLENGE TO THE NJUPA WITH RESPECT TO FOREIGN PROPERTY OWNERS

Defendants argue that Plaintiff cannot mount a facial challenge to the NJUPA. MTD at 31. But Plaintiff challenges the NJUPA scheme both as applied to Plaintiff and on its face with respect to other foreign property owners, who are systematically denied constitutionally adequate notice under the Statute prior to the seizure of their property. With respect to the class of foreign property owners, the Act is unconstitutional in every instance because it systematically fails to provide them with any constitutionally adequate notice at all.

## V. PLAINTIFF HAS PROPERLY STATED A TAKINGS CLAIM

Defendants argue that Plaintiff's Takings claim fails as a matter of law because Plaintiff cannot "demonstrate that the state's action affected its legally cognizable property interest." MTD at 34 (internal quotation marks and citations omitted). But "[w]hen a state directly appropriates private property, it is considered a *per se* taking, and the state has a duty to compensate the owner." *Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 370 (3d Cir. 2012). "The

33

**Appx246**

owner is to be put in the same position monetarily as he would have occupied if his property had not been taken." *United States v. Reynolds*, 397 U.S. 14, 16 (1970). Here, Plaintiff has not been "put in the same position" because, but for the State's seizure of his stocks, Plaintiff would have had stocks worth over $623,936 instead of the $487,581.23 returned. AC ¶ 97. The failure to pay compensation for the lost appreciation of property violates the longstanding rule under the Fifth Amendment that a property owner must be put "'in as good a position pecuniarily as if his property had not been taken.'" *United States v. 564.54 Acres Land*, 441 U.S. 506, 510 (1979) (quoting *Olson v. United States*, 292 U.S. 246, 255 (1934)). Plaintiff has received only a fraction of the value of his property from the State of New Jersey. *See* AC ¶ 97. The property of thousands of proposed Class members has been taken in its entirety, without any notice. That they may pursue an administrative process to recoup some of their losses is irrelevant under the Takings Clause because the State's duty to pay just compensation under the Takings Clause "arises at the time of the taking, regardless of post-taking remedies that may be available to the property owner." *Knick v. Township of Scott, Pa.*, 588 U.S.180, 181 (2019).

Additionally, Plaintiff and Class members who had owned stocks were deprived of more than mere cash. "When securities are transferred out of the owner's name by the state, certain rights associated with ownership are lost, such as the right to vote his or her shares in important matters of corporate governance, … or the

34

**Appx247**

ability to sell the securities." AC ¶ 49; *see also, e.g., Taylor v. Chiang*, CIV. S-01-2407 WBS GGH, 2007 WL 1628050, at *2 (E.D. Cal. June 1, 2007). ("When [the government] takes custody of property pursuant to the [unclaimed property law], even temporarily, certain rights associated with ownership are lost" including "the right to vote his or her shares in important matters of corporate governance.").

Defendants contend that Plaintiff is not entitled to the appreciated value of his property, MTD at 34–35, but, as discussed above, that contention is foreclosed by Supreme Court precedent holding that the "owner is to be put in the same position monetarily as he would have occupied if his property had not been taken." *Reynolds*, 397 U.S. at 16; *see also 564.54 Acres Land*, 441 U.S. at 510.

Moreover, the cases Defendants cite in support of their position are inapposite and themselves rely on one circuit panel's precedent for their holdings. *Suever v. Connell*, 579 F.3d 1047, 1059–60 (9th Cir. 2009), and *Peters v. Cohen*, No. 24-1040, 2025 WL 733237, at *2 (9th Cir. Mar. 7, 2025), each simply rely on the holding in *Taylor v. Westly*, 402 F.3d 924, 932 (9th Cir. 2005), for this position without engaging in any additional reasoning on the issue. But the *Taylor* court never actually considered the issue of whether a plaintiff who has suffered a constitutional taking should be forced to bear the loss of the actual property and receive only the value of the property the state realized when it liquidated the property. And in *Suever*, 579 F.3d at 1059–60, the Ninth Circuit opined that the plaintiffs were not

35

**Appx248**

entitled to receive more than the actual cash proceeds realized by the State from the sale of stock; but that case involved plaintiffs who "'have failed to meet their burden to show as a matter of undisputed fact that seizures of property outside the scope of the [Unclaimed Property Law] have occurred.'" *Id.* at 1058. Here, by contrast, Defendants failed to provide Plaintiff with any constitutionally required notice at all.

Defendants also rely on *Texaco, Inc. v. Short*, 454 U.S. 516, 530 (1982), in which the Supreme Court examined a situation where an owner failed to use his mineral leasing rights for decades, which were deemed lapsed. *See* MTD at 35. However, that was not a Takings case because the statute did not take private property for public use at all but merely allocated the ownership of unexploited mineral interests between private parties, *id.* at 519. Moreover, the *Texaco* plaintiff was provided full procedural due process, whereas here Plaintiff was not even provided notice prior to seizure by the State.

Most importantly, as the Supreme Court recently emphasized in analyzing *Texaco*: "It is the owner's failure to make any use of the property—and for a lengthy period of time—that causes the lapse of the property right." *Tyler v. Hennepin Cnty., Minnesota*, 598 U.S. 631, 647 (2023) (citation and quotation omitted). However, this is ***not a case of neglect or "failure to make any use of the property"*** because pursuing a buy-and-hold strategy for stocks is not akin to sleeping on mineral *leasing* rights for decades. Just owning a stock and doing nothing more ***is*** making use of that

36

**Appx249**

stock. One can collect dividends, or simply hope the stock appreciates in value over time or even hope that its value skyrockets at some point in the future due to a particular catalyst. Indeed, many great investors buy stocks only to hold them for decades. *See, e.g.*, Warren E. Buffett, *Chairman's Letter* (1996), available at https://www.berkshirehathaway.com/letters/1996.html ("If you aren't willing to own a stock for 10 years, don't even think about owning it for 10 minutes."). In short, Plaintiff *was* making use of his property when New Jersey seized it without constitutionally adequate notice.

## VI.   BURFORD ABSTENTION IS INAPPLICABLE TO THIS CASE

Defendants' invocation of the *Burford* abstention doctrine is not well taken. Their own description of the doctrine eschews its application to a case such as this:

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

MTD at 37 (quoting *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans* (*"NOPSI"*), 491 U.S. 350, 361 (1989)). In fact, *NOPSI* held that *Burford* abstention did **not** apply where a case did "not involve a state-law claim, nor even an assertion that the federal claims are 'in any way entangled in a skein of state-law that must be

37

**Appx250**

untangled before the federal case can proceed.'" *Id.* at 361 (citation omitted). Here, both claims are federal claims under 42 U.S.C. § 1983 and the U.S. Constitution. And there are no doubts about the application of state law here, the plain language of which has no ambiguity. Just because the NJUPA contains an administrative process which was already followed here, AC ¶¶ 122–23, or just because some portions of the NJUPA may be deemed unconstitutional, are insufficient reasons for this Court to abstain. *See id.* at 362 (*Burford* "does not require abstention whenever there exists such a [state administrative] process, or even in all cases where there is a 'potential for conflict' with state regulatory law or policy") (citation omitted).

In the Third Circuit, courts undertake a two-step analysis to determine whether *Burford* abstention is appropriate. "The first question is whether timely and adequate state-court review is available. If such review is available, the District Court next considers whether the case (1) implicates a regulatory scheme that involves a matter of substantial public concern; (2) whether it is the sort of complex, technical regulatory scheme to which the *Burford* abstention doctrine usually is applied; and (3) whether federal review of a party's claims would interfere with the state's efforts to establish and maintain a coherent regulatory policy." *Empire Abrasive Equip. Co., LP v. Acceptance Ins. Co.*, 302 F. Supp. 3d 687, 694 (E.D. Pa. 2018) (cleaned up).

38

**Appx251**

While review in New Jersey state court would be available here, there is no "difficult question[] of state law" at issue in this case. *NOPSI*, 491 U.S. at 361. Rather, this case concerns whether a state law violates the United States Constitution. "The interpretation of [NJUSA] in this case does not require consideration of any other [New Jersey] statute and the relevant facts are simple and undisputed." *United Servs. Auto. Ass'n v. Muir*, 792 F.2d 356, 365 (3d Cir. 1986).

Second, "the [Administrator] has not suggested any peculiar local conditions or special expertise required to interpret the statute. The state proceeding merely involves reading and construing a statute, a task for which courts are best equipped, and not administrative factual determinations, such as are involved in the setting of a proper utility rate." *Id.* And there is no "specialized state tribunal," *id.* at 364, indeed, the state court would largely be construing the requirements of federal constitution, a matter with which New Jersey can hardly claim a peculiar interest.

This is indisputably not the sort of regulatory scheme to which *Burford* is usually applied. Defendants' inability to point to even a single instance of a federal court refusing to hear a case regarding a state's unclaimed property regime based on *any* abstention doctrine is itself extremely telling. *See Univ. of Md. at Balt. v. Peat Marwick Main & Co.*, 923 F.2d 265, 271 (3d Cir. 1991) (weighing the fact that no other cases had applied *Burford* under similar circumstances against abstention). Defendants do not even point to a case concerning an alleged taking. Rather,

**Appx252**

Defendants argue that unclaimed property regimes are "of local concern." MTD at 38. However, here, New Jersey seized property belonging to a family *in a different hemisphere of the globe* that has zero nexus to New Jersey.

There is no interference with New Jersey's ability to maintain a coherent regulatory policy. Again, there is no dispute over how to construe any provision of the NJUPA. Thus, there is zero risk of inconsistent interpretations. Moreover, rendering the NJUPA's notice provisions and compensation provisions compliant with the U.S. Constitution is not akin to dismantling the entire statute. Simply put, this is not "the sort of complex technical regulatory scheme to which the *Burford* abstention doctrine usually is applied." MTD at 37 (quoting *Chiropractic Am. v. LaVecchia*, 180 F.3d 99, 105 (3d Cir. 1999)).

## CONCLUSION

For the preceding reasons, Defendants' Motion to Dismiss should be denied, and this case should proceed to discovery.

Dated: July 7, 2025                 Respectfully submitted,

By: */s/ Kevin P. Roddy*
WILLENTZ, GOLDMAN & SPITZER, P.A.
KEVIN P. RODDY, ESQ.
(NJSBA # 014802005)
90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ 07095
Telephone: (732) 636-8000
Facsimile: (732) 726-6686
Email: kroddy@wilentz.com

40

**Appx253**

William W. Palmer, Esq.
(*Pro Hac Vice Counsel*)
PALMER LAW GROUP, a PLC
2443 Fair Oaks Boulevard, No. 545
Sacramento, CA 95825
Telephone: (916) 972-0761
Email: wpalmer@palmercorp.com

Jonathan S. Massey, Esq.
Bret R. Vallacher, Esq.
Matthew E. Layden, Esq.
(*Pro Hac Vice Counsel*)
MASSEY & GAIL LLP
1000 Maine Ave. SW
Suite 450
Washington, D.C. 20024
Telephone: (202) 650-5452
Email: jmassey@masseygail.com
Email: bvallacher@masseygail.com
Email: mlayden@masseygail.com

41

**Appx254**

<u>**CERTIFICATE OF SERVICE**</u>

I, Kevin P. Roddy, hereby certify that on this 7th day of July 2025, caused the foregoing Response Memorandum in Opposition to Defendants' Motion to Dismiss to be served on Defendants which effected service on all counsel of record.

*/s/ Kevin P. Roddy*

**Appx255**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ESTATE OF RENE CORREA BORQUEZ, Jaime Vial, individually, as representative of the heirs of Rene Correa Borquez, and on behalf of other persons similarly situated, | ) ) ) ) | Hon. Robert Kirsch, U.S.D.J. Hon. J. Brendan Day, U.S.M.J. |
| Plaintiff, | ) ) | Case No. 3:24-cv-11301-RK-JBD |
| v. | ) ) | |
| ELIZABETH MAHER MUOIO, in her official capacity as Treasurer of the State of New Jersey, and STEVEN HARRIS, in his official capacity as Administrator of the State of New Jersey Unclaimed Property Administration, | ) ) ) ) ) ) | Return Date:  August 18, 2025 |
| Defendants. | ) | |

---

**REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION PURSUANT TO FED. R. CIV. P. 12(b)(1) AND (6) TO DISMISS PLAINTIFF'S CLASS ACTION COMPLAINT WITH PREJUDICE**

---

MATTHEW J. PLATKIN
Attorney General of New Jersey
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 106
Trenton, New Jersey 08625

*Attorney for Defendants*

On the Brief:
  Valerie A. Hamilton (# 018201995)
  Timothy M. Kawira (# 242822019)
  Deputy Attorneys General

**Appx256**

# TABLE OF CONTENTS

**Page(s)**

ARGUMENT ..................................................................................................1

    I.      PLAINTIFF'S SUIT IS BARRED BY THE ELEVENTH AMENDMENT ........................................................................1

    II.     PLAINTIFF LACKS STANDING .......................................................5

          A.     Plaintiff Has No "Actual" or "Imminent" Injury........................5

          B.     Plaintiff's "As Applied" Due Process Claim is Time-Barred..................................................................................9

          C.     The Complaint Fails to State a Facial Due Process Claim .......11

    III.    PLAINTIFF'S TAKINGS CLAIM FAILS AS A MATTER OF LAW ......................................................................................12

    IV.    BURFORD ABSTENTION IS APPROPRIATE IN THIS CASE ..................................................................................................14

CONCLUSION.............................................................................................15

**Appx257**

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

Anderson Nat. Bank v. Luckett,
    321 U.S. 233 (1944)..................................................................................................12

Ashcroft v. Iqbal,
    556 U.S. 662 (2009)..................................................................................................8

Bell Atl. Corp. v. Twombly,
    550 U.S. 544 (2007)..............................................................................................1, 8

Bruni v. City of Pittsburgh,
    824 F.3d 353 (3d Cir. 2016) ....................................................................................9

In re Burlington Coat Factory Sec. Litig.,
    114 F.3d 1410 (3d Cir. 1997) .............................................................................9, 10

Calderon v. U.S. Dep't of Agric., Food & Nutr. Serv.,
    756 F. Supp. 181 (D.N.J. 1990).............................................................................11

Clapper v. Amnesty Int'l USA,
    568 U.S. 398 (2013)..............................................................................................8, 9

Coello v. DiLeo,
    43 F.4th 346 (3d Cir. 2022) ...................................................................................11

Cotto v. Campbell,
    126 F.4th 761 (1st Cir. 2025)...............................................................................3, 4

Edelman v. Jordan,
    415 U.S. 651 (1974)..................................................................................................1

Ex Parte Young,
    209 U.S. 123 (1908)..........................................................................................2, 3, 4

FDA v. All. For Hippocratic Med.,
    602 U.S. 367 (2024)............................................................................................8, 12

Garza v. Woods,
    2023 U.S. Dist. LEXIS 153721 (D. Ariz. Aug. 30, 2023) ....................................12

Green v. Mansour,
    474 U.S. 64 (1985)............................................................................................3

Hess v. Port Auth. Trans-Hudson Corp.,
    513 U.S. 30 (1994)............................................................................................5

In re Horizon Healthcare Servs. Data Breach Litig.,
    846 F.3d 625 (3d Cir. 2017) ............................................................................2

James v. Hegar,
    86 F.4th 1076 (5th Cir. 2023) ..........................................................................3

Knellinger v. Young,
    134 F.4th 1034 (10th Cir. 2025) ......................................................................2

Knick v. Twp. of Scott, Pa.,
    588 U.S. 180 (2019)......................................................................................4, 12

Marathon Petroleum Corp. v. Sec'y of Fin. for Del.,
    876 F.3d 481 (3d Cir. 2017) ...........................................................................14

Maron v. Chief Fin. Officer of Fla.,
    136 F.4th 1322 (11th Cir. 2025) ......................................................................3

McNair v. Synapse Grp., Inc.,
    672 F.3d 213 (3d Cir. 2012) ............................................................................4

Merritts v. Richards,
    62 F.4th 764 (3d Cir. 2023) .............................................................................3

Monsanto Co. v. Geertson Seed Farms,
    561 U.S. 139 (2010)..........................................................................................7

Moody v. NetChoice,
    603 U.S. 707 (2024)........................................................................................11

Narrigan v. Goldberg,
    772 F. Supp. 3d 182 (D. Mass. 2025)..............................................................4

Osprey LLC v. Kelly-Moore Paint Co.,
    984 P.2d 194 (Okla. 1999)..............................................................................15

iii

**Appx259**

Papasan v. Allain,
    478 U.S. 265 (1986).................................................................................3

Patry v. Capps,
    633 So.2d 9 (Fla. 2019) ........................................................................14

Pennell v. San Jose,
    485 U.S. at 12, n.4 (1987).....................................................................8

Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,
    998 F.2d 1192 (3d Cir. 1993) ...............................................................9

Peters v. Cohen,
    No. 24-1040, 2025 U.S. App. LEXIS 5343 (9th Cir. Mar. 7, 2024)..................14

Salvato v. Harris,
    No. 21-12706, 2022 U.S. Dist. LEXIS 75575 (D.N.J. Apr. 26,
    2022) ................................................................................................2

Sherwin-Williams Co. v. Cnty. of Del.,
    968 F.3d 264 (3d Cir. 2020) ..................................................................8

Spokeo, Inc. v. Robins,
    578 U.S. 330 (2016)...............................................................................8

Suever v. Connell,
    579 F.3d 1047 (9th Cir. 2009) ..............................................................14

Taylor v. Westly,
    488 F.3d 1197 (9th Cir. 2007) ................................................................7

Tim Hortons USA, Inc. v. Singh,
    2017 U.S. Dist. LEXIS 52092 (S.D. Fla. Apr. 5, 2017)....................................15

U.S. v. 564.54 Acres of Land,
    441 U.S. 506 (1979)..............................................................................13

U.S. v. Reynolds,
    397 U.S. 14 (1970)................................................................................13

U.S. v. Salerno,
    481 U.S. 739 (1987)..............................................................................11

**Appx260**

Wallace v. Kato,
    549 U.S. 384 (2007)........................................................................................10

**Statutes**

N.J.S.A. 2A:14-2.................................................................................................9

N.J.S.A. 46:30B-7.1 .......................................................................................6, 7

N.J.S.A. 46:30B-31 .........................................................................................6, 7

N.J.S.A. 46:30B-50 ..........................................................................................12

**Appx261**

Plaintiff's Amended Complaint ("AC") fails for the reasons set forth below and in Defendants' opening brief. In short, the Eleventh Amendment bars Plaintiff from seeking compensation beyond the proceeds of abandoned stock already remitted to him. Plaintiff's Due Process claim is time-barred, and the State's Uniform Unclaimed Property Act is constitutional on its face and as applied to Plaintiff. Plaintiff's Takings claim likewise fails because custodial escheat is not a taking, and, even if it were, Plaintiff received just compensation. The Court should dismiss the Amended Complaint in its entirety, with prejudice.

## ARGUMENT

I. **PLAINTIFF'S SUIT IS BARRED BY THE ELEVENTH AMENDMENT.**

Plaintiff argues that the Eleventh Amendment is not implicated because he seeks an accounting and the return of his own property (Plaintiff's Brief ["Pb"] at 11-12), but he has not plausibly alleged that any of his property is in the custody of the Unclaimed Property Administrator ("UPA"). Bell Atl. Corp. v. Twombly, 550 U.S. 544, 563 n.8 (2007). The AC alleges "no nexus between . . . the Borquez Family and the State," (AC ¶ 86), and that it has been 20 years since Borquez's death (id. ¶ 88). Accordingly, his claim is not only meritless, but, because any relief would come from the State's general fund, barred by the Eleventh Amendment. See Edelman v. Jordan, 415 U.S. 651, 663 (1974) ("a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment").

1

**Appx262**

That the UPA does not presently hold Plaintiff's property distinguishes this matter from Salvato v. Harris, the unpublished decision on which Plaintiff relies. No. 21-12706, 2022 U.S. Dist. LEXIS 75575 (D.N.J. Apr. 26, 2022).  In Salvato, which was ultimately dismissed with prejudice, the plaintiff sued for the return of stock interest instead of claiming it from the UPA.  Because Salvato sought the return of her property, not money damages, the Eleventh Amendment did not bar the suit. Id. at *18.  Here, Plaintiff filed a claim with the UPA, which was approved and paid, (AC ¶¶ 93-94), and Plaintiff has not alleged Defendants are holding more of his property.  This fact alone distinguishes this case from Salvato and other cases Plaintiff cites.  See Knellinger v. Young, 134 F.4th 1034, 1042 (10th Cir. 2025) (finding standing because plaintiff plausibly alleged that the state held his property, and he was seeking its return).

Nor do the hypothetical claims of putative class members save this case from dismissal.  (Pb11-12, 20).  In the class action context, a named plaintiff must demonstrate that he personally has a viable claim and may not merely allege that others might have been harmed.  McNair v. Synapse Grp., Inc., 672 F.3d 213, 223 (3d Cir. 2012); In re Horizon Healthcare Servs. Data Breach Litig., 846 F.3d 625, 634 (3d Cir. 2017).

Ex parte Young is no more helpful to Plaintiff.  Plaintiff argues (Pb21) that the State's alleged use of his property without paying just compensation constitutes

2

**Appx263**

an ongoing violation of federal law.  Ibid. (citing Maron v. Chief Fin. Officer of Fla., 136 F.4ᵗʰ 1322, 1333-34 (11th Cir. 2025)).  The Supreme Court and several circuit courts (including the Third Circuit) have rejected that argument.  See Papasan v. Allain, 478 U.S. 265, 280-81 (1986) (continued withholding of trust funds is not an ongoing violation); Merritts v. Richards, 62 F.4th 764, 772 (3d Cir. 2023) ("Although those earlier actions [uncompensated property acquisitions] may have present effect, that does not mean that they are ongoing."); Cotto v. Campbell, 126 F.4th 761, 770 (1st Cir. 2025) ("continued holding of forfeited property does not qualify as an ongoing violation").

There is no reason to deviate from this Supreme Court and circuit court precedent in this case.  Here, Plaintiff has identified no personal or estate property in UPA custody, so no alleged violation can be considered "ongoing."  Plaintiff has identified no other property owned by the long-deceased Borquez requiring notice to the estate.  And Plaintiff's speculative concern that his newly acquired Exxon shares may later escheat at some indeterminate point in the future does not work a present or ongoing due process violation.  AC ¶ 102; Cotto, 126 F.4th at 771; James v. Hegar, 86 F.4th 1076, 1083 (5th Cir. 2023) (holding that vague, unsupported allegations fail to show an ongoing violation under Ex parte Young).

Plaintiff cannot dodge the Eleventh Amendment bar by recasting the requested relief as declaratory, equitable, or injunctive in nature.  Green v. Mansour,

3

**Appx264**

474 U.S. 64, 73 (1985) ("[T]he issuance of a declaratory judgment in these circumstances would have much the same effect as a full-fledged award of damages or restitution by the federal court . . . prohibited by the Eleventh Amendment"); see Prayer for Relief, ¶¶ A-C, E, F.  Indeed, Plaintiff concedes that the "the crux of [his] claim" is money damages (Pb17); see also AC ¶ D (seeking to be "put in the same position monetarily"); ¶ G (interest); ¶ H (costs and attorney's fees).

Plaintiff mistakenly argues (Pb20) his requests for "alterations to the way the NJUPA is administered" and "an accounting and return of property" fall within the Ex parte Young exception.  See Prayer for Relief, ¶ A (injunction against taking), ¶ C (equitable accounting).  First, equitable relief is generally unavailable for takings claims.  Knick v. Twp. of Scott, Pa., 588 U.S. 180, 201 (2019).  Second, state officials lack "the authority to unilaterally nullify" unclaimed property laws, so "an injunction . . . could not bring about the [alterations P]laintiff seeks, meaning the Ex parte Young exception does not apply."  Narrigan v. Goldberg, 772 F. Supp. 3d 182 (D. Mass. 2025); see also Cotto, 126 F.4th at 768 (Ex parte Young inapplicable where state official lacks authority to enforce or change procedures).  Third, an accounting is inherently backward-looking and thus beyond Ex parte Young's narrow exception for prospective relief.  Cotto, 126 F.4th at 772 (noting that an accounting is not itself prospective, and is thus barred by Eleventh Amendment where there is no ongoing violation of federal law).

4

**Appx265**

Finally, Plaintiff argues (Pb9-12) that, because the Act provides for custodial escheat of property, unclaimed funds held in the Unclaimed Personal Property Trust Fund and General Fund remain the property of their owners and are available to pay a judgment in this case without affecting the State treasury. Plaintiff fails to identify authority for Defendants to use funds belonging to private parties to pay a judgment against the State; that "the fund [allegedly] contains over $6 billion," and "not all will be claimed" (Pb17) is irrelevant. Plaintiff's property has been returned to him, and any further payment would draw directly or indirectly on State funds, implicating the Eleventh Amendment bar.[1]

## II.     PLAINTIFF LACKS STANDING.

### A.     Plaintiff Has No "Actual" or "Imminent" Injury.

Plaintiff asserts that he has standing because the payment made on account of Borquez's stock was insufficient, causing a "textbook Article III injury" in the form of monetary loss. (Pb17). But Plaintiff alleges no facts supporting an inference that the stock was sold for less than fair market value or that his payment was less than the entire sale proceeds. Therefore, he has not suffered a cognizable injury.

---

[1] Reliance on <u>Hess v. Port Auth. Trans-Hudson Corp.</u>, 513 U.S. 30 (1994) is misplaced. (Pb18). PATH is a bistate entity "occupying a significantly different position in our federal system than do States themselves." The sovereignty of a bistate entity is not threatened because a district court is "ordained by one of the entity's founders." <u>Id.</u> at 40-41.

**Appx266**

Plaintiff asserts standing because he owns additional property—Exxon shares held by TradeUp Securities—"likely" to be escheated without notice unless he "churns" and monitors it, and he is deterred from acquiring additional property due to the provisions of the Act. (Pb23). These alleged "injuries" do not confer standing because they are not actual or imminent.

To show imminence, Plaintiff argues "it is <u>certain that Plaintiff's shares will escheat</u> to New Jersey unless Plaintiff takes action regarding his property in such a way that New Jersey requires to toll escheatment." (Pb25) (emphasis in original). The Amended Complaint alleges no facts that support his erroneous conclusion that stock held in his TradeUp account would escheat at all, let alone "imminently." (AC ¶¶ 104-108). Plaintiff mischaracterizes how the Act works, and his claim that his stock would escheat to the state if he does not take the actions listed in N.J.S.A. 46:30B-7.1 ("Section 7.1") is based on a misunderstanding of the statute. (Pb25).

N.J.S.A. 46:30B-31 ("Section 31") defines when stock is presumed to be abandoned—three years after uncashed dividend checks or undelivered stock certificate, or three years after the second mailing of a statement of account that was returned as undeliverable. A "buy-and-hold" strategy will not cause the stock to escheat. Plaintiff's decision not to reinvest dividends and to accrue them in his account does not trigger escheatment. The Act defines when various kinds of property are presumed abandoned, and Section 7.1 describes the circumstances that

6

**Appx267**

negate that presumption.   Section 7.1 <u>excludes</u> property otherwise presumed abandoned from being escheated.  It is not, as Plaintiff argues, a list of tasks Plaintiff must complete to "toll escheatment."  (Pb25).  The Act does not require monitoring, churning, or taking any action listed in Section 7.1.[2]

The following example is illustrative:  Under Section 31, if two brokerage account statements are returned to the holder as undeliverable, the stock in the account would be presumed abandoned three years later.  However, under Section 7.1, the presumption of abandonment would not apply if the owner indicates an interest in the account.  Evidence that an owner received an electronic distribution is sufficient to indicate an owner's interest, as are nominal acts like logging in to an account or communicating with the holder once every three years.  N.J.S.A. 46:30B-7.1.  If the owner fails to take an action described in Section 7.1, the stock would not escheat unless the abandonment criteria of Section 31 are met.

Here, Plaintiff admits TradeUp has his correct address in Chile (AC ¶ 104), so account statements should not be returned as undeliverable, and the complaint

---

[2] Reliance on <u>Taylor v. Westly</u>, 488 F.3d 1197 (9th Cir. 2007) and <u>Monsanto Co. v. Geertson Seed Farms</u>, 561 U.S. 139 (2010) is misplaced.  The <u>Taylor</u> court created no generalized rule that monitoring property creates standing.  Instead, it found standing based on the likelihood of recurrence of injury because California law at the time allowed notice of escheat via newspaper, up to one year after receipt, and required immediate sale of remitted property.  488 F.3d at 1199-1200.  In <u>Monsanto</u>, 561 U.S. at 153, farmers had standing based on a "reasonable probability" that crops would be infected with an engineered gene.  Plaintiff has made no similar showing.

7

**Appx268**

alleges no other facts showing escheat is "actual or imminent, not speculative." FDA v. All. For Hippocratic Med., 602 U.S. 367, 381 (2024); Sherwin-Williams Co. v. Cnty. of Del., 968 F.3d 264, 269 (3d Cir. 2020) ("A threatened injury must be 'certainly impending' to constitute an injury in fact" under Article III).[3]

Article III standing demands actual, not hypothetical, harm. Clapper v. Amnesty Int'l USA, 568 U.S. 398, 416 (2013). Plaintiff suggests that merely asserting a chilling effect is sufficient to establish standing. (Pb18). That is incorrect. Generally alleging a chilling effect, without sufficient context or details, does not survive scrutiny. Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009); Twombly, 550 U.S. at 555. Otherwise, every plaintiff would have standing, regardless of whether they owned property subject to the Act, by simply alleging the Act deterred their purchase. Plaintiff has not even alleged a specific instance of investment deterred. Spokeo, Inc. v. Robins, 578 U.S. 330, 339-40 (2016). Indeed, Plaintiff actually purchased stock with the specific goal of becoming subject to the Act, see Db25-27 (Plaintiff's injury is not traceable to Defendant's conduct). See Clapper, 568 U.S. at 418 (self-inflicted injury cannot satisfy Art. III standing requirements).

---

[3] Pennell v. San Jose, 485 U.S. 1 (1988), does not help Plaintiff's case (Pb23). The court did not decide Pennell's standing (485 U.S. at 12, n.4 (1987)), but found that a co-plaintiff landlords' association had Article III standing based on uncontested facts, a demonstrated likelihood the ordinance would be enforced against its members, and the probability of economic harm due to the ordinance. None of those facts exist in this case.

**Appx269**

**B.    Plaintiff's "As Applied" Due Process Claim is Time-Barred.**

Assuming Plaintiff suffered a § 1983 due process injury (which he did not), Plaintiff was required to bring that claim within two years of learning of the injury. N.J.S.A. 2A:14-2.  Plaintiff consulted counsel and submitted an inquiry through MissingMoney.com on December 15, 2016—more than eight years before filing suit.  Vial Decl. (Doc. 21-2) at Exh. I (email confirmation of claim); id. at ¶ 12 (describing consultation with attorney in 2016); id. at ¶ 15 (describing attempt to reclaim property in December 2016).

Plaintiff argues that, when considering a motion to dismiss, the court may not rely on facts outside the complaint to determine the claim's timeliness.  (Pb24) (citing Bruni v. City of Pittsburgh, 824 F.3d 353, 361 (3d Cir. 2016)).  But Bruni does not support Plaintiff's position.  In that case, the Third Circuit stated that district courts may rely upon "the facts alleged in the Complaint and the documents on which the claims made therein [are] based."  Bruni, 824 F.3d at 360 (quoting In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997) and Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993); see also (Db9 n.4) (citing authority for taking judicial notice of the Vial Declaration).  "The rationale underlying this exception is that the primary problem raised by looking to documents outside the complaint—lack of notice to the

9

**Appx270**

plaintiff—is dissipated where plaintiff has actual notice and has relied upon these documents in framing the complaint." Burlington Coat Factory, 114 F.3d at 1426.

Here, the complaint alleges Plaintiff "contacted the Administrator in an attempt to recover the property seized and taken by the State," following a search that lasted "[f]or years." AC ¶ 18. Plaintiff also alleges that he was "actively engaged in an administrative process to retrieve the escheated shares," and had "extensive communications" with Defendants about the property. Id. at ¶¶ 123-24. In deciding this motion, the court may rely upon the December 15, 2016 email confirmation of Plaintiff's inquiry through MissingMoney.com because that document forms the basis of Plaintiff's allegations at paragraphs 18, 123 and 124, and Plaintiff clearly had notice and relied upon the veracity of its contents.

Further, the four corners of the complaint contain sufficient evidence of its untimely filing. It alleges a search lasting "years," and contains multiple paragraphs under the heading "The Statutes Of Limitations Have Not Run, And In Any Case Have Been Tolled," which would not be necessary if the case had been filed within § 1983's two year limitations period. AC ¶¶ 18, 122-125.

Plaintiff's fallback argument (Pb31-33), that his due process claims for lack of notice did not accrue until he received payment from the State, fails as a matter of law. They accrued no later than 2016, and thus the period expired in 2018. See Wallace v. Kato, 549 U.S. 384, 391 (2007) ("the tort cause of action accrues, and

10

**Appx271**

the statute of limitations commences to run, when the wrongful act or omission results in damages"); (Db27-31).  Plaintiff knew of his alleged injury in 2016 at the latest, since Plaintiff submitted an inquiry regarding Borquez's property in 2016—eight years before filing suit.  Coello v. DiLeo, 43 F.4th 346, 352 (3d Cir. 2022) (applying New Jersey's two-year statute of limitations to § 1983 claim).  The lone case cited by Plaintiff, Calderon v. U.S. Dep't of Agric., Food & Nutr. Serv., 756 F. Supp. 181, 184-85 n.4 (D.N.J. 1990), does not prevent dismissal.  There, the law established that the limitations period for commencing suit began upon receipt of a final notice of determination.  No such rule applies here.  Instead, § 1983 claims are governed by the two-year limitation period applicable to torts, which begins to run when the cause of action accrues (in this case, no later than 2016).

**C.    The Complaint Fails to State a "Facial" Due Process Claim.**

Plaintiff maintains that the Amended Complaint asserts a facial challenge to the Act because, "[w]ith respect to the class of foreign property owners," the Act is "unconstitutional in every instance."  (Pb33).  Such a challenge is not properly characterized as a facial challenge, and Plaintiff cites no authority to support his claim that it is.  As the Supreme Court has noted, facial attacks seek determinations that a challenged statute "cannot be applied to anyone at any time under any circumstances without violating the Constitution."  Moody v. NetChoice, 603 U.S. 707, 777 (2024); U.S. v. Salerno, 481 U.S. 739, 745 (1987) ("[T]he challenger must

11

**Appx272**

establish that no set of circumstances exists under which the Act would be valid"). Plaintiff's claim is limited to <u>foreign</u> property owners only and therefore cannot be characterized as a facial challenge, which would apply to <u>all</u> property owners. Moreover, Plaintiff fails to address the text of the statute, which plainly requires holders to mail notice to all property owners at the last known address before remitting property valued over $50 to the UPA—with no exception for foreign addresses.  N.J.S.A. 46:30B-50.  Plaintiff cannot demonstrate that the Act is unconstitutional in <u>all</u> of its applications.  Therefore, Plaintiff's due process claim should be dismissed with prejudice.

**III.    <u>PLAINTIFF'S TAKINGS CLAIM FAILS AS A MATTER OF LAW.</u>**

Custodial escheat of unclaimed property is not a constitutional "taking."  <u>See</u> <u>Anderson Nat. Bank v. Luckett</u>, 321 U.S. 233, 241 (1944) (custodial escheat results in the substitution of the state for the holder, and preserves an owner's right to demand payment from the state); <u>accord</u> <u>Garza v. Woods</u>, 2023 U.S. Dist. LEXIS 153721 at *18 (D. Ariz. Aug. 30, 2023) (noting that "[p]laintiffs can make the same claim on the State that they could have made on the original holder, had [p]laintiffs been diligent in the first instance").  Absent a taking, there is no duty to pay "just compensation" or to put Plaintiff in the same position he would have occupied had the stock not escheated.  <u>Knick</u>, 588 U.S. at 190 (noting that "'the act of taking' is the 'event which gives rise to the claim for compensation.'") (citations omitted).

12

**Appx273**

Here, the complaint does not clearly allege the specific act that allegedly violated the Takings Clause. Even if this Court determines that Plaintiff's allegation that New Jersey employed the net sale proceeds for public use states a Takings claim equal to the amount of such proceeds, the claim still fails. AC at ¶ 154; (Pb33-34). Plaintiff relies on U.S. v. Reynolds, 397 U.S. 14, 16 (1970), as requiring that the owner be "put in the same position monetarily as he would have occupied if his property had not been taken," (Pb3, 12, 34, 35), but neglects to include the following sentence, which defines such compensation as "the fair market value of the property at the time of the taking." Ibid.; U.S. v. 564.54 Acres of Land, 441 U.S. 506, 511 (1979) (fair market value defined as "what a willing buyer would pay in cash to a willing seller"). Plaintiff has already received fair market value—all funds the UPA held on account of Borquez's stock, including the entire sale proceeds, all dividends accrued before the stock was sold, and interest. Had Plaintiff made a claim for the property at the time the stock was sold, he would have received no more than he has already received from the UPA. Thus, even assuming arguendo that Plaintiff can show that a taking has occurred, he still cannot prevail on his claim that the State has violated the Takings Clause, since he has received just compensation in the form of the fair market value of his stock at the time of the sale.

Here, Plaintiff seeks to recover the difference between the sale proceeds realized by the State and what the securities could have been worth ten years later

13

**Appx274**

had they never been sold.  Plaintiff cited no case law in which a party was permitted to bring suit in federal court to recover more from the state than the value the state received and paid to him.  Indeed, the Ninth Circuit (upon which Plaintiff heavily relies) has consistently denied such relief on Eleventh Amendment grounds.  Suever v. Connell, 579 F.3d 1047, 1060 (9th Cir. 2009) (holding plaintiffs cannot "recover anything beyond the actual cash proceeds that the Controller realized upon liquidating their non-cash escheated property."); Peters v. Cohen, No. 24-1040, 2025 U.S. App. LEXIS 5343 at *3-4 (9th Cir. Mar. 7, 2024) (finding plaintiff's attempt to recover the appreciated value of stock was "plainly foreclosed under our precedent.").  Thus, Plaintiff's Takings claim should be dismissed with prejudice.

## IV.   BURFORD ABSTENTION IS APPROPRIATE IN THIS CASE.

Even if Plaintiff's claims survive dismissal, this court may "decline jurisdiction over a declaratory judgment action" to allow the state court system an opportunity to resolve the question of state law.  Marathon Petroleum Corp. v. Sec'y of Fin. for Del., 876 F.3d 481, 497-98 (3d Cir. 2017) (court favorably views a process that would give Delaware state courts first opportunity to interpret state law relating to unclaimed property audit).  Here, though Plaintiff claims the Act does not require notice to foreign owners based on the reference to "certified mail" (Pb9), the Act is not so limited—alternate means, such as registered mail (for international addresses) or first class mail may be required.  Patry v. Capps, 633 So.2d 9 (Fla. 2019) (holding

14

**Appx275**

that hand-delivered pre-suit notice of malpractice claim was effective even though statute required service by certified mail); Tim Hortons USA, Inc. v. Singh, 2017 U.S. Dist. LEXIS 52092, *23 (S.D. Fla. Apr. 5, 2017) (strict compliance with a notice provision is unnecessary if a party has actual notice)(collecting cases); Osprey LLC v. Kelly-Moore Paint Co., 984 P.2d 194, 197-98 and n.4 (Okla. 1999) (finding majority of courts hold that use of alternative method does not render notice defective if the substituted method performs the same function or serves the same purpose as the authorized method)(collecting cases).

In the interest of comity, this court should allow New Jersey courts to resolve the issue of sufficiency of notice in the first instance. Plaintiff admits that a state court forum is available to address his claims (Pb39), which makes abstention under Burford particularly appropriate here.

## CONCLUSION

For the reasons stated above and the Defendants' opening brief, the court should dismiss the Amended Complaint with prejudice.

Respectfully submitted,

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY

Dated:  August 15, 2025        By: /s/ Valerie A. Hamilton
                                   Valerie A. Hamilton (#018201995)
                                   Timothy M. Kawira (#242822019)
                                   Deputy Attorneys General

15

**Appx276**

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 106
Trenton, New Jersey 08625

*Attorney for Elizabeth Maher Muoio,*
*Treasurer of the State of New Jersey,*
*and Steven Harris, Administrator of*
*the New Jersey Unclaimed Property*
*Administration*

By:    Valerie A. Hamilton
       Deputy Attorney General
       NJ Bar ID No. 018201995
       (609) 376-3256
       Valerie.Hamilton@law.njoag.gov

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| ESTATE OF RENE CORREA BORQUEZ, Jaime Vial, representative of the heirs of Rene Correa Borquez and on behalf of those similarly situated, | ) ) ) ) | Hon. Robert Kirsch, U.S.D.J. Hon. J. Brendan Day, U.S.M.J. |
| Plaintiff, | ) ) ) | Case No. 3:24-cv-11301-RK-JBD |
| v. | ) ) | |
| ELIZABETH MAHER MUOIO, in her official capacity as Treasurer of the State of New Jersey; STEVEN HARRIS, in his official capacity as Administrator of the State of New Jersey Unclaimed Property Administration; and KELMAR ASSOCIATES, LLC. | ) ) ) ) ) ) ) ) ) ) | Return Date: August 18, 2025 **CERTIFICATION OF SERVICE OF DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION PURSUANT TO FED. R. CIV. P. 12(b)(1) AND (6) TO DISMISS THE AMENDED COMPLAINT** |
| Defendants. | ) | **WITH PREJUDICE** |

**Appx277**

VALERIE HAMILTON, of full age, hereby certifies as follows:

1.    I am employed as a Deputy Attorney General with the State of New Jersey's Department of Law and Public Safety, Division of Law.  I am assigned to represent Defendants, Elizabeth Maher Muoio, in her official capacity as Treasurer of the State of New Jersey, and Steven Harris, in his official capacity as Administrator of the State of New Jersey Unclaimed Property Administration (the "Defendants"), in this matter.

2.    I hereby certify that on August 15, 2025, I caused the Defendants' Reply Brief in Further Support of Defendants' Motion to Dismiss Plaintiff's Amended Complaint With Prejudice to be served by First Class Mail, postage prepaid, and by electronic mail, upon the following:

> Kevin P. Roddy, Esq.
> Kseniya Lezhnev, Esq.
> Wilentz, Goldman & Spitzer, P.A.
> 90 Woodbridge Center Dr., Box 10
> Woodbridge, NJ 07095
> E: kroddy@wilentz.com
>    klezhnev@wilentz.com
> *Attorney for Plaintiff*
>
> William Palmer, Esq.
> Palmer Law Group
> 2443 Fair Oaks Blvd, No. 545
> Sacramento, CA 05825
> E: wpalmer@palmercorp.com
> *Attorney for Plaintiff*

2

**Appx278**

Jonathan Massey, Esq.
Bret R. Vallacher, Esq.
Matthew E. Layden, Esq.
Massey & Gail, LLP
1000 Maine Avenue, SW
Suite 450
Washington, DC 20024
E:  jmassey@masseygail.com
    bvallacher@masseygail.com
    mlayden@masseygail.com
*Attorney for Plaintiff*

3.    I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

 /s/ Valerie A. Hamilton
Valerie A. Hamilton
Deputy Attorney General
New Jersey Bar ID # 018201995

Dated:  August 15, 2025

3

**Appx279**

Kevin P. Roddy, Esq.
WILENTZ, GOLDMAN & SPITZER, P.A
90 Woodbridge Center Dr., Suite 900
Woodbridge, NJ 07095
Telephone: (732) 636-8000
Email: kroddy@wilentz.com

William W. Palmer, Esq.
(*Pro Hac Vice Counsel*)
PALMER LAW GROUP, PLC
2443 Fair Oaks Boulevard, No. 545
Sacramento, CA 95825
Telephone: (916) 972-0761
Email: wpalmer@palmercorp.com

Jonathan S. Massey
Bret R. Vallacher
(*Pro Hac Vice Counsel*)
MASSEY & GAIL LLP
1000 Maine Avenue SW
Suite 450
Washington, D.C. 20024
Telephone: (202) 652-4511
Email: jmassey@masseygail.com
bvallacher@masseygail.com

*Attorneys for Plaintiff Vial and Proposed Class Members*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JAIME VIAL, individually and as representative of the heirs of Rene Correa Borquez, and on behalf of other persons similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> ELIZABETH MAHER MUOIO, in her official capacity as TREASURER OF THE STATE OF NEW JERSEY; and STEVEN HARRIS, in his official capacity as ADMINISTRATOR OF THE STATE OF NEW JERSEY UNCLAIMED PROPERTY ADMINISTRATION. <br><br> Defendants. | Case No.: 3:24-cv-11301 <br><br> **NOTICE OF INTENTION TO STAND ON THE AMENDED COMPLAINT AND REQUEST FOR ENTRY OF FINAL JUDGMENT** |

**Appx280**

Notice is hereby given that, Plaintiff, Jaime Vial ("Plaintiff" or "Vial"), as an individual and legal representative of the heirs of Rene Correa Borquez, elects to stand on the Amended Complaint (ECF No. 45) as dismissed without prejudice by the Court's Order dated January 12, 2026 (ECF No. 55).

Accordingly, pursuant to Federal Rule of Civil Procedure 58(d), Plaintiff respectfully requests that the Court enter a final judgment of dismissal to allow for appellate jurisdiction under 28 U.S.C. § 1291.

Dated: February 9, 2026   Respectfully submitted,

/s/ *Kevin P. Roddy*
WILLENTZ, GOLDMAN & SPITZER, P.A.
KEVIN P. RODDY, ESQ.
(NJSBA # 014802005)
90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ 07095
Telephone: (732) 636-8000
Email: kroddy@wilentz.com

William W. Palmer, Esq.
(*Pro Hac Vice Counsel*)
PALMER LAW GROUP, a PLC
2443 Fair Oaks Boulevard, No. 545
Sacramento, CA 95825
Telephone: (916) 972-0761
Email: wpalmer@palmercorp.com

Jonathan S. Massey, Esq.
Bret R. Vallacher, Esq.
(*Pro Hac Vice Counsel*)
MASSEY & GAIL LLP
1000 Maine Ave. SW, Suite 450
Washington, D.C. 20024

2

**Appx281**

Telephone: (202) 650-5452
Email: jmassey@masseygail.com
Email: bvallacher@masseygail.com

3

**Appx282**

**CERTIFICATE OF SERVICE**

I, Kevin P. Roddy, hereby certify that on this 9th day of February 2026, filed the foregoing NOTICE OF INTENTION TO STAND ON THE AMENDED COMPLAINT AND REQUEST FOR ENTRY OF FINAL JUDGMENT with the Clerk of Court using the CM/ECF system, which effected service on all counsel of record.

Dated: February 9, 2026        Respectfully submitted,

/s/ *Kevin P. Roddy*
WILLENTZ, GOLDMAN & SPITZER, P.A.
KEVIN P. RODDY, ESQ.
(NJSBA # 014802005)
90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ 07095
Telephone: (732) 636-8000
Email: kroddy@wilentz.com

William W. Palmer, Esq.
(*Pro Hac Vice Counsel*)
PALMER LAW GROUP, a PLC
2443 Fair Oaks Boulevard, No. 545
Sacramento, CA 95825
Telephone: (916) 972-0761
Email: wpalmer@palmercorp.com

Jonathan S. Massey, Esq.
Bret R. Vallacher, Esq.
(*Pro Hac Vice Counsel*)
MASSEY & GAIL LLP
1000 Maine Ave. SW, Suite 450
Washington, D.C. 20024
Telephone: (202) 650-5452

4

**Appx283**

Email: jmassey@masseygail.com
Email: bvallacher@masseygail.com

5

**Appx284**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JAIME VIAL, individually and as representative of the heirs of Rene Correa Borquez, and on behalf of other persons similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>ELIZABETH MAHER MUOIO, in her official capacity as TREASURER OF THE STATE OF NEW JERSEY; and STEVEN HARRIS, in his official capacity as ADMINISTRATOR OF THE STATE OF NEW JERSEY UNCLAIMED PROPERTY ADMINISTRATION.<br><br>    Defendants. | Case No.: 3:24-cv-11301 |

## [PROPOSED] ORDER ENTERING FINAL JUDGMENT

THIS MATTER came before the Court upon Plaintiff's Notice of Intention to Stand on the Amended Complaint and Request for Entry of Final Judgment. Upon consideration of the Notice, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that:

1. Plaintiff has elected to stand on the Amended Complaint as dismissed without prejudice by the Court's Order dated January 12, 2026 (ECF No. 55); and

2. The action is DISMISSED WITH PREJUDICE; and

3. The Clerk is directed to ENTER FINAL JUDGMENT and CLOSE the case.

_____
Robert Kirsch
United States District Judge

**Appx285**